**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **D'ALESSANDRO CHAVEZ-SANDOVAL;** | § | |
| **JANTRA PALMER, Individually, and as** | § | |
| **Next Friend of Alan Kerber, Deceased;** | § | |
| **MARGARET SIMON and JOSEPH SIMON** | § | |
| **Individually and as Next Friends of Victoria** | § | |
| **Simon, Deceased, and G.L., a minor,;** | § | |
| **KYLE RYKER; MICHAEL WALKER;** | § | |
| **DAEVION YOUNG; and ERIC RUSSELL,** | § | |
| | § | |
| | § | **CIVIL ACTION NO: 4:24-cv-3072** |
| *Plaintiffs*, | § | **Jury Requested** |
| | § | |
| **v.** | § | |
| | § | |
| **HARRIS COUNTY, TEXAS,** | § | |
| | § | |
| *Defendant.* | § | |

---

### PLAINTIFFS' ORIGINAL COMPLAINT

---

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW D'ALESSANDRO CHAVEZ-SANDOVAL; JANTRA PALMER, individually and as next friend of her son, Alan Kerber, deceased; MARGARET SIMON and JOSEPH SIMON, individually and as next friends of their daughter Victoria Simon, deceased, and G.L., a minor; KYLE RYKER; MICHAEL WALKER; ERIC RUSSELL; and DAEVION YOUNG ("Plaintiffs"). complaining of HARRIS COUNTY, TEXAS, ("Defendant"), and in support thereof would respectfully show unto the Court as follows:

# TABLE OF CONTENTS

I.    SUMMARY OF THE COMPLAINT ................................................................ 4

II.   PARTIES ................................................................................................. 8

III.  JURISDICTION AND VENUE .................................................................... 9

IV.   BACKGROUND FACTS ............................................................................ 9

    A.    PLAINTIFFS WERE DEPRIVED OF THEIR CONSTITUTIONAL RIGHTS  BY HARRIS COUNTY JAIL. .......................................................................................... 10

    B.    HARRIS COUNTY'S POLICIES, CUSTOMS, AND PRACTICES WERE THE MOVING FORCE AND PROXIMATE CAUSE OF PLAINTIFFS' CLAIMS AND INJURIES. ..................... 23

    C.    HARRIS COUNTY'S LONGSTANDING CULTURE OF DELIBERATE INDIFFERENCE TO THE LIVES OF PRE-TRIAL DETAINEES EXEMPLIFIES THE POLICIES, CUSTOMS, AND PRACTICES THAT LED TO THE VIOLATIONS OF PLAINTIFFS' CONSTITUTIONAL RIGHTS. ............................................................................................... 27

        i.    Harris County Was Made Aware of Its Systemic Constitutional Failures by the Department of Justice in 2009. ................................ 28

        ii.    No Later Than 2016, The Harris County Sheriff as the Policymaker for Harris County Jail Was Well Aware of the Unconstitutional "Culture" that is Prevalent in the Harris County Jail that Continues to Get Worse. ..... 33

        iii.    The Texas Commission on Jail Standards Identifies Numerous Constitutional Violations in Relation to Harris County's Policies, Customs, and De Facto Policies. ............................................................... 43

        iv.    Prior And Concurrent Inmate Deaths and Injuries Due to Harris County's Unconstitutional Policies, Customs, and De Facto Policies. ........... 68

        v.    Harris County's History of Constitutional Violations Is Further Exemplified Through Testimony of Prior Employees, Witnesses, and Detainees. ......................................................................................... 177

    D.    CURRENTLY KNOWN POLICIES, PRACTICES, CUSTOMS, AND/OR DE FACTO POLICIES ADOPTED AND PROMULGATED BY THE HARRIS COUNTY SHERIFF WITH DELIBERATE INDIFFERENCE WHICH CAUSED THE VIOLATIONS OF PLAINTIFFS' CONSTITUTIONAL RIGHTS. ..................................................................... 183

V.    CAUSES OF ACTION ............................................................................. 184

    COUNT I: MONELL CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; CONDITIONS OF CONFINEMENT .................................. 184

    COUNT II: MONELL CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; FAILURE TO TRAIN OR SUPERVISE. ......................... 201

VI.   DAMAGES ............................................................................................ 211

VII.  ATTORNEY'S FEES .............................................................................. 216

**VIII.   JURY REQUEST** .................................................................................................. 216

**IX.     PRAYER** ................................................................................................................ 216

## I.    SUMMARY OF THE COMPLAINT

1.    The infamous history of the Harris County Jail grows daily as the band-aids used in reaction to the past claims are insufficient to reverse the longstanding policies, practices, and procedures that the Harris County policymakers have implemented, encouraged, and ratified with deliberate indifference to the constitutional rights of the detainees who are under their protection and care. Individuals who are presumed innocent are faced with the ever-present danger of significant physical injuries and death due to these unconstitutional policies before they even get their day in court. A person who walks into the jail has a strong chance of either never walking out of the jail again or walking out with physical deformities, chronic illnesses, or severe injuries. In the past several years, more people have been killed in the Harris County Jail than have been executed on death row in all of Texas.

2.    The Harris County Sheriff as the policymaker for the Jail has created a pervasive pattern and culture of death which has claimed over sixty lives of pre-trial detainees since 2021. This pattern does not end with simply those who lost their lives but extends to each of those individuals who have suffered needless and numerous beatings, lack of medical attention, and whose cries for help were silenced by their captors. Many of these issues stem from the rampant and systemic understaffing and overcrowding of the jail which has been a continuous problem since the early 2000s and continues to be pointed out by government agencies. The consequences of these systemic issues extend even further to the families of these victims and their loved ones, who are forced to mourn deaths that occurred under questionable circumstances, and without certainty as to what happened to their family members. It is time for justice to wield her mighty hand and hold Harris County accountable for their deliberate indifference to basic human rights. These individuals deserve humanity, and they deserve life.

3.      For the past eight years, Harris County and its policy-maker Sheriff Ed Gonzalez have been objectively and subjectively aware of the deplorable conditions that face the pretrial detainees trusted to their care. During this time frame, Harris County has become a place of punishment prior to conviction and a death sentence for many who walk in its doors especially those who suffer from mental and physical disabilities. Harris County and Sheriff Gonzalez cannot claim ignorance as they have been deliberately indifferent and encouraged the ongoing policies, customs, and practices that they know cause constitutional, statutory, and common law violations to the pretrial detainees within the walls of the Harris County Jail and its associated annexes. Their indifference is compounded by the fact that despite their awareness of these ongoing violations they have failed to implement corrective or remedial customs or policies as these same injuries continue at an alarming rate.

4.      Harris County Jail's checkered history goes back almost a quarter of a century when in the late 1990s and early 2000s, the community called for change in the Jail as many detainees were suffering the same constitutional violations that face present-day detainees. Due to this public outcry, the Department of Justice stepped in and conducted an extensive investigation which resulted in numerous findings of unconstitutional practices and conditions within the Jail. Their 2009 Report expressly found that the number of detainee deaths was "alarming" and that the Jail's use of force exposed detainees to serious injury risks and their inadequate medical care ultimately increased the detainees risk of death and injuries.

5.      The seriousness of the DOJ Report should have wrought drastic change within the Jail; yet, less than seven years later, Sheriff Ron Hickman admitted that the Jail had a culture of violence and a culture of using excessive force which led to detainee injuries. When Sheriff Gonzalez ran against Sheriff Hickman in 2016, Sheriff Gonzalez attacked Sheriff Hickman's

handling of the Jail and stated in a debate that "We've got to end this culture that quickly leads to physical altercation."

6.      Both Sheriffs expressly understood what was going on in the Jail, yet nothing ultimately changed within the Jail. The Jail has been grossly overpopulated and understaffed which is a significant factor in causing the other issues in the Jail. Detainees still lacked adequate medical care. Detainees were still subjected to beatings by officers. Detainees were still subjected to routine violence amongst themselves. As one detainee said, "You fight, or you get beat up." And detainees were still dying within the Jail from the lack of proper observation and monitoring by jail employees.

7.      Since Sheriff Gonzalez's statement in 2016, the culture and medical care within the Jail has only grown worse. Statistics show that for the past four and a half years, the Harris County Jail has had more assaults within the Jail than all 251 other Texas county jails combined. Additionally, in 2022, the Harris County Jail accounted for 51% of all officer uses of force in all of Texas. In contrast, the Harris County Jail accounted for 23% of all officer uses of force in all of Texas in 2018. These assaults and officer uses of force are a consequence of the other unconstitutional policies, procedures, and practices including the lack of proper observations, overcrowding, and understaffing of the jail.

8.      The Texas Commission on Jail Standards (TCJS) has issued almost a dozen reports and notices of non-compliance since Sheriff Gonzalez was elected that found that the Jail violated numerous minimum jail standards. Several of these even related to specific deaths within the Jail. seven of these reports came between September 2022 and April 2024. Additionally, outside of the notices of non-compliance, the TCJS has issued many warnings noting discrepancies in the jail's

practices and requiring additional training for the officers and staff in the jail. This is further evidence that the Jail's conditions continue to get worse.

9.      The ever-growing list of prior incidents, complaints, and other lawsuits by detainees in the past five years further exemplifies the egregious pattern and practice of the Jail's policies and procedures which cause constitutional violations. As will be shown further below, even with the limited public information available to Plaintiffs, there at least 75 other individuals who suffered injuries or death because of Harris County's policies and procedures. Some of these individuals were fortunate enough to live, while others exemplify the death sentence that the Jail has become.

10.      Plaintiffs now join the battle seeking justice for the seven individuals who were detained in the Harris County Jail from October 2022 through July 2024 alongside many other detainees who also died or were injured due to Harris County's malicious actions and inactions. These individuals are as follows:

1)  Daevion Young

2)  Michael Walker

3)  D'Alessandro Chavez-Sandoval

4)  Victoria Simon

5)  Alan Kerber

6)  Kyle Ryker

7)  Eric Russell

11.      Through Harris County's deplorable policies, procedures, and customs, each of these individuals either died or suffered significant injuries within the jail. Harris County has been aware of these policies, practices, and customs for over a decade prior to these injuries and deaths;

yet, Harris County continues to endorse, ratify, and expand on these unconstitutional policies, practices, and customs. Harris County must provide compensation for these injuries and deaths and be deterred from continuing these practices otherwise there will be a never-ending line of victims who also must receive compensation.

12.    These families and victims join with the scores of other plaintiffs who have brought claims against Harris County for the injuries suffered in the jail. Thus, Plaintiffs ask that justice be done for them and their loved ones. They understand that no amount of money will bring back their family, but at least they hope to create a legacy to effect real change and make Harris County wake up to begin the long process of fixing the cesspool these policymakers created.

## II.    PARTIES

13.    Plaintiff Joseph Simon is the father and heir of Victoria Simon in this Complaint. Mr. Simon resides in Fort Bend County, Texas.

14.    Plaintiff Margaret Simon is the mother and heir of Victoria Simon in this Complaint. Ms. Simon resides in Fort Bend County, Texas. Mr. and Ms. Simon are bringing claims individually and as the heirs and representatives of the Estate of Victoria Simon. Mr. and Ms. Simon are also bringing claims as the Next Friends of G.L. a minor. G.L. is a child and heir of Victoria Simon and resides with Mr. and Ms. Simon in Fort Bend County, Texas.

15.    Plaintiff Daevion Young is an individual residing in Harris County, Texas.

16.    Plaintiff Michael Walker is an individual residing in Harris County, Texas.

17.    Plaintiff Kyle Ryker is an individual residing in Harris County, Texas.

18.    Plaintiff Jantra Palmer is the mother and heir of Alan Kerber. Ms. Palmer resides in Maricopa County, Arizona. Ms. Palmer brings claims individually and as the heir and representative of the Estate of Alan Kerber.

19.     Plaintiff D'Alessandro Chavez-Sandoval is an individual residing in Harris County, Texas.

20.     Plaintiff Eric Russell is an individual residing in Harris County, Texas.

21.     Defendant Harris County is the government entity responsible for the Harris County Sheriff's Office which is in turn responsible for the Harris County Jail where Victoria Simon, Daevion Young, Michael Walker, Kyle Ryker, Eric Russell, Alan Kerber, and D'Alessandro Chavez-Sandoval suffered their injuries and/or died. Harris County is located in the Southern District of Texas. Harris County may be served with this Complaint by and through Harris County Judge Lina Hidalgo at 1001 Preston, Suite 911, Houston, Texas 77002.

### III.     JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 because Plaintiffs are suing for relief under 42 U.S.C. § 1983.

23.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391 because Defendant is located in the Southern District of Texas, and all or a substantial part of the causes of action accrued in the Southern District of Texas.

### IV.     BACKGROUND FACTS

24.     Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein.

25.     Plaintiffs' claims arise out of the same transaction, occurrence, and series of transactions and occurrences and involve significant questions of law and fact common to all Plaintiffs and to the other similar incidents identified below. For example, the ongoing pervasive policies, practices, and procedures of Harris County that led to the constitutional deprivations of Plaintiffs' rights are identical amongst the different Plaintiffs' claims and the similar incidents, statistics, DOJ Report, and the TCJS notices.

A. **Plaintiffs Were Deprived of Their Constitutional Rights by Harris County Jail.**[1]

26.    Plaintiffs each suffered injuries and/or death caused by Harris County's pervasive acts and omissions which were sufficiently extended and pervasive to constitute the policies and conditions of Harris County.

### i.    Victoria Margaret Simon

27.    On September 29, 2022, Victoria Margaret Simon was booked into the Harris County Jail and placed into a single quarantine cell. Ms. Simon had a history of drug usage of which she was withdrawing at the time she entered the jail. The jail staff were aware that she was withdrawing and that she had specific medication she had to take during this process. Ms. Simon also had a history of anxiety and depression.

28.    Ms. Simon was never fully processed and provided proper medical evaluation but was instead placed in a single quarantine cell as potentially a way for her to "detox." This process is consistent with Harris County history and their policies and practices as they did not properly evaluate her medical needs, properly classify her to be observed appropriately, or process her in the required 48 hours of being placed in the jail. Jail staff did not provide her the medication she was required to take and gave her medications that were not appropriate for her condition.

29.    On October 2, 2022, nurses and a jail officer found Ms. Simon unresponsive in her cell when they came to conduct a tuberculosis test. The officers and jail staff had failed to properly conduct the face-to-face observation prior to this random test. Any officer that passed her cell did not properly stop and conduct a full observation that would have evaluated her condition to see if she was in distress or needed any type of aid. If the officers had conducted a proper face-to-face

---

[1] Although Plaintiffs include the heirs and representatives of some of the detainees who are deceased, the factual allegations pertaining to each Plaintiffs' claims are broken up into sections relating to the name of the detainee who either was injured or died while in the Harris County Jail.

observation throughout her stay, they would have seen her deteriorating condition and could have and should have rendered medical aid that would have prevented her death.

30.    After being transported to the clinic, Ms. Simon was pronounced dead by a jail doctor.

31.    Failure to properly observe and monitor Ms. Simon and conduct proper face-to-face observations led to inadequate medical care being provided to her in a timely manner and ultimately caused Ms. Simon's death. This is in conjunction with the improper classification and evaluation of Ms. Simon which would have required a change in observation requirements and patterns by the jail staff.

32.    Harris County's policies, procedures, customs, and practice of not providing appropriate medical care to their detainees resulted in their failure to provide Ms. Simon with medication and medical attention for her known medical needs including ongoing complications with her drug withdrawal. This ongoing policy and pervasive conduct led to the deprivation of Ms. Simon's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Ms. Simon's death. Had the Jail provided Ms. Simon with appropriate medical care and attention and conducted full testing in light of her known conditions and obvious symptoms Ms. Simon would have survived.

33.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Ms. Simon's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Ms. Simon's death.

34.    Ms. Simon is survived by her parents, Plaintiffs Mr. and Ms. Simon and her child G.L. who now has to live without her mother.

35.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Simon died due to the jail's unconstitutional policies, customs, and practices.

**ii.    Alan Christopher Kerber**

36.    On October 9, 2022, Alan Christopher Kerber was booked into the Harris County Jail in a single quarantine cell which lacked proper observation and monitoring by Harris County officials. Jail staff did not properly categorize Mr. Kerber and place him in a high risk cell which has greater observation requirements. Instead, Mr. Kerber was placed in a standard quarantine cell which did not have proper suicide prevention methods or additional observation requirements in place.

37.    On October 12, 2022, at 3:20 a.m., the video in his single cell showed Mr. Kerber forcing a tube of toothpaste down his throat. The officer that was supposed to be monitoring the cameras either saw Mr. Kerber's actions and did nothing to interfere with Mr. Kerber's actions or to respond and render aid to get the tube out of his mouth, or the officer was not properly monitoring the cameras. Either situation exemplifies the pervasive pattern and practice of failing to monitor and observe detainees properly to prevent detainees from getting injured or committing suicide or to be able to react quickly and render aid properly.

38.    At 3:23 a.m., Mr. Kerber can be seen on the cameras collapsing on the ground next to his toilet. Again, no officers responded to his cell, no officers rendered medical aid, and no officers were monitoring the cameras or conducted any observations. Mr. Kerber lay on the ground unresponsive for two hours before a jailer finally entered his cell at 5:13 a.m.

39.    Egregiously, the cameras show that jailers entered the cell block at 3:28 a.m. and 4:20 a.m. but did not actually conduct a face-to-face observation of Mr. Kerber during those observations despite recording that they did conduct their observations. So Mr. Kerber was lying in his cell and a few feet away was a jailer who was acting in accordance with Harris County's

policies, practices, and procedures and falsely stating that he conducted the required observations with deliberate indifference to the rights and conditions of the detainees, specifically, Mr. Kerber.

40.     Mr. Kerber was pronounced deceased by the jail doctor at 5:36 a.m. on October 12, 2022.

41.     The TCJS investigated the conditions surrounding Mr. Kerber's death and determined that Harris County did not have proper policies in place for ensuring that their officers were actually conducting face-to-face observations and not simply walking through and scanning the QR codes or filling in their logbooks without actually looking at the detainees. TCJS determined that this failure to observe was not appropriate and the minimum observation requirements were not completed to observe Mr. Kerber as unresponsive for the two hours he lay on the floor. On January 3, 2023, the TCJS required additional training on conducting proper observations for Harris County and stated that it would be reviewed again within the following three months. In February 2023 as shown below, the TCJS found glaring deficiencies in Harris County's observation requirements which show that Harris County did not change or address the issues that caused Mr. Kerber's death.

42.     Failure to properly observe and monitor Mr. Kerber and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Kerber's death.

43.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Kerber's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Kerber's death.

44.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Kerber died due to the jail's unconstitutional policies, customs, and practices.

### iii.    Kyle Ryker

45.    In August 2023, Kyle Ryker was in the Harris County Jail awaiting his day in Court.

46.    On August 7, 2023, while being escorted by several officers, Mr. Ryker was placed in a holding cell at the courthouse with several other detainees. Eventually, two or more detainees who did not like where Mr. Ryker sat in the cell began punching him in the face numerous times until he ended up on the floor where the assault continued.

47.    During the assault, Mr. Ryker saw the three officers watching from the open cell door and laughing at the assault. When Mr. Ryker eventually was beaten out of the door into the hallway, an officer sarcastically stated "Oh, what happened there." The officers never interfered with the assault until the detainees were finished.

48.    An officer eventually took Mr. Ryker to the clinic where he passed out from the injuries. Six to eight hours later, paramedics were finally called and Mr. Ryker was taken to the hospital.

49.    Due to the actions, policies, practices, and customs of Harris County, Mr. Ryker suffered significant injuries to his face as well as a fracture in his spine. These injuries resulted in Mr. Ryker being placed in a Harris County rehab facility where he experienced significant balancing issues leading to him falling and exacerbating his back injuries.

50.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence and failing to discipline detainees who instigate violent attacks on other detainees

led to Mr. Ryker's injuries when the Jail staff either failed to observe or monitor Mr. Ryker or the detainees beating Mr. Ryker, deliberately refused to interfere with the ongoing assault, and encouraged detainees to assault each other as a method to solve issues between detainees.

51.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Ryker's access to medical care, impeded providing medical care timely, impeded the jailer's ability or willingness to deter detainee on detainee violence, and reduced the jailer's ability to properly observe the detainees resulting in Mr. Ryker's injuries.

52.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Ryker suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### iv.    D'Alessandro Chavez-Sandoval

53.    Harris County rarely discloses video footage of incidents inside the jail. However, when they do, the video footage reveals wrongful actions and inactions on behalf of the County and its officers. A great example is the case of D'Allesandro Chavez-Sandoval who was unjustifiably and brutally assaulted by numerous Harris County officers while he was waiting in line to be processed. This story is very similar to Jacoby Pillow and others. Fortunately, Mr. Chavez-Sandoval survived his beating.

54.    On January 18, 2024, Mr. Chavez-Sandoval turned himself into the jail because his ankle monitor had run out of battery.

55.    On January 19, 2024, Mr. Chavez-Sandoval was in the Joint Processing Center in the Harris County Jail waiting to be processed so he could return back home.[2] While standing against a wall with several other individuals, an officer for no reason began yelling at him from

---

[2] The video of the incident is available online at: https://www.fox26houston.com/news/video-altercation-inmate-harris-county-jail-guards-investigation.

across the room. When the officer approached Mr. Chavez-Sandoval, the officer needlessly grabbed Mr. Chavez-Sandoval's shirt. Mr. Chavez-Sandoval harmlessly pulled away from the grab as he was planning on following the officer.

56.     Shockingly, without warning, as Mr. Chavez-Sandoval pulled away, the officer threw numerous punches at Mr. Chavez-Sandoval's face and head. Mr. Chavez-Sandoval, understandably, tried to defend himself from this excessive force. However, Mr. Chavez-Sandoval did not stand a chance as several other officers also began throwing punches and tackling Mr. Chavez-Sandoval to the ground. While Mr. Chavez-Sandoval was on the ground, the officers placed him in a hog-tie position by holding his hands behind his back and pulling his ankles towards his back. This position is illegal in many states and is against proper standards as it leads to detainee deaths and injuries. During this time, one officer was still standing over Mr. Chavez-Sandoval throwing punches while he was lying defenseless face down on the ground. Eventually, the officers pulled him off the ground and escorted him out of the facility. The video shows Mr. Chavez-Sandoval's blood on the ground where he was lying face down while the officers were on top of him.



*Officer in the top right square and Mr. Chavez-Sandoval in the bottom left square.*






*Officer grabbing Mr. Chavez-Sandoval and throwing the first punch when Mr. Chavez-Sandoval pulled away.*

57.     Another video shows that after the beating, Mr. Chavez-Sandoval was transferred to a solitary cell with his face swollen and bloody.[3] Mr. Chavez-Sandoval was then left in this cell

---

[3] https://abc13.com/harris-county-jail-inmate-beating-caught-on-camera-dalessandro-chavez-sandoval/14393315/

with his hands and feet tied. Per Harris County's policies, practices, and procedures, Harris County charged Mr. Chavez-Sandoval with assaulting an officer even though the video clearly shows the officer attacking Mr. Chavez-Sandoval first. This false charge was made to cover up and defend the officers involved. Thankfully the charges were dropped as they were completely false. During this time, Mr. Chavez-Sandoval became aware that Daevion Young was also beat up by an officer for no reason.

58.    Due to these egregious actions, Mr. Chavez-Sandoval suffered several facial injuries and a hurt back.

59.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Chavez-Sandoval's injuries.

60.    Harris County Jail's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees and created the environment which intensified the violence against detainees which were the direct cause and moving force of Mr. Chavez-Sandoval's injuries.

61.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Chavez-Sandoval suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### v.     Michael Walker

62.     In December 2022, Michael Walker was booked into the Harris County Jail with known medical conditions including diabetes requiring insulin. Harris County was aware of these conditions through his own statements to staff and through his paperwork.

63.     On February 16, 2024, Mr. Walker told his wife that he was not feeling well. Mr. Walker's wife told him to go to the clinic. Mr. Walker was most likely not receiving his insulin at this time which is consistent with Harris County policies, practices, and procedures, i.e. Kristan Smith and Matthew Shelton.

64.     When Mr. Walker made it to the clinic, the clinic simply gave him a shot. The jail staff knew, however, that Mr. Walker was allergic to this type of shot. Mr. Walker was then sent back to his cell without any further follow-up or any revision to the observation patterns by the officers.

65.     Between the allergic reaction to the shot and the lack of insulin, Mr. Walker passed out causing him to hit his head. Mr. Walker remained lying in his cell for a significant period of time without any proper observation or detection by the officers. The officers never responded to the emergency.

66.     Eventually, Mr. Walker was found unresponsive in his cell. Fortunately, the EMTs were able to shock Mr. Walker back to life. When Mr. Walker made it to the hospital, the doctors believed that Mr. Walker would be brain dead due to the extensive period of time he was lying alone. Fortunately, Mr. Walker did eventually wake up but now has to live with severe brain damage.

67.     Harris County Jail's persistent culture of ignoring detainee medical needs, deliberately choosing to not provide required medications, and prevalent policies, practices, and

customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Walker's injuries.

68.     Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Walker suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### vi.     Daevion Young

69.     In March 2024, Daevion Young was in the Harris County Jail. Mr. Young was on the same floor as Mr. Chavez-Sandoval when Mr. Chavez-Sandoval was recovering from his injuries.

70.     On or around March 6, 2024, Mr. Young was in jail and was placed in handcuffs while in the presence of some officers. While Mr. Young was handcuffed, the officers unjustifiably punched Mr. Young several times and slammed his head into the wall. Mr. Young suffered and continues to suffer head, neck, and other injuries as a result of this unjustified and excessive use of force.

71.     To add insult to injury, Mr. Young was placed in solitary confinement for the next 28 days with an occasional hour out of the cell in the dayroom. Mr. Young was not provided proper follow up medical care for his injuries and was precluded from any interaction with other detainees. This resulted in severe anxiety and depression due to his injuries and lack of proper care and interaction.

72.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more

likely than not to lead to serious bodily injury, that encourages officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Young's injuries.

73.     Failure to properly observe and monitor Mr. Young and conduct proper face-to-face observations while holding him in solitary confinement led to inadequate medical care being provided to him in a timely manner and impeded proper follow up care for his injuries which caused and exacerbated Mr. Young's injuries.

74.     Harris County Jail's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees and created the environment which intensified the violence against detainees which were the direct cause and moving force of Mr. Young's injuries

75.     Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Young suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### vii.     Eric Russell

76.     On May 1, 2024, Eric Russell was booked into the Harris County Jail. Mr. Russell was placed into a general pod on the 6th floor in the 701 N. San Jacinto

77.     On or around July 15–16, 2024, Mr. Russell was set to be released from jail as the charges had been dropped against him. However, pursuant to Harris County policies, practices, and customs, Mr. Russell was kept in his pod and not timely released.

78.    On July 16, 2024, when Mr. Russell was supposed to be home with his family, the officer in the picket on Mr. Russell's floor, after receiving a signal from the other detainees in the pod, turned off the lights in the pod. As soon as the lights were turned off, several detainees jumped Mr. Russell and severely beat him for several minutes. Mr. Russell lost consciousness and suffered facial injuries, skull fractures, and almost lost vision in one of his eyes. It was the middle of the day when Mr. Russell was beat and the lights should have never been turned off.

79.    When Mr. Russell regained consciousness, he managed to stumble to the pod door to try to get some medical help. Two officers outside of the door saw that Mr. Russell was bleeding from several places on his head and took him to the clinic. The officers in the clinic laughed at Mr. Russell and sent him to a new pod where he spent the night.

80.    Mr. Russell was released on July 17, 2024. Mr. Russell was in significant pain and his family took him to the hospital. He was transferred to a trauma center due to the significance of his injuries so he could see neurologist and optometrist experts for his injuries. Mr. Russell is receiving on-going care for his head injuries, skull fracture, and injured eye which will likely require surgery. Mr. Russell should not have been in the jail when he was beat, but Harris County due to their overcrowded and understaffed facility left him in the jail to suffer.

81.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, facilitating the ability for detainees to assault other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Russell's injuries

when the Jail staff either failed to observe or monitor Mr. Russell or the detainees beating Mr. Russell, deliberately refused to interfere with the ongoing assault, and encouraged detainees to assault each other as a method to solve issues between detainees.

82.    Failure to properly monitor and observe Mr. Russell and the detainees in his pod and conduct proper face-to-face observations led to inadequate protection and intervention from the assaults by other detainees and inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Russell's injuries.

83.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Russell's access to medical care, impeded providing medical care timely, impeded the jailer's ability or willingness to deter detainee on detainee violence, impeded the ability to properly process Mr. Russell and release him timely, and reduced the jailer's ability to properly observe the detainees resulting in Mr. Russell's injuries.

84.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Russell suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

**B. HARRIS COUNTY'S POLICIES, CUSTOMS, AND PRACTICES WERE THE MOVING FORCE AND PROXIMATE CAUSE OF PLAINTIFFS' CLAIMS AND INJURIES.**

85.    Due to the actions, policies, practices, and customs of Harris County, Plaintiffs suffered significant injuries and death. Each of the following policies, practices, and customs were the direct cause and moving force of Plaintiffs' injuries and death. Harris County adopted, ratified, and maintained these policies, practices, procedures, and customs with objective deliberate indifference especially in light of the numerous deaths and injuries suffered by detainees as a result of these policies.

86.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages officers to use excessive force as a means of punishment and retaliation, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in the injuries to Daevion Young and D'Alessandro Chavez-Sandoval.

87.     Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law.

88.     Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues

through violence, failing to respond to requests for aid to be protected from detainees, failing to discipline detainees who instigate violent attacks on other detainees, failing to observe or monitor detainees, deliberately refusing to interfere with ongoing assaults, and encouraging detainee assaults to resolve interpersonal problems led to the injuries to Kyle Ryker and Eric Russell.

89.     Failure to properly observe and monitor Plaintiffs and the other detainees and conduct proper face-to-face observations led to inadequate and untimely medical care, led to inadequate protection and prevention from detainee assaults, led to inadequate supervision of officers permitting officer attacks, led to inadequate responses to his requests for attention, led to inadequate responses by officers for calling medical aid, and led to inadequate responses to their needs which were a moving force and ultimately caused the injuries and deaths of Daevion Young, Michael Walker, Victoria Simon, Eric Russell, and Alan Kerber.

90.     Harris County's policies, procedures, customs, and practice of not providing appropriate medical care to their detainees, failing to provide medication or medical attention for known medical needs and ongoing complications with injuries received while in jail, failing to fully and properly evaluate and diagnose injuries and ongoing medical treatment, failing to place detainees in the appropriate facility in light of their known medical needs, failing to change observation patterns in light of ongoing medical conditions, and falsifying medical treatment and diagnoses resulted in the deliberate indifference to the known and obvious risks which led to the deprivation of the constitutional rights and the injuries and deaths of Daevion Young, Michael Walker, D'Alessandro Chavez-Sandoval, Victoria Simon, Alan Kerber, Eric Russell, and Kyle Ryker.

91.     Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, caused additional psychological and

physical stresses on officers which leads to violent outbursts directed at detainee's, prevented a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring," impedes Plaintiffs' access to medical care, impedes the officers ability to provide medical care timely, impedes the jailer's ability and/or willingness to observe and monitor detainees, impedes the jailer's ability and/or willingness to deter detainee on detainee or officer on detainee violence, reduces the ability of officers to escort detainees safely, and results in insufficient officers to carry out even minute functions of the jail safely, which resulted in the injuries and deaths of Daevion Young, Michael Walker, D'Alessandro Chavez-Sandoval, Victoria Simon, Alan Kerber, Eric Russell, and Kyle Ryker.

92.     It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and practices identified above is that detainees would suffer significant injuries and death. The DOJ, TCJS, and even the Sheriff as explained below have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

93.     Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Plaintiffs' constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in the injuries and deaths of Plaintiffs. Additionally, the officers and employees involved in each of the actions knew that their actins would pose a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference to those rights.

94.     Each of the policies taken above and in context with Plaintiffs' injuries were promulgated, enforced, ratified, and created by Harris County's policymakers including Sheriff Gonzalez. Harris County has been aware of these policies, practices, and customs since at least 2009 as shown below and continue to have these problems as admitted by Harris County and its policymakers as recently as June 4, 2024, in front of the Harris County Commissioners.

C.  **HARRIS COUNTY'S LONGSTANDING CULTURE OF DELIBERATE INDIFFERENCE TO THE LIVES OF PRE-TRIAL DETAINEES EXEMPLIFIES THE POLICIES, CUSTOMS, AND PRACTICES THAT LED TO THE VIOLATIONS OF PLAINTIFFS' CONSTITUTIONAL RIGHTS.**

95.     Harris County's rampant constitutional failures go back for the better part of two decades. When looking back at the Jail's most recent history, the records and information available to the public creates a trail of constitutional violations that has steadily grown year over year. The information available to the public only shows the tips of the icebergs that make up this trail, but the tips of the icebergs are more than sufficient to draw the conclusion that Defendant has ongoing policies, practices, procedures, and customs that are the moving force behind the violation of Plaintiffs' constitutional rights leading to his injuries and death.

96.     Harris County attempts to hide what happens behind the doors of the Jail, but a few public records are available to give insight into the ongoing pervasive nature of the deplorable conditions behind those doors. These records include an investigation by the Department of Justice, numerous investigations and non-compliance reports by the Texas Commission on Jail Standards, multiple admissions by the Harris County Sheriffs of the "culture" within the Jail, statistics gathered and reported by the Harris County Sheriff showing the violent nature of the Jail which are a byproduct of the unconstitutional policies, practices and procedures identified in this case, and numerous incidents involving similar facts and injuries suffered by other Harris County

Jail detainees over the years. Then on top of these public records, numerous detainees are involved in similar actions simultaneously which also exemplify the policies of Harris County.

> **i.    Harris County Was Made Aware of Its Systemic Constitutional Failures by the Department of Justice in 2009.**

97.    The deplorable conditions and nature of Harris County Jail grew to such a degree that the Department of Justice was forced to investigate the Jail for constitutional violations beginning in March 2008.[4] DOJ Report at 1.

98.    What the officials found were "systemic deficiencies" throughout the Jail. *Id.* To summarize their findings, the DOJ found:

> [W]e also conclude that certain conditions at the Jail violate the constitutional rights of detainees. Indeed, the number of inmate deaths related to inadequate medical care, described below, is alarming. As detailed below, we find that the Jail fails to provide detainees with adequate: (1) medical care; (2) mental health care; (3) protection from serious physical harm; and (4) protection from life safety hazards.

*Id.* at 2.

99.    Notably, the Jail had over 9,400 detainees at the time the DOJ inspected. *Id.*

### *Unconstitutional Medical Care*

100.    Regarding medical care, the DOJ found significant deficiencies in multiple areas:

> [T]he Jail fails to provide consistent and adequate care for detainees with serious chronic medical conditions. . . .These deficiencies, in themselves and when combined with the problems in medical record-keeping and quality assurance discussed below, are serious enough to place detainees at an ***unacceptable risk of death or injury.***

*Id.* at 3 (emphasis added).

101.    Specifically, "Because of **crowding**, administrative weaknesses, and resource limits, the Jail does not provide constitutionally adequate care to meet the serious medical needs

---

[4] Plaintiffs ask the Court to take judicial notice of the Department of Justice report from June 4, 2009 ("DOJ Report"). Plaintiffs will cite to the page numbers of that report as it appears to the public.

of detainees with chronic illness." *Id.* at 4 (emphasis added). Chronic illness includes diabetes and heart disease. *Id.*

102.    The DOJ reported that physicians and nurses routinely fill out paperwork incorrectly stating that evaluations were done when in fact they were not completed. *Id.* The Jail lacked sufficient processes to identify detainees with chronic illnesses who were worsening or unwilling to notify the staff of their illness. *Id.*

103.    "Problems with chronic care assessments are particularly pronounced in the assessment of detainees receiving medications." *Id.* Medications were not monitored, were not routinely given out, dosages were provided in varying levels with potentially fatal combinations, and the effects of the medication were not followed up with. *Id.* at 4–5.

104.    The DOJ noted that the Harris County Jail's clinic was a "makeshift emergency room" that was insufficient to meet the needs of the thousands of detainees within the Jail. *Id.* at 5–6. The process for requesting care was insufficient "due to crowding, staffing limits, and some problematic practices." *Id.* at 6. Some of these practices include having inadequate oversight for detainee requests for medical care and significant delays in responding to medical requests. *Id.* In fact, Harris County has the same trend of deleting medical requests after being processed with no confirmation or follow-up to confirm that the medical issue had been resolved. *Id.*

105.    "[T]he detainees have a difficult time first accessing the clinic, and then receiving continuity of care." *Id.* "Detainees with mental illness are an especially high[]risk group." *Id.* at 6–7. "Detainees with mental illness, especially those who are acutely psychotic or suicidal, may not even try to use the sick call process to obtain continuing treatment of their conditions." *Id.* at 7.

106.    The DOJ points to multiple incidents within the Jail that are similar to Plaintiffs' claims for lack of medical care. For example, the DOJ noted that a detainee went to the clinic

complaining of swelling in his legs. *Id.* at 7. Medical prescribed blood pressure medication even though the detainee's blood pressure was normal. *Id.* When the detainee's condition worsened, the clinic did not change his treatment plan despite sending him to the hospital. *Id.* at 7–8. Ultimately, the detainee died. *Id.* at 8.

107.    Another example is a diabetic detainee who complained of swelling in their legs. *Id.* at 7. The medical staff only prescribed pain medication and kept sending the detainee to their cell. *Id.* Eventually, while waiting in the clinic, the detainee collapsed and passed away. *Id.*

108.    Similar to Plaintiffs, "many of the detainees with serious medical conditions cannot be adequately identified or treated. . ." *Id.* at 6. The jail's medical systems provide a significant delay in detainees receiving care. "[I]ndividuals who may need more intensive or immediate care receive the same level of attention as those with relatively low priority needs." *Id.*

109.    The DOJ further found that the Jail had significant issues with its record keeping with notes being illegible and containing "factually inaccurate documentation." *Id.* at 8.

110.    The DOJ found that the Jail's care of detainees with mental illnesses was especially deficient. The DOJ found that the Jail had at least 2,000 detainees in need of psychotropic medications. *Id.* at 9. Instead of having specialized housing for those with mental illnesses, the detainees were typically kept in general population or a few single cells or dormitories. *Id.*

111.    "[D]etainees with serious mental health conditions often cannot obtain timely and appropriate care. These deficiencies violate generally accepted correctional mental health standards." *Id.* at 9–10. Unless a detainee falls within a limited category of suicidal and homicidal tendencies, "detainees must wait for treatment, often for significant periods of time, if they receive mental health treatment at all." *Id.* at 10.

112.    The DOJ found that many detainees who had not received proper mental health care including medications and follow up care were involved in more "altercations" with staff and with other detainees leading to injuries. *Id.* at 10–12. Detainees with a history of seizures would not receive medication upon arrival in the jail and would suffer seizures within a few days of being in the Jail leading to injuries. *Id.* at 11.

113.    The DOJ examples include many detainees who were "evaluated" by the clinic and sent back to their cell either with little to no medication or evaluation and the individual passed away shortly thereafter. *Id.* at 12–14.

114.    The DOJ specifically noted multiple issues in the Jail's suicide prevention policies:

> In general, a comprehensive system for providing adequate mental health care should also include policies, procedures and practices to prevent detainee suicides.  Because suicide prevention is itself an important legal concern, we note specifically that the Jail has a number of conditions that are dangerous for suicidal detainees.
>
> First, the Jail lacks adequate video surveillance and supervision in various holding areas.  Some of the cells used for housing newly arrested detainees include unsafe physical fixtures (e.g., exposed bars) that can be used to facilitate suicide. While the Sheriff's Department was in the process of retrofitting these cells during our tour, such efforts need to be broadened. Many of the mental health holding areas throughout the Jail appear to be clinically inappropriate.  For instance, padded rooms in administrative separation and maximum security units are difficult to supervise and the conditions are so stark, they can cause a detainee with mental illness to degenerate.
>
> Second, the detainees' generally limited access to mental health care can be especially dangerous for suicidal detainees, since suicidal detainees may not be particularly inclined to seek care on their own.  Thus, adequate screening and pro-active efforts to identify and treat suicidal detainees are necessary to ensure compliance with minimum standards of care.

*Id.* at 14.

### *Unconstitutional Policies Concerning Detainee and Officer Violence*

115.    One main area that the DOJ found as unconstitutional was "significant and often glaring operational deficiencies" in security matters including lacking: "(1) a minimally adequate

system for deterring excessive use of force, and (2) an adequate plan for managing a large and sometimes violent detainee population." *Id.*

116.    In addressing this area, tellingly, the DOJ started their analysis with: "We have serious concerns about the use of force at the Jail." *Id.* at 15.

117.    "Indeed, we found significant number of incidents where staff used inappropriate force techniques, often without subsequent documented investigation or correction by supervisors." *Id.* The staff would fail to properly investigate the use of force when used with inaccurate documentation and relying exclusively on officer statements. *Id.* "Jail data regarding use of force levels cannot be considered reliable." *Id.* "We believe that the incidents noted during our review may only reflect part of what is really occurring within the facility." *Id.*

118.    "As a result of systemic deficiencies. . . the Jail exposes detainees to harm or risk of harm from excessive use of force." *Id.* The DOJ provided numerous examples of the use of force resulting in life altering injuries or death. *Id.* at 15–17.

119.    In relation to the Jail's unconstitutional history of violence, the DOJ discussed the impact of overcrowding has on the conditions of the Jail which are the exact same issues that have faced the Jail from 2009 till today. *Id.* at 16–18.

> **Jail crowding affects multiple Jail systems. For instance, it impedes detainee access to medical care, indirectly affects detainee hygiene, and reduces the staff's ability to supervise detainees in a safe manner.** ***How the Jail handles inmate supervision and violence illustrates some of the complexities associated with overcrowding***.

*Id.* at 17 (emphasis added)

120.    With overcrowding, the DOJ found that detainee violence increased with the Jail having no plan to deter violence or provide better oversight and supervision of detainees. *Id.* at

17–18. Many areas of the Jail lacked video surveillance which has still not been addressed fully. *Id.* at 18.

121.    Each of these constitutional violations noted by the DOJ should have caused immediate and permanent change within the Jail itself. The Sheriff as the policymaker for the Jail was on actual notice of these issues and precludes any excuse for allowing these constitutional violations to occur. The trend of deaths and injuries in the Jail should have sloped downward. Instead, it has spiraled upward as each of the deficiencies noted by the DOJ have only worsened.

122.    Harris County should not need the DOJ to come into the Jail each year to point out its problems. Unfortunately, the Sheriff has shown that without significant oversight the Jail will continue its policies, practices, and customs that violate the detainee's constitutional rights. The lack of permanent change following the DOJ Report is illustrated perfectly by the violations of the constitutional rights of Plaintiff in this case and the victims in numerous cases since as the deficiencies noted are still the moving force in the violation of Plaintiff's rights.

      **ii.    No Later Than 2016, The Harris County Sheriff as the Policymaker for Harris County Jail Was Well Aware of the Unconstitutional "Culture" that is Prevalent in the Harris County Jail that Continues to Get Worse.**

123.    Each politician that runs for Harris County Sherriff says that the Jail has a culture of violence, overcrowding, understaffing, and lack of medical care; yet, after being elected, that culture only grows worse.

124.    In 2016, when Sheriff Gonzalez was running against the former Sheriff Ron Hickman, they both participated in a publicized debate discussing key questions concerning Harris County and the Jail itself. In this debate, both Sheriffs acknowledged the rampant issues within the Jail. Sheriff Hickman pointed the finger at his predecessor while also acknowledging that

things needed to change. Sheriff Gonzalez attacked the state of affairs in the Harris County Jail and attacked the policies of Sheriff Hickman.[5]

125.    The second question in the debate was directed toward Sheriff Gonzalez: "Mr. Gonzalez, a concerning number of people have died in the Harris County Jail, that's a number that has, that's not new, it's going on for some time, how can those kinds of deaths be prevented?" Sheriff Debate.

126.    Sheriff Gonzalez's answer reveals his actual knowledge concerning the ongoing constitutional issues that were depriving the detainees of their constitutional rights which were present in the DOJ Report, and which are continuing to be present in recent detainee's claims and this action.

> Well, I think we need to change the culture. I think here recently there was another civil rights lawsuit of an inmate that was beaten so severely it required reconstructive facial surgery. So the culture needs to change. Uh and so, we need to also that we are leveraging technology, there's technology available that could help reduce suicides uh for example by measuring when there is a decreased pulse inside the jail cell. We need to be pursuing that. We also need to make sure that we're better training our deputies and detention officers as well as the triage when they first come in. . . employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change. And we also need to improve training as well. Make sure that we are creating opportunities to learn better de-escalation techniques so things don't get out of control, but it starts with leadership. **We've got to end this culture that quickly leads to physical altercation**, and we also need to better address mental illness in the community.

Sheriff Debate (emphasis added).

127.    When asked about the Jail's efforts to prevent issues with mentally ill detainees, Sheriff Gonzalez specifically cited to an incident in 2015 where the Texas Commission on Jail

---

[5] A video copy of the debate can be found at https://abc13.com/debate-harris-county-sheriffs-office-sheriff-law-enforcement/1552812/ and will be referred to herein as the "Sheriff Debate."

Standards found the Jail as non-compliant for refusing to provide treatment to a mental health patient on four different occasions.

128.     Sheriff Gonzalez continued that if proper treatment and access would have been provided for another detainee, "then I don't think she would have spent 27 days inside that jail being beaten not only by an inmate but by a deputy as well." "[T]his is nothing new this is a culture. . .something should have been done rather than just letting her be in [the Jail] beaten by a deputy and by an inmate and come out worse than what she went in. . . . that's wrong that could be your daughter, your granddaughter, it could have been one of our loved ones."

129.     Continuing with their questions about the Harris County Jail, the moderators asked Sheriff Gonzalez what he was going to do with the "overcrowding problem" in Harris County Jail. To summarize his position, he stated, "I'm gonna fight to make sure that we lower our jail overpopulation."

130.     Sheriff Gonzalez recognized that the Jail's overpopulation was a problem and that "this is not a new problem, we've had overpopulation before. . ." "[I]f the jail overcrowding is such an issue as we've talked about quite a bit here tonight, then we need to be changing that system. If not, we're going to continue to see a lot of the same problems." Yet, when looking at the Jail population statistics, the Jail is at a higher population now, and for the majority of the tenure of Sheriff Gonzalez than it was during Sheriff Hickman's office.

131.     Sheriff Gonzalez recognized the staffing issues within the Jail by pointing out the requirements for staff to work overtime and by criticizing Sheriff Hickman by claiming that there were too many people in laundry and the kitchen and other areas when they should only be focusing on the positions that must meet the 1:48 ratio. This practice of pulling unqualified staff from other positions to meet the 1:48 ratio is the exact sort of policy that the Texas Commission

on Jail Standards found was non-compliant in its November 2021 Report and Notice of Noncompliance.

132.    In his closing argument, Sheriff Gonzalez reiterated that he had the skills to "clean up our county jail. . . too many inmates are losing their lives or are less safe."

133.    This debate exemplifies the prolonged public discussion and high degree of publicity concerning the unconstitutionality of the policies of Harris County Jail. Sheriff Gonzalez himself showed that he had actual knowledge of these ongoing issues when he entered the Jail, but remarkably, the deaths and injuries of detainees has only grown since Sheriff Gonzalez took over this position.

134.    Upon winning the election, Sheriff Gonzalez's public statements have become far more guarded and political but ultimately, he cannot hide behind a veil of ignorance when it comes to the wrongdoing occurring in the Jail.

135.    In a recent interview, Sheriff Gonzalez admitted that the overcrowding in the Jail has caused significant problems and that they are in need of 700 additional staff members.[6] Sheriff Gonzalez stated that even though they try to meet the state staffing ratio standard, that standard is "not always sufficient. . . . because minimum isn't always going to be what we really need. . . ." Sheriff Gonzalez has admitted in front of the Texas Commission on Jail Standards that they are significantly understaffed and overpopulated which has led to many issues in the jail.

136.    Sheriff Gonzalez's toned-down talk about the issues with Harris County exemplifies one of the roadblocks facing victims and their families. Harris County has tried for years to hide what is happening within the Jail's walls which prevents plaintiffs, victims, and their families from discovering all of the facts and information pertaining to their loved ones.

---

[6] https://www.houstonpublicmedia.org/articles/shows/houston-matters/2023/01/19/441370/sheriff-gonzalez-on-jail-deaths-jan-19-2023/

137.    Sheriff Hickman claimed accountability and touted a multi-million-dollar camera system implemented in the Jail to help with accountability and transparency. Although some of the atrocities were caught on camera (i.e. Jerome Bartee), the officers and detainees quickly learned that many parts of the jail are without cameras providing them areas to conduct beatings, hazings, and where they can act with absolute impunity to any oversight or accountability.

138.    When some video evidence is available of the death or injuries of a detainee, it usually results in Harris County being cited for non-compliance with minimum jail standards.

139.    Ultimately, some insight can be seen into the horrors within the Jail now that Harris County along with every other county jail in Texas are required to provide a "Serious Incident Report" to the Texas Commission on Jail Standards every month on the fifth day of the month. The only reports available start in 2018.

140.    These statistics tell a gruesome story that underlies the widespread practice of excessive force, lack of medical care, and lack of observation and supervision that has only grown worse since the 2009 DOJ Report and that are the ultimate byproducts of the policies and practice of overcrowding and understaffing the jail.

141.    The Serious Incident statistics are solely reliant on the self-reporting from the county. With Harris County's history of false reporting and underreporting of assaults and use of force, this would mean that Harris County's Serious Incidents are likely far higher than what is reported.

142.    Texas has 252 county jails. Harris County is the highest populated county jail, but even with its history of overpopulation, it has only accounted for 14% of the jail population across the entire state at its highest. During May 2023, Harris County accounted for 12.9% of the jail population across the state.

143.    Each report contains a breakdown of what the law defines as a Serious Incident. This includes suicides, attempted suicides, death in custody, escapes, assaults, sexual assaults, serious bodily injuries, and use of force resulting in a bodily injury. If a detainee is injured or placed in a hospital due to injuries suffered or lack of medical care in the jail but is "released" from custody prior to passing away, then those individuals are not counted as a "death in custody."

144.    Assaults encompass many different assaults including detainee-on-detainee and officer-on-detainee. Use of force encompasses when an officer uses force on a detainee; however, this is not a serious incident if the use of force does not result in a bodily injury. This is reliant on the county and officers to report the use of force, report an injury, and/or permit a detainee to report an injury which is precarious as detainees are often scared to report officer abuse for fear of additional abuse.

145.    Despite the likely underreporting of Harris County Jail's Serious Incidents, these reports reveal the abhorrent reality that Harris County's culture of violence, death, and excessive use of force has grown out of control and exemplifies the ongoing policies that Harris County promotes within its system. This culture of violence is a foreseeable consequence, as noted by the DOJ 2009 report, when the jail has a policy and practice of failing to conduct proper observations, failing to provide proper medical care, and when the jail is overpopulated and understaffed.

146.    From 2018 until today, the number of assaults occurring in Harris County continues to grow. The easiest way of seeing this growth is a breakdown of the number of assaults that occur in Harris County compared to all other Texas counties *combined*. In 2018 and 2019, Harris County accounted for 44% of all assaults that occurred in the state. In 2020, Harris County accounted for 55% of all assaults in the state. In 2021, Harris County accounted for 56% of all assaults in the state. In 2022, Harris County accounted for 52% of all assaults in the state. In 2023, Harris County

accounted for 54% of all assaults in the state. Thus, for the past six years, Harris County Jail has had hundreds to thousands of more assaults than the 251 other Texas county jails **combined.**

147.    These numbers are even more shocking when you compare Harris County's monthly numbers to the other large counties in Texas. In April 2018, Harris County Jail had 426 reported assaults. The next closest county was Bexar County with 113 which is the only other county in Texas that ever has over 100 assaults. No other county, including Dallas, Tarrant, or Travis, had more than 26 assaults in that month. In January 2020, Harris County had 633 reported assaults. Dallas, Tarrant, and Travis Counties only had 15 assaults in that month combined.

148.    Fast forward to January 2021, Harris County had 711 reported assaults. Dallas, Tarrant, and Travis Counties only had 33 assaults in that month combined. In January 2022, Harris County had 565 reported assaults. Dallas, Tarrant, and Travis Counties only had 23 assaults in that month combined. In January 2023, Harris County Jail had 665 reported assaults. Dallas, Tarrant, and Travis Counties only had 8 assaults in that month combined. In April 2024, Harris County Jail had 629 assaults with Dallas, Tarrant, and Travis Counties only having 23 assaults combined. Since 2020, Harris County Jail has only had one month (April 2020) with less than 500 assaults during that month. In 2023 and 2024, Harris County Jail has only had one month (February 2023) with less than 600 assaults during a month.

149.    The chart below shows the yearly comparison of assaults in Harris County Jail versus all other Texas county jails combined.



150.     The disturbing number of violent incidents in Harris County Jail only scratches the surface of the horrors facing the detainees within the Jail. The use of force statistics paint even more detail into the Harris County Sheriff's ratified "culture that quickly leads to physical altercation" due to their insufficient training, understaffed and overpopulated Jail, and deliberate indifference to the human lives placed within their care.

151.     The use of force statistics shows a pattern, practice, and culture of excessive force by officers against detainees in the Harris County Jail. In 2018 when the statistics first started to be reported, Harris County Jail accounted for 23% of all Use of Force resulting in bodily injury in Texas. In 2019, that number grew to 27%. In 2020, Harris County Jail accounted for 30% of all use of force. In 2021, the use of force number grew to 34%. In 2022, Harris County Jail's proportion of the use of force jumped to 51% of all use of force in Texas. In 2023, Harris County

---

<sup>7</sup> The statistics for 2024 run through May 2024. All Serious Incident Reports are a matter of public record. Tex. Gov't Code Ann. § 511.020(d).

reached an all-time high of 53% of all use of force in Texas. In 2024, Harris County is on pace to exceed that percentage.

152.    When looking at the sheer number of uses of force incidents in Harris County in the past six years, the total number of use of force incidents continues to eclipse astronomical records. In 2018, 2019, and 2020, Harris County had 628 use of force incidents combined. In 2022 alone, Harris County had 653 use of force incidents. In 2023, Harris County had a record high 739 use of force incidents. As of the beginning of 2024, Harris County is maintaining this record pace.

153.    The monthly totals continue to tell the shocking difference between Harris County and other counties in Texas that have patterns of unconstitutional conditions. In July 2021, Harris County had 42 use of force incidents. Bexar, Dallas, Travis, and Tarrant Counties only had 4 use of force incidents combined. In July 2022, Harris County had 54 use of force incidents. For that same month, Bexar, Dallas, Travis, and Tarrant Counties only had 8 use of force incidents. In January 2023, which was one of the most violent months in Harris County history, Harris County had 87 use of force incidents. Bexar, Dallas, Travis, and Tarrant Counties only had 4 use of force incidents combined. In January 2024, Harris County had 54 use of force incidents with Bexar, Dallas, Travis, and Tarrant Counties having only 9 use of force incidents combined.

154.    The chart below compares the yearly number of uses of force incidents in Harris County Jail versus the number of use of force incidents in all Texas county jails combined.



155.    These statistics of the violence against detainees is the result of the lack of proper observations, understaffing, and overcrowding the jail that lead to officers resulting to violence quicker and not being able to respond to detainees in need.

156.    Since 2009, over 200 pre-trial detainees have died in Harris County Jail with a record 28 dying in 2022 alone.[9] Only 160 individuals in all of Texas were executed during that same time period. Out of the 252 county jails in Texas, in 2022, Harris County accounted for 18% of all in custody deaths. Death row is safer than Harris County Jail.

157.    The twenty-eight detainee deaths in 2022 is even higher than the eighteen who died in the widely criticized New York's Rikers Island. Unlike Harris County, New York has at least responded to their deaths by seeking a complete reformation of their system.

---

[8] The statistics for 2024 run through May 2024. All Serious Incident Reports are a matter of public record. Tex. Gov't Code Ann. § 511.020(d).
[9] With each passing month, this discrepancy continues to grow. Since 2018, Harris County has at least not reported 6 deaths because the detainee was released for an unknown reason after they were sent to the hospital where they died. Mr. Hackl who passed away on June 18, 2024, has not been reported yet and most likely will not be reported by the jail because he was released before he passed away.

158.    Each of these statistics show the ongoing and growing pattern, practice, and culture of excessive force, failure to observe, lack of medical care, overcrowding and understaffing in the Harris County Jail which includes officer on detainee force and the failure to interfere, discourage, or stop detainee on detainee violence which has caused many of the deaths and injuries in the Jail. The Jail's culture of inadequate medical care compounds these issues by being inundated with injuries on a daily basis and not providing sufficient care for those in need. Further, exasperating the situation is the fact that the Jail promotes a culture of overcrowding and understaffing vital positions which then leads to inadequate observation and monitoring of the detainees.

159.    These statistics further show that the Harris County Sheriff as the policymaker for the Jail is actually aware of the widespread practices within the Jail that are the moving force in constitutional violations because the Sheriff is the officer charged with gathering and submitting the Serious Incident Reports each month. The Harris County Sheriff would be hard pressed to say that the Jail does not have a culture of excessive force when it has twenty-five times more assaults than 250 other Texas counties on average per month.

### iii.    The Texas Commission on Jail Standards Identifies Numerous Constitutional Violations in Relation to Harris County's Policies, Customs, and De Facto Policies. [10]

160.    The widespread practices evidencing Harris County's unconstitutional policies, customs, and de facto policies have been the subject of numerous investigations, reports, commission meetings, and non-compliance notices from the Texas Commission on Jail Standards ("TCJS"). The TCJS inspects county jails to determine if they meet certain minimum standards. The TCJS may conduct reviews of in custody deaths.

---

[10] Plaintiffs incorporate the Texas Commission on Jail Standards' Reports cited within this Complaint. Plaintiffs ask the Court to take judicial notice of the TCJS Reports.

161.    In this case, the TCJS has found Harris County consistently non-compliant with minimum standards in their practices, policies, and customs which are some of the same policies and customs which were the moving force in the deprivation of Plaintiffs' constitutional rights. As of the time of the filing of this Complaint, Harris County has been in a continuous state of non-compliance with minimum jail standards since at least September 7, 2022.

### a.  Texas Commission on Jail Standards March 11, 2016, Report.

162.    On March 11, 2016, TCJS issued a notice of non-compliance when the Jail failed to provide medical services to a detainee despite the detainee making five (5) different medical requests. These requests spanned over the course of an entire month, yet the detainee was not provided any medical services within the minimum 30-day requirement.

163.    The TCJS report states as follows:

> Documentation received and reviewed by the Commission revealed that Harris County did not provide MHMR services within thirty days after the requests had been submitted by the inmate. The inmate in question requested MHMR services on 10/30/2015, 11/2/2015, 111812015, 1111012015 and 11/23/2015. The inmate in question had the paperwork triaged on each occasion and the inmate was deemed a level 3. Per Harris Co. policies and procedures, level 3 type inmates are to be seen by the clinician within 30 days of the triage which failed to occur.

164.    This report shows an official record that the Harris County Sheriff as the policymaker for the Jail was aware of the lack of rapid and sufficient medical care to detainees. This is almost identical to the DOJ Report which found a similar incident of a detainee not receiving medical care despite four different requests. This report is also consistent with several similar incidents at or around this time of detainees failing to receive any medical care.

165.    Plaintiffs' claims involve similar issues as this report because of Harris County's ongoing policies and customs of failing to provide adequate medical care as their requests for medical care were ignored and failed to be provided timely.

**b. Texas Commission on Jail Standards February 21, 2017, Report.**

166.    On February 21, 2017, TCJS issued another notice of non-compliance in a special inspection report while inspecting the in-custody death of Vincent Young.

167.    In this report, TCJS noted that the Jail was required to conduct face-to-face observations every 30 minutes with detainees "known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior. . ."

168.    Vincent Young, as explained more fully below, was known to be suicidal. He had mental illnesses and had made numerous suicidal statements. Unfortunately, Harris County, in accordance with its policies, practices, and procedures failed to properly and timely conduct face-to-face observations of Mr. Young.

169.    TCJS found the Jail non-compliant as follows:

> After reviewing both written documentation and video evidence from Harris County officials, it was determined that the jailer exceeded the 30 minute visual face-to-face observations of I/M Vincent Young by 44 minutes. IIM Young was observed at 1756 hours. The next completed welfare check was completed at 1910 hours.

170.    Ultimately, by failing to properly conduct the face-to-face observations, Mr. Young hung himself in his cell.

171.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

172.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

### c. Texas Commission on Jail Standards April 3, 2017, Report.

173.    On April 3, 2017, TCJS issued a notice of noncompliance to the Jail based on a special inspection report when two detainees were left in a transport van at the jail for ten hours.

174.    TCJS found that the Jail had failed to properly observe and monitor the two detainees because they were left in an unsupervised van. Harris County did not conduct any face-to-face observations during that time. Additionally, Harris County did not account for the missing detainees.

175.    The only way Harris County became aware of the detainees being left in the vehicle was a report from a member of the public who passed by the vehicle and heard banging on the walls.

176.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. If the jailers had conducted proper face to face observations they would have noticed that the detainees were missing from their cells.

177.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

### d. Texas Commission on Jail Standards December 19, 2017, Report.

178.    On December 19, 2017, TCJS conducted a special inspection of the Harris County Jail following the in-custody death of Maytham Alsaedy.

179.    As explained more fully below, Mr. Alsaedy had a history of mental illness and suicidal ideations which went untreated while in the Harris County Jail.

180.    Despite his known suicidal intentions, Mr. Alsaedy was largely ignored by the jailers and allowed to place paper over his window and attempt to hang himself with a sheet.

181.    TCJS found that the Jail was non-compliant with minimum standards because they failed to conduct proper and timely face-to-face observations of Mr. Alsaedy.

182.    Further, the Jail permitted Mr. Alsaedy to cover his window with paper, so even though a jailer did pass by Mr. Alsaedy's cell, the jailer did not properly observe him or make him remove the paper.

183.    This non-compliance was a moving force with Mr. Alsaedy being able to commit suicide. The DOJ warned about these dangers in their DOJ Report as explained above.

184.    TCJS report states as follows:

> After reviewing documentation and video evidence in conjunction with self-reporting of facility administration, it was determined that the 30 minute face-to-face observation, prior to the inmate being discovered, did not occur due to the inmate obstructing the view of the jailer by placing paper in the view panel. While the jailer made a round within the required time period, the jailer did not view the inmate face-to-face as required by minimum jail standards.

185.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

186.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

**e.  Texas Commission on Jail Standards August 23, 2018, Report.**

187.    On August 23, 2018, TCJS conducted another special inspection of the Harris County Jail in response to the in-custody death of Debora Ann Lyons where they found the Jail in non-compliance.

---

188.    Ms. Lyons, as explained below, had a history of mental illness and suicidal ideations. Yet, the detention officers failed to ensure that they observed Ms. Lyons face-to-face within the required time limits.

189.    Instead, Ms. Lyons was able to sneak into an empty meeting room for several hours where she was able to hang herself.

190.    Despite the face-to-face observation requirements, the officers did not look for Ms. Lyons. Ms. Lyons was not found until other detainees attempted to use the meeting room and found her unresponsive hanging from a sheet.

191.    By failing to properly observe and monitor Ms. Lyons, the Jail failed to prevent Ms. Lyons from committing suicide and failed to provide timely medical care.

192.    TCJS found Harris County Jail non-compliant and stated the following:

> After reviewing documentation and video evidence in conjunction with self-reporting by facility administration, it was determined that the inmate was not observed every 30 minutes prior to being discovered. While the jailed made a round within the required time period in the inmates' cellblock, the jailer did not view the inmate face-to-face due to the inmate leaving the cellblock for medicine call and never returning.

193.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

194.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

### f.    Texas Commission on Jail Standards December 9, 2020, Report.

195.    On December 9, 2020, TCJS issued their report after its annual inspection of Harris County Jail and found the jail in non-compliance in multiple areas.

196.     First, TCJS noted that "it was determined that staff are routinely not completing the initial classification assessment and re-assessments properly." Classification of detainees is important to help prevent violent criminals from being placed with high-risk detainees or those suffering from a mental illness. This also helps ensure that detainees with mental illnesses or chronic conditions are placed in areas subject to the 30-minute observation requirement and not the 60-minute observation requirement. Unfortunately, throughout its history, Harris County Jail has a pattern, practice, and policy of placing violent detainees with mentally ill detainees resulting in injuries or death of the mentally ill detainee, e.g., Fred Harris.

197.     Additionally, Harris County has a history of failing to classify detainees with mental illnesses properly to ensure that they are observed every 30 minutes. Instead, detainees with mental illnesses are only being placed in the 60-minute observation category which is still not followed by the jail resulting in extended periods of time where these high-risk detainees are not properly observed. This discrepancy was a moving force in many Plaintiffs' deaths and injuries.

198.     Second, TCJS noted that the jail staff were not filling out the detainee medication files correctly with many detainees' records being blank. The records did not show if the medication was issued or if it was refused. Harris County Jail continues to use this same pattern, practice, and policy as many detainees do not receive their medication and their files are either blank or filled out incorrectly.

199.     Third, TCJS found that the jail staff were not filling in mental health screening forms correctly resulting in many detainees not being classified within the proper mental health category. This is consistent with Harris County's current policies and customs as many detainees

are not properly categorized resulting in a lack of medical care or incorrect medical care for those

detainees which lead to serious injuries and death.

200.    Fourth, TCJS found significant failures by Harris County in conducting face-to-

face observations of inmates ranging from 3 minutes to 464 minutes.

| 275 | Supervision | Reviewed 1081 jailer TCOLE certification records. Reviewed officer documentation. Interviewed staff. <u>Deficiencies noted. Technical assistance provided</u> - While reviewing the face-to-face observations from the 1200 Baker Jail it was observed that the electronic and handwritten 30 minute face-to-face observations were late from anywhere between 3 minutes to 37 minutes on the date October 11, 2020 during first shift. It was also determined during the review of face-to-face observations from 701 North San Jacinto that numerous face-to-face observations were late from multiple shifts on multiple dates in areas where 30 minute face-to-face observations were to be conducted, and also in general population areas where inmate face-to-face observations are to be conducted within 60 minutes. It should be noted that the inspection team reviewed both electronic and handwritten face-to-face observations from 701 North San Jacinto and determined that the observations were late anywhere from 464 minutes on a 60 minute face-to-face observation and 79 minutes on a 30 minute face-to-face observation. The inspection team recommended that the administration implement a plan of action to ensure that all jailers are retrained on when face-to-face observations are required and how to conduct face-to-face observations to include routing issues. Furthermore the inspection team observed several entries made by floor jailers that observations were conducted late due to waiting on support staff or that other inmate services were being conducted. <u>Follow - up action required</u>- The administration will email Inspector Byron Shelton a plan of action and training rosters within 30 days of receipt of the inspection report. Additionally, the administration will email Inspector Byron Shelton random selections of both 30 minute and 60 minute face-to-face observations every Friday until further notice. |

201.    This report is additional evidence that the Harris County Sheriff continued to know

that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them

from injuring themselves or others and to provide timely medical care.

202.    It also provided evidence that the Harris County Jail has ongoing issues with

properly documenting and providing medications to their detainees.

203.    These same policies and customs identified in this report are also the moving force

behind the constitutional violations at the heart of Plaintiffs' claims.

### g. Texas Commission on Jail Standards April 6, 2021, Report.

204.    On April 6, 2021, TCJS issued its report and notice of noncompliance to the Harris County Jail for its investigation into the in-custody death of Jaquaree Simmons.

205.    As explained in depth below, Mr. Simmons was beat to death by multiple detention officers within the Harris County Jail and then was left inside of his cell alone without any observation.

206.    TCJS found that the jail was still in non-compliance with minimum observation requirements as identified in the December 9, 2020, report.

207.    Specifically, TCJS found:

| 275 | Supervision | Deficiencies noted - Upon review of documentation provided by Harris County Jail Administration, it was determined that the observation of inmates by jail staff in 7M1 was not documented from 0715 to 1124 hours as required by minimum jail standards. Additionally, video surveillance was submitted and reviewed, but this inspector was unable to clearly identify when observation rounds were conducted. This issue was an area of Non-Compliance during the annual unannounced inspection conducted between November 30 through December 4, 2020 and has also been monitored by their territory inspector prior to this report. |
|---|---|---|

208.    The detention officers had not observed any of the detainees within the pod that also contained Mr. Simmons.

209.    Mr. Simmons was suffering from his injuries during this time and needed continuous medical treatment.

210.    By failing to provide proper face-to-face observation and monitoring of Mr. Simmons and the other detainees, Harris County Jail failed to provide sufficient and timely medical care which was a moving force in Mr. Simmons death.

211.    At the time of TCJS's report, it had not been revealed that the use of force documentation leading to Mr. Simmons' death was falsely filled out.

212.     This report is additional evidence that the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

213.     It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing observations of the detainees.

214.     These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

### h. Texas Commission on Jail Standards December 7, 2021, Report.

215.     Despite being in non-compliance in 2017, 2018, 2020, and April 2021, TCJS found Harris County to be in continuous non-compliance in multiple areas in its annual inspection report on December 7, 2021.

216.     Namely, TCJS found that Harris County Jail continued to not conduct face-to-face observations in a timely and sufficient manner with as many as 90 to 144 minutes between rounds. The excuses included short staffed and no rover.

217.     TCJS also found that compounding these issues is Harris County's use of supervisors and essential personnel including intake personnel to work housing to meet their 1:48 ratio requirements. This was part of the plan and policy discussed by Sheriff Gonzalez in the debate five years previously.

218.     TCJS specifically commented on this issue with the following:

> The Harris County Jail is utilizing supervisors and essential personnel such as intake personnel to work housing unit assignments in order to meet the officer to inmate 1:48 ratio. This is being done on a regular and ongoing basis which does not allow these personnel to perform their regular duties. Minimal staffing has a direct impact on the ability to provide a safe and secure environment for inmates and jail staff in areas such as enforcing inmate rules, ensuring inmates clean housing areas, provide for sufficient

staff to support housing officers and has possibly contributed to an increase in inmate on inmate assaults and inmate on staff assaults.

219.    TCJS's inspector even went a step further and noted the increased violence and

assaults within the Jail which is directly correlated with the staffing issues within the Jail.

**Inspector's Note:**    It is the professional opinion of the members of the inspection team that the lack of sufficient staffing has contributed to the heightened level of tension and inmate hostility at the Harris County Jail System that was experienced during the course of this inspection.  A review of Serious Incident Reports reveals that inmate assaults have increased when comparing 2020 numbers to 2021 numbers. While this was a limited inspection to review specific areas, it was evident that while the administration strives to meet the 1 officer to 48 inmate ratio, it can only be accomplished by reducing the resources allocated to other ancillary but necessary and required services.

220.    This report is additional evidence that despite being made aware of these issues

through numerous non-compliance notices, the Harris County Sheriff continued to know that the

Jail suffered from a failure to properly observe and monitor their detainees to prevent them from

injuring themselves or others and to provide timely medical care.

221.    It also provided evidence that the Harris County Jail has ongoing issues with

properly documenting and providing observations of the detainees.

222.    Further, this report exemplified the staffing and overcrowding issues which is part

of Harris County's ongoing policy which inhibits proper medical care, proper supervision, and

proper deterrence of violence both amongst detainees and by officers on detainees.

223.    These same policies and customs identified in this report are also the moving force

behind the constitutional violations at the heart of Plaintiffs' claims.

**i.    Texas Commission on Jail Standards September 7, 2022, Report.**

224.    On September 7, 2022, TCJS issued another Notice of Non-compliance to the

Harris County Jail.

225.    Under Texas law, a jail is not permitted to place detainees in temporary holding cells for longer than 48 hours as the holding cells are not supposed to be permanent housing. Detainees are supposed to be brought in, evaluated, and processed quickly to be placed in housing that meets their needs and provides appropriate medical attention and observation.

226.    TCJS inspected the jail in relation to one detainee's complaint that she was kept in an intake cell for longer than the 48 hours allowed. During the course of this inspection, TCJS found that 64 detainees had been kept in their holding cells while waiting admission for longer than 48 hours. One particular detainee had been kept in her holding cell for 99 hours with no records showing that she was provided items for personal hygiene.

227.    The overcrowding and understaffing of the Jail have also led to numerous individuals being left in holding cells unsupervised for significant periods of time. As recognized by the DOJ, solitary holding cells and speedy admission were two of the areas that the Jail needed to improve on especially as it downgrades the mental health of detainees.

228.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care as detainees were permitted to remain in holding cells without proper processing and observation.

229.    It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and processing detainees.

230.    Further, this report exemplified the staffing and overcrowding issues which are part of Harris County's ongoing policy which inhibits proper medical care and proper supervision. It

also invokes additional resentment between detainees and officers as detainees do not get timely care or processing.

231.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

**j.    Texas Commission on Jail Standards December 19, 2022, Report.**

232.    On December 19, 2022, TCJS issued a notice of non-compliance after a special inspection of the Harris County Jail following the in-custody death of Matthew Shelton.

233.    As explained more fully below, Mr. Shelton passed away in March 2022 due to a failure to receive his diabetes medications.

234.    TCJS found that the Harris County Jail failed to provide, prescribe, or follow doctor's orders for providing medication to Mr. Shelton.

> Provide procedures that shall require that a qualified medical professional shall review as soon as possible any prescription medication an inmate is taking when the inmate is taken into custody. These procedures shall include providing each prescription medication that a qualified medical professional or mental health professional determines is necessary for the care, treatment, or stabilization of an inmate with mental illness.
> **Documentation reviewed after a custodial death revealed that while insulin was reviewed, ordered and provided while the inmate was in intake, it was not reviewed, ordered and provided once the inmate was housed.**
> All medical instructions of designated physicians shall be followed.
> **Documentation reviewed after a custodial death revealed that daily orders were written for the inmate to receive KOP (Keep On Person) blood pressure medication, however, this order was not filled nor was this medication provided once this inmate was housed.**

235.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the

Jail suffered from a failure to properly observe and monitor their detainees and failure to properly document and provide medical care and medications to their detainees resulting in their deaths.

236.    Further, this report exemplifies the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care and proper supervision of detainees.

237.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

### k.  Texas Commission on Jail Standards March 8, 2023, Report.

238.    On February 13–17, 2023, TCJS conducted a special investigation of the Harris County Jail in response to the numerous deaths within the jail in December 2022 and January 2023 and to follow up on the deficiencies noted in their investigation into Mr. Kerber's death.

239.    On March 8, 2023, TCJS issued its report which found Harris County Jail in non-compliance with numerous minimum jail standards. Notably, TCJS noted that these same areas were supposed to have been corrected by Harris County after the previous non-compliance reports; yet, they had not been fixed.

240.    First, TCJS found that numerous detainees that were supposed to be booked, medically evaluated, and placed in detainee housing within 48 hours, had been in holding cells without proper evaluation for longer than the 48-hour minimum. TCJS noted that this should have been addressed following the September 2022 notice of non-compliance.

241.    Second, TCJS found that the Harris County Jail continued to be in non-compliance with providing timely and sufficient medical care to detainees. Specifically, TCJS found that detainees were not being seen within 48 hours after placing medical requests in the medical kiosks.

Reviewed a random selection of 60 files. Interviews were conducted with staff and inmates. Reviewed training records. Reviewed the policy. **Deficiencie'** **noted. Technical** **assistance** **provided.** **1.)** During the inspection team's review of medical requests submitted by inmates through the kiosk system, two inmates were not attended by medical staff within 48 hours, as required by the facility's operation plan. A prisoner submitted a medical request through the kiosk on 10-20-2022 for a large growth protruding from his gum line and was not seen by medical staff until 33 days later on 11-22-2022. Despite being referred to dental, the inmate was not seen by dental for 38 days. On 10-4-2022, a second inmate submitted a medical request for a bullet lodged in his neck. The inmate's medical documentation indicates that he was a "no show" for his appointment on 10-7-22. There was no documentation to explain the no-show. The inmate submitted a second request to the medical staff on 10-28-22. However, he was not seen by the medical staff until 10 days later, on 11-7-22 **2.)** In December 2022 the Harris County Jail was placed in non-compliance for failing to follow a physician's orders and provide medication to an inmate as directed. During the Comprehensive Re-Inspection, this was determined to be a continuing issue by the inspection team. **Follow** **up** **is** **required** - HCSO jail staff and the medical provider (Harris Health) shall coordinate to provide a plan of action to the lead inspector within 30 days, to ensure these issues do not occur in the future.

242.    Additionally, TCJS found that several officers who were supposed to have received suicide prevention training had not received that training in accordance with jail policies.

243.    Notably, TCJS found that the Jail continued to be in non-compliance with the minimum observation requirements. Jail staff on a "routine basis" exceeded the minimum observation requirements for detainees that required 60-minute intervals by up to 1 hour and 13 minutes.

244.    For detainees that were known to be assaultive, suicidal or mentally ill, they require observations every 30 minutes. However, the Jail routinely exceeded those requirements by up to 2 hours and 9 minutes.

245.    This is a continued pattern of failing to provide sufficient observation and monitoring of detainees which leads to a failure to provide sufficient and timely medical care, to provide intervention in use of force, and fails to deter wrongful acts and prevent attempted suicides. Unfortunately, Harris County in accordance with its policies, practices, and procedures continued to fail to properly and timely conduct face-to-face observations of detainees.

246.    Instead of conducting face-to-face observations, TCJS noted that jailers were documenting that they had conducted observations by simply scanning QR codes within the

housing area. Yet, those jailers never actually observed any of the detainees in that area. This is another example of Harris County's pattern, practice, and policy of failing to properly document observations and records which leads to false reporting.

247.    TCJS found that "staffing was not sufficient to perform required functions" despite Harris County's documentation which alleged that they did have enough staff. Particularly, on the day of the inspection, the third floor of 701 Baker had only thirteen officers working when fourteen were needed. The fourth floor was worse when it only had thirteen officers and fifteen were needed.

248.    As has been seen in the numerous reports previously and can be seen in Harris County's history, the Jail does not have sufficient staff to perform required functions which include "transporting of inmates, medication passes, face to face observations and feeding." Many of the deficiencies in conducting face-to-face observations, in intervening in detainee fights, and in the increase in the use of force by officers against detainees can be traced to Harris County's long-running policies, practices, and procedures of understaffing the Jail.

Holding Cells - One or more holding cells shall be provided to hold inmates pending intake, processing, release, or other reason for temporary holding. Inmates shall not be held for more than 48 hours. **Inmates were in holding anywhere from 63 hours to 70 hours. Additionally, during the review of inmate files, seven (7) additional inmates were found to be in holding from 48.5 hours to 66 hours prior to housing**

Health Services Plan - Each facility shall have and implement a written plan, approved by the Commission, for inmate medical, mental, and dental services. The plan shall provide procedures for regularly scheduled sick calls. **Inmates were not seen by medical within 48 hours, as required by facility operation plan.**

Health Instructions: All medical instructions of designated physicians shall be followed. **In December 2022 the Harris County Jail was placed in non-compliance for failing to follow a physician's orders and provide medication to an inmate as directed. During the Comprehensive Re-Inspection, this was determined to be continuing issue by the inspection team.**

Regular Observation by Corrections Officers - Every facility shall have the appropriate number of jailers at the facility 24 hours each day. Facilities shall have an established procedure for documented face-to-face observation of all inmates by jailers no less than once every 60 minutes. Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined.

**60 minute observations of inmates were routinely exceeded by staff on a routine basis by 1 minute to 1 hour 13 minutes. Additionally, observation records for areas where inmates k own to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined were routinely exceeded by staff on a routine basis by 1 minute to 2 hours 9 minutes.**

Staff - Inmates shall be supervised by an adequate number of jailers to comply with state law and this chapter. One jailer shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than 1 jailer per 48 inmates or increment thereof on each floor for direct inmate supervision. This jailer shall provide documented visual inmate supervision not less than once every 60 minutes. Sufficient staff to in'lude supervisors, jailers and other essential personnel as accepted by the Commission shall be provided to perform required functions.

**Documentation sent to the lead inspector for supervision indicated that the Harris County staffing was sufficient. However, floor rosters reviewed during the walkthrough of the 3rd floor at 701 Baker verified staffing shortage on the day of inspection.    It was determined that there are only 13 officers currently working the floor when 14 are needed. This is for a total population of 659 inmates. The 4th floor staffing was also reviewed, and it was noted that 13 officers were present when 15 officers were required to supervise 684 inmates.**

249.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

250.    It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing observations of the detainees.

251.    Further, this report exemplified the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst detainees and by officers on detainees.

252.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

**l.    Texas Commission on Jail Standards April 17, 2023, Report.**

253.    Despite repeated warnings, inspections, and notices of non-compliance within only a few years, the Harris County Jail failed to make any effort to correct its issues or make any significant change in its policies, practices, customs, or culture. Instead, on April 17, 2023, TCJS found Harris County in non-compliance with minimum standards after inspecting the in-custody death of Fabien Cortez.

254.    TCJS found that Mr. Cortez was permitted to enter a restroom and not be observed for over 88 minutes before he was discovered with a pant string wrapped around his neck.

> Every facility shall have the appropriate number of jailers at the facility 24 hours each day.  Facilities shall have an established procedure for documented face-to-face observation of all inmates by jailers no less than every 60 minutes.
>
> **A review of video submitted after a custodial death revealed an inmate was able to enter a restroom and remain unobserved for 88 minutes before being discovered.**

255.    Harris County has a continuing and ongoing policy, practice, and custom of failing to properly monitor and observe detainees which leads to the violation of their constitutional rights. Specifically, in this report, it showed that Harris County's policies of failure to observe permitted Mr. Cortez to commit suicide and prevented a timely provision of medical care.

256.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the

Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

257.    Further, this report exemplified the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst detainees and by officers on detainees.

258.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

**m. Texas Commission on Jail Standards August 28, 2023, Report.**

259.    In a continuing pattern of non-compliance with *minimum* jail standards, on August 28, 2023, TCJS issued its report and Notice of Non-compliance from its August 13–18, 2023, random inspection of the jail. This special inspection found that the jail was still in non-compliance with numerous minimum standards that should have been fully addressed after the reports from 2022.

260.    First, as identified in the previous reports, Harris County was continuing to hold detainees in booking longer than 48 hours without the proper evaluation of those detainees. This was an issue identified in 2022 and early 2023 that had not been addressed. Some of the detainees were kept in these holding cells for an additional two days longer than the maximum allowed time.

261.    Second, several detainees were improperly classified resulting in them being placed in incorrect housing areas. For example, a detainee who was supposed to be kept in a minimum custody area was placed with maximum custody detainees for nine days before the discrepancy was caught. This incorrect classification is consistent with the patterns, practices, and procedures of the jail that result in detainees not receiving the proper care for their classification and not being placed in facilities that meet their needs.

---

Plaintiffs' Original Complaint

262. Third, TCJS also found that the jail were not properly documenting and ensuring that detainees were given their allotted dayroom time or access to a shower. This issue is the result of the overpopulation and understaffing of the jail which impedes the officers' availability to provide the basic needs of the detainees.

263. Fourth, consistent with the reports for the prior year, Harris County was found to exceed the minimum required observations times on a "routine basis."

> **60-minute observations of inmates were routinely exceeded by staff anywhere from 1 minute to 1 hour 18 minutes. Additionally, observation records for areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined were routinely exceeded by staff anywhere from 1 minute to 2 hours 38 minutes.**

Instead, many officers were "completing" their face-to-face observations from the control stations instead of looking at the actual inmates. The officers would either scan the QR codes within the control station or in the housing area without actually conducting the observation.

> t.) **Technical assistance provided** - During the walk through of the facility the inspection team observed jailers documenting the required visual observation of inmates by scanning QR codes that were located within the housing control station. While the housing control station allows for viewing of the inmate housing area, the jailer never left the housing control station and inspection staff does not believe that the officer is able to visually observe every inmate, face-to-face, that is assigned to the housing area. Officers were also observed scanning QR codes located within the control station without conducting a face-to-face observation of the inmates assigned to that housing areas. Facilities shall have an established procedure for documented face-to-face observation of all inmates by jailers no less than once every 60 minutes according to minimum jail standards. **Follow-up**

264. Fifth, TCJS found that Harris County did not meet the minimum staffing requirements for each facility. "It was determined that staffing was still not sufficient to perform required functions. Required functions including transporting of inmates, medication passes, face to face observations, and feeding are not being performed withing minimum jail standards due to inadequate staffing within the housing units." Feedings, which are normally conducted by an officer with the assistance of a trustee, are instead handled exclusively by a trustee while an officer looks on from the control station due to the short staffing.

265.    To make matters worse, detainees in the medical unit and mental health units were not being allowed to participate in the required recreation time allegedly because the doctors had stated that they should not participate in the recreation. However, when asked for the prescriptions or doctor's orders prohibiting their participation in recreation, the jail could not provide any paperwork supporting their decision. Jail staff were also shortening other detainees' recreation time without any justification.

266.    As this report shows, Harris County has a continuing and ongoing policy, practice, and custom of failing to properly monitor and observe detainees which leads to the violation of their constitutional rights.

267.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

268.    Further, this report exemplified the ongoing staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, proper response to medical needs and emergencies, and proper deterrence of violence both amongst detainees and by officers on detainees. The report exemplifies the inappropriate measures the officers take to try to superficially meet the minimum standards without actually meeting those standards. This can be seen in the fact that the officers are scanning QR codes and reporting that they conducted face-to-face observations without ever actually conducting those observations.

269.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

Plaintiffs' Original Complaint

**n. Texas Commission on Jail Standards February 20, 2024, Report.**

270.    From February 12–16, 2024, TCJS conducted another inspection of the Harris County Jail. This inspection resulted in a Notice of Non-compliance being issued on February 20, 2024, which found that Harris County Jail continued to be out of compliance with the minimum jail standards.

271.    TCJS found that Harris County was failing to ensure that detainees were receiving medication prescribed by their doctors. As an indication of the incorrect policies, procedures, and training within the jail, detainees who were sent to Court during medicine call are "counted as no-shows" instead of the jail staff ensuring that the detainees are receiving their medication. A detainee should not have to choose between getting their required medicine and appearing for their day in court. This is a recurring issue with several prior reports and the DOJ 2009 Report finding this same issue. This same issue was a direct cause of the death of Kristan Smith and Matthew Shelton and is an indication of the ongoing custom and practice of detainees failing to receive any medical attention or their medications leading to their death or serious injury.

272.    As a common theme throughout each TCJS report, Harris County failed to comply with the minimum observation requirements by a significant amount of time.

> **60-minute observations of inmates were exceeded by staff in January approximately 1400 times by 2 minutes to 115 minutes. Additionally, observation records for areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined exceeded the 30-minute observation by 2 minutes to 195 minutes. This deficiency is continued from the August 28, 2023, inspection.**

273.    Additionally, Harris County also failed to meet the minimum staffing requirements several times. This deficiency has been ongoing since 2009.

> On more than one occasion, Harris County failed to meet the 1:48 as required by standards. This deficiency is continued from the August 28, 2023, inspection.

274.    This report like the 14 reports previously provides another example that Harris County has a continuing and ongoing policy, practice, and custom of failing to properly monitor and observe detainees which leads to the violation of their constitutional rights.

275.    Despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continues enforcing, implementing, and encouraging these policies, practices, and procedures that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care which constitutes deliberate indifference to the rights of the detainees within their care.

276.    This report exemplified the ongoing staffing and overcrowding issues which is part of Harris County's continuing policy which inhibits proper medical care, proper supervision, proper response to medical needs and emergencies, and proper deterrence of violence both amongst detainees and by officers on detainees.

277.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiffs' claims.

**o.  Texas Commission on Jail Standards April 10, 2024, Report.**

278.    On April 10, 2024, TCJS issued a special Notice of Non-Compliance due to the unconstitutional acts of the officers in the jail in conducting unjustified disciplinary actions against detainees creating dangerous conditions to the detainees.

279.    On April 8, 2024, TCJS conducted a surprise inspection to address detainee complaints that jailers were taking their mattresses for extended periods of time as a way to punish

the detainees without any justification. Many detainees were required to sleep on their metal bunks. Notably, the detainees who were interviewed all said that this was a common practice amongst jailers which is an indication of the jailers' lack of training on proper detainee interaction, disciplinary actions, and de-escalation techniques as this form of punishment further agitates the detainee population.

280.    TCJS found that the detainees were correct and that the officers were removing detainees' mattresses for no purpose for several hours at a time. The officers were not conducting a contraband search or any other justified basis for removing the mattresses.

281.    This report provides another indication of the unconstitutional policies, practices, and conditions of the jail as officers are permitted to take whatever action against the detainees they wish with no proper training, supervision, or discipline for their actions. This exemplifies the lack of training the officers have for proper detainee interaction and shows that the officers take the expedient route instead of the proper route when responding to detainee needs. These same policies and lack of training were the moving force in the constitutional violations at the heart of Plaintiffs' claims.

**p.  Texas Commission on Jail Standards August 3, 2023, Meeting.**

282.    Since several of the Notices of Non-compliance were issued, the quarterly meetings of the Texas Commission on Jail Standards have heavily focused on the issues facing the Harris County Jail. These meetings have included testimony by several high officials within the Harris County Sheriff's Office and the County itself with representatives from Sheriff Gonzalez and Judge Hidalgo.

283.     Specifically, the quarterly meetings that occurred on August 3, 2023, November 2, 2023, February 1, 2024, and May 2, 2024,[11] pointed out the ongoing policies and procedures in the jail specifically the lack of conducting proper observations and the overcrowding and understaffing of the jail. In each meeting, the Harris County representative admitted that they were overcrowded and understaffed. The representatives in the May 2024 meeting even went as far as stating that they are unlikely to meet the minimum standards for a long period of time and even requested that they be excused from meeting those standards. Thankfully, TCJS's commissioners pointed out that almost every other county jail is able to meet their staffing requirements and meet all other minimum requirements, so Harris County has no excuse. TCJS pointed out that all of the issues for meeting the minimum standards including the observations, providing medical care, the history of violence between officers and detainees, and the actions of the officers when interacting with detainees all stem from the overcrowding and understaffing of the jail which has been ongoing for almost two decades.

284.     In the November, February, and May meetings, TCJS notified Harris County that they would be removing beds from Harris County to force them to lower their population. This removal of beds would continue until the population and staffing requirements were met. As of the date of the filing of this Complaint, these issues have not been addressed and continue causing ongoing constitutional violations as per the policy, practice, and procedure of the jail.

285.     Harris County's deliberate indifference to the rights of the detainees is further evidenced when combining the TCJS reports with Harris County's own written policy which identifies the proper procedure for conducting observations.

---

[11] The video recording of these meetings are a matter of public record and are available at the Texas House of Representatives' website. https://house.texas.gov/video-audio/capitol-events/ Unlike most meetings, the November 2023 meeting was not livestreamed or properly recorded and saved in the state archives as required by law.

6. **Observation** – Means to obtain a firsthand evaluation of the inmates' attitudes and temperament, while paying close attention to the physical, mental, and emotional condition of each inmate to detect signs of distress or need for medical, psychological or other special services. (See III, D, (1-12) for additional requirements. **OBSERVATION REQUIRES THE STAFF MEMBER TO ACTUALLY LOOK AT AND EVALUATE EACH INMATE. IF YOU CANNOT SEE THE INMATE, YOU DID NOT COMPLY WITH REQUIREMENTS REGARDING INMATE OBSERVATION!**

286.    In light of the continuous findings that Harris County jailers are not actually observing the detainees through the TCJS findings and the numerous similar incidents below, Harris County has ratified and created a culture where officers are no longer required to complete accurate and proper face-to-face observations. If the officers had conducted the proper observation and "paid close attention to the physical, mental, and emotional condition" of Plaintiffs, they would have observed their condition and should have provided immediate medical care. However, per Harris County's de facto and ratified practices, policies, and procedures, offices did not conduct these proper observations.

      **iv.**    **Prior And Concurrent Inmate Deaths and Injuries Due to Harris County's Unconstitutional Policies, Customs, and De Facto Policies.**

287.    In addition to the DOJ Report, the admissions by Harris County Sheriffs, the Serious Incident Reports, and the TCJS reports, numerous detainees suffered similar violations of their constitutional rights as Plaintiffs which further corroborates Harris County's pattern, practices, and customs even though specific prior examples are not required to meet the elements for Plaintiffs' claims. *Feliz v. El Paso Cnty.*, 441 F. Supp. 3d 488, 499 (W.D. Tex. 2020).

      **1) Jacoby Pillow**

288.    The family and representatives of Jacoby Pillow filed nearly identical claims against Harris County due to their unconstitutional policies, practices, and procedures. Plaintiff

incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

289.    On January 1, 2023, Mr. Pillow was placed in the Harris County Jail on a misdemeanor charge.

290.    Mr. Pillow was then set to be released the next day after posting a $100 bond. Mr. Pillow should have been released the same day he posted bond.

291.    However, Mr. Pillow was inexplicably kept in a medical holding cell instead of being placed in the joint processing center in preparation for release.

292.    Despite being prepared to leave, Mr. Pillow was allegedly involved in an altercation with an officer which resulted in the Jail charging him with another crime to keep him in the Jail longer. In this altercation, multiple officers beat Mr. Pillow to the point where he had significant blunt force trauma to his head, back, and extremities. The officers placed their weight onto Mr. Pillow's chest and back preventing him from breathing until they stopped beating him.

293.    Despite the severity of these injuries, the Jail clinic conducted a cursory evaluation and cleared him to go back to a holding cell within the medical clinic, the same cell notorious for beatings of other detainees because it was without cameras. Mr. Pillow was then transferred to a holding cell on the 6th floor of 1200 Baker.

294.    The Jail left Mr. Pillow in the cell alone to languish in severe pain.

295.    Jail staff did not check on Mr. Pillow for several hours violating numerous minimum standards.

296.    Eventually on January 3, 2023, an officer finally found Mr. Pillow unresponsive in his cell. Mr. Pillow passed away shortly after arriving at the hospital.

297.    Despite Harris County refusing to provide the medical examiner's report, a second autopsy revealed that Mr. Pillow passed away due to compression and blunt force trauma caused by the officers' excessive force. Mr. Pillow should have been processed and released well in advance of the alleged altercation; yet, due to Harris County's rampant practices and policies Mr. Pillow was kept in the Jail and was beat to death when he should have been at home with his family.

298.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalized excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Pillow's injuries and death.

299.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Pillow died due to the jail's unconstitutional policies, customs, and practices.

### 2) Bryan Johnson

300.    The family and representatives of Bryan Johnson filed nearly identical claims as Plaintiff against Harris County, Texas due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

301.    On June 8, 2022, Bryan Johnson was booked into the Harris County Jail with known medical and mental disabilities.

302.    On or around August 5, 2023, Mr. Johnson was in his cell on the 6th floor of 1200 Baker when several officers asked him to leave the cell as they wanted to investigate a potential detainee/detainee fight. As he was walking out of his cell, an officer pushed Mr. Johnson in the back causing him to stumble. Several officers then tackled Mr. Johnson, placed him on the ground,

and began beating him outside of his cell and placed him in restraints. This beating lasted several minutes.

303.    Despite the injuries Mr. Johnson suffered, the officers did not take Mr. Johnson to the clinic; instead, they placed him in the floor's holding cell. After being in the cell for several hours, the officers returned and beat Mr. Johnson a second time.

304.    Mr. Johnson was not taken to the clinic until a couple days later after he was transferred to 701 N. San Jacinto. The clinic did a cursory evaluation and noted that he had injuries to his wrists from the handcuffs, facial bruising, and injuries to his right leg.

305.    Around September 9, 2023, Mr. Johnson began having significant trouble breathing due to the injuries he suffered. He was eventually prescribed an inhaler which was to be kept on him at all times. Unfortunately, in retaliation, the officers took his inhaler from him and then returned it empty.

306.    Besides providing the inhaler, the Jail did not provide sufficient diagnostic testing that should have been ordered for someone in Mr. Johnson's position. Had they conducted sufficient testing, the Jail would have noticed Mr. Johnson's worsening condition and the sudden onset of lung and heart conditions.

307.    A week prior to his death, Mr. Johnson requested emergency medical assistance for his trouble breathing. Mr. Johnson placed a request on the medical kiosk. However, the Jail did not respond to his requests and did not provide him any medical evaluation.

308.    On October 1, 2022, Mr. Johnson's breathing became worse, and he had another detainee request medical assistance. By the time Jail staff arrived, Mr. Johnson could no longer function. Mr. Johnson was taken to the clinic where he became unresponsive while waiting for

care. Mr. Johnson passed away later that day due to the injuries inflicted upon him by the Jail guards which resulted in complications with his heart and lung condition.

309.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalized excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Johnson's injuries and death.

310.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Johnson died due to the jail's unconstitutional policies, customs, and practices.

### 3)  Evan Ermayne Lee

311.    The family and representatives of Evan Ermayne Lee filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

312.    On December 22, 2021, Evan Ermayne Lee was booked into 1200 Baker for the Harris County Jail.

313.    Mr. Lee had a history of mental illness including manic depression, schizophrenia, anxiety, and bipolar. Mr. Lee also had a history of high blood pressure and diabetes. Mr. Lee had medication to treat these items going into the Jail, and the Jail was aware of these conditions.

314.    Throughout his time in the Jail, Mr. Lee would either not receive medication or he would not receive his medication timely. This resulted in Mr. Lee relapsing in his mental state and suffering serious side effects which affected both his physical and social position in the Jail. At one point, Mr. Lee laid in his bunk for two days due to the lack of medication for his diabetes.

315.    The failure to provide Mr. Lee with his medication likely impacted his interactions with other detainees.

316.    On or around March 9, 2022, Mr. Lee was beat up by another detainee resulting in visible facial bruising. His injuries were severe enough that the beating was more extensive than a simple punch to the face to which a sufficient staff should have been able to intervene. He was later diagnosed with a blunt force head trauma with blood on his brain.

317.    The first record of Mr. Lee receiving any medical care for his injuries was on March 11, 2022, two days after he was beaten up. The Jail simply looked at Mr. Lee and sent him back to his cell without any treatment, observation, or further diagnostic testing despite his observable head injuries and the known likelihood of suffering life threatening damage due to untreated head trauma. The clinic recorded no reported injuries or deficits.

318.    Eventually on March 18, 2022, Mr. Lee tried to get the attention of the Jail staff when he was found altered and disoriented. He was noted to still have facial bruising due to the altercation over a week prior.

319.    Mr. Lee was eventually transported to the hospital where they found that he had significant head injuries with two areas of brain bleed.

320.    On March 20, 2022, Mr. Lee became unresponsive and was ruled brain dead. His official date of death was March 22, 2022. The medical examiner determined that the death was a homicide with a blunt force trauma to the head.

321.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Lee's injuries and death.

322.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the Jail when Mr. Lee died due to the Jail's unconstitutional policies, customs, and practices.

### 4)  William Curtis Barrett

323.    The family and representatives of William Curtis Barrett filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

324.    On November 17, 2022, William Curtis Barrett was booked into the Harris County Jail with known mental health issues for which he received medications.

325.    When placed into the Jail, Mr. Barrett was placed into a single person cell despite his known mental health issues and the known damage solitary confinement can have on the psychological disposition of a detainee with his disability.

326.    Mr. Barrett was not given the opportunity to bond out despite the minor nature of the charge resulting in him remaining in the Jail longer than necessary.

327.    While in the Jail, Mr. Barrett was assaulted resulting in significant trauma to his head. The injuries to his head were noticeable.

328.    Despite these visible injuries, Mr. Barrett was not provided sufficient medical treatment or full medical evaluation for known head injuries.

329.    On November 20, 2022, despite his known injuries, the Jail did not conduct consistent or timely observations or monitoring of Mr. Barrett. He was found unresponsive on his cell floor.

330.    Mr. Barrett was declared deceased due to blunt force trauma to his head.

331.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Barrett's injuries and death.

332.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the Jail when Mr. Barrett died due to the Jail's unconstitutional policies, customs, and practices.

### 5)  Kevin Leon Smith, Jr.

333.    The family and representatives of Kevin Smith, Jr. filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

334.    On July 1, 2022, Kevin Leon Smith, Jr. was booked in the Harris County Jail with known medical conditions. His uncle was Decedent Gary Wayne Smith.

335.    Mr. Smith was likely not receiving his medications and proper treatment and/or diagnostic testing for his medical condition.

336.    On or around January 31, 2023, Mr. Smith suffered a medical emergency in his cell. Officers were not properly observing or monitoring Mr. Smith as other detainees had to inform the officers of Mr. Smith's condition.

337.    Some of the trustees who were working in the clinic were required to get a stretcher even though they were not employees of the jail. Although the trustees were prepared to head to the cell with the emergency, the medical staff stood around the clinic for several minutes joking about unrelated topics. Eventually, the trustees and medical staff headed to Mr. Smith's pod and when they arrived four to five officers ran out of the pod in a hurry.

338.    In the pod, five to six more officers and the sergeant were in the room looking at Mr. Smith in his top bunk. Although the officers knew that Mr. Smith was unresponsive, they were not attempting to get Mr. Smith onto the ground to do CPR or other life saving measures. Instead, the officers were simply stating that Mr. Smith was "faking" it. Eventually, the trustees got Mr. Smith onto the back board and took him to the elevator. No CPR was being conducted. Medical staff were simply standing by the backboard and not providing any assistance.

339.    Mr. Smith's fingers, lips, and face were already blue prior to even entering the elevator. Once in the elevator, an officer reluctantly began giving compressions but refused to let anyone give breaths or provide a breathing apparatus. When they finally arrived at the clinic, an AED was retrieved, but it was not charged. The clinic for the entire jail only had one AED.

340.    Later that day, Mr. Smith was declared dead.

341.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Smith's injuries and death.

342.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Smith died due to the jail's unconstitutional policies, customs, and practices.

### 6)  Ramon Thomas

343.    The family and representatives of Ramon Thomas filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

344.    On April 19, 2023, Ramon Thomas was booked into the Harris County Jail with a known mental disability including being bipolar and schizophrenic.

345.    Due to his mental state, Mr. Thomas was extremely vulnerable to bullying and abuse within the jail. During his time in the jail, Mr. Thomas was constantly bullied to the point that Mr. Thomas's family were requesting that he be placed in the mental health section of the jail.

346.    Despite assurances that Mr. Thomas would be placed in a safe part of the jail, the jail placed Mr. Thomas in the general population on the sixth floor of 1200 Baker. This is the same floor where several other detainees identified in this Complaint were injured or lost their lives.

347.    Although Mr. Thomas's mental disability required continuous observation and care to ensure his safety, Mr. Thomas was placed on the sixth floor which lacked measures to provide sufficient observation and monitoring.

348.    On the morning of July 1, 2023, Mr. Thomas spoke with his mother, Ms. Rijsenburg, and did not appear to be suffering from any additional illness. However, Mr. Thomas did seem threatened by some other detainees in his pod. The next phone call Ms. Rijsenburg received was from the chaplain informing her that Mr. Thomas had died.

349.    Later that night, on July 1, 2023, the other detainees found Mr. Thomas suffering from a medical emergency. The detainees were calling for help for several minutes without any response from the detention officers.

350.    Eventually, some officers responded but failed to begin conducting CPR or any other life saving measures. Instead of handling Mr. Thomas with care, the officers dropped Mr. Thomas on the ground causing the landing to be heard in adjoining rooms. Mr. Thomas was taken to the clinic and was later declared dead at the hospital shortly after arrival. This failure to provide CPR and other life saving measures immediately is consistent with Harris County policies as also

seen in the death of Kevin Smith and other detainees. In fact, it is common for Harris County employees to falsify when life saving measures began with Kevin Smith and Ramon Thomas being specific examples.

351.    Notably, Mr. Thomas received significant injuries when he was beaten by either a detainee or an officer as his second autopsy revealed that he had received significant blunt force trauma injuries to his back, chest, and extremities. Notably absent from Harris County's autopsy report is any mention of these blunt force trauma injuries.

352.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Thomas's injuries and death.

353.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Thomas died due to the jail's unconstitutional policies, customs, and practices.

### 7) Nathan Henderson

354.    The family and representatives of Nathan Henderson filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

355.    On July 23, 2022, Nathan Henderson was booked into the Harris County Jail. He was transferred from a local hospital where he was being treated for a stab wound in his abdomen.

356.    While in the hospital, the wound became infected. Despite this infection and not being cleared to be released, the Jail took over his custody and transferred him to a single cell inside the Jail.

357.    Although Mr. Henderson was prescribed antibiotics for his infection, the Jail in accordance with their pervasive pattern and practice failed to provide him his medications regularly or at all.

358.    Mr. Henderson's wound was not being properly cared for despite the significance of the infection.

359.    On July 31, 2022, Mr. Henderson exited the shower area of his cell when he began to stumble. Eventually, Mr. Henderson steadied himself on a railing. However, as time wore on, Mr. Henderson ended up passing out hitting his head.

360.    Mr. Henderson passed away later that day from the effects of his infection.

361.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Henderson's injuries and death.

362.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Henderson died due to the jail's unconstitutional policies, customs, and practices.

### 8) Deon Peterson

363.    The family and representatives of Deon Peterson filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

364.    On February 23, 2021, Deon Peterson was booked into the Harris County Jail with a history of asthma, diabetes, and other medical conditions to which he was prescribed medications.

365.    While in the Jail, Mr. Peterson had a history of heart disease and needing blood pressure medication; however, the Jail would only prescribe taking Mr. Peterson's blood pressure instead of providing full diagnostic testing and evaluation for his known heart issues.

366.    In July 2021, Mr. Peterson complained of left arm pain which is indicative of heart issues. Yet, the Jail did not provide any additional testing, evaluation, observations, or medications.

367.    On August 10, 2021, Mr. Peterson complained of chest pain and trouble breathing. When he was taken to the clinic, he was summarily assessed and sent back to his cell.

368.    While in the elevator, Mr. Peterson had to place himself on the floor due to his ongoing medical emergency. The clinic simply "looked" at him again and sent him back to the cell. Mr. Peterson continued to complain about his ongoing chest pain which should have indicated to the medical staff a life-threatening heart condition due to his known medical issues.

369.    However, when he was finally taken back to the clinic, Mr. Peterson was left sitting in a chair instead of being permitted to lie down to prevent him from falling should he pass out. Mr. Peterson was left in the chair until he eventually passed out and hit his head on the ground.

370.    Later that day, Mr. Peterson passed away due to an issue with his heart.

371.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Peterson's injuries and death.

372.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Peterson died due to the jail's unconstitutional policies, customs, and practices.

### 9) Gary Wayne Smith

373.    The family and representatives of Gary Wayne Smith filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

374.    On December 6, 2022, Gary Wayne Smith was booked into the Harris County Jail.

375.    Mr. Smith had a history of a kidney disorder when entering the Jail that required consistent medication, medical treatment, and observation.

376.    Mr. Smith was placed into a single cell at 1200 Baker which lacked measures to provide sufficient observation and monitoring in light of his condition.

377.    Despite being transported to and from the hospital numerous times over the period of one month, Mr. Smith was not placed permanently in a hospital or sufficient medical facility for continuous observation and care in light of his ongoing medical condition.

378.    On January 10, 2023, Mr. Smith was found unresponsive in his cell and was later declared deceased.

379.    Although he was within a holding cell inside the infirmary portion of the Jail, Mr. Smith was not provided sufficient observation and medical care including failing to provide medications necessary for his treatment or sufficient testing for ongoing medical issues.

380.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care,

and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Smith's injuries and death.

381.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Smith died due to the jail's unconstitutional policies, customs, and practices.

### 10) Kristan Smith

382.    The family and representatives of Kristan Smith filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

383.    On April 27, 2022, Kristan Smith was booked into the Harris County Jail with a history of diabetes and blood pressure problems to which she required insulin and blood pressure medication.

384.    Although she was required to take her medications for her conditions, Harris County's overcrowding, understaffing, and policies of failing to provide medical care and medications led to Ms. Smith not receiving her medications timely or at all.

385.    Ultimately, on May 20, 2022, Ms. Smith was found unresponsive in her bunk due to the failure to receive her medications.

386.    The detention officers were not properly observing or monitoring Ms. Smith as they did not observe Ms. Smith struggling for medical attention or become unresponsive; instead, Ms. Smith was not discovered by the officers until other detainees informed them.

387.    On May 28, 2022, Ms. Smith was declared deceased due to her diabetes and failing to receive her medications.

388.    Ms. Smith's death is nearly identical, if not identical, to the case of Matthew Shelton below where he did not receive his medication and passed away due to that failure. Harris County was sited for non-compliance with minimum jail standards for the same policies, practices, and procedures that led to Ms. Smith's death.

389.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Ms. Smith's injuries and death.

390.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Smith died due to the jail's unconstitutional policies, customs, and practices.

### 11) Jeremy Garrison

391.    Jeremy Garrison filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

392.    Prior to April 23, 2023, Jeremy Garrison was booked in the Harris County Jail.

393.    On or around April 23, 2023, Mr. Garrison was beaten by several detention officers causing him to suffer injuries. The jail alleged that they were investigating this situation, but Mr. Garrison was not provided an update on whether the investigation occurred or not. Mr. Garrison was not aware of any disciplinary action being taken against those guards.

394.    On May 20, 2023, Mr. Garrison came out of his cell for his one hour of dayroom time. Mr. Garrison used some of this time to watch television and talk on the phone with his girlfriend.

395.    While on the phone, a detention officer came into the dayroom with a nurse and turned off the television. When Mr. Garrison stated that the officer was not supposed to turn off the television as part of the detainee's rights to see the news, the officer replied that the sergeant told the officer to turn off the television. Mr. Garrison then asked to speak to the sergeant. Because Mr. Garrison asked to speak to the sergeant, the detention officer got mad and told Mr. Garrison that he would "put" him back into his cell even though Mr. Garrison was still entitled to his dayroom time.[12]

396.    Mr. Garrison continued to ask to speak with the sergeant to address the television issue. The officer left the dayroom with the nurse and returned with several additional officers but not the sergeant. One of the officers demanded that Mr. Garrison return to his cell, to which Mr. Garrison responded that he still wanted to speak with the sergeant. Mr. Garrison was not threatening, did not raise his voice, did not advance toward an officer, or display any aggressive demeanor.

397.    Instead of simply getting the sergeant, an officer stepped toward Mr. Garrison and sprayed him with pepper spray. Upon being sprayed, Mr. Garrison set the phone down, turned, and walked back toward his cell away from the officers. But the officers could not simply leave Mr. Garrison alone.

398.    While Mr. Garrison was walking away, the original officer attacked Mr. Garrison punching him in the face. The other officers then joined the assault and slammed Mr. Garrison against the wall, handcuffed him, and continued to beat him while he was laying on the ground. Eventually, the officers dragged Mr. Garrison out of the dayroom. Instead of the officers taking

---

[12] The issues with cutting off detainees' access to the dayroom was noted by the TCJS above. Jeremy Garrison's case illustrates the reasons and the efforts the officers take to deprive the detainees of their rights. Mr. Young was also deprived of these rights after being beaten by the officers.

pictures of the blood on the floors and walls of the dayroom, the officers had workers clean up the blood before any pictures could be taken. Several detainees asked to provide witness statements, but no officer came and took their statement. These detainees can testify to these facts and the ongoing issues within the jail itself.

399.    The detention officers were acting under the common policies, practices, and procedures of the Harris County Jail in taking matters into their own hands. No sergeant or other commanding officer ever came in to interfere or prevent this assault.

400.    Eventually, Mr. Garrison was taken to the hospital. The doctors found that Mr. Garrison was assaulted by the jail guards resulting in a "Hangman's" fracture of his neck. The doctors found that Mr. Garrison was lucky to be alive and not paralyzed. His injuries required that Mr. Garrison undergo immediate neck surgery.

401.    In addition to his broken neck, Mr. Garrison suffered extreme bruising, head trauma, lacerations to multiple areas of his body, loss of consciousness, visual changes, and loss of strength and use in his right hand as a direct result of Harris County's actions.

402.    Consistent with Harris County's policies, the officers falsified the report of the incident to the medical providers. The medical records show that the officers told the emergency responders that only pepper spray was involved. The doctors knew that this statement was false in light of Mr. Garrison's injuries. The hospital rejected this story and determined that the officers assaulted Mr. Garrison causing the above injuries.

403.    Due to the actions, policies, practices, and customs of Harris County, Mr. Garrison suffered significant injuries to his head, neck, and arms.

404.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of institutionalizing excessive force by jail employees on detainees and systemic

understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Garrison's injuries.

405.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Garrison suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 12) Zachery Johnson

406.    Zachery Johnson filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

407.    On or around May 29, 2023, Zachery Johnson was booked into the Harris County Jail.

408.    On or around June 6, 2023, Mr. Johnson was attacked by another detainee causing him to have a red eye and other bruising on his body. Officers did not interfere with or prevent this attack on Mr. Johnson. Officers were not properly monitoring or observing detainees to prevent this attack.

409.    Eventually, Mr. Johnson passed out due to the inadequate medicine provided to him by the jail and was taken to the hospital.

410.    A few days later, Mr. Johnson was assaulted by numerous officers within the jail. The severity of this assault caused Mr. Johnson to suffer seizures during the assault and go in-and-out of consciousness multiple times. Mr. Johnson did not have any prior history of seizures.

411.    Despite suffering from severe injuries and languishing in pain, the jail did not provide adequate care for his injuries and forced him to remain in the general population of the jail.

412.    On June 13, 2023, Mr. Johnson's family, for fear of his life, were able to get Mr. Johnson released from the jail and took him to a hospital near their home.

413.    The hospital found that due to the assault by the officers, Mr. Johnson suffered a fractured skull, a fractured neck, a fractured spine, and fractured ribs. Additionally, Mr. Johnson's head injuries caused him to have blood on his brain. No reasonable use of force would have caused these severe injuries. Instead, Harris County's policies, practices, and procedures encouraging officers to use excessive force caused these injuries.

414.    Mr. Johnson was care flighted to a larger hospital that could handle Mr. Johnson's life-threatening injuries.

415.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalization of excessive force by jail employees on detainees, promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Johnson's injuries.

416.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Johnson suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

**13) Kenneth Richard**

417.    Kenneth Richard filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the

First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

418.    On April 22, 2023, Kenneth Richard was booked in the Harris County Jail with a history of anxiety for which he was taking medication.

419.    On or around April 27, 2023, Mr. Richard had an anxiety attack due to Harris County's failure to provide him with his medication regularly. Mr. Richard was able to call for medical help and walked normally to the clinic.

420.    Mr. Richard had complained to his mother about the terrible conditions within the Jail over the phone.

421.    While sitting in the clinic, Mr. Richard was waiting to receive care when an officer came in and placed him in handcuffs and leg shackles. Mr. Richard thought this was unusual as they had never shackled him in the clinic previously.

422.    Two officers then came into the clinic and escorted Mr. Richard to a holding cell nearby which was a notorious spot for officer-detainee beatings. The two officers pushed Mr. Richard into the cell telling him not to talk to his mom anymore. The officers then left.

423.    A few minutes later, the two officers came back with four additional officers. While Mr. Richard was still restrained, the six officers began punching him to the ground where they proceeded to stomp on him and kick him. This beating lasted for several minutes.

424.    Mr. Richard lost consciousness and was eventually sent to the hospital with severe head injuries, injuries to his back and chest, blurred vision, memory loss, numbness in his extremities, and PTSD. Mr. Richard had lost the skin around his ankles and wrists where the shackles had been when he was beaten up.

425. When Mr. Richard was in the hospital, his injuries required him to be intubated while he was unconscious.

426. Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Richard's injuries.

427. Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Richard suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 14) Jeremiah Anglin

428. Jeremiah Anglin filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

429. On November 28, 2022, Jeremiah Anglin was booked into the Harris County Jail with a known mental illness. Specifically, Mr. Anglin was diagnosed with schizophrenia at four years old.

430. Despite having known mental disabilities, Mr. Anglin was placed into the general population of the Jail instead of in the mental health ward.

431. Mr. Anglin was likely not receiving his medications regularly.

432. On or about February 1, 2023, Mr. Anglin was placed in handcuffs in the Jail when an officer inexplicably began kicking Mr. Anglin in the face.

433.    Due to this inexcusable use of force, Mr. Anglin had six teeth knocked out of his mouth and significant swelling all over his head.

434.    When Mr. Anglin finally received medical care at the hospital, the doctors had to place multiple screws in his mouth.

435.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Anglin's injuries.

436.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Anglin suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 15) Harrell Veal

437.    Harrell Veal filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

438.    On or around January 23, 2022, Harrell Veal (aka Tyrell Bolt) was being escorted by a Harris County Jail officer to the 6th floor elevator in 1200 Baker.

439.    While outside of the elevator and then later inside of the elevator outside of the view of any cameras, the officer lifted Mr. Veal's handcuffed arms high behind his back twisting and hurting Mr. Veal's shoulder and back. Then the officer grabbed the handcuffs and pulled them closer together causing significant pain in Mr. Veal's wrists.

440.    A few months later, Mr. Veal was not receiving his blood pressure medications. These medications were prescribed to him to help control his medical issues. The Jail staff delayed in providing him his medications if they gave it to him at all.

441.    On or around December 24, 2022, Mr. Veal was attacked from behind by either officers or detainees. The assailants punched and kicked Mr. Veal numerous times in the back, chest, and head. Mr. Veal had significant injuries including broken ribs, bruised back, and numerous broken bones in his head.

442.    Mr. Veal was taken to the hospital where he had a plate put into his head and his eye socket reconstructed. Mr. Veal still suffers from these injuries.

443.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalization of excessive force by jail employees on detainees, promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Veal's injuries.

444.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Veal suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 16) John Coote

445.    John Coote filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

446.    On February 1, 2023, Mr. Coote was booked into the Harris County Jail.

447.    On February 7, 2023, while on the 7th floor of the 701 N San Jacinto, Mr. Coote was threatened by a detainee. Mr. Coote tried to get the attention of the Jail staff to get him moved away from this detainee for fear of personal injury. Per Harris County's policy, instead of talking to Mr. Coote in private, the Jail staff talked with Mr. Coote over the intercom system within earshot of the detainee that threatened Mr. Coote. This prevented Mr. Coote from being able to specify what was going on in fear of being labeled a snitch.

448.    After a few minutes the officers opened up the main door which led to the vestibule area. Mr. Coote expected officers to come through the door, but when nobody came through the door, he believed that he was supposed to go through the doors. Unfortunately, this was planned by the staff because the vestibule area did not have cameras whereas the pod did.

449.    Once he walked through the door, multiple detention officers grabbed him and began to wrestle him to the ground. The Jail records from the officers only indicate that one officer punched Mr. Coote. This officer recorded that he punched Mr. Coote in the head and face six times to get him to "stop resisting." Five of these punches came while Mr. Coote was lying on the ground with numerous other officers on top of him shackling his arms and legs. Notably almost all of the other officers did not record anyone punching or hitting Mr. Coote.

450.    Almost a dozen officers were involved, which was a clear indicator of an excessive use of force that is pursuant to Harris County's policies and practices. Mr. Coote cooperated to the extent he was trying to protect himself from the kicks and punches of the guards. When Mr. Coote was picked up off the ground, his lips and eyes were swollen with noticeable bruising on his head. Mr. Coote was also sprayed in the face three different times with a type of pepper spray.

451.    When Mr. Coote was taken to the clinic, the officer escorting him told the nurse that it was a detainee-on-detainee fight. Mr. Coote did not correct this lie out of fear he would be

beaten up again. Mr. Coote only received slight care for his injuries which included facial bruising, a broken nose, and difficulty breathing. Mr. Coote likely suffered a brain injury from this beating as he had a hard time remembering events that occurred a few days later.

452.    On February 8, 2023, Mr. Coote was transferred to the 6th floor of 1200 Baker. During this time, Mr. Coote believes that his face had been on the news in the common area TVs. Pursuant to the culture within the Jail, when a detainee's face is on the news, that detainee was usually jumped by the other detainees. Shortly after arriving, Mr. Coote was jumped by four other detainees who kicked and punched him repeatedly while he was on the ground. Officers did not interfere with this attack until it was over.

453.    Once the attack was over, Mr. Coote was taken to the clinic which cursorily treated him for a broken foot, nose (still broken), bruised shoulder, and still swollen face.

454.    After being released from the clinic, Mr. Coote was jumped again by three more detainees on the 3rd floor of 1200 Baker where he suffered brain trauma. The officers failed to observe and monitor the detainees, which allowed them to attack Mr. Coote in the cell. Mr. Coote was taken to the hospital where they conducted x-rays of his foot to determine the extent of his injuries.

455.    The hospital placed Mr. Coote in a boot and gave him strong medications and sent him back to the Jail where he was placed on the 2nd Floor of 1200 Baker which is the mental health floor. The medications caused Mr. Coote to forget many things in addition to his brain trauma.

456.    On February 10, 2023, Mr. Coote was involved in another altercation due to his medications. The officers involved used excessive force and improper force techniques by

slamming Mr. Coote against the concrete walls and floor and then punched him several times. Mr. Coote had a split lip, and his previous injuries were aggravated.

457.    Due to these various assaults, Mr. Coote still walks with a limp.

458.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Coote's injuries.

459.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Coote suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 17) Ryan Twedt

460.    Ryan Twedt filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

461.    On February 15, 2022, Ryan Twedt was booked into the Harris County Jail with a history of mental illnesses including depression, anxiety, and bipolar.

462.    Mr. Twedt was taking medications for his different disabilities. He was to receive these medications twice daily to help control his behavior. While in the Jail, Mr. Twedt would receive his medications irregularly, if at all.

463.    When Mr. Twedt did not receive his medications, he would act erratically and could not think straight.

464.    On April 8, 2022, on the 5th floor of 1200 Baker, Mr. Twedt was involved in an altercation with another detainee. One of the officers who responded to the altercation threatened Mr. Twedt that if he ever moved to the 6th floor of 1200 Baker they would "beat his a**."

465.    Shortly after the altercation, Mr. Twedt was moved to the 6th floor of 1200 Baker. Due to the officer's threat, Mr. Twedt tried to determine a way to get moved off of the floor. Although he was not thinking straight, Mr. Twedt began to cover the camera of the holding cell. Two other detainees were in the same holding cell. One of the detainees in that cell had just been beat up in another assault.

466.    When the guards finally responded to him covering the camera, the guards yelled and threatened him instead of listening to his complaints. When the guards walked away without removing him from the floor, Mr. Twedt covered the cameras again in hopes they would listen to his concerns.

467.    Instead of listening to his concerns, the Harris County Jail guards made good on their threat and ordered the other two detainees to leave the cell. When Mr. Twedt stood and turned his back to the officers, the officers handcuffed him and then without warning slammed his body and face against the wall and then slammed him into the ground. The officers then kneed, punched, and kicked Mr. Twedt numerous times while he was shackled.

468.    During this use of excessive force, the officers broke his small finger on his left hand which a doctor has advised would require surgery to fix. Mr. Twedt also suffered bruised ribs and a lacerated head.

469.    When taken to medical, Mr. Twedt could not state what happened out of fear of retaliation as the officer was standing menacingly over him. Mr. Twedt did not receive sufficient medical care or attention which led to the improper healing of his left small finger.

470.    Since this incident, Mr. Twedt suffers from short-term memory loss and lower functionality.

471.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Twedt's injuries.

472.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Twedt suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 18) Antonio Radcliffe

473.    Antonio Radcliffe filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

474.    On March 7, 2023, Antonio Radcliffe was booked in the Harris County Jail.

475.    Mr. Radcliffe was a trustee in the jail and was tasked with serving meals in other areas of the jail.

476.    On or around May 18, 2023, Mr. Radcliffe was serving food with two detention officers when another detainee came and attacked Mr. Radcliffe. The detention officers did not stop the attack and did not interfere until after the detainee had stopped beating Mr. Radcliffe. The officers could have easily prevented or intervened in the assault; however, they were deliberately indifferent to the known and obvious risks to Mr. Radcliffe's life but intentionally chose not to interfere in accordance with Harris County's policies, practices, and procedures.

477.    Following the attack, Mr. Radcliffe complained that his jaw felt broken, and he had pain and discomfort around his head. The jail clinic forced Mr. Radcliffe to continue working despite his obvious injuries. Several hours later Mr. Radcliffe was eventually taken to the hospital for his injuries.

478.    Over the next few days, Mr. Radcliffe was not provided any food or nutrition, causing him to deteriorate. Eventually, the hospital conducted surgery on Mr. Radcliffe's jaw, installing several metal plates. The jail did not inform Mr. Radcliffe's family that he was injured or that he was in the hospital. Due to these injuries, Mr. Radcliffe was not able to appear for his court date which pushed back his time in jail by at least three months. Like many of the Plaintiffs and other victims mentioned below, Harris County has a video of the incident but it has not been produced to the victims or their families.

479.    The officers' failure in not observing, monitoring, or interfering with the assault on Mr. Radcliffe by other detainees led to inadequate protection from the other detainees and ultimately caused Mr. Radcliffe's injuries.

480.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Radcliffe's injuries.

481.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Radcliffe suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 19) Zachary Zepeda

482.    Zachary Zepeda originally filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023). Mr. Zepeda passed away due to his injuries suffered in the Harris County Jail, and his family and representatives substituted for him in the other lawsuit.

483.    On June 6, 2023, Zachary Zepeda was booked in the Harris County Jail with a known mental disability including anxiety.

484.    On June 11, 2023, Mr. Zepeda was attacked from behind by other detainees who punched and stomped on him. This attack lasted for a while based on the severity of the injuries he suffered. Officers did not intervene with this assault and permitted the assault to end naturally before interfering.

485.    Mr. Zepeda was eventually rushed to the hospital with skull fractures, blood on his brain, blood on the majority of his spine, facial bruising, eye socket was broken, and a compression fracture of his spine.

486.    These injuries caused him to have trouble thinking. When the hospital released him the first time, Mr. Zepeda was immediately brought back to the hospital due to weakness in his extremities, severe back pain, and incontinence due to his back injuries. The hospital had to place a catheter to help him go to the bathroom. He had this catheter for several weeks in the jail.

487.    When his mother went to see him in the Jail, his head was still swollen with several scars, and he was on crutches. Even while she was visiting him, one of the guards dragged Mr. Zepeda by his leg across the room for no reason.

488.    Shortly after being released from the jail, Mr. Zepeda underwent treatment for his injuries. Tragically, Mr. Zepeda passed away due to the injuries suffered in the jail. Mr. Zepeda's death left behind his mother and two children.

489.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Zepeda's injuries and death.

490.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Zepeda suffered his injuries and death due to the jail's unconstitutional policies, customs, and practices.

### 20) Jaquez Moore

491.    Jaquez Moore filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

492.    In November 2022, Jaquez Moore was booked into the Harris County Jail with a history of seizures due to a brain injury suffered prior to being arrested and being diagnosed with epilepsy.

493.    Mr. Moore had medications when he entered the Jail to control his seizures and symptoms from his brain injury. Mr. Moore would not receive his medications routinely. The officers would withhold Mr. Moore's medications as a punishment to him for any type of perceived slight.

494.     On or around February 13, 2023, Mr. Moore was holding his commissary bag when returning to his cell. Unbeknownst to Mr. Moore, a large commissary bag is considered a target to the violent detainees within the Jail. In accordance with jail customs, Mr. Moore was attacked by several detainees and suffered significant injuries.

495.     In this attack, Mr. Moore suffered a seizure due to being hit on the head where he has a metal plate.

496.     Despite the detainees beating up Mr. Moore and then Mr. Moore remaining on the ground suffering a seizure, Jail staff did not respond to the assault for more than thirty minutes.

497.     Instead of taking Mr. Moore to the clinic to be treated, the Jail staff placed him in the holding cell which is well known within the Jail as the punishment cell. Detainees are routinely placed into this cell as a punishment with it running over with feces and other filth. Because this cell lacks cameras, officers would routinely beat up detainees in that cell to "teach them a lesson." Each floor within the Jail has at least one of these cells.

498.     Eventually, Mr. Moore was sent to medical where he was placed in a holding cell for eight hours and was given Pedialyte and a little pain medicine. Mr. Moore did not receive any thorough evaluation or testing for his injuries including ruling out potential long-term brain injuries.

499.     Throughout his time within the Jail, Mr. Moore has been attacked multiple times. Many, if not all, of these attacks occur in the known blind spots within the Jail that are away from cameras. The officers do not interfere with detainee assaults until the detainees have worked out their differences.

500.     On April 19, 2023, Mr. Moore was attacked again resulting in severe head injuries that resulted in partial memory loss.

501.    In May 2023, Mr. Moore was attacked by another detainee while Mr. Moore was walking back from the commissary. Mr. Moore's commissary back was stolen again. Mr. Moore suffered an eye injury.

502.    Throughout Mr. Moore's time in the Jail and specifically in regard to his eye injury, Mr. Moore has requested medical attention for his injuries and is either ignored or his request is not accepted until a long time has passed. The medical kiosk on his floor is broken preventing him from making medical requests. Officers have stated that it will be fixed, but they have not fixed the kiosk after several weeks. Mr. Moore is still waiting to see a doctor for his eye issues.

503.    During his time and as a result of the continuous violations of his constitutional rights, Mr. Moore has suffered significant injuries including memory loss, seizures, blurred vision, and pain and suffering.

504.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Moore's injuries.

505.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the Jail when Mr. Moore suffered his injuries due to the Jail's unconstitutional policies, customs, and practices.

### 21) Taylor Euell

506.    Taylor Euell filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

507.    On September 28, 2022, Taylor Euell was booked into the Harris County Jail with a known history of mental and physical conditions to which he received medication including seizures.

508.    On or around September 29, 2022, while in the processing center for the Jail, Mr. Euell was waiting in line holding his commissary back. Mr. Euell kept his paperwork in the bag.

509.    While waiting in line, an officer inexplicably snatched the bag out of Mr. Euell's hand. When Mr. Euell asked for his paperwork back, the officer grabbed Mr. Euell and slammed his face against a wall, injuring his eye. The officer then twisted Mr. Euell's hand causing it to break while placing him in handcuffs.

510.    Mr. Euell sought medical treatment for his injuries and was threatened by the officer not to tell anyone about it otherwise he would beat him again. The clinic did not properly treat his broken hand resulting in the hospital months later saying that the bone had grown back improperly.

511.    Over the next several weeks and months, Mr. Euell's vision began to blur, which prompted him and his wife to submit numerous requests for medical attention. After several weeks, the only attention he received was a short evaluation by a general doctor and not an eye doctor. His requests to see the eye doctor were not answered.

512.    During this time, Mr. Euell was not receiving his seizure medication consistently if at all. He went to the clinic multiple times with dangerously high blood pressure. The Jail staff in the clinic would simply require him to sit in the clinic for hours before they would read his blood pressure so that it would look normal. The failure to provide him with his medications or to properly treat him led to a breakthrough seizure around January 27, 2023. This seizure would not have occurred had he received his medications consistently.

513.    During this seizure, the officers that responded claimed that Mr. Euell was faking the seizure, so they stomped on his wrists and his ankles.

514.    On or around February 2, 2023, Mr. Euell had reported to the detention officers that another detainee had threatened to sexually assault him. Instead, of transferring Mr. Euell or conducting additional observations to prevent any assault from happening, the detention officers stated that they would not do anything to help him until he was actually sexually assaulted. This is consistent with Harris County's ongoing practice of encouraging detainee on detainee violence.

515.    After reporting this incident, the other inmate approached Mr. Euell and attempted to sexually assault him. Knowing that the officers would not stop the assault, Mr. Euell tried to defend himself, but the other detainee who was larger than Mr. Euell punched him in the face breaking his nose. The punch also resulted in impaired vision in Mr. Euell's other eye.

516.    Mr. Euell was not provided medical treatment for his broken nose or eye. Weeks later, Mr. Euell was finally seen be a doctor who stated that his nose had healed incorrectly and that the Jail should have taken him to the hospital to have it looked at as soon as the assault happened. Instead, Mr. Euell is now stuck with a deformed nose.

517.    Due to the actions, policies, practices, and customs of Harris County, Mr. Euell suffered significant injuries to his hand, eyes, and nose as well as increased complications and injuries from seizures.

518.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalization of excessive force by jail employees on detainees, promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Euell's injuries.

519.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Euell suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 22) Christopher Young

520.    Christopher Young filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

521.    In February 2023, Christopher Young was in the Harris County Jail.

522.    On or around February 11, 2023, Mr. Young was walking to the bathroom. A few minutes to a few hours later, a detainee casually mentioned that Mr. Young was lying in the bathroom with his head split open. Mr. Young was alleged to have "fallen" in the cell.

523.    This "fall," however, resulted in severe facial fractures that required multiple surgeries and several metal plates being installed. Mr. Young also suffered a lacerated ear and loss of vision in his left eye.

524.    These injuries are not consistent with a fall. Instead, on information and belief, Mr. Young was assaulted by at least one other detainee who left him in the bathroom out of sight of the cameras and the guards.

525.    It is commonly known in Harris County Jail that detainees will "fall" either in the shower or off their bunk to cover up the real reason they were injured. Many times, officers will inform the nursing staff of this type of fall shortly after their use of force caused the injuries.

526.    Mr. Young also was left lying on the floor in significant pain and in his own blood for a significant amount of time because the Jail staff failed to conduct sufficient face-to-face

observations and monitoring of Mr. Young. Had they conducted proper and timely monitoring, they would have found him sooner and could have prevented and/or deterred the detainee violence and provided him with medical care timely. Mr. Young had to stay in the hospital for almost a month to recover from his injuries.

527.     Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Young's injuries.

528.     Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Young suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 23) Dylan Perio

529.     Dylan Perio filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

530.     Around November 2022, Mr. Perio was booked into the Harris County Jail with a known chronic medical condition.

531.     When Mr. Perio was booked into the jail, Mr. Perio told the officers that he had HIV and needed to stay on his medications otherwise he would suffer significant physical injuries and a setback in his condition.

532.     Unfortunately, for almost a year, Mr. Perio was not provided his medications for his illness which resulted in him beginning to suffer a relapse in his condition.

533.    Despite asking for medical care numerous times, Mr. Perio was not provided the medical attention he needed for someone with his condition. He complained that his requests were being ignored, but those complaints were also ignored by the officers and medical staff.

534.    Eventually, in July 2023, Mr. Perio saw a medic in the jail who informed him that his organs were beginning to shut down due to the failure to get his medicine consistently. If Mr. Perio did not receive immediate medical attention, his organs would have shut down further resulting in his death. Mr. Perio was finally provided medication for his condition. However, this medication is unable to reverse the permanent damage to Mr. Perio's body that the months of lack of medical care caused him.

535.    Due to the actions, policies, practices, and customs of Harris County, Mr. Perio suffered significant injuries to his physical condition as well as increased complications and injuries from his medical condition.

536.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Perio's injuries.

537.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Perio suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 24) Robert Andrew Terry

538.    The family and parents of Robert Andrew Terry filed nearly identical claims concurrently with the filing of this lawsuit as a Plaintiff against Harris County for their unconstitutional policies, practices, and procedures. Plaintiffs incorporate the Original Complaint

filed in that lawsuit herein. *Robert Terry, Jr., et. al. v. Harris County, Texas*, (S.D. Tex. filed July 19, 2024).

539. On May 13, 2023, Mr. Terry was booked in the Harris County Jail. Mr. Terry had a known history of bipolar disorder to which he was required to take medications. Jail staff noted the need for this medication; however, the jail never provided this medication to Mr. Terry during his entire time in the jail. However, Mr. Terry was not placed under the supervision requirements of someone with a mental health issues which require heightened observation and medical care requirements. Instead, Mr. Terry was improperly evaluated and placed in the general population subject to the 60-minute interval face-to-face observations instead of the 30-minute intervals required for his condition.

540. Shortly after entering the jail, several officers unjustifiably dragged Mr. Terry to a holding cell known for beating detainees. No cameras covered this cell. The guards then handcuffed Mr. Terry to an item in the room, beat him significantly until there was blood on the walls, and then dragged his unconscious body back to his cell.

541. Mr. Terry was left to anguish for a long period of time before he was sent to the clinic. Mr. Terry was not sent for his injuries to be looked after, but so that he could be transferred to new housing. The beating caused Mr. Terry to suffer internal bleeding and blunt force trauma which should have been visible to the clinic staff. The internal bleeding and his other injuries caused Mr. Terry to complain of nausea and lightheadedness.

542. The medical staff failed to note Mr. Terry's injuries or the fact that he was recently beaten, but instead ordered a chest x-ray at 1:47 a.m. on May 15, 2023, to look at Mr. Terry's heart and lungs. The medical staff did not evaluate him for a head injury or for potential internal hemorrhaging which would have been consistent with his complaints.

543.    After completing the x-ray, the medical staff sent Mr. Terry to the Mental Health Unit for a cursory evaluation prior to putting him back in general population. The jail staff, however, did not do a proper mental health evaluation which would have confirmed his head injuries and his bipolar diagnosis, but instead sent him straight back into the general population.

544.    While in general population the rest of May 15 and the early morning hours of May 16, the other detainees noted that Mr. Terry was constantly complaining about his stomach and was refusing to ingest anything. Mr. Terry requested medical assistance several times and was ignored. At one point, several officers came into the cell and dragged Mr. Terry out yelling at him and making fun of him. The officers put the entire cell on lockdown for 24 hours. Mr. Terry pressed the emergency call button several times to which the officers refused to respond. One officer stated they would return with medical assistance but never returned.

545.    Early on May 16, 2023, Mr. Terry began having significant amounts of blood in his stool. The officer informed of this never returned with medical aid. At one point, Mr. Terry began coughing and throwing up blood into the toilet. Again, any requests for medical attention and pressing of the emergency button were ignored by the officers.[13] Mr. Terry began to be uneasy on his feet and stumbling around the room. Mr. Terry passed out and hit his head on the metal toilet. When Mr. Terry regained consciousness, he tried stumbling to the day room, but he again passed out and hit his head on the bars.

546.    During this time, the officers were failing to conduct proper face-to-face observations otherwise they would have seen Mr. Terry's condition timely to render aid. Additionally, due to the misclassification of Mr. Terry, the officers were allegedly conducting observations every sixty minutes instead of the thirty minutes they should have been conducting it

---

[13] The investigating officer noted that the call button was working. This indicates that the officers were acting with deliberate indifference to Mr. Terry's life as they were intentionally ignoring his requests.

in light of Mr. Terry's known risks and mental condition. Consistent with Harris County's policies, practices, and procedures, Harris County was not properly documenting the observations which led to some observations being documented when they were not actually conducted or were late.

547.    Other detainees called for aid. The officers took their time in coming to the cell. When they did, the officers dragged Mr. Terry out of the cell by his legs and stood around him making fun of him and claiming that he was faking it. Eventually, medical staff arrived after Mr. Terry was left to anguish for several minutes. When he was taken to the clinic, Mr. Terry was not properly evaluated for his injuries and became unresponsive. Mr. Terry was transported to the hospital where he was declared deceased.

548.    Upon inspection of Mr. Terry's corpse, blood was found in his lower intestines and in the upper interior portions of his leg (a sign of internal bleeding), lacerations were found on his body, and he had a fractured skull. Clear indications of a brutal beating resulting in death.

549.    An item that is frustrating to the families and victims of the Harris County Jail that is part and parcel of the ongoing practices, procedures, conditions, and culture of the jail is the lack of information provided to the families and the falsification of documentation and changing of stories. The autopsy report has still not been provided to the family despite this death having occurred over a year prior to this filing. On the Harris County medical examiner case status website, in January 2024, the cause of death was listed partly as internal hemorrhaging and blunt force trauma. Shortly after this being revealed on the website, Harris County pulled down that evaluation and now have stated that the cause of death is "undetermined" which was how the death was reported to the Attorney General for its custodial death report. Thus, Harris County still has not determined a cause of death in over a year since his death.

550.    Harris County Jail's culture of violence and prevalent polices, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalized excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Terry's injuries and death. Harris County's deliberate failure to properly train its staff in conducting proper and timely observations, not training or supervising their officers in correct use of force, not training them on de-escalation techniques, encouraging the officers to use techniques that result in unnecessary harm, encouraging and ratifying false reports, summary investigations, and failing to report and send detainees for proper medical attention predictably caused and were the moving force in Mr. Terry's injuries and death. These policies, practices, and procedures were implemented, enforced, encouraged, and ratified with deliberate indifference to Mr. Terry's rights as it was inevitable that these policies would lead to these constitutional violations.

551.    Sheriff Gonzalez was the policymaker for Harris County with respect to the Jail when Mr. Terry died due to the jail's unconstitutional polices, customs, and practices

### 25) Mikayla Savage

552.    On February 26, 2024, Mikayla Savage filed claims against Harris County, its policymakers, and several detention officers for violations of her constitutional rights based on a number of the same policies, practices, and procedures at issue in this case. Plaintiff incorporates by reference the Complaint from that case. *Savage v. Harris County, Texas, et al.*, No. 4:24-cv-00666, Dkt. No. 1 (S.D. Tex. Filed on Feb. 26, 2024).

553.    On June 2, 2022, Ms. Savage was booked in the Harris County Jail on charges that were dropped shortly thereafter. Ms. Savage was pregnant at the time she was placed in the jail.

554.    The jail cell she was placed in was uninhabitable with feces, vomit, and blood throughout the cell. The officers ignored her requests for care or for a new cell and she was forced

to use soiled blankets and towels as retaliation for reporting these issues. She eventually passed out from the smell and hit her head. The officers did not observe her as required or they would have seen her lying unconscious with this injury. Ms. Savage never received any care for her injury.

555.    Ms. Savage was improperly designated when she was initially placed in the jail as she was placed in general population and not the pregnancy cells. This improper designation is common as mentioned previously, and the jail has been cited numerous times for placing detainees in the wrong cells. These deficiencies are exacerbated and caused by the understaffing and overcrowding of the jail, the improper training of the staff, and the failure to observe the detainees to ensure that the detainees are properly cared for, to avoid detainee violence, to deter other officer violence, and to ensure that the detainee is in the appropriate cell.

556.    Ms. Savage while waiting in line to go to court was assaulted by an officer who caused her damage to her abdomen and extremities. Shortly after this assault, Ms. Savage began experiencing a miscarriage in her cell. The officers did not observe Ms. Savage and failed to provide medical aid and ignored her requests for aid several times. Eventually, Ms. Savage was seen by hospital staff and placed back in the jail.

557.    For the next several weeks, Ms. Savage began having more medical issues but was ignored and failed to be observed by jail staff even after she threw up in her own blanket. The staff eventually sent her to the hospital where she received an unconsented abortion due to her miscarriage. Instead of receiving proper follow up care and being placed in the medical facility, Ms. Savage was placed in a holding cell and was ignored for hours. Ms. Savage was never sent to her follow up appointment.

558.    When Ms. Savage was placed back in the general population, she was assaulted and raped several times under the supervision of several officers who refused to intervene or provide medical care following the assaults. The detainees who assaulted her were not punished or disciplined for these actions. After one assault, the officer who caused the miscarriage began assaulting Ms. Savage as well to add further injuries. Other officers did not intervene with this assault.

559.    Due to these conditions and policies and practices, Ms. Savage attempted to commit suicide several times. Despite these known issues, the medical staff and officers did not provide any meaningful treatment and did not change their observation requirements. Her requests for mental health assistance were ignored. The officers instead falsified records and created records that were derogatory of Ms. Savage to discourage others from rendering assistance.

560.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care, encouraging excessive force and assaults of detainees by officers, encouraging and failing to interfere with detainee assaults, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Ms. Savage's injuries.

561.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Ms. Savage suffered her injuries due to the jail's unconstitutional policies, customs, and practices.

### 26) Nathan Nichols

562.    In August 2022, Nathan Nichols was in the Harris County Jail.

563.    On August 2, 2022, Mr. Nichols was inexplicably attacked by another detainee who beat him with a broomstick and a boot. No officers intervened in this beating until it was over. Officers failed to properly respond, supervise, or observe the detainees permitting this assault. The

officers did have video cameras capturing the incident; however, the officers were not properly monitoring the cameras or observing the detainees. Even if they did monitor the cameras, the officers failed to react or interfere with the assault until after it was too late.

564.    Mr. Nichols suffered a fractured eye socket and cheek bone. When the officers finally stepped in, Mr. Nichols had to be rushed to the hospital to get surgery on his eye.

565.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Nichols's injuries.

566.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Nichols suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 27) Dequon Buford

567.    Dequon Buford, by and through his attorney-in-fact, filed nearly identical claims as Plaintiff-Intervenor against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Plaintiff-Intervenor's Original Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 42 (S.D. Tex. Filed April 16, 2024)

568.    On June 12, 2023, Dequon Buford was booked into the Harris County Jail with known schizophrenia, anemia, iron deficiency, anxiety, and bipolar I disorder.

569.    Despite his known mental health issues and the need for special care for his condition, Harris County placed him in the general population of the jail. The medical staff saw Mr. Buford prior to placing him in the general population and noted that he was "hearing voices" and showing other signs of disturbance.

570.    On September 25, 2023, Mr. Buford was immediately beaten and raped by three other detainees. The detainees had covered the light and camera while they raped Mr. Buford and no officer responded or attempted to interfere with these actions.

571.    On September 27, 2023, Mr. Buford was raped and assaulted again in the shower. Harris County officials did nothing to interfere or respond to this incident. Mr. Buford reported both incidents to the jail. Although Harris County eventually moved him to an administrative floor, the officers eventually moved him back to general population where he was raped again.

572.    While Mr. Buford was in the general population, jail staff were failing to properly deliver Mr. Buford's medications which caused him to have more issues. When medications were provided, they were not in the proper dosage. The failure to provide appropriate medical care in response to his mental health and the physical injuries suffered at the hands of the detainees caused Mr. Buford to deteriorate both mentally and physically. When Mr. Buford was released, he was suffering from dehydration, bed bugs, heart issues, and an injured rectum.

573.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence amongst detainees, the failure to provide proper medical care and medications, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Buford's injuries.

574.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Buford suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 28) Vincent Young

575.    On February 2, 2017, Vincent Young was booked into the Harris County Jail.

576.    Mr. Young had a history of mental illness when he entered the Jail.

577.    Mr. Young's mental illness and drug withdrawal was not treated while he was in the Jail. Mr. Young was not provided his medications which he needed to function normally.

578.    Mr. Young had made suicidal statements while in the Jail.

579.    Mr. Young had made statements that he was becoming depressed without his medication which were unanswered by Harris County staff.

580.    Another detainee told jail staff that Mr. Young might be suicidal, which prompted the officers to place him in a holdover cell by himself.

581.    On February 13, 2017, Mr. Young was found in an infirmary cell after guards making their rounds spotted him hanging from a bed sheet wrapped around his neck.

582.    Mr. Young was taken to the hospital where he was declared deceased.

583.    Upon investigating Mr. Young's death, the Texas Commission on Jail Standards issued Harris County a notice of non-compliance finding that Harris County had failed to meet the minimum jail standards by exceeding the required 30-minute face-to-face observation minimum by 44 minutes.

584.    Harris County staff had not stepped inside Mr. Young's cell for over six hours.

585.    The jailer responsible for checking Mr. Young's cell had recorded numerous cell checks that never happened stating that he was too busy doing other jobs to conduct proper rounds.

586.    The Texas Rangers found numerous discrepancies in round sheets where rounds were said to be conducted when in fact, they were not conducted at all or were done improperly.

587.    The jailer was ultimately fired for his actions.

588.    Failure to properly observe and monitor Mr. Young and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Young's death.

589.    Failure to provide Mr. Young with his medications and medical attention for his ongoing mental and physical issues led to the deprivation of Mr. Young's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Young's death.

590.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Young's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Mr. Young's death.

591.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Young died due to the jail's unconstitutional policies, customs, and practices.

### 29) Maytham Alsaedy

592.    On February 27, 2015, Maytham Alsaedy was booked into the Harris County Jail.

593.    Mr. Alsaedy had a history of mental illness and had made suicidal statements and previous suicide attempts while in the jail.

594.    Although Mr. Alsaedy was on the mental health floor, he was not placed on suicide watch despite his suicidal statements and suicide attempts.

595.    Mr. Alsaedy was not being treated properly for his mental illness.

596.    On November 30, 2017, Mr. Alsaedy had covered his window with paper. No Harris County officer noticed the paper, made him remove the paper, or attempted to observe him in his cell.

597.    The jailer making rounds failed to make any face-to-face or any other visual observation of Mr. Alsaedy.

598.    Ultimately, Mr. Alsaedy was discovered with a sheet around his neck hanging from a smoke detector.

599.    Mr. Alsaedy was later declared deceased at the hospital.

600.    The Texas Commission on Jail Standards once again found that Harris County was not in compliance with the minimum observation requirements as the jail permitted Mr. Alsaedy to place paper over his view panel, failed to make him remove the paper, and failed to make any visual check on Mr. Alsaedy for the required time period.

601.    Failure to properly observe and monitor Mr. Alsaedy and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Alsaedy's death.

602.    Failure to provide Mr. Alsaedy with his medications and medical attention for his ongoing mental and physical issues led to the deprivation of Mr. Alsaedy's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Alsaedy's death.

603.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Alsaedy's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Mr. Alsaedy's death.

604.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Alsaedy died due to the jail's unconstitutional policies, customs, and practices.

**30) Debora Ann Lyons**

605.    On August 14, 2018, Debora Ann Lyons was booked into Harris County Jail.

606.    Ms. Lyons had a history of mental illness and making suicidal statements while in the jail.

607.    Ms. Lyons had been approved for a PR bond this same day.

608.    On August 14, 2018, at 1758 hours, Ms. Lyons exited her cell to receive insulin at which time she grabbed a sheet and placed it around her waist.

609.    At 1804 hours, she entered a multi-purpose room on the fourth floor of 1200 Baker and closed the door behind her.

610.    Harris County jailers failed to observe Ms. Lyons throughout this timeframe and did not conduct a face-to-face observation with Ms. Lyons during normal rounds.

611.    At 1848 hours, detainees attending a church service in the multi-purpose room opened the door to discover Ms. Lyons handing inside the door.

612.    At 1858 hours, the Houston Fire Department was finally notified to transport her to Ben Taub hospital.

613.    On August 15, 2018, Ms. Lyons was pronounced deceased by medical staff at the hospital.

614.    The Texas Commission on Jail Standards issued another notice of non-compliance for failure to properly observe Ms. Lyons in the proper timeframe.

615.     Failure to properly observe and monitor Ms. Lyons and conduct proper face-to-face observations led to inadequate medical care being provided to her in a timely manner and ultimately caused Ms. Lyons' death.

616.    Failure to provide Ms. Lyons with her medications and medical attention for her ongoing mental and physical issues led to the deprivation of Ms. Lyons' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Ms. Lyons' death.

617.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Ms. Lyons' access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Ms. Lyons' death.

618.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Lyons died due to the jail's unconstitutional policies, customs, and practices.

### 31) Tracy Whited

619.    On January 12, 2019, Tracy Whited was booked into the Harris County Jail with a $3,000 bond.

620.    Ms. Whited had a history of mental illness and making suicidal statements while in the jail.

621.    On January 14, 2019, despite being in a general population cell, jailers did not observe Ms. Whited attempting to hang herself. Instead, an inmate advised the guards that Ms. Whited was hanging from a sheet in her cell.

622.    Ms. Whited was transported to the hospital unconscious.

623.    Later that day, Ms. Whited was granted a personal bond, releasing her from custody.

624.    Ms. Whited was pronounced deceased after being taken off life support on January 16, 2019.

625.    Failure to properly observe and monitor Ms. Whited and conduct proper face-to-face observations led to inadequate medical care being provided to her in a timely manner and ultimately caused Ms. Whited's death.

626.    Failure to provide Ms. Whited with medical attention for her ongoing mental issues and suicidal ideations led to the deprivation of Ms. Whited's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Ms. Whited's death.

627.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Ms. Whited's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Ms. Whited's death.

628.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Whited died due to the jail's unconstitutional policies, customs, and practices.

### 32) Wallace Harris

629.    On May 1, 2020, Wallace Harris was booked into the Harris County Jail.

630.    Mr. Harris had a history of hypertension which required ongoing medication and medical care.

631.    Mr. Harris did not receive adequate medical screening or medical care during his time in the jail.

632.    On May 6, 2020, Mr. Harris was discovered on his cell floor unresponsive with shallow breathing.

633.    After being taken to the hospital, Mr. Harris was declared deceased due to his medical condition.

634.    Failure to properly observe and monitor Mr. Harris and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Harris's death.

635.    Failure to provide Mr. Harris with medication and medical attention for his ongoing medical condition led to the deprivation of Mr. Harris's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Harris's death.

636.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Harris's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Harris's death.

637.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Harris died due to the jail's unconstitutional policies, customs, and practices.

### 33) David Perez

638.    On September 9, 2020, David Perez was booked into the Harris County Jail.

---

639.    On September 13, 2020, Mr. Perez was found in his single-cell unresponsive, and CPR was started before he was transported to the hospital.

640.    On September 15, 2020, Mr. Perez was declared deceased. The medical cause of his death "could not be determined."

641.    Failure to properly observe and monitor Mr. Perez and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Perez's death.

642.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Perez's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Perez's death.

643.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Perez died due to the jail's unconstitutional policies, customs, and practices.

### 34) Israel Lizano Iglesias

644.    On February 8, 2021, Israel Lizano Iglesias was booked into the Harris County Jail.

645.    Mr. Iglesias was not immediately screened for medical or mental health concerns. Instead, he was placed in a holding cell in the jail's clinic to await the proper screening prior to receiving any medical treatment.

646.    Jail staff did not properly observe Mr. Iglesias; instead, other detainees had to inform jail staff that Mr. Iglesias needed medical attention.

647.    Mr. Iglesias was found alert but non-verbal.

648.    After waiting in the clinic, Mr. Iglesias became unresponsive and was transported to the hospital.

649.    At 5:08 a.m., Mr. Iglesias was pronounced deceased.

650.    Failure to properly observe and monitor Mr. Iglesias and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Iglesias's death.

651.    Failure to provide Mr. Iglesias with medication and medical attention for his ongoing medical condition led to the deprivation of Mr. Iglesias's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Iglesias's death.

652.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Iglesias's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Iglesias's death.

653.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Iglesias died due to the jail's unconstitutional policies, customs, and practices.

### 35) Jim Franklin Lagrone

654.    On July 26, 2022, Jim Franklin Lagrone was booked into the Harris County Jail.

655.    Mr. Lagrone had a history of drug usage and abuse and was booked for possession of drugs.

656.    Mr. Lagrone's known history, however, did not result in a further screening of Mr. Lagrone for medical conditions and additional treatment while in the jail.

657.    Around 4 a.m. on July 31, 2022, Mr. Lagrone was found vomiting into his toilet by detention officers, but he was not provided any medical care or additional monitoring.

658.    A few hours later, a detention officer discovered Mr. Lagrone unresponsive inside his single cell.

659.    Mr. Lagrone was transported to the clinic and eventually transported to the hospital.

660.    The doctors declared Mr. Lagrone deceased shortly after arriving at the hospital.

661.    Failure to properly observe and monitor Mr. Lagrone and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Lagrone's death.

662.    Failure to provide Mr. Lagrone with medication and medical attention for his known medical needs including potential drug overdose led to the deprivation of Mr. Lagrone's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Lagrone's death.

663.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Lagrone's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Lagrone's death.

664.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Lagrone died due to the jail's unconstitutional policies, customs, and practices.

### 36) James Earl Gamble

665.    On August 26, 2021, James Earl Gamble was booked into the Harris County Jail.

666.    While in the jail, Mr. Gamble was not receiving medical screening, care, or medication for his medical conditions including hypertension.

667.    On August 25, 2022, detention officers were distributing dinner trays when detainees informed them that Mr. Gamble was unresponsive in his bunk.

668.    The detention officers had not properly observed him as unresponsive.

669.    After taking him to the clinic, the Houston Fire Department was called who took him to LBJ Hospital.

670.    Later that day, Mr. Gamble was declared deceased.

671.     Failure to properly observe and monitor Mr. Gamble and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Gamble's death.

672.     Failure to provide Mr. Gamble with medication and medical attention for his known medical needs including hypertension led to the deprivation of Mr. Gamble's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Gamble's death.

673.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Gamble's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Gamble's death.

674.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Gamble died due to the jail's unconstitutional policies, customs, and practices.

### 37) Damien Lavon Johnson

675.     On July 27, 2022, Damien Lavon Johnson was booked into the Harris County Jail.

676.     On November 13, 2022, Mr. Johnson was left unobserved and unmonitored by jail staff for a significant enough time to tie a sheet in his cell, place it around his neck and hang himself until he was unresponsive.

677.     Jail staff in fact did not observe Mr. Johnson; instead, a detainee had to inform the officer that Mr. Johnson was hanging in his cell.

678.     On November 15, 2022, Mr. Johnson was declared deceased.

679.     Proper face-to-face observations would have observed either Mr. Johnson attempt to use the sheet, or him hanging in his cell to render aid within a sufficient time that would have prevented Mr. Johnson's death.

680.    Failure to properly observe and monitor Mr. Johnson and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Johnson's death.

681.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Johnson's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Johnson's death as there was insufficient staff to handle the necessary functions of the jail let alone monitor the thousands of inmates even with the minimum required number of officers.

682.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Johnson died due to the jail's unconstitutional policies, customs, and practices.

### 38) Michael Griego

683.    The family and representatives of Michael Griego filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

684.    On March 4, 2022, Michael Griego was booked in the Harris County Jail.

685.    The Harris County Jail is notorious for officer use of force that leads to bodily injury, detainee-on-detainee assaults, and detainee's receiving severe injuries during beatings by officers or detainees in which officers are complicit or indifferent and permit the detainees to beat each other up without any interference until after the beating stops.

686.    On November 13, 2022, Mr. Griego was attacked by numerous detainees within the observation of the detention officers.

---

687.    Detention officers did not interfere until after the beating had stopped when the detainees were gathering around the unconscious Mr. Griego.

688.    Mr. Griego had numerous injuries including severe visible head trauma.

689.    Mr. Griego was transported to the hospital where he succumbed to his injuries on November 22, 2022.

690.    Failure to properly observe and monitor Mr. Griego and the detainees in and around his cell and conduct proper face-to-face observations led to inadequate protection from the other inmates and inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Griego's death.

691.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Griego's injuries and death when the Jail staff either failed to observe or monitor Mr. Griego or the detainee's beating Mr. Griego, deliberately refused to interfere with the ongoing assault, and encouraged detainees to assault each other as a method to solve issues between detainees.

692.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Griego's access to medical care, encouraged violence between detainees, discourages or prevents the staff from interfering with detainee assaults, discourages staff from

disciplining known threats or rendering aid without evidence of physical injuries, and reduced the jailer's ability to properly observe the detainees resulting in Mr. Griego's death.

693.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Griego died due to the jail's unconstitutional policies, customs, and practices.

### 39) Jaquaree Simmons

694.    The family and representatives of Jaquaree Simmons filed nearly identical claims as Plaintiff against Harris County, Texas, and others based on the policies, practices, and procedures of the jail. Plaintiff incorporates the Amended Complaint from that case herein. *Larhonda Biggles v. Harris County, Texas, et al.,* No. 4:22-cv-03326, Dkt. No. 51 (S.D. Tex. filed on Dec. 28, 2022).

695.    On February 10, 2021, Jaquaree Simmons was booked into the Harris County Jail.

696.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encourage officers to resort to violence quickly and to forego reasonable non-violent techniques.

697.    This leads to jailers using force to injure detainees for minor offenses and to use more force than necessary to meet penological purposes.

698.    This culture also encourages jailers to use force as a means of communication and unnecessarily exert their power and authority over detainees for any act that the jailer does not like. A common example is punching detainees in the face even while the detainee is restrained when the detainee talks back to the jailer. This force is unnecessary but encouraged by Harris County because Sheriff Gonzalez is aware of the incessant use of force by his officers and the dangers this imposes on the detainees but fails to make any changes to address these constitutional violations. Essentially, just like the inmates at Shawshank, the detainees of Harris County can just wait to see which detainee will be beaten for crossing the guards.

699.    The example of Harris County's culture of violence is seen in the beating and death of Mr. Simmons which included "significant policy violations",[14] as admitted by the Harris County Sheriff's Office over two years following his death.

700.    On February 16, 2021, at 9:40 a.m. seven detention officers including Eric Morales responded to water flowing under Mr. Simmons' cell door from his clogged toilet.

701.    The only report about this incident disciplined Mr. Simmons and stated that he was removed from his cell while it was cleaned and placed back into his cell "without further incident" and with no report of any use of force being used.

702.    Upon an investigation into this incident, the detention officers had falsified this report and the actions that were taken against Mr. Simmons by those officers in an attempt to cover up this incident.

703.    During the investigation, Mr. Morales lied under oath stating that he placed Mr. Simmons against the wall because he was squirming but did not slam him or use any force and that he did not observe anyone else use force against Mr. Simmons.

704.    Contrary to Mr. Morales' testimony, the other detention officers testified that the officers forced Mr. Simmons to the ground, handcuffed him, stripped him of his clothing, threw him against the wall and the ground with significant force, hit him on the face, and then Mr. Morales dropped his knee on Mr. Simmons face with all of his 6'5" 300 lbs. frame which caused Mr. Simmons to stop moving. The other officers testified that it was excessive use of force. Mr. Simmons was 5'10" and 130 lbs. at most.

---

[14] Statement by Jason Spencer, Chief of Staff of the Harris County Sheriff's Office. https://www.houstonpublicmedia.org/articles/news/criminal-justice/2023/02/06/443102/former-detention-officer-charged-with-manslaughter-in-death-at-harris-county-jail/.

705.    One officer testified that Mr. Simmons was not resisting when he was being stripped of his clothing; yet two officers including Mr. Morales remained in the cell after the other officers left when they heard banging coming from Mr. Simmons' cell.

706.    The officers then placed Mr. Simmons with a lacerated lip and eye and swelling above his left eye back into his cell without any clothing during Winter Storm Uri while the jail was less than 50 degrees Fahrenheit.

707.    The officers did not provide Mr. Simmons with any medical aid despite his obvious injuries and did not report this use of force as required by law.

708.    Mr. Morales was found to have violated numerous policies:

> With regard to the 9:40 a.m. incident, you violated Harris County Sheriff's Office's Department policies, rules, and regulations by using unnecessary and unreasonable force against Inmate Simmons; by failing to de-escalate or reasonably attempt to de-escalate the situation presented to secure Simmons' voluntary compliance and avoid or mitigate the need for force; by failing to render aid to Simmons by ensuring that he received timely access to medical evaluation and care after the incident; by failing to report the use of force to your Sergeant; by failing to document your use of force in a report consistent with the requirements of HCSO Department Policy 501; by failing to report the force you observed other employees use against Simmons to your

> supervisor and in a use of force report; and by knowingly and willingly entering, or causing to be entered, false, inaccurate or improper information in official HCSO records.

> You also clearly violated CJC Policy No. 312(III)(D)(6)(c), which requires supervisory approval in connection with the removal of an inmate's clothing and which requires that the inmate "shall be afforded some type of covering which may include a suicide smock or suicide blanket". After stripping Inmate Simmons of his clothing, you failed to afford some type of covering, such as a suicide smock or suicide blanket. You then walked away, leaving him unclothed and injured in his cell during Winter Storm Uri.

709.    At 6:45 p.m. on the same day, four detention officers were distributing food to the detainees in Mr. Simmons' cell block.

710.    When the officers reached Mr. Simmons' door, he swiped up at the food tray causing it to hit one of the officers. Mr. Simmons then allegedly lunged at the officer who allegedly hit Mr. Simmons two times in the face, which caused Mr. Simmons to stumble and allowed the

officer to close the cell. At this point, Mr. Simmons seemed to be under control as he was confined to his cell.

711.    Yet, eighteen detention officers entered the cellblock outside of the view of any cameras for five minutes and emerged with Mr. Simmons, handcuffed, nude, with obvious face injuries.

712.    Mr. Morales was the officer holding Mr. Simmons up as he was escorted out of the cell.

713.    Mr. Morales did not submit a use of force report but issued a false report charging Mr. Simmons with a violation of jail policies after Mr. Simmons had already died. This report falsely stated that no officer punched, struck, or kicked Mr. Simmons.

714.    In those five minutes inside Mr. Simmons' cell after they opened the cell back up, officers hit Mr. Simmons over twenty-five times to his head, face, and ribs.

715.    Some officers claimed that they took Mr. Simmons to the ground easily, restrained him, and then other officers came into the cell and began hitting Mr. Simmons.

716.    Upon being escorted out of his cell, another officer punched Mr. Simmons in the head and torso two to three times despite him being restrained.

717.    Mr. Morales then picked Mr. Simmons up by the arms, slammed him to the ground, and began punching him multiple times while he was on the ground. Mr. Simmons' head hit the concrete floor.

718.    Officers observed that Mr. Simmons was bleeding from his facial area and a pool of blood had accumulated in his cell. Mr. Simmons had to be carried out of his cell due to his loss of consciousness.

719.    Many officers falsified their reports and lied concerning the use of force. Officers used unnecessary force as part of the rampant policy, customs, and practices within the Jail to resort to force as punishment, as retaliation to detainees that offend the guards, and to a greater extent than necessary to control detainees.

720.    Despite his significant and obvious injuries, Mr. Simmons was prescribed medications and was sent back to his cell without any further medical care.

721.    The next day, February 17, 2021, Mr. Simmons had not been properly observed for over four hours when he was finally found face down, unresponsive in his cell.

722.    Upon being taken to the hospital, Mr. Simmons was pronounced dead.

723.    On April 6, 2021, the Texas Commission on Jail Standards issued a notice of non-compliance finding that the jail had failed to conduct proper observations for over four hours on the date of Mr. Simmons death which could have found Mr. Simmons earlier had they been conducted.

724.    The Harris County Sheriff's office then terminated eleven officers for their involvement and their history of falsified use of force reports and suspended six others.

725.    Despite the significant evidence, many of the facts surrounding Mr. Simmons' death were not made public until after two years following his death.

726.    Ultimately, Mr. Morales was charged in 2023 with felony manslaughter for his involvement in Mr. Simmons' death.

727.    The FBI is also investigating the Harris County Jail specifically in regard to Mr. Simmons and Mr. Pillow's deaths.

728.    Failure to properly observe and monitor Mr. Simmons and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately was a moving force in Mr. Simmon's death.

729.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Simmons' death.

730.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, prevented the rendering of sufficient medical aid, and reduced the jailer's ability to properly observe the detainees which was a moving force in Mr. Simmons' death.

731.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Simmons died due to the jail's unconstitutional policies, customs, and practices.

### 40) Rory Ward, Jr.

732.    Rory Ward Jr.'s family has filed a suit against Harris County Jail in this District asserting similar claims for the death of Mr. Ward. *Rowena Ward v. Harris County, Texas,* No. 4:23-cv-01708 (S.D. Tex., filed May 8, 2023). Mr. Ward's First Amended Complaint is incorporated by reference herein. *Id.* Dkt. No. 13.

733.    On May 8, 2021, Rory Ward Jr. was brutally assaulted by detainee Melvin Johnson while being held in Harris County Jail.

734.    Despite a duty to prevent detainees from assaulting each other, Detention Officer Kelsey Chambers observed Johnson stand over Mr. Ward and punch him six times in the head while Rory was lying defenseless on the ground. No officer interfered with this senseless beating.

735.    Mr. Ward only received minor treatment for his injuries without sufficient diagnostic studies in the jail's medical clinic, which has been cited as inadequate to treat serious injuries by the Department of Justice.

736.    Mr. Ward was then placed back in a single cell without any further medical attention or sufficient observation or monitoring in light of his condition and known head injuries.

737.    Despite the continued failure to observe Mr. Ward either through video or face-to-face observations, Mr. Ward was discovered on May 11, 2021, slumped over in his cell.

738.    After being transported to the hospital, Mr. Ward was pronounced deceased due to the blunt force head trauma he received from Harris County's failure to interfere with the assault from a fellow detainee.

739.    The jailers failed to properly observe and monitor Mr. Ward through minimum face-to-face checks, video monitoring, and intermittent medical checkups despite the jailers' awareness of Mr. Ward's head injuries.

740.    Failure to properly observe and monitor Mr. Ward and conduct proper face-to-face observations led to inadequate protection from the other inmates and inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Ward's death as timely intervention would have prevented Mr. Ward's injuries to begin with, and adequate monitoring would have noticed Mr. Ward's continuous need for medical attention.

741.     Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Ward's injuries and death when the Jail staff either failed to observe or monitor Mr. Ward or the detainee's beating Mr. Ward, or deliberately refused to interfere with the ongoing assault.

742.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Ward's access to medical care, encouraged violence between detainees, discouraged or prevented the staff from interfering with detainee assaults, discouraged staff from disciplining known threats or rendering aid without evidence of physical injuries, and reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Mr. Ward's death.

743.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Ward died due to the jail's unconstitutional policies, customs, and practices.

### 41) Adael Gonzalez Garcia

744.     Adael Gonzalez Garcia filed suit against Harris County asserting claims similar to the Plaintiffs'. Mr. Garcia's Complaint is incorporated herein by reference. *Adael Gonzalez Garcia v. Harris County, Texas*, 4:23-cv-00542, Dkt. No. 12 (S.D. Tex. filed Feb. 14, 2023).

745.     After allegedly falling off of his bunk, Mr. Garcia was being escorted back from the clinic when one or more detention officers used excessive force against Mr. Garcia to cause severe injuries to his head, neck, eye and other areas of his body.

746.    The officers' attack on Mr. Garcia was unwarranted, unprovoked, and was in conjunction with Harris County's pattern, practice, policies, and culture of officers handling matters of disrespect and minor discipline issues with life threatening force.

747.    "Falling off of a bunk" is a common excuse created by guards and detainees for a detainee's injuries to cover up officer use of force and detainee assaults.

748.    Mr. Garcia's injuries were so severe that he was placed into a coma in which he remained for several weeks before being placed in a rehabilitation hospital.

749.    While in the hospital, Mr. Garcia's warrant was dropped which meant that he was no longer in custody, so if he had died, he would not be counted against Harris County's quotas.

750.    Mr. Garcia was never charged with assaulting an officer, which is unusual for Harris County when an inmate is beaten by an officer.

751.    In May 2024, three of the officers who were involved in the assault of Mr. Garcia were indicted on charges of assault causing a bodily injury. Those officers include John Ziesemer, Ezihuo Osiminibeke, and Jimmy Poole. Similar to the Jaquaree Simmons case, the County waited almost two years before actually indicting any of the officers for their unconstitutional actions.

752.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Garcia's injuries.

753.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Garcia's injuries.

754.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Garcia was injured due to the jail's unconstitutional policies, customs, and practices.

### 42) Fred Harris

755.    On October 10, 2021, Fred Harris was booked into the Harris County Jail.

756.    Mr. Harris had known mental disabilities and was very small weighing only 98 pounds.

757.    The Harris County Jail was aware of Mr. Harris's disabilities and the need for special care and observation.

758.    While Mr. Harris was in the jail, a known violent detainee, Michael Ownby (weighed 240 pounds) was also in the jail.

759.    On October 27, 2021, Mr. Ownby showed his violent tendencies and viciously attacked and injured a jail detention officer. His violent tendencies required Mr. Ownby to be escorted by jail staff whenever he was outside of his cell.

760.    On October 29, 2021, Mr. Ownby assaulted a detainee so that he could be placed in a single person holding cell. The jailers subsequently took Mr. Ownby and placed him in a 3rd floor holding cell.

761.    At 10:41 p.m. on October 29, 2021, detention officers in a rush to finish other duties that should have been covered if the jail had sufficient staff and less crowding, placed Mr. Harris in the same single holding cell with Mr. Ownby and did not conduct any additional observations or monitoring despite placing a large violent detainee with a small mentally disabled detainee.

762.    The foreseeable happened, and Mr. Ownby knocked Mr. Harris on the concrete floor and repeatedly kicked and smashed Mr. Harris's head on the floor.

763.    Three detention officers were aware that Mr. Ownby was killing Mr. Harris, yet those officers watched but did not attempt to make any effort to stop the assault.

764.    The officers did not make any effort to determine the status of individual detainees to ensure that violent detainees were not placed with other detainees. The understaffing and overcrowding of the jail forces the staff to cut corners and not act in accordance with even the minimum standards of jail operation.

765.    During the assault, Mr. Ownby ended up stabbing Mr. Harris with a shank.

766.    By the time, any officer decided to enter the cell, Mr. Harris was at the point of death. Mr. Harris passed away on October 31, 2021, in the hospital after being pronounced brain dead.

767.    Failure to properly observe and monitor Mr. Harris and his killer, Mr. Ownby, and conduct proper face-to-face observations led to inadequate protection from the other inmates and inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Harris's death as timely intervention would have prevented Mr. Harris's injuries to begin with, and adequate monitoring would have allowed immediate medical intervention.

768.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing

assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Harris's injuries and death when the Jail staff either failed to observe or monitor Mr. Harris or the detainee beating Mr. Harris, or deliberately refused to interfere with the ongoing assault.

769.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Harris's access to medical care, encouraged violence between detainees, discouraged or prevented the staff from interfering with detainee assaults, discouraged staff from disciplining known threats or rendering aid without evidence of physical injuries, caused jailers to not properly place detainees in appropriate holding cells in accordance with known threats, and reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Mr. Harris's death.

770.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Harris died due to the jail's unconstitutional policies, customs, and practices.

771.    Mr. Harris's family has filed a complaint against Harris County for very similar claims as Plaintiffs which is incorporated by reference herein. Plf.'s 2nd Am. Compl., *Dallas Garcia v. Harris County, Texas*, 4:22-cv-03093, Dkt. No. 31 (S.D. Tex. filed March 31, 2023).

### 43) Jerome Bartee

772.    Jerome Bartee, Jr. was a pretrial detainee at the Harris County Jail on September 4, 2016.

773.    While Mr. Bartee was being escorted from the clinic to his cell, the detention officer pushed Mr. Bartee out of the door into the hallway.

774.     When Mr. Bartee verbally reacted to the unnecessary push, several detention officers began to assault Mr. Bartee by throwing him against a chair and podium in the hallway and throwing him to the ground. Once on the ground the officers laid on top of him.

775.     Although Mr. Bartee was subdued, around ten detention officers punched, kicked, and stomped on Mr. Bartee while he was on the ground. Other officers watched and encouraged the beating.

776.     Once the officers stopped beating Mr. Bartee, the officers handcuffed him and pulled him up from a pool of his own blood.

777.     Due to this vicious and unnecessary assault, Mr. Bartee suffered bilateral nasal bone fractures, orbital fractures, cuts, bruises, and a closed head injury along with unconsciousness.

778.     This beating was one of the few beatings actually recorded by the camera system in the jail because it had just been installed. One jailer even attempted to have the video stop recording once they determined that they were on video.

779.     Following the beating, Mr. Bartee was charged with assaulting an officer and was taken for minimal treatment at the local hospital.

780.     The Harris County Sheriff as the policymaker for the jail expressly stated to the media that the jailers used "an unnecessary application of force," that more jailers than necessary were involved in trying to subdue Mr. Bartee, that jailers failed to de-escalate the situation, and that jailers failed to stop using force when it became unnecessary.

781.     Ultimately, Mr. Bartee was released the following day and the charges against him were dismissed for lack of evidence as it was determined he did not initiate the assault.

782.     Three employees were suspended, and five detention officers were indicted for various felonies for their actions in beating Mr. Bartee.

783.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Bartee's injuries.

784.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force (closed fist strikes to the face) were justified and within the guidelines of their policies, procedures, and the law.

785.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence,

and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Bartee's injuries.

786.    The Harris County Sherriff policymaker for Harris County with respect to the jail when Mr. Bartee was injured due to the jail's unconstitutional policies, customs, and practices.

787.    Mr. Bartee filed suit against Harris County which Plaintiffs incorporate by reference herein to which Harris County settled his claims. Order of Dismissal, *Jerome Bartee, Jr. v. Harris County*, 4:16-cv-02944, Dkt. No. 172 (S.D. Tex. filed Oct. 28, 2021).

### 44) Terry Goodwin

788.    Terry Goodwin was a pretrial detainee in Harris County Jail who suffered from mental illnesses.

789.    When a jail compliance team entered his cell on October 10, 2013, they found Mr. Goodwin filthy with a shredded jail uniform with shards of his clothing hanging from the ceiling where he had attempted to hang himself.

790.    His sink, toilet, and shower were clogged with feces, toilet paper in an attempt to cover up his fees, and orange rinds to cover the smell.

791.    The cell had not been opened for months with observations not being conducted other than placing food under his door with a sign on the door telling officers not to open the cell.

792.    Officers, supervisors, medical staff, and the head of the jail knew for weeks about Mr. Goodwin's position.

793.    During this time, Mr. Goodwin's mental and physical health deteriorated, which ultimately required a stay at a mental health facility.

794.    The jail did not begin an investigation until almost a year after Mr. Goodwin was discovered by a whistleblower.

795.    Sheriff Hickman who had been recently appointed following this investigation said that more investigations would be conducted, that the culture of the jail would be changed under his watch, and that "breakdowns in leadership in previous administration led to an atmosphere of non-confrontational deference." Ron Hickman, Twitter, 10:42 a.m., June 2, 2015. As can be seen in all of the cases and incidents since this time, this atmosphere and culture has not changed but has gotten worse under the supervision of the policymaker, the Harris County Sheriff's Office.

796.    Failure to properly observe and monitor Mr. Goodwin and conduct proper face-to-face observations led to inadequate medical care being provided to him and allowed him to be stuck in inhumane conditions in his own feces and waste that was the moving force in the cause of his injuries.

797.    Failure to provide Mr. Goodwin with medication and medical attention for his known medical needs including his mental illnesses led to the deprivation of Mr. Goodwin's constitutional rights by being deliberately indifferent to the known and obvious risk that led to his injuries.

798.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Goodwin's access to medical care, reduced the jailer's ability to properly observe the detainees, led to the deliberate indifference to the needs of human decency by allowing Mr. Goodwin to remain in the cell for over two months as it was more convenient to leave him in the cell by himself rather than providing him with basic care which was a moving force in Mr. Goodwin's injuries.

799.    The Harris County Sheriff was the policymaker for Harris County with respect to the jail when Mr. Goodwin was subjected to the jail's unconstitutional policies, customs, and practices.

800.    Harris County paid Mr. Goodwin $400,000 in a settlement for his injuries.

### 45) Tramell Morelle

801.    Tramell Morelle filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

802.    On or around July 28, 2023, Tramell Morelle was booked into the Harris County Jail.

803.    On July 30, 2023, in the sight of several officers, Mr. Morelle was assaulted by seven other detainees. The officers did not attempt to interfere or prevent this assault from occurring despite understanding that Mr. Morelle's life was in danger. After the detainees had finished beating up Mr. Morelle, the officers stepped in and took Mr. Morelle to get medical treatment.

804.    Due to the assault, Mr. Morelle suffered a broken jaw which required an extensive surgery and two metal plates to hold his jaw together.

805.    The officers' failure in not observing, monitoring, or interfering with the assault on Mr. Morelle by other detainees led to inadequate protection from the other detainees and ultimately caused Mr. Morelle's injuries.

806.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Morelle's injuries.

807.    Mr. Morelle's case is nearly identical to the case involving Kyle Ryker and similar to the case involving Eric Russell and exemplifies the culture, policies and practices of permitting and failing to intervene in detainee assaults.

808.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Morelle suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 46) Gregory Barrett

809.    On June 30, 2021, Gregory Barrett was booked into the custody of Harris County Jail with pre-existing medical conditions.

810.    On August 26, 2021, Mr. Barrett told his wife during a visitation that he did not feel well and was vomiting blood.

811.    On August 27, 2021, Mr. Barrett was still vomiting blood and had not received any medical attention despite the obvious need for medical treatment.

812.    On August 28, 2021, Mr. Barrett was staying in a solitary quarantine cell in lieu of receiving treatment for his non-Covid symptoms and pre-existing medical attention.

813.    That morning Mr. Barrett was discovered in his cell dead on the floor.

814.    Failure to properly observe and monitor Mr. Barrett and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Barrett's death.

815.    Failure to provide Mr. Barrett with medication and medical attention for his known medical needs including pre-existing medical conditions and his vomiting of blood led to the deprivation of Mr. Barrett's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Barrett's death.

816.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Barrett's access to medical care and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Barrett's death.

817.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Barrett died due to the jail's unconstitutional policies, customs, and practices.

818.    Mr. Barrett's family filed suit against Harris County with similar to claims to Plaintiffs which is incorporated herein by reference. *Jacqueline Strain-Barrett v. Harris County*, 4:22-cv-03526 (S.D. Tex. filed Oct. 12, 2022).

### 47) Bernard Lockhart

819.    Bernard Lockhart filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

820.    On June 28, 2022, Bernard Lockhart was booked into the Harris County jail. On that day, Mr. Lockhart and an officer exchanged some words; however, Mr. Lockhart was not threatening the officer or becoming aggressive in any other manner.

821.    Despite the lack of a threat or a serious policy violation, the officer grabbed Mr. Lockhart's arm wrenched it behind his back, slammed his face against a wall and then dragged him to the holding cell which is notorious for officer beatings as seen by several of the Plaintiffs and similar incidents in this Complaint.

822.    Additional officers then came into the cell that lacked proper observation measures and began beating Mr. Lockhart without any justification. This resulted in severe injuries including a torn rotator cuff. On May 19, 2023, Mr. Lockhart was finally able to receive surgery for his

shoulder upon being released from the Jail because the Jail refused to provide him the proper medical care for his injuries.

823.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Lockhart's injuries.

824.    Sheriff Gonzalez was the policymaker for Harris County with respect to the Jail when Mr. Lockhart suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 48) Christopher Johnson

825.    On July 25, 2015, Christopher Johnson was booked into Harris County Jail.

826.    During the booking process, Mr. Johnson posed to take his booking photo in which he smiled for the camera.

827.    The detention officers did not like that Mr. Johnson was smiling for his photo, so they commanded that he not smile or "We gon' to make you stop smiling."

828.    When Mr. Johnson stated that he was going to smile because he had nothing to worry about, two officers grabbed Mr. Johnson's neck choking him for over 30 seconds while another officer took his picture. Mr. Johnson was handcuffed the entire time.

829.    Other Harris County employees were standing by and witnessed the assault but refused to intervene and/or encouraged the officers' conduct. This approach is consistent with Harris County's policies of allowing, encouraging, and not deterring officers using force unnecessarily when detainees refuse to comply with petty and needless commands.

830.    Mr. Johnson was refused any medical treatment for his injuries and feared that if he pressed the issue he would be met with a beating from the officers.

831.    The officers present falsified reports on what transpired which is consistent with false and incorrect reporting by officers to cover up or mask excessive use of force against detainees and which encourages officers to continue using excessive force.

832.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Johnson's injuries.

833.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law.

834.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Johnson's injuries.

835.    The Harris County Sherriff was the policymaker for Harris County with respect to the jail when Mr. Johnson was injured due to the jail's unconstitutional policies, customs, and practices.

836.    Mr. Johnson filed suit against Harris County which Plaintiffs incorporate by reference herein to which some of Mr. Johnson's claims were settled. Order of Dismissal, *Christopher Johnson v. Harris County*, 4:16-cv-01623, Dkt. No. 80 (S.D. Tex. filed Aug. 21, 2018).

### 49) Matthew Shelton

837.    On March 22, 2022, Matthew Shelton was booked into the Harris County Jail with a history of diabetes and blood pressure problems to which he required insulin and blood pressure medication.

838.    Although he was required to take his medications for his conditions, Harris County's overcrowding, understaffing, and policies of failing to provide medical care and medications led to Mr. Shelton not receiving his at all after being placed into his cell.

839.    Mr. Shelton entered the jail having insulin and needles to treat his diabetes with an order that he was to keep his medications on his person.

840.    Ultimately, on March 27, 2022, Mr. Shelton was found in his cell unresponsive due to failing to get his medications.

841.    The detention officers were not properly observing or monitoring Mr. Shelton as they did not observe Mr. Shelton struggling for medical attention or become unresponsive.

842.    Mr. Shelton was declared deceased in the jail clinic later that day.

843.    On December 19, 2022, the Texas Commission on Jail Standards issued a Notice of Non-Compliance finding that Harris County had failed to meet even minimum jail standards by not providing Mr. Shelton with his medications despite orders to do so.

844.    Failure to properly observe and monitor Mr. Shelton and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Shelton's death.

845.    Failure to provide Mr. Shelton with medication and medical attention for his known medical needs including diabetes and high blood pressure led to the deprivation of Mr. Shelton's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Shelton's death.

846.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Shelton's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Shelton's death.

847. Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Shelton died due to the jail's unconstitutional policies, customs, and practices.

**50) Michael A. Alaniz**

848. On October 23, 2015, Mr. Alaniz was booked into the Harris County Jail.

849. When arriving at the jail, Mr. Alaniz was escorted by two larger detention officers. When they arrived at a window visible to other detainees, Mr. Alaniz was forced to face the wall and be stripped searched.

850. When Mr. Alaniz asked for the officers' names and badge numbers, they refused and took him to a vacant single cell where they slammed him to the ground, sat on top of his back with their knees, and was repeatedly kicked by the officers. Mr. Alaniz lost consciousness, but instead of being taken to medical, he was left alone in the cell for over two hours.

851. When Mr. Alaniz requested medical treatment for his injuries, one officer forcibly grabbed his throat with both hands and cut off his airways. Mr. Alaniz still requested medical despite the officer's response.

852. Mr. Alaniz's request for medical treatment was refused until thirty-six hours after he was assaulted. The clinic only gave him some ibuprofen and sent him on his way.

853. Once released from jail, Mr. Alaniz went to the hospital where they diagnosed him with a fractured nose and a concussion.

854. Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply

with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Alaniz's injuries.

855.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law.

856.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Alaniz's injuries.

857.    The Harris County Sheriff was the policymaker for Harris County with respect to the jail when Mr. Alaniz was injured due to the jail's unconstitutional policies, customs, and practices.

858.    Mr. Alaniz filed suit against Harris County which Plaintiffs incorporate by reference herein in which Harris County settled Mr. Alaniz's claims. Order of Dismissal, *Michael A Alaniz v. Harris County*, 4:16-cv-01495, Dkt. No. 53 (S.D. Tex. filed Aug. 24, 2018).

### 51) Natividad Flores

859.    On July 27, 2019, Natividad Flores was booked in the Harris County Jail with a history of epilepsy requiring constant medical attention and medications.

860.    Mr. Flores disclosed his condition and stated that he needed his medications and needed to stay on a bottom bunk for fear of falling out of the bunk due to his medical condition.

861.    Consistent with Harris County's policies and practices of ignoring medical requests of detainees and withholding medical attention and medications from detainees, the detention officers never provided Mr. Flores with his medication and placed him on a top bunk.

862.    On July 29, 2019, because of the failure to provide him with his medications, Mr. Flores began experiencing several seizures. The officers failed to observe these seizures and failed to monitor Mr. Flores, otherwise they would have noticed his seizures and would have had to render aid.

863.    Instead, Mr. Flores continued to suffer seizures on July 30, 2019, and fell from his top bunk suffering a serious head injury.

864.    Although some other detainees rendered aid, the officer on duty laughed at Mr. Flores and failed to call for medical assistance or help render aid.

865.    Ultimately, Mr. Flores lost consciousness and was taken to St. Joseph Hospital.

866.    Failure to properly observe and monitor Mr. Flores, conduct proper face-to-face observations, and failed to complete intake documents properly led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Flores' injuries.

---

Plaintiffs' Original Complaint

867.    Failure to provide Mr. Flores with medication and medical attention for his known medical needs including epilepsy led to the deprivation of Mr. Flores's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Flores that he would suffer seizures without medication and would fall from his seizures by being on a top bunk.

868.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Flores's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Flores's injuries.

869.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Flores suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

870.    Mr. Flores filed a complaint against Harris County for similar claims as Plaintiffs which Harris County eventually settled. Conditional Order of Dismissal, *Natividad Flores v. Harris County*, 4:20-cv-03162, Dkt. No. 72 (S.D. Tex. filed May 10, 2022).

### 52) Kareem Jefferson

871.    On May 29, 2019, Kareem Jefferson was in the process of being released from the Harris County Jail.

872.    While waiting in line to leave, detention officer Alexandro Ramos confronted Mr. Jefferson that he was past a "line" on the ground.

873.    When Mr. Jefferson spoke to Officer Ramos, Ramos hit Kareem and then slammed him on the ground, injuring him and placing him back in custody.

874.    Ramos then filed a false report that Kareem attacked an officer which resulted in him being in Harris County Jail for almost two more years before the case was dismissed for lack of evidence.

875.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion that leads to discipline, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Jefferson's injuries.

876.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law. Harris County also encourages false reports against detainees preparing to be released from the jail by provoking them and using force against the detainee and writing a report charging the detainee with a false crime. This same action was taken against Mr. Pillow as shown above.

877.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Jefferson's injuries.

878.    The Harris County Sherriff Ed Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Jefferson was injured due to the jail's unconstitutional policies, customs, and practices.

879.    Mr. Jefferson filed suit against Harris County. *Kareem Jefferson v. Harris County, Texas*, 4:21-cv-00545 (S.D. Tex. filed May 11, 2021).

### 53) Henry Williams

880.    On or about February 21, 2022, Henry Williams was in the Harris County Jail with a known medical condition specifically gout, high blood pressure, and arthritis.

881.    Around this time, Mr. Williams suffered a gout attack and notified the jail through the medical kiosk. Mr. Williams did not get a response to this request.

882.    When Mr. Williams talked with the nurse, the nurse said that he would not receive his medication because they were short-staffed, and they had closed the clinic.

883.    On February 22, 2022, Mr. Williams submitted another request through the medical kiosk for medical assistance and medication for his gout attack. Once again, Mr. Williams did not get a response from the jail.

884.    On February 28, 2022, Mr. Williams filed a grievance for not receiving any of his medications for three and a half weeks. Mr. Williams did not receive a reply.

885.    When Mr. Williams talked with another nurse, the nurse stated that she had asked for his medication but was told that they would not give it to her.

886.    On March 2, 2022, Mr. Williams again asked the detention officer for medication who informed him that the clinic would not be providing him with his medication because they were short staffed.

887.    The repeated failure to provide Mr. Williams with his medications led to him suffering bodily injuries including pain and suffering.

888.    Failure to provide Mr. Williams with medication and medical attention for his known medical needs including gout, high blood pressure, and arthritis led to the deprivation of Mr. Williams' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Williams' injuries.

889.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Williams' access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Williams' injuries.

890.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Williams suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

891.    Mr. Williams filed a *pro se* complaint against Harris County for similar claims as Plaintiffs. *Henry Williams v. Harris County*, 4:22-cv-01215 (S.D. Tex. filed April 14, 2022).

### 54) Loron Ernest Fisher

892.     On November 7, 2020, Loron Ernest Fisher was booked into the custody of Harris County Jail with a known medical condition specifically sickle cell.

893.     On June 15, 2022, Mr. Fisher was in his cell when he became in the need of medical attention.

894.     Detention officers were not properly monitoring and observing Mr. Fisher as they did not observe him needing medical attention and were only made aware of his condition by other detainees. Upon getting to Mr. Fisher, they took Mr. Fisher to the clinic.

895.     After being in the clinic for three hours with likely only a portion of that being examined by a clinic staff member, Mr. Fisher was cleared and returned to his floor.

896.     Instead of placing Mr. Fisher with other detainees to allow better observation of Mr. Fisher, the officers placed Mr. Fisher in a holding cell that lacked sufficient windows or cameras to observe him.

897.     Later that day, Mr. Fisher was not properly observed until an officer entered the cell after he did not answer the knocks on his door. The officer found Mr. Fisher unresponsive.

898.     Mr. Fisher was declared deceased that night at the hospital due to his sickle cell disease.

899.     Failure to provide Mr. Fisher with medication and medical attention for his known medical needs including sickle cell and failure to provide sufficient examination, observation, and diagnostic testing when Mr. Fisher went to the clinic led to the deprivation of Mr. Fisher's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Fisher's death.

900.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Fisher's access to medical care, including not having sufficient staff to pass

out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Fisher's death.

901.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Fisher died due to the jail's unconstitutional policies, customs, and practices.

### 55) Robert Wayne Fore

902.    The family and representatives of Robert Wayne Fore filed a lawsuit asserting similar claims as Plaintiff for the death of Mr. Fore due to the ongoing unconstitutional policies, practices, and procedures against Harris County. Plaintiff incorporates herein the First Amended Complaint filed in that action. *Wagner, et. al. v. Harris County, Texas*, N. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. filed on Nov. 21, 2023).

903.    On May 21, 2022, Robert Wayne Fore was booked into the Harris County Jail and placed in a single cell. Mr. Fore was not properly booked and evaluated timely to determine the appropriate location for his mental and physical condition.

904.    On May 24, 2022, shortly after Mr. Fore entered his cell, a neighboring detainee noticed him trying to hang himself with a sheet from his bedding. This detainee notified an officer who simply told Mr. Fore not to hang himself via the intercom. The officer did not approach Mr. Fore face-to-face or try to deter him from committing suicide. The officers and jail staff did not

change their observation pattern, report this attempted suicide, or place Mr. Fore under continuous observation with cameras and modified observation rounds.

905.    Even after this suicide attempt, the officers kept Mr. Fore to a 60-minute observation schedule instead of the required 30-minute observation schedule for someone who has suicidal ideations.

906.    A few hours later, an officer conducting rounds noticed a sheet tied around the mirror and around Mr. Fore's neck. The officer cut Mr. Fore down, but at that time he was already unresponsive.

907.    The officers and jail staff had failed to properly observe Mr. Fore and conduct face-to-face observations at the correct time periods. In fact, the officers took well over the 60-minute period to conduct their observations and certainly did not attempt to meet the 30-minute observation requirements despite Mr. Fore's known suicide attempts just a few hours previously. The officers also admitted during the Texas Ranger's investigation that they did not stop to conduct a face-to-face observation, but simply walked past and glanced in the cell. This improper observation was insufficient to actually assess Mr. Fore's physical and mental condition. One officer even stated that they did not look into the cell so that they could complete their rounds on time. This is a further illustration of the pattern and practice of the jail of failing to observe detainees.

908.    Mr. Fore was later declared deceased at the hospital.

909.    Failure to properly observe and monitor Mr. Fore and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Fore's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice Mr. Fore using the sheet and intervene.

910.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Fore's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Mr. Fore's death.

911.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Fore died due to the jail's unconstitutional policies, customs, and practices.

### 56) Benjamin Pierce

912.    On May 20, 2022, Benjamin Pierce was booked into the Harris County Jail.

913.    Instead of receiving a full medical screening for any health issues upon entering the Jail, Mr. Pierce was placed into a solitary holding cell.

914.    Detention officers were not properly monitoring and observing Mr. Pierce as they did not conduct face to face observations to determine if he was in need of medical attention upon being placed in the solitary cell that lacked sufficient windows or cameras to observe him.

915.    On May 21, 2022, at 4:24 a.m., Mr. Pierce was found unresponsive in his cell.

916.    Mr. Pierce was declared deceased that night at the hospital due to his heart condition that would have been discovered and treated had Mr. Pierce been properly screened and observed.

917.    Failure to provide Mr. Pierce with medication and medical attention for his known medical needs and failure to provide sufficient examination, observation, and diagnostic testing when Mr. Pierce was booked into the Jail led to the deprivation of Mr. Pierce's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Pierce's death.

918.    Failure to properly observe and monitor Mr. Pierce and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Pierce's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice Mr. Pierce become unresponsive.

919.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Pierce's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Pierce's death.

920.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Pierce died due to the jail's unconstitutional policies, customs, and practices.

### 57) Gilbert Allen Nelson

921.    On February 10, 2021, Gilbert Allen Nelson was booked into the Harris County Jail.

922.    Due to the lack of medical care and hygiene within the Jail, Mr. Nelson contracted a urinary tract infection. Mr. Nelson was not receiving medical treatment for this infection despite the obvious need for medical treatment.

923.    Detention officers were not properly monitoring and observing Mr. Nelson as they did not conduct face-to-face observations to determine if he was in need of medical attention within a sufficient amount of time.

924.    On May 11, 2022, detention officers were not monitoring Mr. Nelson as other detainees had to inform them that Mr. Nelson was unresponsive in his bunk.

925.    Mr. Nelson was declared deceased a few hours later with sepsis due to his untreated urinary tract infection.

926.    Failure to provide Mr. Nelson with medication and medical attention for his known medical needs led to the deprivation of Mr. Nelson's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Nelson's death.

927.    Failure to properly observe and monitor Mr. Nelson and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Nelson's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice Mr. Nelson become unresponsive.

928.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Nelson's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Nelson's death.

929.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Nelson died due to the jail's unconstitutional policies, customs, and practices.

### 58) Kevin Alexander Sanchez-Trejo

930.    The family and representatives of Kevin Alexandar Sanchez-Trejo filed a claim as Plaintiff-Intervenors in a lawsuit asserting similar claims as Plaintiff for the death of Mr. Fore due to the ongoing unconstitutional policies, practices, and procedures against Harris County. Plaintiff incorporates herein their Plaintiff-Intervenor Complaint filed in that action. *Wagner, et. al. v. Harris County, Texas*, N. 4:23-cv-02886, Dkt. No. 41 (S.D. Tex. filed on Nov. 21, 2023).

931.    On November 21, 2021, Kevin Alexander Sanchez-Trejo was booked into the Harris County Jail.

932.    Detention officers were not properly monitoring and observing Mr. Sanchez-Trejo as they did not conduct face to face observations to determine if he was in need of medical attention within a sufficient amount of time and for failing to prevent his acquiring and ingestion of fentanyl and heroin.

933.    On February 12, 2022, Mr. Sanchez-Trejo was found unresponsive in his bed by a supervisor.

934.    Mr. Sanchez-Trejo was declared deceased a few hours later due to a drug overdose.

935.    Failure to properly observe and monitor Mr. Nelson and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and led to inadequate supervision permitting the distribution and use of illicit drugs within the Jail which has become a significant pattern within the Jail, and ultimately caused Mr. Sanchez-Trejo's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice the distribution and ingestion of the illicit drugs and sufficient time to notice Mr. Sanchez-Trejo become unresponsive.

936.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Sanchez-Trejo's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to properly observe the use and distribution of drugs amongst detainees in the Jail, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Sanchez-Trejo's death.

937.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Sanchez-Trejo died due to the jail's unconstitutional policies, customs, and practices.

### 59) Simon Peter Douglas

938.    On February 10, 2022, Simon Peter Douglas was booked into the Harris County Jail with known mental illnesses.

939.    While in booking, Mr. Douglas immediately began exhibiting erratic and aggressive behavior consistent with his mental illness, so the detention officers placed him in a single isolation cell that did not have any protections or sufficient avenues of observing and monitoring Mr. Douglas.

940.    While in this cell, Mr. Douglas took a piece of his clothing and attempted to hang himself.

941.    Detention officers then entered Mr. Douglas's cell and forcibly handcuffed him and placed him in a single padded room. This room though still had hard objects on the door and wall and a metal grate in the middle of the floor.

942.    Despite knowing Mr. Douglas's behavior, the officers did not restrain Mr. Douglas any further, did not place him in a suicide vest, and did not attempt to remove damaging items.

943.    Mr. Douglas then began ramming his head against the door, walls, and the metal grate continuously while the detention officers watched. The detention officers did not interfere with Mr. Douglas despite knowing the harm he was causing to himself and his mental condition. Instead, the officers waited until Mr. Douglas knocked himself out and then went in and carried Mr. Douglas out on a stretcher.

944.    Mr. Douglas was declared deceased shortly thereafter at the hospital.

945.    Failure to provide Mr. Douglas with medication and proper medical care for his known mental condition and failure to provide sufficient examination and observation when Mr. Douglas was booked into the Jail led to the deprivation of Mr. Douglas's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Douglas's death.

946.    Failure to properly observe and monitor Mr. Douglas and conduct proper face-to-face observations including failure to interfere with Mr. Douglas's attempts at self-harm led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Douglas's death as proper observation and interference would have provided sufficient time to prevent his death.

947.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Douglas's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues including failure to properly book and evaluate detainees with known mental conditions, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Douglas's death.

948.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Douglas died due to the jail's unconstitutional policies, customs, and practices.

### 60) Fabien Cortez

949.    On March 21, 2023, Fabien Cortez was in the processing center of the Harris County Jail where he was being booked.

950.    While in the processing center, Mr. Cortez went to the bathroom.

951.    In accordance with their customs and policies, Harris County Jail failed to observe, monitor, or conduct any face-to-face observations with Mr. Cortez for at least 88 minutes. Further, the Jail failed to ensure that Mr. Cortez did not have any items which would permit him to attempt to commit suicide.

952.    The Jail did not even know that Mr. Cortez had been gone until another detainee informed them that he had been in the bathroom for a long time.

953.    Eventually, officers went into the bathroom and found Mr. Cortez with a drawstring from his jacket wrapped around his neck. At this point, it was too late to save Mr. Cortez. Mr. Cortez was declared deceased at the hospital a few hours later.

954.    On April 17, 2023, the Texas Commission on Jail Standards, as laid out below, found that the Jail violated minimum jail standards by failing to conduct face-to-face observations with Mr. Cortez for over 88 minutes. This led to a severe constitutional violation as Mr. Cortez was given more than enough time to hang himself and the lapse in time prevented timely medical care.

955.    Failure to properly observe and monitor Mr. Cortez and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Cortez's death.

956.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Cortez's access to medical care, impeded providing medical care timely, and reduced the jailer's ability to properly observe the detainees resulting in Mr. Cortez's death.

957.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Cortez died due to the jail's unconstitutional policies, customs, and practices.

### 61) Elijah Gamble

958.    Around November 2020, Elijah Gamble was booked into the Harris County Jail.

959.    Mr. Gamble's mother is the wife of Plaintiff Taylor Euell.

960.    Mr. Gamble is part of the LGBQT+ community which is a vulnerable group in the Harris County Jail.

961.    Mr. Gamble got into an argument with another detainee when that detainee threatened to fight him. Mr. Gamble went to the officers watching outside of the room and asked to be removed from the room due to the threat of violence. Unfortunately, the officers refused to remove him from the room until he told them who had threatened him. The detainee that threatened him was standing right next to him, so out of fear of getting beat up for snitching, Mr. Gamble did not tell them who had threatened him.

962.    However, right in front of the officers, the other detainee punched Mr. Gamble in the face knocking him out for a few seconds. When he woke up, he was being stomped on the face by this detainee. The officers did not interfere.

963.    After several minutes, the officers finally came into the cell only after Mr. Gamble was crawling to the door.

964.    Upon going to the clinic, Mr. Gamble was told that his jaw was broken but that the clinic would not wire his mouth shut. Eventually, Mr. Gamble was sent to the hospital where they wired his mouth shut. Upon returning to the Jail, Mr. Gamble was not provided with a liquid diet but had to buy his own ramen soup at the commissary when available.

965.    Eventually on the eve of his surgery for his jaw, the Jail released him which forced him to have to use his own insurance to pay for his surgery.

966.    In his time at Harris County, Mr. Gamble saw a common trend where detainees would not be provided medical treatment or medications regularly. When a detainee needed to be taught a lesson, the detainee would be taken to a place with closed doors and no cameras and would

be beaten up by several officers. Each floor had four cells where these lessons would be taught. Many cells had blood and feces on the walls and floor.

967.    Failure to properly observe, monitor, and intervene when Mr. Gamble was beat up by the other detainee despite requesting to be removed from the presence of that detainee led to inadequate protection and inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Gamble's injuries as timely intervention would have prevented Mr. Gamble's injuries to begin with, and adequate monitoring would have allowed immediate medical intervention.

968.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Gamble's injuries when the Jail staff either failed to observe or monitor Mr. Gamble or the detainee beating Mr. Gamble, or deliberately refused to interfere with the ongoing assault.

969.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Gamble's access to medical care, encouraged violence between detainees, discouraged or prevented the staff from interfering with detainee assaults, discouraged staff from disciplining known threats or rendering aid without evidence of physical injuries, caused jailers to not properly place detainees in appropriate holding cells in accordance with known threats, and

reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Mr. Gamble's death.

970.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Gamble was injured due to the jail's unconstitutional policies, customs, and practices.

### 62) Kenneth Lucas

971.    On February 14, 2015, Kenneth Lucas was arrested for keeping his children too long during a scheduled visit and was booked into the Harris County Jail.

972.    On February 17, 2015, Mr. Lucas was upset in his locked single cell unarmed and did not pose a threat to anyone. However, Harris County organized several officers to forcibly enter his cell, knock him to the ground, handcuff his arms behind his back, and drag him from his cell by his face. Once pulled out of the cell, the officers continued to sit on his back and legs while he was restrained. Mr. Lucas was not resisting their efforts.

973.    Despite his cries that he was going to pass out and could not breathe, the officers continued their trained tactics of sitting on his back preventing him from breathing and causing him immense trauma and pain. No medical staff were informed of this situation. Eventually, Mr. Lucas stopped breathing due to the officer's actions. Yet, nobody noticed that he stopped breathing and continued to sit on his back and legs.

974.    When Mr. Lucas was taken to the clinic, he was not taken there to receive medical care or evaluation; instead, while officers were still sitting on his back and legs, a nurse gave Mr. Lucas a sedative. This sedative was unnecessary as everyone could see that Mr. Lucas was unconscious. Many officers and supervisors saw the officers' actions and did not attempt to interfere or suggest a different way to restrain him or that they should stop sitting on Mr. Lucas's back. These same tactics were prevalent during the 2009 DOJ Report.

975.    The officers continued to hold Mr. Lucas down for several minutes after he became lifeless. The medical staff tried to take his blood pressure but could not find any. Ultimately, due to the ongoing restraint and unnecessary use of force, Mr. Lucas passed away. In one of the few moments of transparency, the prior Sheriff of Harris County released the full video of the incident but found that the officers did nothing wrong. Instead of condemning these actions, the Sheriff condoned these actions as part of the policies, practices, and procedures of the County. [15]

976.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Lucas's death.

---

[15] In a rare circumstance, Harris County filmed the entirety of this incident and released it to the public. The full video can be seen at the following link: https://abc13.com/jail-footage-video-kenneth-lucas-inmate-death/515300/.

977.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force (sitting on the back of detainees) were justified and within the guidelines of their policies, procedures, and the law.

978.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Lucas's death.

979.    The Harris County Sherriff policymaker for Harris County with respect to the jail when Mr. Lucas died due to the jail's unconstitutional policies, customs, and practices.

980.    Mr. Lucas's family filed suit against Harris County which Plaintiffs incorporate by reference herein. First. Am. Complaint, *Salcido v. Harris Cnty., Tex.*, 4:15-cv-02155 (S.D. Tex. filed July 30, 2015). Harris County settled the claims against them for $2.5 million.

### 63) Rachel Hatton

981.    On or around May 7, 2016, Rachel Hatton was booked into the Harris County Jail.

982.    While waiting in line with other detainees, an officer ordered her to go back to her cell. Despite moving in that direction, the officer charged and punched her causing her to lose consciousness and required her to get stiches for her injuries. Ms. Hatton suffered a concussion due to this excessive and unnecessary use of force.

983.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more

likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Ms. Hatton's injuries.

984.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force (closed hand fist strikes to the face) were justified and within the guidelines of their policies, procedures, and the law.

985.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Ms. Hatton's injuries.

986.    The Harris County Sherriff was the policymaker for Harris County with respect to the jail when Ms. Hatton suffered her injuries due to the jail's unconstitutional policies, customs, and practices.

987.    Ms. Hatton filed suit against Harris County which Plaintiffs incorporate by reference herein. *Hatton v. Harris Cnty., Tex.*, 4:18-cv-01948 (S.D. Tex. 2018).

### 64) John Raymond Hackl

988.    With each passing week, new cases and incidents arise that show the ongoing policies, practices, and procedures that have deprived Plaintiffs and many other detainees of their constitutional rights. This ongoing issue further exemplifies the deliberate indifference that Harris County has towards these constitutional violations and the policies and practices they endorse and encourage.

989.    On July 24, 2024, the family and representatives of the estate of John Raymond Hackl filed a Motion to Intervene with an Attached Complaint in the *Wagner* litigation asserting nearly identical claims against Harris County, Texas due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates that Complaint from that lawsuit. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 73-1 (S.D. Tex. filed July 24, 2024).

990.    John Raymond Hackl was booked into the Harris County Jail on April 24, 2024, with a history of medical issues.

991.    On May 24, 2024, Mr. Hackl had been complaining about further medical issues but did not receive any medical care by the staff. Eventually, Mr. Hackl passed out in his jail cell from a pulmonary embolism where he lay on the floor for almost two hours with no officers or jail staff watching him or responding to his need for medical care.

992.    Eventually, a jail employee eventually came to Mr. Hackl's cell where they found him unresponsive and got him transported to the hospital. Mr. Hackl never regained consciousness and was transferred to hospice care.

993.    Four days later, Harris County "released" Mr. Hackl from their custody. This is consistent with Harris County's attempt to hide additional deaths that occur on their watch by having the detainees die after they get "released" from custody. Harris County does not have to report deaths that occur after the individual is released.

994.    On June 18, 2024, Mr. Hackl passed away due to the reckless actions and inactions of Harris County.

995.    Failure to provide Mr. Hackl with medication and proper medical care for his known mental condition and failure to provide sufficient examination and observation when Mr. Hackl was booked into the Jail led to the deprivation of Mr. Hackl's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Hackl's death.

996.    Failure to properly observe and monitor Mr. Hackl and conduct proper face-to-face observations including failure to observe Mr. Hackl for several hours as he lay unresponsive led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Hackl's death as proper observation and interference would have provided sufficient time to prevent his death.

997.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Hackl's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues including failure to properly book and evaluate detainees with known mental

conditions, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Hackl's death.

998.    Harris County Judge Hidalgo following Mr. Hackl's death pointed out some of the issues with overcrowding of the jail on her Twitter/X account. "We've been looking at what's going on that's causing us to have such problems with overcrowding. . ."

999.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Hackl died due to the jail's unconstitutional policies, customs, and practices.

### 65) Additional Unreported Detainee Deaths

1000.    In addition to Mr. Hackl and per Harris County's custom and practice, six individuals who passed away due to the conditions and policies within the jail were unreported. Specifically, each of these six individuals' conditions grew to a fatal level while in the jail but they were "released" from custody just prior to them passing away. This ensures that each of these individuals do not count against the Jail as an in-custody death and their deaths do not get reported to the Attorney General's office. As such, very little information is available concerning the circumstances surrounding their deaths.

1001.    Out of the information available and upon information and belief, each death resulted from Harris County's practices, policies, and procedures of failing to observe and monitor detainees and responding to their needs, failing to provide appropriate and timely medical care (including providing required medications), and the rampant understaffing and overcrowding of the jail that were the moving force in the constitutional violations.

1002.    In January 2018, Walter Klein was placed in the Harris County Jail. Within 14 hours, Mr. Klein collapsed and was later taken to the hospital. Harris County failed to properly observe Mr. Klein which delayed the care owed to him. Due to the failure to observe and provide

proper medical care, Mr. Klein eventually passed away due to a heart attack. Harris County "released" Mr. Klein prior to him passing which allowed them to not report his passing as an in-custody death.

1003.   Kelvin Williams was arrested and placed in the Harris County Jail in December 2017. Mr. Williams was on dialysis when he entered the jail with his doctors projecting that he would live for an additional 20 years. Per Harris County's policy, practice, and procedures, Harris County did not provide Mr. Williams with his dialysis while in the jail. Mr. Williams also was subjected to deplorable conditions that resulted in him being sent to the hospital and then an acute care facility. After being released to the hospital, Harris County released him from their custody. Mr. Williams ended up passing away from the damage caused to him by these policies.

1004.   In February 2021, Bobby McGowen was arrested and placed in the Harris County Jail. A month later, Mr. McGowen experienced severe health issues that had not been properly observed or taken care of in the jail per Harris County's policies, practices, and procedures. When Mr. McGowen was finally transferred to the hospital, his case was dismissed. He died nine days later due to Harris County's policies.

1005.   Moses Almazan was in the Harris County Jail in 2021 when he contracted Covid-19 in the jail. He was not properly observed or taken care of in the jail per Harris County's policies, practices, and procedures of failing to properly observe detainees and respond to medical requests and the need for medical care. After being placed in the hospital, Mr. Almazan was "released" from custody and died eight days later.

1006.   Damian Lopez was in the Harris County Jail in 2021 and 2022. Due to the lack of observation and medical care which is part of the policies, practices, and procedures of the jail,

Mr. Lopez contracted Covid-19, pneumonia, and sepsis. He was released and placed in the hospital where he died seventeen days later.

1007.   Lawrence Gutierrez was in the Harris County Jail in 2023. The judge dismissed his case making a finding that the officers did not have probable cause. But before the jail processed his release, Mr. Gutierrez began experiencing extreme health issues. Consistent with Harris County's policies, practices, and procedures, the jail failed to properly observe Mr. Gutierrez or render appropriate medical care due to the overcrowding and understaffing of the jail. Mr. Gutierrez was eventually transported to the hospital where he died eight hours later.

      **v.    Harris County's History of Constitutional Violations Is Further Exemplified Through Testimony of Prior Employees, Witnesses, and Detainees.**

        **1)  Treyvan Crowder**

1008.   Treyvan Crowder is a relative of decedent Deon Peterson.

1009.   Mr. Crowder spent time as a pre-trial detainee in the Harris County Jail.

1010.   Mr. Crowder suffered from several medical conditions while in Harris County Jail. When Mr. Crowder submitted medical requests in the kiosk within the Jail, the requests would not be responded to and many times the request would be wiped from the system.

1011.   Commonly, detention officers would prevent or deter medical attention to detainees who got on their bad side as a form of retaliation and punishment.

1012.   The only way Mr. Crowder would receive medical attention for his treatment would be for his mother to call the jail and demand that he receive medical attention. Many of the family members of the detainees identified above were required to do the same before their loved ones would receive treatment. Even with family members seeking medical treatment for detainees, the Jail could take weeks or months before seeing a detainee for treatment.

        **2)  Harris County Detention Officer J. Valdiviez**

1013.    Throughout Sheriff Gonzalez's tenure as the Harris County Sheriff, numerous jail employees and staff have been injured due to Harris County's ongoing practice and policies of understaffing and overcrowding the jail. Some of these employees have filed suit against Harris County while others have bravely stepped forward to talk with the media.

1014.    Officer J. Valdiviez was a detention officer with Harris County.

1015.    On July 21, 2023, Officer Valdiviez was working on a double lockdown floor in the jail. Officer Valdiviez told the media that the pod he was working in was supposed to have at least three officers but with the systemic understaffing of the jail, the pod only had two officers including himself.

1016.    While Officer Valdiviez was making rounds, a detainee who was supposed to be escorted at all times was left unsupervised and assaulted Officer Valdiviez severely injuring him. Officer Valdiviez suffered injuries all of over his body and eventually had to be resuscitated.

1017.    As stated by Officer Valdiviez, "If we would have had better control of how we staff our personnel, or how we staff every floor in general, I'm pretty sure the situation could have been avoided."[16]

1018.    Harris County's rampant practice and policies of understaffing and overcrowding the jail and failing to conduct adequate monitoring and observation of detainees encouraged violence by detainees, prevented a correct proportion of guards to carry out the necessary functions of the jail safely, and interfered with the officers' abilities to adequately monitor and observe detainees which was a moving force in causing Officer Valdiviez's injuries.

---

[16] https://www.fox26houston.com/news/harris-county-jail-inmate-accused-of-violently-attacking-and-seriously-injuring-detention-officer.

1019.   Sherriff Gonzalez, as the Harris County Sheriff, was the policymaker for Harris County with respect to the jail when Officer Valdiviez suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 3)  Harris County Sergeant Jane Doe[17]

1020.   On December 6, 2021, Jane Doe was a sergeant within the Harris County Jail.

1021.   While in her office on the fifth floor of 1200 Baker, a detainee entered her office and sexually assaulted her. This detainee's armband indicated that he was to be escorted anytime he was outside of his cell. Unfortunately for Ms. Doe, the detainee was not escorted.

1022.   Despite crying for help, no other officer or employee ever arrived to help Ms. Doe. The detainee was able to walk out of the office without any officer interference. Sheriff Gonzalez failed to take responsibility for this action and instead solely blamed the detainee.

1023.   Ms. Doe filed suit against Harris County on July 28, 2023, for their rampant policies, practices, and procedures of understaffing, underfunding, and overcrowding the jail. Ms. Doe's injuries directly resulted from this policy as an officer should have been able to hear her cries for help and should have been escorting the detainee.

1024.   Harris County's rampant practice and policies of understaffing and overcrowding the jail and failing to conduct adequate monitoring and observation of detainees encouraged violence by detainees, prevented a correct proportion of guards to carry out the necessary functions of the jail safely, and interfered with the officers' abilities to adequately monitor and observe detainees which was a moving force in causing Ms. Doe's injuries.

---

[17] This Sergeant filed suit under a pseudonym due to the sensitive nature of her injuries suffered due to Harris County's rampant policies, practices, and procedures. The location of Jane Doe's allegations can be found at Plf.'s Orig. Pet., *Jane Doe v. Harris County, Tex., et. al.*, No. 2023-47871 (125th Dist. Ct., Harris County, Tex. July 28, 2023).

Plaintiffs' Original Complaint

1025.   Sherriff Gonzalez, as the Harris County Sheriff, was the policymaker for Harris County with respect to the jail when Ms. Doe suffered her injuries due to the jail's unconstitutional policies, customs, and practices.

### 4)  Harris County Jail Employees [18]

1026.   In February 2023, two former employees of the Harris County Jail who had recently resigned did an anonymous interview with Fox 26 in Houston.

1027.   In this interview, the employees repeatedly stated that the jail was extremely unsafe. The employees discussed the rampant culture where detainees are welcomed into the "through violence" and are "beaten to a bloody pulp."

1028.   The employees specifically discussed the incident involving Sergeant Jane Doe mentioned above. They stated that before the sergeant was raped "these things happened before" and they were warning that something worse would happen if nothing changed and inevitably because Harris County did not change any of their policies or procedures Ms. Doe was assaulted. "After the sergeant was brutally raped and beaten, we expected something different to happen. It never did."

1029.   Detainees were frequently left unattended and unescorted when they should have been escorted at all times.

1030.   The Harris County Sheriff's Office issued a statement in response recognizing "The crisis in the Harris County Jail" and "the overcrowded conditions." Yet, nothing has changed throughout the history of the jail.

### 5)  The Head of the Harris County Jail Resigns on January 9, 2023

---

[18] These two jail employees provided an interview to the media in early 2023 but asked to remain anonymous. Part of their interview can be found at the following links. https://www.youtube.com/watch?v=unwfp72ASNY; https://www.fox26houston.com/news/two-former-harris-co-jail-employees-say-inmates-are-running-the-show.

1031.   Harris County's ongoing policies, practices, and procedures of overcrowding and understaffing the jail can also be seen in the resignation of the Head of the Harris County Jail.

1032.   On January 9, 2023, shortly after the death of Jacoby Pillow, Shannon Herklotz who served as the Assistant Chief of Detentions with the Harris County Sheriff's Office submitted his resignation letter. In this letter, Mr. Herklotz cited numerous issues within the jail that they were seeking to overcome including overcrowding and staffing deficiencies. [19]

1033.   This letter serves as another reminder that the overcrowding and understaffing of the jail is a systemic issue that has not been resolved or addressed despite that issue being raised no later than 2009 in the DOJ Report.

**6)   Recently Released Videos Show the Ongoing Culture in the Jail.**

1034.   In January 2024, a Harris County Jail supervisor leaked videos showing excessive violence and abuse in the jail both by detainees and by officers.[20] These videos also show the lack of observation and supervision which encourages violence within the jail and shows issues with the understaffing and overcrowding of the jail.

1035.   One video shows a jailer abusing a detainee in a broom closet while being watched by several detainees. The officer's actions indicate that he is very comfortable committing these acts within the jail. The detainee was not posing any threat but received several slaps and an upper cut to the jaw.

1036.   A few of the other videos show officers and detainees fighting with the officers continuing to punch and use force against the detainee even after the detainee has been restrained.

---

[19] Mr. Herklotz's letter can be found at the following link: https://www.houstonpublicmedia.org/articles/news/criminal-justice/2023/01/12/440990/head-of-harris-county-jail-resigns-as-death-toll-increases-amid-overcrowding-issues/.
[20] https://www.fox26houston.com/news/newly-released-video-shows-alleged-abuse-of-inmates-and-deputies-at-harris-county-jail.

This is consistent with the jails overcrowded and understaffed nature where officers are permitted and encouraged to engage in excessive force as a quicker method to try to get compliance and to punish the detainees. This also shows the lack of training for the officers as they do not engage in appropriate levels of force but use whatever force they want. These videos also exemplify the ongoing policies and procedures of failing to properly observe detainees and officers to ensure that detainees are properly treated and to discourage violence in the jail.

### 7) Harris County's New Funding and Renovations of the Jail.

1037.   On June 4, 2024, the Harris County Commissioners' Court approved a $122 million emergency maintenance plan for the jail.[21] Harris County admitted that this is only enough to cover the emergency items needed for the jail to avoid a critical failure. Items identified included hiring consultants to try to address the admittedly overcrowded nature of the jail and to help with technical assistance training in conjunction with the Institute of Corrections.

1038.   This technical assistance training is the same training that the TCJS has required for several months to help ensure that the jailers are meeting proper observation requirements, staffing ratios, and to provide proper medical care and medical emergency responses. Judge Hidalgo stated that this just addresses what is required and does not provide the complete overhaul needed and which is being evaluated to make the jail safe.

1039.   This funding is further evidence of the policy, practice, and culture of overcrowding and understaffing the jail as admitted by the policymakers within the county. As shown in the discussions, this overcrowding and understaffing leads to numerous violations of minimum jail standards which include the failure to observe and monitor and provide adequate medical

---

[21] https://harriscountytx.new.swagit.com/videos/307080.

assistance to detainees. Each of these policies, practices, and procedures, were the moving force in Plaintiffs' injuries and deaths.

**D. CURRENTLY KNOWN POLICIES, PRACTICES, CUSTOMS, AND/OR DE FACTO POLICIES ADOPTED AND PROMULGATED BY THE HARRIS COUNTY SHERIFF WITH DELIBERATE INDIFFERENCE WHICH CAUSED THE VIOLATIONS OF PLAINTIFFS' CONSTITUTIONAL RIGHTS.**

1040. The repeated, extensive, and pervasive acts and omissions of constitutional violations in the Harris County Jail as shown above gives rise to multiple official policies, practices, culture, and customs which have been adopted, ratified, and maintained with objective deliberate indifference to the lives and wellbeing of Plaintiffs are the basis for many of the causes of action stated below.

1041. The County's policies, practices, culture, and customs are more fully developed throughout this Complaint, but for the sake of clarity, these policies include but are not limited to the following:

   a. *Failure to Observe and Monitor:* Routine failure to properly observe and monitor detainees through face-to-face checks, video monitoring, and in identifying and monitoring blind spots within the jail and subsequent inaccurate reporting and documentation of those observations.

   b. *Failure to Provide Medical Care:* Routine failure to provide detainees with medical care and/or sufficient medical care within a timely manner or at all through the failure to provide medications to detainees, failure to follow medical instructions from physicians, failure to properly document health concerns and medical needs of detainees, failure to properly evaluate and test detainees with known injuries in reckless disregard to the known consequences of failing to test and diagnose injuries and medical conditions, and failure to transfer detainees with known or knowable medical conditions to a medical facility or detention facility that could provide adequate acute and chronic care for the detainees' disabilities and medical conditions.

   c. *Institutionalized Excessive Force by Jail Employees on Detainees:* Patterns, practices, policies, and culture of encouraging and failing to deter the use of force by jail employees;

      i. By creating a "culture that quickly leads to physical altercation";

    ii.    Insufficient training and enforcement of non-physical de-escalation techniques;

    iii.    Policy of officers and sergeants utilizing excessive force and inappropriate force techniques that cause unnecessary harm to detainees to teach detainees lessons for requesting medical care, for snitching on officers, or for requesting too many accommodations;

    iv.    Inaccurate documentation of the use of force, falsified use of force documentation, and failure to investigate allegations of use of force outside the testimony of interested parties;

    v.    Promulgating a culture where detainees are too scared to provide accurate testimony due to threats by officers of physical harm; and

    vi.    Charging detainees with offense/use of force charges by reporting false, misleading, and inaccurate statements and resorting to use of force unnecessarily to extend the stay of the detainee in the jail as a punishment to the detainee.

d. ***Promulgated a Culture of Violence Amongst Detainees:*** Creating a culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all in ongoing assaults, by ignoring requests of detainees for help, and by encouraging detainees to solve interpersonal issues through violence; and by failing to discipline detainees who instigate violent attacks on other detainees.

e. ***Systemic Understaffing and Overcrowding:*** Routine understaffing and overcrowding of the jail that encourages violence between detainees and between detainees and guards, impedes detainees' access to medical care, reduces the staff's abilities to supervise detainees in a safe manner, reduces the staff's abilities to conduct face-to-face observations, and increases the likelihood of harm suffered by the detainees.

1042.    These policies are not exclusive, but they are the main policies apparent to the public and that are the moving forces in the injuries and deaths of Plaintiffs and that were involved in all similar incidents mentioned above. These policies may be considered individually and in the aggregate as many policies lead to or stem from other policies.

## V.    CAUSES OF ACTION

1043.    Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein.

### COUNT I: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; CONDITIONS OF CONFINEMENT

1044.    Plaintiffs.[22] bring claims against Defendant Harris County for the violations of the detainee's 14th Amendment rights under 42 U.S.C. § 1983.

1045.    Plaintiffs invoke the conditions of confinement theory for the deaths and injuries of the Plaintiffs which requires a showing of (1) an official policy; (2) a policymaker; and (3) that the policy was the moving force behind the constitutional violation.[23]

1046.    Harris County's acts and omissions, which resulted in Plaintiffs' deaths and injuries, were committed pursuant to one or more interrelated policies, practices, and customs of Harris County that were promulgated by its policymaker, the Harris County Sheriff, and which resulted in conditions, practices, rules, and restrictions imposed on the detainees that "amounts to punishment in advance of trial." *Sanchez v. Young Cnty.*, 866 F.3d 274, 279 (5th Cir. 2017).

1047.    The Court is not required to consider each policy in a vacuum but may consider the interrelation of multiple policies and practices in the county and how each policy may exacerbate the harmful effects of each policy.

### *Harris County's Policies, Practices, and Customs Were the Moving Force Behind the Violation of Plaintiffs' Constitutional Rights*

1048.    Plaintiffs' injuries and deaths were caused by numerous policies, practices, and customs of Harris County. Those policies have been identified above and constitute a condition of confinement that amounts to the level of a punishment. These policies were the moving force behind the injuries to each Plaintiff.

---

[22] When referencing Plaintiffs in the causes of action, the Plaintiffs will refer to the individual detainee who suffered the injuries or death in the Harris County Jail even though for the Decedents their family members are the actual Plaintiffs.

[23] Plaintiff asserts the *Monell* claim and the condition of confinement theory jointly and alternatively as separate theories to the extent that the Court and the Fifth Circuit do not consider *Monell* to be applicable to the context of Plaintiff's claims. *See* Order on Motion to Dismiss, *Wagner v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 51 (S.D. Tex. filed on June 4, 2024).

1049.   Harris County's policies were persistent, widespread practices of County officials and employees which were so common and well settled that they constitute a custom within the County that arises to the level of a County policy.

1050.   This persistent, widespread practice has extended unimpeded as far back as the 2009 DOJ Report, through Sheriff Gonzalez's admissions of the culture of the Jail in 2016 and 2023, through continuous TCJS notices of non-compliance beginning in 2017 and continuing till most recently in April 2024, through continuous meetings before the TCJS by Harris County officials, the numerous other detainees' injuries and deaths from the same acts and policies during this time, and through each of the Plaintiffs' cases herein.

1051.   Additionally and in the alternative, even though each of these allegations establish a clear condition of confinement claim, should the Court determine that the facts show some of the claims also constitute episodic acts and omissions, Plaintiff would plead and show that each of the claims show that the individual employees and officers of the Jail acted with subjective deliberate indifference to Plaintiffs' clearly established constitutional rights and the violation resulted from the same municipal policies and customs adopted and maintained by Harris County with objective deliberate indifference to Plaintiffs' rights.

***Victoria Simon***

1052.   Harris County's policies, practices, and customs singularly and taken together, of failing to provide medical care and medications for Ms. Simon's known medical needs, the failure to provide proper observation and monitoring of Ms. Simon to provide timely medical care, and the systemic overcrowding and understaffing of the jail which impeded Ms. Simon's access to medical care and medical attention and reduced the jailer's ability to observe Ms. Simon was the moving force behind Ms. Simon's death.

---

Plaintiffs' Original Complaint

1053.   Absent these policies, practices, and customs, Harris County would have or should have provided proper medical care, proper observation and monitoring, and would have had sufficient staff and a limited number of detainees that would have prevented Ms. Simon's death.

1054.   It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and practices identified above is that detainees would suffer significant injuries, death, and exacerbation of their medical condition. The DOJ, TCJS, and even the Sheriff as explained above have all recognized these policies and the likely consequences of those policies causing constitutional violations.

1055.   Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Ms. Simon's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Ms. Simon's death.

1056.   The officers and employees of the Jail knew that understaffing and overcrowding, failing to provide required medical care to Plaintiff, and failing to provide required observation and monitoring of Plaintiff posed a substantial risk of serious harm to Plaintiff and they responded to that risk with subjective deliberate indifference. Harris County and its employees have known of each of the incidents cited above along with the repeated jail standard violations relating to the improper observation and monitoring of detainees, improper medical care, and the understaffing and overcrowding of the Jail all of which led to the deaths and injuries of detainees within the Jail similar to the exact scenario that led to Plaintiff's injuries. These acts were done in accordance with Harris County's policies, practices, and procedures which were adopted, maintained, and ratified with objective deliberate indifference to the rights of the detainees. These policies,

practices, and procedures were the moving force behind the officer's and employee's constitutional violations of Plaintiff.

*Alan Kerber*

1057.   Harris County's policies, practices, and customs, singularly and taken together, of failing to provide medical care and medications for Mr. Kerber's known medical needs, the egregious failure to provide proper observation and monitoring of Mr. Kerber to provide timely and continuous medical care and prevention of his attempt to commit suicide, and the systemic overcrowding and understaffing of the Jail which impeded Mr. Kerber's access to medical care and reduced the jailer's ability to observe Mr. Kerber, to conduct the minimally required observations, and to respond timely and properly to see when he was attempting to commit suicide and when he became unresponsive was the moving force behind Mr. Kerber's death.

1058.   Absent these policies, practices, and customs, Harris County would have or should have provided proper medical care, proper observation and monitoring, and would have had sufficient staff and a limited number of detainees that would have prevented Mr. Kerber's death.

1059.   It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and practices identified above is that detainees would suffer significant injuries and death. The DOJ, TCJS, and even the Sheriff as explained above have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

1060.  Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Kerber's constitutional rights by being aware of the known and obvious

consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Mr. Kerber's death.

1061.   The officers and employees of the Jail knew that understaffing and overcrowding, failing to provide required medical care to Plaintiff, and failing to provide required observation and monitoring of Plaintiff posed a substantial risk of serious harm to Plaintiff and they responded to that risk with subjective deliberate indifference. Harris County and its employees have known of each of the incidents cited above along with the repeated jail standard violations relating to the improper observation and monitoring of detainees, improper medical care, and the understaffing and overcrowding of the Jail all of which led to the deaths and injuries of detainees within the Jail similar to the exact scenario that led to Plaintiff's injuries. These acts were done in accordance with Harris County's policies, practices, and procedures which were adopted, maintained, and ratified with objective deliberate indifference to the rights of the detainees. These policies, practices, and procedures were the moving force behind the officer's and employee's constitutional violations of Plaintiff.

### D'Alessandro Chavez-Sandoval

1062.   Harris County's policies, practices, and customs, singularly and taken together, of failing to provide medical care and medications for Mr. Chavez-Sandoval's known medical needs and injuries incurred while in the Jail, the institutionalization of using excessive force by Jail employees against Mr. Chavez-Sandoval, and the continuous overcrowding and understaffing of the Jail which impeded Mr. Chavez-Sandoval's access to medical care and heightened the use of excessive force by Jail employees was the moving force behind Mr. Chavez-Sandoval's injuries.

1063.   Absent these policies, practices, and customs, Harris County would have or should have provided proper medical care, would not have utilized unnecessary use of force, and would

have had sufficient staff and a limited number of detainees that would have prevented Mr. Chavez-Sandoval's injuries.

1064.   It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and practices identified above is that detainees would suffer significant injuries and death. The DOJ, TCJS, and even the Sheriff as explained above have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

1065.   Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Chavez-Sandoval's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Mr. Chavez-Sandoval's injuries.

1066.   The officers and employees of the Jail knew that their use of force on Plaintiff, their understaffing and overcrowding of the Jail, and their failure to provide proper medical care to Plaintiff posed a substantial risk of serious harm to Plaintiff and they responded to that risk with subjective deliberate indifference. Harris County and its employees have known of each of the incidents cited above along with the repeated jail standard violations relating to the ramifications of the use of force on detainees, to the improper observation and monitoring of detainees, improper medical care, and the understaffing and overcrowding of the Jail all of which led to the deaths and injuries of detainees within the Jail similar to the exact scenario that led to Plaintiff's injuries. These acts were done in accordance with Harris County's policies, practices, and procedures which were adopted, maintained, and ratified with objective deliberate indifference to the rights of the detainees. These policies, practices, and procedures were the moving force behind the officer's and employee's constitutional violations of Plaintiff.

*Michael Walker*

1067.   Harris County's policies, practices, and customs singularly and taken together, of failing to provide medical care and medications for Mr. Walker's known medical needs, the failure to provide proper observation and monitoring of Mr. Walker to provide timely and continuous medical care, and the systemic overcrowding and understaffing of the jail which impeded Mr. Walker's access to medical care and medical attention and reduced the jailer's ability to observe Mr. Walker was the moving force behind Mr. Walker's injuries.

1068.   Absent these policies, practices, and customs, Harris County would have or should have provided proper medical care, proper observation and monitoring, and would have had sufficient staff and a limited number of detainees that would have prevented Mr. Walker's injuries.

1069.   It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and practices identified above is that detainees would suffer significant injuries and death. The DOJ, TCJS, and even the Sheriff as explained above have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

1070.   Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Walker's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Mr. Walker's injuries.

1071.   The officers and employees of the Jail knew that understaffing and overcrowding, failing to provide required medical care to Plaintiff, and failing to provide required observation and monitoring of Plaintiff posed a substantial risk of serious harm to Plaintiff and they responded to that risk with subjective deliberate indifference. Harris County and its employees have known

of each of the incidents cited above along with the repeated jail standard violations relating to the improper observation and monitoring of detainees, improper medical care, and the understaffing and overcrowding of the Jail all of which led to the deaths and injuries of detainees within the Jail similar to the exact scenario that led to Plaintiff's injuries. These acts were done in accordance with Harris County's policies, practices, and procedures which were adopted, maintained, and ratified with objective deliberate indifference to the rights of the detainees. These policies, practices, and procedures were the moving force behind the officer's and employee's constitutional violations of Plaintiff.

***Daevion Young***

1072.   Harris County's policies, practices, and customs, singularly and taken together, of failing to provide medical care and medications for Mr. Young's known medical needs and injuries incurred while in the Jail, the failure to provide proper observation and monitoring of Mr. Young to provide timely and appropriate medical care, the institutionalization of using excessive force by Jail employees against Mr. Young, and the continuous overcrowding and understaffing of the Jail which impeded Mr. Young's access to medical care and heightened the use of excessive force by Jail employees was the moving force behind Mr. Young's injuries.

1073.   Absent these policies, practices, and customs, Harris County would have or should have provided proper medical care, would not have utilized unnecessary use of force, and would have had sufficient staff and a limited number of detainees that would have prevented Mr. Young's injuries.

1074.   It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and practices identified above is that detainees would suffer significant injuries and death. The DOJ,

TCJS, and even the Sheriff as explained above have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

1075.  Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Young's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Mr. Young's injuries.

1076.  The officers and employees of the Jail knew that their use of force on Plaintiff, their understaffing and overcrowding of the Jail, and their failure to provide proper medical care to Plaintiff posed a substantial risk of serious harm to Plaintiff and they responded to that risk with subjective deliberate indifference. Harris County and its employees have known of each of the incidents cited above along with the repeated jail standard violations relating to the ramifications of the use of force on detainees, to the improper observation and monitoring of detainees, improper medical care, and the understaffing and overcrowding of the Jail all of which led to the deaths and injuries of detainees within the Jail similar to the exact scenario that led to Plaintiff's injuries. These acts were done in accordance with Harris County's policies, practices, and procedures which were adopted, maintained, and ratified with objective deliberate indifference to the rights of the detainees. These policies, practices, and procedures were the moving force behind the officer's and employee's constitutional violations of Plaintiff.

***Kyle Ryker***

1077.  Harris County's policies, practices, and customs, singularly and taken together, of failing to provide proper observation and monitoring of Mr. Ryker and the detainees around him to prevent detainee violence and interfere with ongoing detainee assaults, the failure to provide timely medical care and prevention of detainee violence, the systemic encouragement and

promulgation of a culture of violence between detainees, and the continuous overcrowding and understaffing of the Jail which impeded Mr. Ryker's access to medical care and reduced the jailer's ability to observe Mr. Ryker and the detainees around him and increased the jailers' indifference to detainee violence was the moving force behind Mr. Ryker's injuries.

1078.   Absent these policies, practices, and customs, Harris County would have or should have provided proper observation and monitoring, proper protection and deterrence of detainee violence, proper medical care, and would have had sufficient staff and a limited number of detainees that would have prevented Mr. Ryker's injuries.

1079.   It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and practices identified above is that detainees would suffer significant injuries and death. The DOJ, TCJS, and even the Sheriff as explained above have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

1080.   Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Ryker's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Mr. Ryker's injuries.

1081.   The officers and employees of the Jail knew that undeterred and cultural detainee violence against Plaintiff, their understaffing and overcrowding of the Jail, their failure to provide proper medical care to Plaintiff, and failure to provide required observation and monitoring of Plaintiff posed a substantial risk of serious harm to Plaintiff and they responded to that risk with subjective deliberate indifference. Harris County and its employees have known of each of the incidents cited above along with the repeated jail standard violations relating to undeterred culture

of detainee violence, to the improper observation and monitoring of detainees, improper medical care, and the understaffing and overcrowding of the Jail all of which led to the deaths and injuries of detainees within the Jail similar to the exact scenario that led to Plaintiff's injuries. These acts were done in accordance with Harris County's policies, practices, and procedures which were adopted, maintained, and ratified with objective deliberate indifference to the rights of the detainees. These policies, practices, and procedures were the moving force behind the officer's and employee's constitutional violations of Plaintiff.

***Eric Russell***

1082.   Harris County's policies, practices, and customs, singularly and taken together, of failing to provide proper observation and monitoring of Mr. Russell and the detainees around him to prevent detainee violence and interfere with ongoing detainee assaults, the failure to provide timely medical care and prevention of detainee violence, the systemic encouragement and promulgation of a culture of violence between detainees including by creating the environment to conduct assaults, and the continuous overcrowding and understaffing of the Jail which impeded Mr. Russell's access to medical care and reduced the jailer's ability to observe Mr. Russell and the detainees around him and increased the jailers' indifference to detainee violence was the moving force behind Mr. Russell's injuries.

1083.   Absent these policies, practices, and customs, Harris County would have or should have provided proper observation and monitoring, proper protection and deterrence of detainee violence, proper medical care, and would have had sufficient staff and a limited number of detainees that would have prevented Mr. Russell's injuries.

1084.   It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and

practices identified above is that detainees would suffer significant injuries and death. The DOJ, TCJS, and even the Sheriff as explained above have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

1085.  Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Russell's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Mr. Russell's injuries.

1086.  The officers and employees of the Jail knew that undeterred and cultural detainee violence against Plaintiff, their understaffing and overcrowding of the Jail, their failure to provide proper medical care to Plaintiff, and failure to provide required observation and monitoring of Plaintiff posed a substantial risk of serious harm to Plaintiff and they responded to that risk with subjective deliberate indifference. Harris County and its employees have known of each of the incidents cited above along with the repeated jail standard violations relating to undeterred culture of detainee violence, to the improper observation and monitoring of detainees, improper medical care, and the understaffing and overcrowding of the Jail all of which led to the deaths and injuries of detainees within the Jail similar to the exact scenario that led to Plaintiff's injuries. These acts were done in accordance with Harris County's policies, practices, and procedures which were adopted, maintained, and ratified with objective deliberate indifference to the rights of the detainees. These policies, practices, and procedures were the moving force behind the officer's and employee's constitutional violations of Plaintiff.

### *Harris County's Policies, Practices, and Customs Are Not Reasonably Related to Any Legitimate Penological Goal and Amount to Punishment*

1087.  Harris County's numerous policies, practices, and customs that were the moving force causing the violations of Plaintiffs' constitutional rights are not related to any penological purpose.

1088.  Harris County's continuous, pervasive, and widespread practice of failing to properly observe and monitor detainees amounts to a punishment on the detainees as Harris County has no legitimate penological purpose for this practice. The DOJ and the TCJS have both censured Harris County numerous times for the unconstitutionality of this policy. This gross inattention to the needs and protection of Plaintiffs amounts to a punishment.

1089.  Harris County's continuous and routine failure to provide detainees with medical care and/or sufficient medical care within a timely manner or at all, failure to provide medications to detainees, failure to follow medical instructions from physicians, failure to properly document health concerns and medical needs of detainees, failure to properly evaluate and test detainees with known injuries in reckless disregard to the known consequences of failing to test and diagnose injuries and medical conditions, and failure to transfer detainees with known or knowable medical conditions to a medical facility or detention facility that could provide adequate acute and chronic care for the detainees' disabilities and medical conditions has no legitimate penological purpose. The DOJ and the TCJS have both censured Harris County numerous times for this unjustified policy. This gross inattention to provide adequate and appropriate medical care to Plaintiffs and the detainees constitutes a punishment.

1090.  Harris County's policy, practices, and culture of encouraging and failing to deter the excessive use of force by jail employees against detainees serves no legitimate penological purpose.

1091.   The DOJ found this area had "significant and often glaring operational deficiencies" including lacking: "(1) a minimally adequate system for deterring excessive use of force, and (2) an adequate plan for managing a large and sometimes violent detainee population." *Id.* The DOJ started their analysis with: "We have serious concerns about the use of force at the Jail." *Id.* at 15. Sheriff Gonzalez and Sheriff Hickman, while serving as the Harris County Jail policymaker, both admitted that Jail employees have a history of excessive use of force showing no change between the DOJ Report and now.

1092.   The TCJS in December 2021 also noted the heightened violence in the Jail when they found the Jail in non-compliance with minimum jail standards.

1093.   The investigation into Mr. Simmons' death also led to multiple findings of the excessive use of force, yet, despite those findings, the number of use of force with serious injuries and the numerous cases where detainees are beat by guards has only grown. The investigation into Mr. Garcia's injuries also led to a finding of excessive force and the charging of three officers with criminal assault. This ongoing issue shows no legitimate penological purpose as violative of Plaintiffs' rights.

1094.   Harris County's culture, pattern, practice, and policies of encouraging and not deterring violence amongst detainees serves no legitimate penological purpose. The DOJ, TCJS, the Harris County Sheriff, and the numerous detainees' cases indicate this persistent widespread practice's unconstitutionality. The statistics from the past five years only amplify the increasing violence facing detainees in the Jail. Detainees should not have to fear being attacked by other detainees. This pattern and policy amounts to a punishment of detainees.

1095.   Harris County's systemic understaffing and overcrowding of the Harris County Jail does not serve any legitimate penological purpose. The DOJ, TCJS, the Harris County Sheriff, and

numerous similar cases all indicate the pervasive practices and policies that make this condition of confinement amount to the level of punishment.

### Harris County Sheriff is the Policymaker for the County Jail

1096.   Under well-established Texas law, the Harris County Sheriff is the final policymaker for the Harris County Jail for the purpose of holding the County liable under § 1983.

1097.   The Sheriff position regardless of the individual holding that position is the policymaker.

1098.   In November 2016, Sheriff Ed Gonzalez was elected as the Sheriff of Harris County with specific responsibilities over the Harris County Jail.

1099.   Sheriff Gonzalez was the policymaker when Plaintiffs were injured or killed in the Harris County Jail.

1100.   Sheriff Gonzalez was also the policymaker when almost all of the individuals identified above suffered their injuries and died in the Harris County Jail. In addition to these detainees, Sheriff Gonzalez was the policymaker for Harris County Jail when Officer J. Valdiviez and Sergeant Jane Doe suffered injuries in the jail, the two anonymous employees and Shannon Herklotz resigned their positions, and the videos from within the jail showing the excessive force and detainee assaults within the jail.

1101.   Sheriff Gonzalez compiled the Serious Incident Reports supplied to TCJS since 2018 which show the massive discrepancy in assaults and use of force in Harris County compared to every other county jail in Texas. These reports also show the growing increase in violence in Harris County Jail under Sheriff Gonzalez's watch.

1102.   Sheriff Gonzalez was the policymaker during numerous TCJS reports and notices of non-compliance in relation to the Jail's policies and customs that violated numerous minimum jail standards which are at issue in this case. The TCJS reports and notices during Sheriff

Gonzalez's tenure are from February 21, 2017; April 3, 2017; December 19, 2017; August 23, 2018; December 9, 2020; April 6, 2021; December 7, 2021; September 7, 2022; December 19, 2022; March 8, 2023; April 17, 2023; August 28, 2023, February 20, 2024; and April 10, 2024.

1103.   The Harris County policymakers had actual or at the very least constructive knowledge of the policies, practices, and customs outlined in this lawsuit because Sheriff Gonzalez would have known about these policies and practices had he properly exercised his responsibilities.

1104.   Sheriff Gonzalez's own comments on the overpopulation, understaffing, lack of medical care, and the excessive use of force within the Jail show that he had actual knowledge of these policies as early as 2016. Additionally, the DOJ Report, TCJS reports, previous lawsuits, and the numerous other cases identified above, show that Sheriff Gonzalez was aware or should have been aware of the pervasive practices within the Jail.

1105.   Each of the policies, practices, and customs have been the subject of prolonged public discussion and a high degree of publicity. This is exemplified in the 2016 debate between Sheriff Gonzalez and Sheriff Hickman where over half of the debate centered on the overpopulation, lack of medical care, and the culture of violence and excessive force in the Harris County Jail. Nothing has changed since that debate and the conditions have only grown worse.

1106.   Sheriff Gonzalez was aware that continuing and not correcting or remedying these policies and practices would lead to detainees becoming injured and dying. Sheriff Gonzalez has been deliberately indifferent to these known unreasonable risks by failing to implement any corrective or remedial customs, practices, or policies following the TCJS reports or the deaths or injuries of detainees. The Jail has only grown worse with more deaths, more injuries, less medical care, less supervision and observations, less staff, and more detainees.

1107.   Based on Harris County's continued policies, practices, and customs that were the moving force behind Plaintiffs' injuries and deaths, Plaintiffs have suffered the damages enumerated in the damage section below.

**COUNT II: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; FAILURE TO TRAIN OR SUPERVISE.**

1108.   Plaintiffs incorporate the foregoing paragraphs as if set forth herein.

1109.   Plaintiffs also bring claims for Harris County's deliberate failure to train and/or supervise their Jail employees which resulted in the violation of Plaintiffs' constitutional rights.

1110.   For a failure to train claim, Plaintiffs must show (1) the training policy and procedures were inadequate; (2) the County was deliberately indifferent in adopting its training policy and procedures; and (3) the inadequate training policy and procedures directly caused the constitutional violation.

1111.   As shown above, Harris County and its policymaker, Sheriff Gonzalez, have been aware of the Jail's rampant culture of violence, excessive use of force, lack of medical care, and lack of observation for over seven years; yet, despite being made aware of their deficiencies, Sheriff Gonzalez has continued with the same training policies and practices and has not implemented new policies or practices that would correct the failure of the Jail employees. These issues have not been addressed by any Harris County Sheriff.

1112.   Specifically, Sheriff Gonzalez recognized in 2016 that the Jail had a culture of employees resorting to excessive use of force too quickly and that this was a training problem. Yet, since 2016, as exemplified in the specific detainee incidents and the Serious Incident Reports, the use of force has increased exponentially since 2016. This same issue was noted in the 2009 DOJ Report, but it has only grown worse.

1113.   As exemplified in Plaintiffs' claims and in the various reports and incidents noted above, Harris County has a history of encouraging officers to use excessive force, not supervising them in the use of force, not training them on proper de-escalation techniques, encouraging them to use techniques that result in unnecessary harm, encouraging and ratifying false reports, encouraging and ratifying summary investigations, and ultimately charging detainees with the false charges to cover up the use of force. Officers are not disciplined or discouraged from engaging in these practices as their supervisors and superiors are also engaging in these behaviors and are ratifying their actions.

1114.   Harris County has also a history of failing to train and supervise employees in the handling of detainee violence and detainee conflicts and responding to requests for aid and protection from detainees. Harris County's training policy and practice encourages officers to not interfere with detainee fights until after the fight is over, encourages officers to not act preemptively to prevent fights between detainees, ratifies officer conduct of encouraging detainees to fight prior to getting involved, and not responding timely to prevent further injury to detainees. Example of this deliberate indifference for the need for training and supervision can be seen in the cases of Mr. Ryker and Mr. Russell where officers were laughing at the situation and facilitated the ability of the detainees to assault the Plaintiffs.

1115.   As exemplified in the repeated TCJS reports and numerous prior incidents, Harris County also has a rampant policy of not training or supervising their employees in the proper observation and monitoring of detainees. Harris County employees routinely fail to observe detainees within the minimum jail standards, fail to conduct complete cell checks, fail to monitor detainees while they are in areas with no video cameras, fail to monitor video cameras, and falsify documentation and reports pertaining to observations and cell checks. Harris County was aware of

this in the DOJ Report and was made aware of it again through each TCJS report; yet, Harris County has not made any change to their policy and does not hold their employees accountable. The circumstances leading to Mr. Kerber's death is another example of this policy and lack of training as jailers walked right past his cell while he was unconscious on the ground, yet those jailers "reported" that they conducted face-to-face observations.

1116.   As shown above, Harris County also has an inadequate training policy and practice for providing medications and medical treatment to detainees. Harris County employees in accordance with their policy will not provide medications regularly, employees may skip detainees who are being punished, employees will not respond to requests for medical help timely or at all, employees will not conduct sufficient testing or analysis of detainees with injuries which are known to have serious consequences, they falsify records pertaining to the detainee's symptoms and care to make it appear as if the detainee received care, the officers falsify the cause of the medical condition to the medical staff which causes improper treatment and diagnosis of the injury, and they fail to adequately monitor and observe detainees with known injuries and medical conditions to ensure proper medical care. Despite knowing about these failures in their training, Harris County has not made a change to this training policy.

1117.   Sheriff Gonzalez was well aware of the consequences of failing to train the jail employees in the areas of medical care, observation, detainee violence, and use of force. Sheriff Gonzalez knew or should have known that this failure to train employees who are tasked with the care and control of the detainees would result in the deaths or injuries of detainees.

1118.   The need for a different training policy and practice to address the discrepancies raised by the DOJ, the TCJS, and the numerous prior incidents has been obvious for years with

knowledge that continued failure to address this policy will result in additional constitutional violations.

1119.   Harris County's failure to implement new and additional training policies was the direct cause of Plaintiffs' injuries and/or deaths.

***Victoria Simon***

1120.   Harris County's inadequate training, supervision, and disciplinary policies, practices, and procedures, pertaining to the lack of providing medical care and medications for Ms. Simon's known medical needs and the failure to provide proper observation and monitoring of Ms. Simon to ensure that she was receiving the proper medical care and timely medical care was the direct cause of Ms. Simon's death.

1121.   It was highly predictable that Harris County employees under the current inadequate training and supervision model would fail to provide Ms. Simon with the medical care and attention needed for her medical condition and would fail to conduct proper observations and monitoring of Ms. Simon which would hinder her getting proper and timely medical care. The known and obvious consequences of Harris County's inadequate training is that detainees would suffer significant injuries and death. Failure to provide medications, proper observation, and consistent medical care to detainees with known medical conditions like Ms. Simon results in those detainees' conditions worsening and would likely result in debilitating injuries or death. The DOJ, TCJS, and even the Sheriff as explained above have all recognized this inadequate training and the likely consequences of those policies causing constitutional violations. The numerous incidents and ongoing non-compliance exemplifies the gross inadequacies of Harris County's training policies and procedures and show the need for the program to be changed.

1122.   Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Ms. Simon's constitutional rights by being aware of the known and obvious consequences of their training policies and practices and failing to implement new or additional training policies or procedures to correct these known deficiencies.

***Alan Kerber***

1123.   Harris County's inadequate training policies, practices, and procedures, pertaining to the lack of providing medical care for Mr. Kerber's known medical needs, and the failure to provide proper observation and monitoring of Mr. Kerber to provide timely medical care and to notice and prevent any attempts at suicide, notice and render timely medical care when Mr. Kerber became unresponsive, and to place Mr. Kerber in the correct classification for his known condition was the direct cause of Mr. Kerber's death.

1124.   It was highly predictable that Harris County employees under the current inadequate training and supervision model would fail to provide Mr. Kerber with the medical care and attention needed for to prevent him from attempting suicide and to provide proper medical aid and would fail to conduct proper observations and monitoring of Mr. Kerber which would hinder him getting proper and timely medical care. The knowledge of this failure in training and supervision is easily shown by the fact that employees are continually cited for not actually conducting face-to-face observations but simply scanning QR codes to falsely document an observation when none occurred. This specifically occurred with the officers failing to actually conduct a face-to-face observation with Mr. Kerber. The known and obvious consequences of Harris County's inadequate training is that detainees would suffer significant injuries and death. Failure to provide medications, proper observation, and consistent medical care to detainees with known medical conditions and/or suicidal ideations like Mr. Kerber results in those detainees'

conditions worsening and would likely result in debilitating injuries or death. The DOJ, TCJS, and even the Sheriff as explained above have all recognized this inadequate training and the likely consequences of those policies causing constitutional violations.

1125. Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Kerber's constitutional rights by being aware of the known and obvious consequences of their training policies and practices and failing to implement new or additional training policies or procedures to correct these known deficiencies.

### D'Alessandro Chavez-Sandoval

1126. Harris County's inadequate training and supervision policies, practices, and procedures pertaining to the lack of providing medical care and medications for Mr. Chavez-Sandoval's known medical needs and injuries suffered while in Jail, and the institutionalization of excessive use of force by Jail employees was the direct cause of Mr. Chavez-Sandoval's injuries.

1127. It was highly predictable that Harris County employees under the current inadequate training and supervision model would fail to provide Mr. Chavez-Sandoval with the medical care and attention needed for his medical condition and would use excessive force which resulted in Mr. Chavez-Sandoval's injuries. Officers in part due to the understaffing and overcrowding of the jail are trained and encouraged to resort to excessive force with little to no provocation or necessity but to simply put fear into detainee's lives and to cause detainees to move quicker than necessary. The known and obvious consequences of Harris County's inadequate training is that detainees would suffer significant injuries and death. Failure to provide medications, proper observation, and consistent medical care along with the use of excessive force predictably results in detainees suffering injuries or death. The DOJ, TCJS, and even the Sheriff

as explained above have all recognized these policies and the likely consequences of those policies causing constitutional violations.

1128. Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Chavez-Sandoval's constitutional rights by being aware of the known and obvious consequences of their training and supervision policies and practices and failing to implement new or additional training policies or procedures to correct these known deficiencies.

***Michael Walker***

1129. Harris County's inadequate training, supervision, and disciplinary policies, practices, and procedures, pertaining to the lack of providing medical care and medications for Mr. Walker's known medical needs and the failure to provide proper observation and monitoring of Mr. Walker to ensure that he was receiving the proper medical care and timely medical care was the direct cause of Mr. Walker's injuries.

1130. It was highly predictable that Harris County employees under the current inadequate training and supervision model would fail to provide Mr. Walker with the medical care and attention needed for his medical condition and would fail to conduct proper observations and monitoring of Mr. Walker which would hinder his getting proper and timely medical care. The known and obvious consequences of Harris County's inadequate training is that detainees would suffer significant injuries and death. Failure to provide medications, proper observation, and consistent medical care to detainees with known medical conditions like Mr. Walker results in those detainees' conditions worsening and would likely result in debilitating injuries or death. The DOJ, TCJS, and even the Sheriff as explained above have all recognized this inadequate training and the likely consequences of those policies causing constitutional violations. The numerous

incidents and ongoing non-compliance exemplifies the gross inadequacies of Harris County's training policies and procedures and show the need for the program to be changed.

1131. Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Walker's constitutional rights by being aware of the known and obvious consequences of their training policies and practices and failing to implement new or additional training policies or procedures to correct these known deficiencies.

***Daevion Young***

1132. Harris County's inadequate training and supervision policies, practices, and procedures pertaining to the lack of providing medical care and medications for Mr. Young's known medical needs and injuries suffered while in Jail, the failure to provide proper observation and monitoring of Mr. Young to provide timely and adequate medical care for the injuries inflicted by jail staff, and the institutionalization of excessive use of force by jail employees was the direct cause of Mr. Young's injuries.

1133. It was highly predictable that Harris County employees under the current inadequate training and supervision model would fail to provide Mr. Young with the medical care and attention needed for his medical condition, would fail to conduct proper observations and monitoring of Mr. Young which would hinder her getting proper and timely medical care, and would use excessive force which resulted in Mr. Young's injuries. Officers in part due to the understaffing and overcrowding of the jail are trained and encouraged to resort to excessive force with little to no provocation or necessity but to simply put fear into detainee's lives and to cause detainees to move quicker than necessary. The known and obvious consequences of Harris County's inadequate training is that detainees would suffer significant injuries and death. Failure to provide medications, proper observation, and consistent medical care along with the use of

excessive force predictably results in detainees suffering injuries or death. The DOJ, TCJS, and even the Sheriff as explained above have all recognized these policies and the likely consequences of those policies causing constitutional violations.

1134. Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Young's constitutional rights by being aware of the known and obvious consequences of their training and supervision policies and practices and failing to implement new or additional training policies or procedures to correct these known deficiencies.

***Kyle Ryker***

1135. Harris County's inadequate training and supervision policies, practices, and procedures pertaining to the lack of providing medical care and medications for Mr. Ryker's known medical needs and injuries suffered while in Jail, the failure to provide proper observation and monitoring of Mr. Ryker to provide timely medical care and prevention of detainee violence, and the inadequate handling of detainee violence was the direct cause of Mr. Ryker's injuries.

1136. It was highly predictable that Harris County employees under the current inadequate training and supervision model would fail to provide Mr. Ryker with the medical care and attention needed for his medical condition, would fail to conduct proper observations and monitoring of Mr. Ryker which would hinder him getting proper and timely medical care, and would fail to properly handle, deter, or prevent the detainee violence which resulted in Mr. Ryker's injuries. The known and obvious consequences of Harris County's inadequate training is that detainees would suffer significant injuries and death. Failure to provide medications, proper observation, consistent medical care, and preventions and interference with detainee violence predictably results in detainees suffering injuries or death. The DOJ, TCJS, and even the Sheriff

as explained above have all recognized these policies and the likely consequences of those policies causing constitutional violations.

1137.   Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Ryker's constitutional rights by being aware of the known and obvious consequences of their training and supervision policies and practices and failing to implement new or additional training policies or procedures to correct these known deficiencies.

***Eric Russell***

1138.   Harris County's inadequate training and supervision policies, practices, and procedures pertaining to the lack of providing medical care and medications for Mr. Russell's known medical needs and injuries suffered while in Jail, the failure to provide proper observation and monitoring of Mr. Russell to provide timely medical care and prevention of detainee violence, and the inadequate handling of detainee violence and the encouragement of detainee violence was the direct cause of Mr. Russell's injuries.

1139.   It was highly predictable that Harris County employees under the current inadequate training and supervision model would fail to provide Mr. Russell with the medical care and attention needed for his medical condition, would fail to conduct proper observations and monitoring of Mr. Russell which would hinder him getting proper and timely medical care, and would fail to properly handle, deter, or prevent the detainee violence which resulted in Mr. Russell's injuries. The known and obvious consequences of Harris County's inadequate training is that detainees would suffer significant injuries and death. Failure to provide medications, proper observation, consistent medical care, and preventions and interference with detainee violence predictably results in detainees suffering injuries or death. The DOJ, TCJS, and even the Sheriff

as explained above have all recognized these policies and the likely consequences of those policies causing constitutional violations.

1140.    Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Russell's constitutional rights by being aware of the known and obvious consequences of their training and supervision policies and practices and failing to implement new or additional training policies or procedures to correct these known deficiencies.

## VI.        DAMAGES

1141.    Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein.

1142.    Plaintiffs seek compensatory damages, pre and post judgment interest, costs, and attorney's fees to the maximum amounts allowed by law.

### *Victoria Simon*

1143.    Plaintiffs suffered the following damages as a direct and proximate result of Harris County's violations as identified above;

    a.    Actual damages;

    b.    Medical expenses incurred in the past;

    c.    Funeral and burial expenses;

    d.    Mental anguish and emotional distress suffered in the past by Ms. Simon;

    e.    Mental anguish and emotional distress suffered in the past and in the future by Plaintiffs;

    f.    Lost earning capacity;

    g.    Lost care, guidance, love, affection, or counsel;

    h.    Lost household services;

    i.    Lost inheritance;

     j.  Pain and suffering incurred in the past by Ms. Simon;

     k.  Lost enjoyment of life;

     l.  Loss of companionship and society;

     m.  Loss of consortium;

     n.  Pre-judgment interest; and

     o.  Post-judgment interest.

***Alan Kerber***

    1144.  Plaintiffs suffered the following damages as a direct and proximate result of Harris County's violations as identified above;

     a.  Actual damages;

     b.  Medical expenses incurred in the past;

     c.  Funeral and burial expenses;

     d.  Mental anguish and emotional distress suffered in the past by Mr. Kerber;

     e.  Mental anguish and emotional distress suffered in the past and in the future by Plaintiffs;

     f.  Lost earning capacity;

     g.  Lost care, guidance, love, affection, or counsel;

     h.  Lost household services;

     i.  Lost inheritance;

     j.  Pain and suffering incurred in the past by Mr. Kerber;

     k.  Lost enjoyment of life;

     l.  Loss of companionship and society;

     m.  Loss of consortium;

    n.  Pre-judgment interest; and

    o.  Post-judgment interest.

***D'Alessandro Chavez-Sandoval***

1145.  Plaintiffs suffered the following damages as a direct and proximate result of Harris County's violations as identified above;

    a.  Actual damages;

    b.  Medical expenses incurred in the past and will reasonably and likely to incur in the future;

    c.  Mental anguish and emotional distress suffered in the past and in the future;

    d.  Pain and suffering incurred in the past and in the future;

    e.  Lost enjoyment of life;

    f.  Physical disfigurement;

    g.  Pre-judgment interest; and

    h.  Post-judgment interest.

***Michael Walker***

1146.  Plaintiffs suffered the following damages as a direct and proximate result of Harris County's violations as identified above;

    a.  Actual damages;

    b.  Medical expenses incurred in the past and will reasonably and likely to incur in the future;

    c.  Lost earning capacity;

    d.  Mental anguish and emotional distress suffered in the past and in the future;

    e.  Pain and suffering incurred in the past and in the future;

    f.   Lost enjoyment of life;

    g.   Loss of consortium;

    h.   Physical disfigurement;

    i.   Physical impairment;

    j.   Pre-judgment interest; and

    k.   Post-judgment interest.

***Daevion Young***

1147.   Plaintiffs suffered the following damages as a direct and proximate result of Harris County's violations as identified above;

    a.   Actual damages;

    b.   Medical expenses incurred in the past and will reasonably and likely to incur in the future;

    c.   Lost earning capacity;

    d.   Mental anguish and emotional distress suffered in the past and in the future;

    e.   Pain and suffering incurred in the past and in the future;

    f.   Lost enjoyment of life;

    g.   Loss of consortium;

    h.   Physical disfigurement;

    i.   Physical impairment;

    j.   Pre-judgment interest; and

    k.   Post-judgment interest.

***Kyle Ryker***

1148.   Plaintiffs suffered the following damages as a direct and proximate result of Harris County's violations as identified above;

   a.   Actual damages;

   b.   Medical expenses incurred in the past and will reasonably and likely to incur in the future;

   c.   Lost earning capacity;

   d.   Mental anguish and emotional distress suffered in the past and in the future;

   e.   Pain and suffering incurred in the past and in the future;

   f.   Lost enjoyment of life;

   g.   Loss of consortium;

   h.   Physical disfigurement;

   i.   Physical impairment;

   j.   Pre-judgment interest; and

   k.   Post-judgment interest.

***Eric Russell***

1149.   Plaintiff suffered the following damages as a direct and proximate result of Harris County's violations as identified above;

   a.   Actual damages;

   b.   Medical expenses incurred in the past and will reasonably and likely to incur in the future;

   c.   Lost earning capacity;

   d.   Mental anguish and emotional distress suffered in the past and in the future;

   e.   Pain and suffering incurred in the past and in the future;

f.  Lost enjoyment of life;

g.  Loss of consortium;

h.  Physical disfigurement;

i.  Physical impairment;

j.  Pre-judgment interest; and

k.  Post-judgment interest.

## VII.        ATTORNEY'S FEES

1150.   Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein.

1151.   Pursuant to 42 U.S.C. § 1988(b); Plaintiffs are entitled to recover their reasonable attorney's fees and costs incurred in prosecuting the § 1983 claims against Defendant.

## VIII.        JURY REQUEST

1152.   Plaintiffs respectfully request a trial by a jury of their peers on all matters triable to a jury. Plaintiffs will tender the appropriate fee concurrently with the filing of this Complaint.

## IX.        PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiffs pray that judgment be rendered against Defendant Harris County, for an amount in excess of the jurisdictional limits of this Court. Plaintiffs further pray for all other relief, both legal and equitable, to which they may show themselves entitled.

Respectfully submitted,

**BEN CRUMP LAW, PLLC**

*/s/ Paul A. Grinke*
Paul A. Grinke
Lead Attorney
Attorney to be Noticed
State Bar No. 24032255
paul@bencrump.com
Aaron Dekle
Attorney to be Noticed
State Bar No. 24100961
aaron@bencrump.com
5 Cowboys Way, Suite 300
Frisco, Texas 75034
Telephone: (972) 942-0494
Facsimile: (800) 770-3444

**ATTORNEYS FOR ALL PLAINTIFFS**

**The Ghuneim Law Firm**

Wisam Ghuneim
Attorney to be Noticed
State Bar No. 24035702
wg@ghuneimlaw.com
4702 Spencer Hwy.
Pasadena, Texas 77505
Telephone: (281) 487-8929
Facsimile: (281) 487-0022
Designated E-Service Email Address:
eservice@ghuneimlaw.com

**ATTORNEYS FOR PLAINTIFFS
D'ALESSANDRO CHAVEZ-SANDOVAL AND
DAEVION YOUNG**