# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **D'ALESSANDRO CHAVEZ-SANDOVAL**[1], § | | |
| § | | |
| *Plaintiff,* § | | |
| § | **CIVIL ACTION NO: 4:24-cv-3072** |
| **v.** § | **Jury Requested** |
| § | |
| **HARRIS COUNTY, TEXAS,** § | |
| § | |
| *Defendant.* § | |

---

## PLAINTIFF'S SECOND AMENDED COMPLAINT

---

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW D'ALESSANDRO CHAVEZ-SANDOVAL ("Plaintiff") complaining of

HARRIS COUNTY, TEXAS, ("Defendant"), and in support thereof would respectfully show unto

the Court as follows:

---

[1] Plaintiff D'Alessandro Chavez-Sandoval is filing this Second Amended Complaint reserving all rights pertaining to the issue of joinder and to bring these claims in conjunction with the other original Plaintiffs which the Court severed.

# TABLE OF CONTENTS

I.    SUMMARY OF THE COMPLAINT ................................................................. 4

II.   PARTIES .................................................................................................... 12

III.  JURISDICTION AND VENUE ..................................................................... 13

IV.   BACKGROUND FACTS .............................................................................. 13

    A.    PLAINTIFF WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS BY HARRIS COUNTY JAIL. ........................................................................................... 13

    B.    HARRIS COUNTY'S POLICIES, CUSTOMS, PRACTICES, DEFICIENT TRAINING, AND DEFICIENT SUPERVISION WERE THE MOVING FORCE AND PROXIMATE CAUSE OF PLAINTIFF'S CLAIMS AND INJURIES. ................................................................. 22

    C.    HARRIS COUNTY'S LONGSTANDING CULTURE OF DELIBERATE INDIFFERENCE TO THE LIVES OF PRE-TRIAL DETAINEES EXEMPLIFIES THE POLICIES, CUSTOMS, PRACTICES, LACK OF TRAINING, AND LACK OF SUPERVISION THAT LED TO THE VIOLATIONS OF PLAINTIFF'S CONSTITUTIONAL RIGHTS. ................................................. 28

        i.    Harris County Was Made Aware of Its Systemic Constitutional Failures by the Department of Justice in 2009. .................................... 30

        ii.   No Later Than 2016, The Harris County Sheriff as the Policymaker for Harris County Jail Was Well Aware of the Unconstitutional "Culture" that is Prevalent in the Harris County Jail that Continues to Get Worse Specifically the Training on Excessive Force, the Excessive Force Used, the Overcrowding and Understaffing, and the Lack of Medical Care. ................ 36

        iii.  The Texas Commission on Jail Standards Identifies Numerous Constitutional Violations that Illustrate the Policies, Practices, Conditions, Lack of Training, and Lack of Supervision that Are the Moving Force in Plaintiff's Claims. ....................................................................... 48

        iv.   KHOU *Struck* Documentary Demonstrates the Rampant Policy of Officers Using Excessive Force Against Detainees and the County's Failure to Train and Supervise Their Officers. ............................................ 83

        v.    Prior And Concurrent Detainee Deaths and Injuries Due to Harris County's Unconstitutional Policies, Customs, Failure to Train, Failure to Supervise, and De Facto Policies Relating to Excessive Use of Force Incidents 88

        vi.   Prior And Concurrent Detainee Deaths and Injuries Evidencing Other Harris County's Unconstitutional Policies, Customs, Failure to Train, Failure to Supervise, and De Facto Policies. ................................... 198

        vii.  Harris County's History of Constitutional Violations Is Further Exemplified Through Testimony of Prior Employees, Witnesses, and Detainees. ................................................................................... 280

**D.    CURRENTLY KNOWN POLICIES, PRACTICES, CUSTOMS, AND/OR DE FACTO POLICIES ADOPTED AND PROMULGATED BY THE HARRIS COUNTY SHERIFF WITH DELIBERATE INDIFFERENCE WHICH CAUSED THE VIOLATIONS OF PLAINTIFF'S CONSTITUTIONAL RIGHTS.** ............................................................ **285**

**E.    CURRENTLY KNOWN TRAINING AND SUPERVISION DEFICIENCIES THAT HARRIS COUNTY PROMULGATES WITH DELIBERATE INDIFFERENCE THAT WERE THE MOVING FORCE IN PLAINTIFF'S INJURIES.** ............................................................ **287**

**V.    CAUSES OF ACTION** ........................................................................ 292

**COUNT I: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; CONDITIONS OF CONFINEMENT** .................................... **292**

**COUNT II: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; EPISODIC ACTS OR OMISSIONS** ............................... **301**

**COUNT III: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; FAILURE TO TRAIN OR SUPERVISE** .......................... **303**

**VI.    DAMAGES** ........................................................................................311

**VII.    ATTORNEY'S FEES** ......................................................................... 312

**VIII.    JURY REQUEST** ............................................................................. 312

**IX.    PRAYER** ........................................................................................... 312

**Certificate of Service** ............................................................................... 313

## I.    SUMMARY OF THE COMPLAINT

1.    The infamous history of the Harris County Jail grows daily as the band-aids used in reaction to the past claims are insufficient to reverse the longstanding policies, practices, and procedures that the Harris County policymakers have implemented, encouraged, and ratified with deliberate indifference to the constitutional rights of the detainees who are under their protection and care. Individuals who are presumed innocent are faced with the ever-present danger of significant physical injuries and death due to these unconstitutional policies before they even get their day in court. A person who walks into the jail has a strong chance of either never walking out of the jail again or walking out with physical deformities, chronic illnesses, or severe injuries. In the past several years, more people have been killed in the Harris County Jail than have been executed on death row in all of Texas.

2.    The Harris County Sheriff as the policymaker for the Jail has created a pervasive pattern and culture of injuries and death which has caused traumatic injuries to thousands of detainees and taken over sixty lives of pre-trial detainees since 2021. This pattern extends to those pre-trial detainees who have suffered needless and numerous beatings, lack of medical attention, and whose cries for help were silenced by their captors. Many of these issues stem from the rampant and systemic understaffing and overcrowding of the jail which has been a continuous problem since the early 2000s and continues to be pointed out by government agencies. In fact, the understaffing and overcrowding of the jail has a direct effect on the increased violence by officers against detainees because the officers are taught and have the practice of taking quick actions and leading to violence quicker due to the lack of time to get all functions of their job finished. Officers are overworked which makes them use excessive force to gain compliance even when no force is necessary. The lack of sufficient staffing also causes officers to overlook medical

needs of the detainees by not having enough officers to take detainees to the clinic, officers not being able to pass out medication, officers not responding to medical requests timely or at all, and officers not actually monitoring and observing the detainees to notice medical needs. Officers routinely have to take quick and unreasonable actions including by not conducting proper observations due to the lack of time to complete their tasks due to the understaffed and overpopulated condition of the jail.

3.      The consequences of these systemic issues extend even further to the families of these victims and their loved ones, who are forced to mourn deaths that occurred under questionable circumstances, and without certainty as to what happened to their family members. It is time for justice to wield her mighty hand and hold Harris County accountable for their deliberate indifference to basic human rights. These individuals deserve humanity, and they deserve life.

4.      For the past eight years, Harris County and its policy-maker Sheriff Ed Gonzalez have been objectively and subjectively aware of the deplorable conditions that face the pretrial detainees trusted to their care. During this time frame, Harris County has become a place of punishment prior to conviction and a death sentence for many who walk in its doors especially those who suffer from mental and physical disabilities. Harris County and Sheriff Gonzalez cannot claim ignorance as they have been deliberately indifferent and encouraged the ongoing policies, customs, and practices that they know cause constitutional, statutory, and common law violations to the pretrial detainees within the walls of the Harris County Jail and its associated annexes. Their indifference is compounded by the fact that despite their awareness of these ongoing violations they have failed to implement corrective or remedial customs or policies as these same injuries continue at an alarming rate.

5.      Harris County Jail's checkered history goes back a quarter of a century when in the late 1990s and early 2000s, the community called for change in the Jail as many detainees were suffering the same constitutional violations that face present-day detainees. Due to this public outcry, the Department of Justice stepped in and conducted an extensive investigation which resulted in numerous findings of unconstitutional practices and conditions within the Jail. Their 2009 Report expressly found that the number of detainee deaths was "alarming" and that the Jail's use of force exposed detainees to serious injury risks and their inadequate medical care ultimately increased the detainees' risk of death and injuries.

6.      The seriousness of the DOJ Report should have wrought drastic change within the Jail; yet, less than seven years later, Sheriff Ron Hickman admitted that the Jail had a culture of violence and a culture of using excessive force which led to detainee injuries. When Sheriff Gonzalez ran against Sheriff Hickman in 2016, Sheriff Gonzalez attacked Sheriff Hickman's handling of the Jail and stated in a debate that "We've got to end this culture that quickly leads to physical altercation." Sheriff Gonzalez specifically recognized this as a training issue that officers were making rash decisions and putting hands on detainees too quickly which escalated the situation and led to officers using excessive and unreasonable force.

7.      Both Sheriffs expressly understood what was going on in the Jail, yet nothing ultimately changed within the Jail. The Jail has been grossly overpopulated and understaffed which is a significant factor in causing the other issues in the Jail. Detainees still lacked adequate medical care. Detainees were still subjected to beatings by officers. Detainees were still subjected to routine violence amongst themselves. As one detainee said, "You fight, or you get beat up." And detainees were still dying within the Jail from the lack of proper observation and monitoring by jail employees.

8.      Since Sheriff Gonzalez's statement in 2016, the culture and medical care within the Jail has only grown worse. Statistics show that for the past four and a half years, the Harris County Jail has had more assaults within the Jail than all 251 other Texas county jails combined. Additionally, in 2022, the Harris County Jail accounted for 51% of all officer uses of force in all of Texas. In contrast, the Harris County Jail accounted for 23% of all officer uses of force in all of Texas in 2018. These assaults and officer uses of force are a consequence of the other unconstitutional policies, procedures, and practices including the lack of proper observations, overcrowding, and understaffing of the jail.

9.      The Texas Commission on Jail Standards (TCJS) has issued over a dozen reports and notices of non-compliance since Sheriff Gonzalez was elected that found that the Jail violated numerous minimum jail standards. Several of these even related to specific deaths within the Jail. Seven of these reports came between September 2022 and April 2024. Additionally, outside of the notices of non-compliance, the TCJS has issued many warnings noting discrepancies in the jail's practices and requiring additional training for the officers and staff in the jail. TCJS and the Texas Attorney General's Office has now entered into multiple remedial orders requiring drastic changes for Harris County, removing beds from the jail to require them to lower their population, and requiring new training and changes in policies that have been unchanged since 2009. This is further evidence that the Jail's conditions continue to get worse.

10.     Most pertinent to Plaintiff's claims, after the First Amended Complaint was filed, KHOU in Houston released their findings from their extensive investigation into the excessive use of force in the Harris County Jail. This documentary is called *Struck* and specifically focuses on jail officers' use of "closed fist strikes" (aka punches) to the head, neck, and body of detainees for

little to no reason.[2] Their investigation looked at over 3,000 incident reports of strikes against detainees from 2020 through 2024. KHOU with their experts and Sheriff Gonzalez's input determined that at least 810 of those incidents were cases of needless and excessive force by punching detainees in the head. Sheriff Gonzalez even admitted that the training and policies pertaining to the use of closed-fist strikes was drastically deficient and was subsequently changed in December 2024.[3] Notably, these admittedly deficient use of force training and policies were the same training and policies that the officers involved in Plaintiff's case were under and the video makes clear that these officers were resorting to the use of closed-fist strikes to Plaintiff's head under needless and excessive circumstances.

11.    The ever-growing list of prior incidents, complaints, and other lawsuits by detainees in the past five years further exemplifies the egregious pattern and practice of the Jail's policies and procedures which cause constitutional violations. As will be shown further below, even with the limited public information available to Plaintiffs, there well over 120 other individuals who suffered injuries or death because of Harris County's policies and procedures.[4] Some of these individuals were fortunate enough to live, while others exemplify the death sentence that the Jail has become.

12.    Through Harris County's deplorable policies, procedures, and customs, Plaintiff suffered significant injuries within the jail. Harris County has been aware of these policies,

---

[2] The documentary can be watched here: https://www.youtube.com/watch?v=t4viAQcAp8k. Plaintiffs incorporate this documentary and its accompanying admissions from Sheriff Gonzalez and video footage within this Second Amended Complaint. https://www.khou.com/video/news/local/struck-revisited-inside-the-harris-county-jail/285-8ed04ca0-d6dc-4eab-8221-398f8d6fbbc4.

[3] A link to the discussion on the change in the use of force policy following the *Struck* documentary. https://www.khou.com/article/news/investigations/harris-county-jail-punching-policy/285-455486bd-890e-4e01-84c9-40c0c39d1f0b.

[4] Many individuals have passed away or been injured in the jail since the First Amended Complaint was filed. *See https://www.houstonpublicmedia.org/articles/news/criminal-justice/2025/08/07/528186/families-grill-harris-county-sheriff-ed-gonzalez-over-in-custody-jail-deaths/.*

practices, and customs for over a decade prior to Plaintiff's injuries; yet, Harris County continues to endorse, ratify, and expand on these unconstitutional policies, practices, and customs. Specifically, Harris County has a culture, practice, policies, and procedures that encouraged and taught their officers to use excessive force against detainees under any circumstance. This culture is so widespread within the Jail due to the thousands of other incidents illustrated throughout this Complaint that any detainee entering the Jail is subjected to this same condition regardless of which officers are involved in their circumstance. This condition of excessive force in the Jail is the same condition that directly caused Plaintiff's injuries as the officers were each using and enforcing this policy by punching Plaintiff numerous times in the head, face, and body despite him posing no threat and minding his own business.

13.    Additionally, Plaintiff's injuries were directly caused by the officer's deliberately knowing that their force of punching Plaintiff in the head, tackling him to the ground, placing him in a hog-tie position, and continue to punch Plaintiff while on the ground would cause substantial injury and potentially life-threatening injuries and were excessive. The officers knew that Plaintiff was not posing a threat when standing against the wall minding his own business and that no force was necessary when Plaintiff merely shrugged off the officer from grabbing his shirt. Additionally, when Plaintiff was taken to the ground still no force was necessary to continue to punch him in the head and face while he was laying on the ground. Yet, despite knowing these risks and in accordance with the longstanding policies and practices of the Jail, the officers needlessly beat Plaintiff causing him substantial injuries. These officers were acting in accordance with the longstanding policies and practices of the Jail which the Sheriff and Jail leadership were aware of, yet the policymakers did not make any changes to the policies, conditions, and culture of the Jail despite knowing that their officers were using excessive and deadly force against detainees on a

routine basis. The County was deliberately indifferent to these dangers and continued to permit them as admitted by Sheriff Gonzalez eleven months later when he stated that the officers had a pattern, culture, and policy of resorting to using punching to the head and neck of detainee for minor slights and that this can constitute deadly force and is unnecessary.

14.    Plaintiff's injuries were also caused by the overcrowding and understaffing of the Jail. Since 2009, the Jail has a history of being overcrowded and understaffed with the Jail not having enough officers to handle even the most basic jail functions. Floors of the jail routinely do not meet minimum staffing requirements and even when sufficient staff are assigned to the floor staff are routinely having to leave the floor and assist either with other floors, the clinic, or for routine purposes leaving the floor with insufficient staffing. This condition has been admitted to by the Sheriff and other county and jail leadership numerous times over the past decade. The DOJ, TCJS, and experts illustrate the direct impact the understaffing and overcrowding has on the detainees and the officers. It causes the officers to be overworked, tired, and leads them to making rash decisions to get the quickest results. This can be seen directly with Plaintiff where the officer in accordance to this condition and caused by the overcrowded nature of the Jail, the specific room Plaintiff was in, and the lack of officers to handle routine tasks, the officer immediately began punching Plaintiff and escalating the situation which was unnecessary. This condition of overcrowded and understaffed was a direct cause of Plaintiff's injuries because the officer's actions were a direct result of the conditions of the Jail. Similarly, the jail does not have enough staff to handle the medical care of the detainees which directly impacted Plaintiff's medical care following the excessive force. Instead of taking Plaintiff immediately to the clinic to get care, the officers placed him in a solitary cell and left him restrained for a long period of time. Even when he was taken to the clinic, the clinic staff is understaffed and overworked which led to them doing

a cursory review and not providing the medical care needed. Ultimately, this condition caused Plaintiff's injuries.

15.    Defendant's training practices, policies, and programs are grossly deficient amounting to deliberate indifference to the care, safety, and protection of the detainees. Specifically, as admitted by Sheriff Gonzalez in December 2024, at the time of Plaintiff's incident, the Jail's training program was deficient in training officers on the appropriate use of force, the use of de-escalation techniques, and how to handle detainees in the Jail. Jail officers are only provided a few weeks of classroom time and then spend the rest of their training learning on the job from other officers who were likewise incorrectly trained. The domino effect applies here because improperly trained officers are following other improperly trained officers and are learning bad habits, techniques, and use of force from those officers. Sheriff Gonzalez admitted that officers were not properly trained on the use of punches to a detainee often resulting in officers using punches as a matter of first-resort instead of using it only when there is life-threatening situations. Punches to the head, neck, or other parts of the body can constitute deadly force, but officers on a routine basis and in accordance with the policies and training of the jail were using punches for any perceived slight or to gain quick responses from the detainees. Officers are taught to lay hands on a detainee for any small situation which needlessly escalates a situation. Officers are not taught to de-escalate or to step back and take their time in handling a situation which is the proper action especially in a jail where the detainees are not at risk of fleeing and are within a controlled situation which can be handled at a later time.

16.    This gross inadequacy in training is exemplified in Plaintiff's situation as the officer can be seen on the video immediately putting his hands on Plaintiff's jacket and then immediately punching Plaintiff in the face merely because Plaintiff shrugged off the officer's grasp. Plaintiff

did not threaten the officer and did not use any force against the officer, but the officer immediately began punching Plaintiff even after getting him to the floor. This is in accordance with the training of the jail where officers are trained to immediately use this deadly force for any perceived slight and even after getting the detainee on the ground to gain "compliance." The County and Sheriff were aware of this deficiency and the threat that these actions can cause injuries and death to the detainees as can be seen by the thousands of similar incidents that occurred prior to Plaintiff's injuries, yet they did not change their training. Similarly the officers were trained not to immediately provide medical care to injured detainees and many times leave detainees in vulnerable conditions, lie to the nursing staff about the detainees' condition, and only due cursory care without actually providing the medical care needed for that detainee. This lack of training or improper training directly caused Plaintiff's injuries by increasing the pain and suffering he was undergoing and hindering the healing process.

17.    Harris County must provide compensation for these injuries and be deterred from continuing these practices otherwise there will be a never-ending line of victims who also must receive compensation. Plaintiff joins with the scores of other plaintiffs who have brought claims against Harris County for the injuries suffered in the jail. Thus, Plaintiff asks that justice be done.

## II.    PARTIES

18.    Plaintiff D'Alessandro Chavez-Sandoval is an individual residing in Harris County, Texas.

19.    Defendant Harris County is the government entity responsible for the Harris County Sheriff's Office which is in turn responsible for the Harris County Jail where Victoria Simon, Daevion Young, Michael Walker, Kyle Ryker, Eric Russell, Alan Kerber, and D'Alessandro Chavez-Sandoval suffered their injuries and/or died. Harris County is located in the Southern

District of Texas. Harris County may be served with this Complaint by and through Harris County

Judge Lina Hidalgo at 1001 Preston, Suite 911, Houston, Texas 77002.

## III.    JURISDICTION AND VENUE

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343

because Plaintiffs are suing for relief under 42 U.S.C. § 1983.

21.    Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391

because Defendant is located in the Southern District of Texas, and all or a substantial part of the

causes of action accrued in the Southern District of Texas.

## IV.    BACKGROUND FACTS

22.    Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.[5]

### A.  PLAINTIFF WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS BY HARRIS COUNTY JAIL.

23.    Plaintiff suffered injuries caused by Harris County's pervasive acts and omissions

which were sufficiently extended and pervasive to constitute the policies and conditions of Harris

County.

24.    Harris County rarely discloses video footage of incidents inside the jail. However,

when they do, the video footage reveals wrongful actions and inactions on behalf of the County

and its officers. A great example is the case of D'Allesandro Chavez-Sandoval who was

unjustifiably and brutally assaulted by numerous Harris County officers while he was waiting in

line to be processed. This story is very similar to Jacoby Pillow, Jeremy Garrison, John Coote,

---

[5] Plaintiff's claims arise out of the same transaction, occurrence, and series of transactions and occurrences and involve significant questions of law and fact common to all Plaintiffs and to the other similar incidents identified in this Complaint. For example, the ongoing pervasive policies, practices, and procedures of Harris County that led to the constitutional deprivations of Plaintiff's rights are identical amongst the different Plaintiff's claims and the similar incidents, statistics, DOJ Report, and the TCJS notices. Plaintiff is reserving his right pertaining to the joinder of the severed Plaintiffs in the same case.

Jaquaree Simmons, Taylor Euell, and multiple others. Fortunately, Mr. Chavez-Sandoval survived his beating.

25.    On January 18, 2024, Mr. Chavez-Sandoval turned himself into the jail because his ankle monitor had run out of battery.

26.    On January 19, 2024, Mr. Chavez-Sandoval was in the Joint Processing Center in the Harris County Jail waiting to be processed.[6] While standing against a wall with several other individuals, an officer for no reason began yelling at him from across the room. When the officer approached Mr. Chavez-Sandoval, the officer needlessly grabbed Mr. Chavez-Sandoval's shirt. The officer laid hands on Plaintiff pursuant to the common practices, culture, conditions, and training within the Jail where officers are trained to escalate situations by putting hands on the detainees for the smallest perceived slights or reasons. Plaintiff harmlessly pulled away from the grab as he was planning on following the officer. Shrugging off the officer's hand was not a threat and did not pose any danger of harm to the officer or others.

27.    Shockingly, without warning, as Mr. Chavez-Sandoval pulled away, the officer threw numerous punches at Mr. Chavez-Sandoval's face and head. The officer was acting in accordance with his training and the policies and conditions of the jail that use of punches to the head and face of a detainee is acceptable despite the clear danger of severe injury or death. The officer was not under any threat of harm yet the officer used this deadly force without warning as part of his training for the perceived slight of Plaintiff pulling away from the officer. At no point is the use of punches to the head or face of a detainee appropriate when the detainee is merely pulling away even if the detainee is not being compliant or is being belligerent.

---

[6] The video of the incident is available online at: https://www.fox26houston.com/news/video-altercation-inmate-harris-county-jail-guards-investigation.

28.    Mr. Chavez-Sandoval, understandably, tried to defend himself from this excessive force which he has a right to do. However, Mr. Chavez-Sandoval did not stand a chance as several other officers also began throwing punches and tackling Mr. Chavez-Sandoval to the ground in accordance with the policies, conditions, and training of the jail that whenever a detainee is defending themselves or a situation requires deescelation the officers escalate the situation and join into a fight by also throwing punches, kicks, or strikes against the detainee even though they were not present for the situation. It is a common practice, training, condition, and policy for multiple officers to get on top of a detainee while he is on the ground and continue to punch him even though he poses no threat. Many times this is illustrated when the detainee has his hands stuck under him due to the force of the bodies of the officers on top of him. In accordance with these conditions, policies, and training, while Mr. Chavez-Sandoval was on the ground, the officers placed him in a hog-tie position by holding his hands behind his back and pulling his ankles towards his back. This position is illegal in many states and is against proper standards as it leads to detainee deaths and injuries. During this time, one officer was still standing over Mr. Chavez-Sandoval throwing punches while he was lying defenseless face down on the ground. No basis for throwing punches at a detainee who is being held to the ground but this is according to the training and policies of the jail. Eventually, the officers pulled him off the ground and escorted him to a solitary cell instead of taking him immediately to the clinic for medical attention. The video shows Mr. Chavez-Sandoval's blood on the ground where he was lying face down while the officers were on top of him.



*Officer in the top right square and Mr. Chavez-Sandoval in the bottom left square.*





*Officer grabbing Mr. Chavez-Sandoval and throwing the first punch when Mr. Chavez-Sandoval pulled away.*

29.    Another video shows that after the beating, Mr. Chavez-Sandoval was transferred to a solitary cell with his face swollen and bloody.[7] Mr. Chavez-Sandoval was then left in this cell with his hands and feet tied. Plaintiff should have been immediately taken to the clinic to be treated for his injuries and the pain and suffering he was experiencing, but pursuant to the policies and practices of the Jail, the officers left him in his cell without receiving any medical treatment allowing him to continue suffering. He was left restrained in this position for several hours before being taken to the clinic where he only received a cursory evaluation and was not properly evaluated for head injuries or other life-threatening injuries. Plaintiff was not provided the proper medical care for his injuries but was sent back to a cell with little to no medication.

30.    Per Harris County's policies, practices, and procedures, Harris County charged Mr. Chavez-Sandoval with assaulting an officer even though the video clearly shows the officer attacking Mr. Chavez-Sandoval first. This false charge was made to cover up and defend the officers involved. Thankfully the charges were dropped as they were completely false. During this

---

[7] https://abc13.com/harris-county-jail-inmate-beating-caught-on-camera-dalessandro-chavez-sandoval/14393315/

time, Mr. Chavez-Sandoval became aware that Daevion Young was also beat up by an officer for no reason.

31.     Due to these egregious actions, Mr. Chavez-Sandoval suffered several facial injuries and a hurt back. The officers punched Plaintiff multiple times due to the training that they received in the Jail. Officers were taught to throw punches at any perceived slight or were failed to be taught that punches are a form of deadly force and should only be used in extreme circumstances. Officers were not trained on proper de-escalation practices leading them to escalate situations such as the officers in this case laying hands on Plaintiff immediately and begin throwing punches at Plaintiff. The officers were also not trained on the proper use of punches and force while detainees are restrained or on the ground. This lack of training resulted in officers punching Plaintiff and other comparator detainees when they are on the ground while under the control of the officers and while laying on the ground with multiple officers on top of him. These training deficiencies are consistent with the policies and practices of the Jail.

32.     Defendant knew that these training deficiencies existed due to the thousands of similar incidents which occurred in less than an eight-year period prior to this incident. Sheriff Gonzalez knew or should have known that their officers were failing to de-escalate situations and were immediately resorting to the use of punches and other forms of excessive force that they knew could cause and did cause substantial bodily injuries and even death. Yet, Sheriff Gonzalez permitted this practice for his entire tenure until December 2024, when KHOU exposed the actions of the Jail and put forward the culture and training of the Jail for the public to see. Only after this public exposure did Sheriff Gonzalez fully admit to the training and policy deficiencies and change its policy on the use of force. However, this change in the written policy has not made any change in the practices or hands-on training of the officers as these excessive force actions continue to

occur.[8] KHOU illustrates perfectly that officers were directly trained and permitted to use excessive force and fail to de-escalate hundreds to thousands of incidents involving detainees by allowing them to punch detainees for the smallest perceived slights. This same deficient training was the moving force in Plaintiff's injuries.

33.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Chavez-Sandoval's injuries. The officers were the embodiment of the conditions of the jail where detainees are routinely subjected to the use of excessive force by officers resulting in their injuries or death. The officers were enforcing the conditions of the jail of failing to de-escalate, intentionally escalating the situation, and using deadly force of punching Plaintiff in the head over a dozen times without a reasonable basis and while laying on the ground.

34.     Harris County Jail's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees and created the environment which intensified the violence against detainees which were the direct cause and moving force of Mr. Chavez-Sandoval's injuries. Overcrowding and understaffing the jail resulted

---

[8] July 2025 officers beat and killed a detainee suffering a mental health crisis by using excessive force including knees to the detainees head even when he was on the ground. Plaintiff incorporates that video footage and articles pertaining to this incident as they illustrate the ongoing issues and lack of training in the jail. https://www.youtube.com/watch?v=WiTNmkBJ0Xs. https://www.houstonpublicmedia.org/articles/news/criminal-justice/2025/08/01/527738/video-footage-shows-officer-altercation-that-led-to-death-in-harris-county-jail/.

in the officers resorting to violence too quickly to get a quick result from the detainee instead of following proper techniques to get compliance, increases the stress and psychological outlook of these officers resulting in them making poor decisions and resulting in excessive force such as in this case. It also slowed down the intake process and classification process which led to Mr. Chavez-Sandoval waiting in the processing area for longer than necessary and remaining tied in his cell for longer than necessary. The understaffing and overcrowded nature of the Jail led the officers to resort to violence quickly and deprived them of the opportunity or mindset to take the time to de-escalate the situation which was a moving force in causing Plaintiff's injuries.

35.    Plaintiff's injuries were also directly caused by and a moving result of the failure to supervise the officers in the Jail. Harris County's rampant failure to supervise their officers is illustrated by the numerous officers joining into the assault on Plaintiff including supervisors and superior officers without any officer attempting to prevent the continued assault on Plaintiff. Officers within the jail who interact with detainees are not provided any supervision by their superiors that would discourage their use of force or cause them to take time to de-escalate a situation. Instead, the supervisors encourage the officer's conduct and join in with the use of force. Supervisors do not discipline or correct the actions of the junior officers, but instead, routinely exhibit the very inappropriate uses of force and failure to provide medical care. The officers do not audit or review the actions of the officers to determine if they were reasonable and do not discipline the officers for their use of force. Even when officers are allegedly violating policies, the officers are not disciplined or eventually have the violations ratified by their supervisors.

36.    The officers in the jail have duties to deal with detainees in a person-to-person manner where they should be supervised to encourage de-escalation and to provide support for an officer if de-escalation techniques are not working. The numerous incidents within the jail of

officers using excessive force against detainees show that the officers are not being properly supervised as they are being placed into situations that they are unprepared for or that they can commit these excessive force actions without the fear of any repercussions. Defendant is deliberately indifferent to this lack of supervision because the painfully obvious result of failing to supervise officers who interact with detainees is that the officers will use actions they deem appropriate including excessive force. This failure to supervise the officers is the moving force in Plaintiff's injuries as the officers were not supervised at all to deter these actions and their supervisors joined and encouraged these actions. The failure to have supervisors enforcing policies or preventing excessive force will foreseeably lead to the injuries and even death of detainees under their care.

37.    Harris County Jail's rampant practice and policies of failure to provide adequate medical care was also a direct and moving cause of Plaintiff's injuries. Harris County has a policy of failing to provide medical care to detainees who suffer head injuries by failing to provide thorough evaluations for life threatening injuries and sending the detainees back to their cells. Plaintiff was not properly evaluated and was placed into a solitary cell while remaining restrained instead of being taken to the clinic. When taken to the clinic, Plaintiff was not properly evaluated for a head injury, concussion, or provided proper medication and treatment for his clearly visible injuries. This was a moving force in the continued pain and suffering he experienced and the ongoing injuries that he suffered as a result of the lack of medical care.

38.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Chavez-Sandoval suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

**B. HARRIS COUNTY'S POLICIES, CUSTOMS, PRACTICES, DEFICIENT TRAINING, AND DEFICIENT SUPERVISION WERE THE MOVING FORCE AND PROXIMATE CAUSE OF PLAINTIFF'S CLAIMS AND INJURIES.**

39.    Due to the actions, policies, practices, and customs of Harris County, Plaintiff suffered significant injuries. Each of the following policies, practices, and customs were the direct cause and moving force of Plaintiff's injuries. Harris County adopted, ratified, and maintained these policies, practices, procedures, and customs with objective deliberate indifference especially in light of the numerous deaths and injuries suffered by detainees as a result of these policies.

40.    ***Policy, Culture, and Condition of Excessive Force by Officers Against Detainees.*** Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages officers to use excessive force as a means of punishment and retaliation, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in the injuries to Plaintiff. These policies include the policy and practice of the officers using closed-fist strikes to

Plaintiff's head and face for any perceived slight when Plaintiff posed no threat of harm to any person. Additionally, the officers used closed-fist strikes even while Plaintiff was being held by officers and while being restrained on the ground when Plaintiff again posed no threat of harm. Harris County's policy permitting the use of this deadly force against detainees and escalating situations instead of de-escalating them were one of the moving forces in Plaintiff's injuries.

41.     Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law. Harris County has known of thousands of instances where officers have used this same excessive force against detainees and have continued to permit this force, train this use of force, and failed to discipline the officers. Harris County's supervisors are even involved in these uses of force ratifying the actions.

42.     ***Policy, Culture, and Condition of Failing to Provide Appropriate Medical Care to Detainees.*** Harris County's policies, procedures, customs, and practice of not providing appropriate medical care to their detainees, failing to provide medication or medical attention for known medical needs and ongoing complications with injuries received while in jail, failing to fully and properly evaluate and diagnose injuries and ongoing medical treatment, failing to place detainees in the appropriate facility in light of their known medical needs, failing to change observation patterns in light of ongoing medical conditions, and falsifying medical treatment and diagnoses resulted in the deliberate indifference to the known and obvious risks which led to the deprivation of the constitutional rights and the injuries of Plaintiff. The policy, procedures, and customs of not providing medical attention to Plaintiff by placing him into a solitary cell instead of immediately taking him to the clinic for full medical evaluation is consistent with this policy. Additionally, the policy of only doing cursory evaluations of detainees with visible head injuries,

only providing minimal medication or attention, and sending the detainee back into general population were the policies and procedures and conditions of the Jail that were moving force in Plaintiff's injuries.

43.    ***Policy, Culture, and Condition of Understaffing and Overcrowding the Jail.*** Harris County's rampant practice and policies of understaffing and overcrowding the jail was a moving force in Plaintiff's injuries. Sheriff Gonzalez has admitted multiple times that the Jail is understaffed and overcrowded. This condition of the Jail was the moving force in Plaintiff's claims because this condition, policy, and culture encourages violence and needless escalation of force by officers against detainees by impeding the amount of time the officers have to do tasks, prevents them from taking proper de-escalations, encourages them to escalate situations quickly to be able to move on to the next task, impedes the amount of officers available to complete the needed tasks, and increases the tension between officers and detainees by encouraging officers to have to show force as an example to the other detainees. As Sheriff Gonzalez stated, the understaffing and overcrowded nature of the Jail makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring." This condition also impedes Plaintiff's access to medical care by interfering with the number of clinic staff to see the detainee, increases the number of detainees in the clinic at a time, impedes the officers ability to have the time to attend to medical needs leading to them placing detainees into holding cells for long periods instead of taking them to the clinic, and reduces the number of officers on each floor to handle the population and still respond to medical needs.

44.    It was highly predictable that Harris County employees would follow these ongoing policies and practices as these policies and practices are expedient and engrained into the culture of the Jail for over a decade which has caused a rolling training issue. The known and obvious

consequences of Harris County's policies and practices of using excessive force, failing to provide medical care, and understaffing and overcrowding the jails is that detainees would suffer injuries and death from these ongoing policies. The DOJ, TCJS, and even the Sheriff as explained below have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

45.    Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Plaintiff's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in the injuries and deaths of Plaintiffs. Additionally, the officers and employees involved in each of the actions knew that their actions would pose a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference to those rights.

46.    ***Training Deficiencies in the Jail.*** Harris County failed to train their officers on multiple areas which was the moving force in Plaintiff's injuries. Defendant's training deficiencies are never ending issue because all officers in the jail received the majority of their training from working on the job following other similarly deficiently trained officers and following their example. Pertaining to Plaintiff, Defendant failed to train their officers on proper de-escalation techniques and using those techniques in practice but instead officers are trained to escalate situations by placing their hands on detainees quickly and immediately resorting to force to gain obedience or in response to any perceived slight. Defendant failed to train their officers on the proper force to use including by training them to use deadly force by punching detainees in the head, neck, and face as a matter of first resort. Officers routinely resort to punching detainees in the head and face at the smallest provocation even when the detainee is not posing a threat. Officers

are taught that strikes to the head and face are appropriate even when other officers have restrained the detainee, the detainee is face-down on the ground, or when the officers have hold of the detainee. Defendant also failed to train their officers and staff on providing medical care to their detainees as the officers instead delay taking detainees to medical care and then only receive a cursory evaluation without evaluating each case with a full medical evaluation. Officers should be trained that they should de-escalate a situation before placing their hands on the detainee, that they should step back and take their time in handling a detainee, and that use of strikes to the body should only be done as a matter of last resort when there is a clear threat of imminent injury or death.

47.    Defendant is or should be aware of these training deficiencies as identified below by the Sheriff's own admissions over the past decade and based on the numerous other incidents where officers take these same actions across the whole Jail. These are not simply actions of a handful of officers, but are the actions of most if not all of the officers in the Jail. Instead of correcting these issues, the Sheriff has encouraged and permitted this training to be ongoing resulting in thousands of detainees suffering injuries at the hands of the inadequately trained officers. This failure to train is evident in Plaintiff's claims as the officers, if properly trained, would not have placed their hands on Plaintiff, would not have immediately resorted to throwing punches against detainee, would not have continued to punch Plaintiff while restrained by the officers, and would have immediately provided medical care and a full medical evaluation to Plaintiff. These training deficiencies were a moving force in Plaintiff's claims.

48.    ***Supervision Deficiencies in the Jail.*** The County's supervision plan and supervision of its officers is wholly deficient and ultimately a moving force in Plaintiff's injuries. The Jail fails to supervise its officers who are interacting with detainees by not having sufficient

supervisors within reach of the floors and officers on the floors. The supervisors also do not observe or monitor their officers allowing the officers to act in the manner they see fit including in immediately resorting to the use of force and escalating situations needlessly when they do not like a detainee's response or actions. The supervisors do not audit, review, or supervise their officers in any manner to make sure that policies are being followed, that proper force is being used, or that de-escalation techniques are being used. Instead, the supervisors are themselves joining into the use of excessive force as can be seen in this case when the supervisors also joined into the assault. The supervisors are also not disciplining or correcting their officers. Instead, the officers are mimicking the actions of their supervisors when interacting with detainees.

49.    Officers in jails that deal with detainees must have close supervision to ensure that they are not abusing detainees within their custody. Officers that interact with detainees must also be supervised to make sure they are de-escalating situations with detainees and have sufficient officers in place to handle detainees without the need to resort to immediate use of force. Officers also must be supervised to review their actions to correct incorrect decisions and to provide discipline. However, Defendant had no supervision policy with supervisors not paying attention to the officers under their control, supervisors not disciplining officers who abuse their power, or supervisors not enforcing the written policies of the Jail. The obvious consequence of allowing officers in a jail to be unsupervised will include the use of excessive force, failing to de-escalate, officers abusing their power, and officers failing to provide medical care to detainees. Each of these deficiencies in the supervision plan were a moving force in Plaintiff's injuries as the officers acted with impunity and resorted to excessive force immediately with the supervisors joining into the use of force itself. The failure in the supervision of the officers also resulted in Plaintiff being

placed in solitary confinement instead of being taken to the clinic and resulted in the clinic only doing a cursory review instead of providing full medical attention.

50.     Each of the policies taken above and in context with Plaintiff's injuries were promulgated, enforced, ratified, and created by Harris County's policymakers including Sheriff Gonzalez. The Harris County Sheriff is the policymaker for the Jail regardless of the individual who is in that role. Harris County has been aware of these policies, practices, and customs since at least 2009 as shown below and continue to have these problems as admitted by Harris County and its policymakers as recently as June 4, 2024, in front of the Harris County Commissioners. Each of the policies and conditions can be considered individually and in the aggregate.

### C. HARRIS COUNTY'S LONGSTANDING CULTURE OF DELIBERATE INDIFFERENCE TO THE LIVES OF PRE-TRIAL DETAINEES EXEMPLIFIES THE POLICIES, CUSTOMS, PRACTICES, LACK OF TRAINING, AND LACK OF SUPERVISION THAT LED TO THE VIOLATIONS OF PLAINTIFF'S CONSTITUTIONAL RIGHTS.

51.     Harris County's rampant constitutional failures go back for the better part of two decades. When looking back at the Jail's most recent history, the records and information available to the public creates a trail of constitutional violations that has steadily grown year over year. The information available to the public only shows the tips of the icebergs that make up this trail, but the tips of the icebergs are more than sufficient to draw the conclusion that Defendant has ongoing policies, practices, procedures, training deficiencies, supervision deficiencies, and customs that are the moving force behind the violation of Plaintiff's constitutional rights leading to his injuries.

52.     Harris County attempts to hide what happens behind the doors of the Jail, but a few public records are available to give insight into the ongoing pervasive nature of the deplorable conditions behind those doors. These records include an investigation by the Department of Justice, numerous investigations and non-compliance reports by the Texas Commission on Jail Standards, remedial orders by the Texas Attorney General, multiple admissions by the Harris

County Sheriffs of the "culture" within the Jail including the failure to train officers on use of force, statistics gathered and reported by the Harris County Sheriff showing the violent nature of the Jail which are a byproduct of the unconstitutional policies, practices and procedures identified in this case, the *Struck* documentary identifying hundreds of similar use of force incidents and training deficiencies pertaining to the use of punches by officers, and numerous incidents involving similar facts and injuries suffered by other Harris County Jail detainees over the years. Then on top of these public records, numerous detainees are involved in similar actions simultaneously which also exemplify the policies of Harris County.

53.     Each of the items below identify issues within the Jail which exemplify the existence and extent of the policies, procedures, culture, failure to train, and failure to supervise which are asserted in this case. For example, the incidents and reports that show a failure of officers to monitor or observe detainees is a byproduct and example of the understaffed and overcrowded nature of the jail that interferes with officers being able to observe and monitor detainees. Additionally, this exemplifies the indifferent nature the officers are to the conditions and care of the detainees and illustrates the failure to provide medical care as they fail to observe medical needs of the detainees. Likewise, detainee-on-detainee assaults also illustrate the Jail's inability to handle the conditions of the Jail do to its overcrowded and understaffed nature and also shows their failure to observe and monitor the detainees. These assaults also illustrate the failure to provide medical care as they fail to respond properly and provide medical care to these detainees in a timely and sufficient manner.

i.    **Harris County Was Made Aware of Its Systemic Constitutional Failures by the Department of Justice in 2009.**

54.    The deplorable conditions and nature of Harris County Jail grew to such a degree that the Department of Justice was forced to investigate the Jail for constitutional violations beginning in March 2008.[9] DOJ Report at 1.

55.    What the officials found were "systemic deficiencies" throughout the Jail. *Id.* To summarize their findings, the DOJ found:

> [W]e also conclude that certain conditions at the Jail violate the constitutional rights of detainees. Indeed, the number of inmate deaths related to inadequate medical care, described below, is alarming. As detailed below, we find that the Jail fails to provide detainees with adequate: (1) medical care; (2) mental health care; (3) protection from serious physical harm; and (4) protection from life safety hazards.

*Id.* at 2.

56.    Notably, the Jail had over 9,400 detainees at the time the DOJ inspected. *Id.*

### *Unconstitutional Medical Care*

57.    Regarding medical care, the DOJ found significant deficiencies in multiple areas:

> [T]he Jail fails to provide consistent and adequate care for detainees with serious chronic medical conditions. . . .These deficiencies, in themselves and when combined with the problems in medical record-keeping and quality assurance discussed below, are serious enough to place detainees at an ***unacceptable risk of death or injury.***

*Id.* at 3 (emphasis added).

58.    Specifically, "Because of **crowding**, administrative weaknesses, and resource limits, the Jail does not provide constitutionally adequate care to meet the serious medical needs of detainees with chronic illness." *Id.* at 4 (emphasis added). Chronic illness includes diabetes and heart disease. *Id.* This exemplifies the early conditions of the jail showing the interaction between

---

[9] Plaintiffs ask the Court to take judicial notice of the Department of Justice report from June 4, 2009 ("DOJ Report"). Plaintiffs will cite to the page numbers of that report as it appears to the public.

the deprivation of medical needs of the detainees and the overcrowded and understaffed nature of the Jail. Detainees routinely did not receive the medical care they needed.

59.    The DOJ reported that physicians and nurses routinely fill out paperwork incorrectly stating that evaluations were done when in fact they were not completed. *Id.* This is another byproduct of the overcrowded and understaffed nature of the Jail as officers and staff were taking shortcuts to deprive detainees of their medical care and get them back to their cells quickly. The Jail lacked sufficient processes to identify detainees with chronic illnesses who were worsening or unwilling to notify the staff of their illness. *Id.*

60.    "Problems with chronic care assessments are particularly pronounced in the assessment of detainees receiving medications." *Id.* Medications were not monitored, were not routinely given out, dosages were provided in varying levels with potentially fatal combinations, and the effects of the medication were not followed up with. *Id.* at 4–5.

61.    The DOJ noted that the Harris County Jail's clinic was a "makeshift emergency room" that was insufficient to meet the needs of the thousands of detainees within the Jail. *Id.* at 5–6. The process for requesting care was insufficient "due to crowding, staffing limits, and some problematic practices." *Id.* at 6. Some of these practices include having inadequate oversight for detainee requests for medical care and significant delays in responding to medical requests. *Id.* In fact, Harris County has the same trend of deleting medical requests after being processed with no confirmation or follow-up to confirm that the medical issue had been resolved. *Id.* Each of these ongoing issues is illustrated in Plaintiff's case as the staffing and crowding issues impeded Plaintiff being taken to the clinic immediately causing aggravation of his injuries and impeding his medical care and when finally seen in the clinic the cursory evaluation did not provide the proper medical care or attention needed for his injuries.

62.    "[T]he detainees have a difficult time first accessing the clinic, [exactly the same with Plainiff] and then receiving continuity of care." *Id.* "Detainees with mental illness are an especially high[]risk group." *Id.*at 6–7. "Detainees with mental illness, especially those who are acutely psychotic or suicidal, may not even try to use the sick call process to obtain continuing treatment of their conditions." *Id.* at 7.

63.    The DOJ points to multiple incidents within the Jail that are illustrate the impediment to medical care experienced by detainees including Plaintiff. For example, the DOJ noted that a detainee went to the clinic complaining of swelling in his legs. *Id.* at 7. Medical prescribed blood pressure medication even though the detainee's blood pressure was normal. *Id.* When the detainee's condition worsened, the clinic did not change his treatment plan despite sending him to the hospital. *Id.* at 7–8. Ultimately, the detainee died. *Id.* at 8. Another example is a diabetic detainee who complained of swelling in their legs. *Id.* at 7. The medical staff only prescribed pain medication and kept sending the detainee to their cell. *Id.* Eventually, while waiting in the clinic, the detainee collapsed and passed away. *Id.*

64.    Similar to Plaintiff, "many of the detainees with serious medical conditions cannot be adequately identified or treated. . ." *Id.* at 6. The jail's medical systems provide a significant delay in detainees receiving care. "[I]ndividuals who may need more intensive or immediate care receive the same level of attention as those with relatively low priority needs." *Id.* Similarly, Plaintiff did not receive immediate care despite the potential for life-threatening head injuries and when he was finally seen by medical they failed to conduct a thorough evaluation due to their lack of staffing and sent him back to his cell with little to no medication.

65.    The DOJ further found that the Jail had significant issues with its record keeping with notes being illegible and containing "factually inaccurate documentation." *Id.* at 8. The DOJ

found that the Jail's care of detainees with mental illnesses was especially deficient. The DOJ found that the Jail had at least 2,000 detainees in need of psychotropic medications. *Id.* at 9. Instead of having specialized housing for those with mental illnesses, the detainees were typically kept in general population or a few single cells or dormitories. *Id.* This was a direct example of the overcrowded nature of the Jail.

66.    "[D]etainees with serious mental health conditions often cannot obtain timely and appropriate care. These deficiencies violate generally accepted correctional mental health standards." *Id.* at 9–10. Unless a detainee falls within a limited category of suicidal and homicidal tendencies, "detainees must wait for treatment, often for significant periods of time, if they receive mental health treatment at all." *Id.* at 10.

67.    The DOJ found that many detainees who had not received proper mental health care including medications and follow up care were involved in more "altercations" with staff and with other detainees leading to injuries. *Id.* at 10–12. This shows how medical care, staffing, and population have a direct correlation with officer uses of force. Detainees with a history of seizures would not receive medication upon arrival in the jail and would suffer seizures within a few days of being in the Jail leading to injuries. *Id.* at 11.

68.    The DOJ examples include many detainees who were "evaluated" by the clinic and sent back to their cell either with little to no medication or evaluation and the individual passed away shortly thereafter. *Id.* at 12–14. Although Plaintiff is fortunate to have survived his time in the Jail, Plaintiff likewise received little to no medication or evaluations despite his obvious injuries and the potential for life-threatening conditions that would result from those injuries.

69.    The DOJ specifically noted multiple issues in the Jail's suicide prevention policies:

> In general, a comprehensive system for providing adequate mental health care should also include policies, procedures and practices to prevent detainee suicides. Because suicide prevention is itself an important legal concern, we note specifically that the Jail has a number of conditions that are dangerous for suicidal detainees.
>
> First, the Jail lacks adequate video surveillance and supervision in various holding areas. Some of the cells used for housing newly arrested detainees include unsafe physical fixtures (e.g., exposed bars) that can be used to facilitate suicide. While the Sheriff's Department was in the process of retrofitting these cells during our tour, such efforts need to be broadened. Many of the mental health holding areas throughout the Jail appear to be clinically inappropriate. For instance, padded rooms in administrative separation and maximum security units are difficult to supervise and the conditions are so stark, they can cause a detainee with mental illness to degenerate.
>
> Second, the detainees' generally limited access to mental health care can be especially dangerous for suicidal detainees, since suicidal detainees may not be particularly inclined to seek care on their own. Thus, adequate screening and pro-active efforts to identify and treat suicidal detainees are necessary to ensure compliance with minimum standards of care.

*Id.* at 14. These issue provide for examples of the overcrowded and understaffed condition of the Jail.

### *Unconstitutional Policies Concerning Detainee and Officer Violence*

70.     One main area that the DOJ found as unconstitutional was "significant and often glaring operational deficiencies" in security matters including lacking: "(1) a minimally adequate system for deterring excessive use of force, and (2) an adequate plan for managing a large and sometimes violent detainee population." *Id.* These same issues existed continuously from the date of this report until Plaintiff's incident.

71.     In addressing this area, tellingly, the DOJ started their analysis with: "We have serious concerns about the use of force at the Jail." *Id.* at 15.

72.     "Indeed, we found significant number of incidents where staff used inappropriate force techniques, often without subsequent documented investigation or correction by supervisors." *Id.* The staff would fail to properly investigate the use of force when used with

inaccurate documentation and relying exclusively on officer statements. *Id.* "Jail data regarding use of force levels cannot be considered reliable." *Id.* "We believe that the incidents noted during our review may only reflect part of what is really occurring within the facility." *Id.* These show systematic issues in the force used, the training that these officers received, and in the supervision of the officers within the Jail. Each of these deficiencies have continued to this day and are noted above and below as the moving force in Plaintiff's injuries.

73.    "As a result of systemic deficiencies. . . the Jail exposes detainees to harm or risk of harm from excessive use of force." *Id.* The DOJ provided numerous examples of the use of force resulting in life altering injuries or death. *Id.* at 15–17. The DOJ was specifically noting that the deficiencies in the Jail's training, supervision, and officer's actions were a condition in the jail that exposed all detainees to harm or risk of harm from excessive use of force. This constitutes a condition of the Jail that exists regardless of the officer that enforces the policy.

74.    In relation to the Jail's unconstitutional history of violence, the DOJ discussed the impact of overcrowding has on the conditions of the Jail which are the exact same issues that have faced the Jail from 2009 till today. *Id.* at 16–18.

> **Jail crowding affects multiple Jail systems. For instance, it impedes detainee access to medical care, indirectly affects detainee hygiene, and reduces the staff's ability to supervise detainees in a safe manner. *How the Jail handles inmate supervision and violence illustrates some of the complexities associated with overcrowding*.**

*Id.* at 17 (emphasis added)

75.    With overcrowding, the DOJ found that detainee violence increased with the Jail having no plan to deter violence or provide better oversight and supervision of detainees. *Id.* at 17–18. Many areas of the Jail lacked video surveillance which has still not been addressed fully. *Id.* at 18. These issues have only increased since the DOJ report.

76.     Each of these constitutional violations noted by the DOJ should have caused immediate and permanent change within the Jail itself. The Sheriff as the policymaker for the Jail was on actual notice of these issues and precludes any excuse for allowing these constitutional violations to occur. The trend of deaths and injuries in the Jail should have sloped downward. Instead, it has spiraled upward as each of the deficiencies noted by the DOJ have only worsened. The training, supervision, and use of force that the DOJ noted was deficient has not changed from 2009 to today but has only grown exponentially worse as will be seen in the statistics below.

77.     Harris County should not need the DOJ to come into the Jail each year to point out its problems. Unfortunately, the Sheriff has shown that without significant oversight the Jail will continue its policies, practices, and customs that violate the detainee's constitutional rights. The lack of permanent change following the DOJ Report is illustrated perfectly by the violations of the constitutional rights of Plaintiff in this case and the victims in numerous cases since as the deficiencies noted are still the moving force in the violation of Plaintiff's rights.

>    **ii.     No Later Than 2016, The Harris County Sheriff as the Policymaker for Harris County Jail Was Well Aware of the Unconstitutional "Culture" that is Prevalent in the Harris County Jail that Continues to Get Worse Specifically the Training on Excessive Force, the Excessive Force Used, the Overcrowding and Understaffing, and the Lack of Medical Care.**

78.     Each politician that runs for Harris County Sherriff says that the Jail has a culture of violence, overcrowding, understaffing, and lack of medical care; yet, after being elected, that culture only grows worse with absolutely no change in the training or supervision of the officers.

79.     In 2016, when Sheriff Gonzalez was running against the former Sheriff Ron Hickman, they both participated in a publicized debate discussing key questions concerning Harris County and the Jail itself. In this debate, both Sheriffs acknowledged the rampant issues within the Jail. Sheriff Hickman pointed the finger at his predecessor while also acknowledging that

things needed to change. Sheriff Gonzalez attacked the state of affairs in the Harris County Jail and attacked the policies of Sheriff Hickman.[10]

80.    The second question in the debate was directed toward Sheriff Gonzalez: "Mr. Gonzalez, a concerning number of people have died in the Harris County Jail, that's a number that has, that's not new, it's going on for some time, how can those kinds of deaths be prevented?" Sheriff Debate.

81.    Sheriff Gonzalez's answer reveals his actual knowledge concerning the ongoing constitutional issues that were depriving the detainees of their constitutional rights which were present in the DOJ Report, and which are continuing to be present in recent detainee's claims and this action.

> Well, I think we need to change the culture. <u>I think here recently there was another civil rights lawsuit of an inmate that was beaten so severely it required reconstructive facial surgery</u>. So the culture needs to change. Uh and so, we need to also that we are leveraging technology, there's technology available that could help reduce suicides uh for example by measuring when there is a decreased pulse inside the jail cell. We need to be pursuing that. <u>We also need to make sure that we're better **training** our deputies and detention officers as well as the triage when they first come in. . . employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change. And we also need to improve training as well.</u> <u>Make sure that we are creating opportunities to **learn better de-escalation techniques** so things don't get out of control, but it starts with leadership. **We've got to end this culture that quickly leads to physical altercation**</u>, and we also need to better address mental illness in the community.

Sheriff Debate (emphasis added). This statement alone exemplifies multiple conditions, policies, and practices which were the moving force in Plaintiff's injuries. Specifically, this statement notes a training deficiency in learning and using de-escalation techniques and having officers quickly

---

[10] A video copy of the debate can be found at https://abc13.com/debate-harris-county-sheriffs-office-sheriff-law-enforcement/1552812/ and will be referred to herein as the "Sheriff Debate."

lead to physical altercation. It also illustrates the understaffing of the Jail and the connection that has on officer's actions and decision making.

82.    When asked about the Jail's efforts to prevent issues with mentally ill detainees, Sheriff Gonzalez specifically cited to an incident in 2015 where the Texas Commission on Jail Standards found the Jail as non-compliant for refusing to provide treatment to a mental health patient on four different occasions.

83.    Sheriff Gonzalez continued that if proper treatment and access would have been provided for another detainee, "then I don't think she would have spent 27 days inside that jail being beaten not only by an inmate but by a deputy as well." "[T]his is nothing new this is a culture. . .something should have been done rather than just letting her be in [the Jail] beaten by a deputy and by an inmate and come out worse than what she went in. . . . that's wrong that could be your daughter, your granddaughter, it could have been one of our loved ones." This clearly illustrates the Sheriff's knowledge of excessive force used by officers against detainees and failure to provide medical care. Yet, the Sheriff did not make any change to the training or policies of the Jail when he took over.

84.    Continuing with their questions about the Harris County Jail, the moderators asked Sheriff Gonzalez what he was going to do with the "overcrowding problem" in Harris County Jail. To summarize his position, he stated, "I'm gonna fight to make sure that we lower our jail overpopulation."

85.    Sheriff Gonzalez recognized that the Jail's overpopulation was a problem and that "this is not a new problem, we've had overpopulation before. . ." "[I]f the jail overcrowding is such an issue as we've talked about quite a bit here tonight, then we need to be changing that system. If not, we're going to continue to see a lot of the same problems." Yet, when looking at

the Jail population statistics, the Jail is at a higher population now, and for the majority of the tenure of Sheriff Gonzalez than it was during Sheriff Hickman's office.

86.    Sheriff Gonzalez recognized the staffing issues within the Jail by pointing out the requirements for staff to work overtime and by criticizing Sheriff Hickman by claiming that there were too many people in laundry and the kitchen and other areas when they should only be focusing on the positions that must meet the 1:48 ratio. This practice of pulling unqualified staff from other positions to meet the 1:48 ratio is the exact sort of policy that the Texas Commission on Jail Standards found was non-compliant in its November 2021 Report and Notice of Noncompliance.

87.    In his closing argument, Sheriff Gonzalez reiterated that he had the skills to "clean up our county jail. . . too many inmates are losing their lives or are less safe."

88.    This debate exemplifies the prolonged public discussion and high degree of publicity concerning the unconstitutionality of the policies of Harris County Jail. Sheriff Gonzalez himself showed that he had actual knowledge of these ongoing issues when he entered the Jail, but remarkably, the deaths and injuries of detainees has only grown since Sheriff Gonzalez took over this position. In fact, the uses of force by officers resulting in bodily injury have grown exponentially during Sheriff Gonzalez's tenure and only after these issues were publicly exposed in *Struck* did Sheriff Gonzalez change a policy.

89.    Upon winning the election, Sheriff Gonzalez's public statements have become far more guarded and political but ultimately, he cannot hide behind a veil of ignorance when it comes to the wrongdoing occurring in the Jail.

90.    In a recent interview on January 19, 2023, Sheriff Gonzalez admitted that the overcrowding in the Jail has caused significant problems and that they are in need of 700 additional

staff members.[11] Sheriff Gonzalez stated that even though they try to meet the state staffing ratio standard, that standard is "not always sufficient. . . . because minimum isn't always going to be what we really need. . . ." Sheriff Gonzalez has admitted multiple times in front of the Texas Commission on Jail Standards that they are significantly understaffed and overpopulated which has led to many issues in the jail. At the most recent meeting in August 2025, Sheriff Gonzalez testified that they still have 121 detention officer vacancies and are understaffed. The Commission discussed the Second Remedial Order against the Jail from the Attorney General which noted the issue with understaffing and the impact the continued understaffing has on conducting minimum observations and transferring inmates to medical to get the proper medical care. Sheriff Gonzalez also provided an interview in relation to the *Struck* documentary which reveal his knowledge of the issues directly relating to the training, supervision, and policies relating to Plaintiff's claims which will be discussed more thoroughly below.

91.    Sheriff Gonzalez's toned-down talk about the issues with Harris County exemplifies one of the roadblocks facing victims and their families. Harris County has tried for years to hide what is happening within the Jail's walls which prevents plaintiffs, victims, and their families from discovering all of the facts and information pertaining to their loved ones.

92.    Sheriff Hickman claimed accountability and touted a multi-million-dollar camera system implemented in the Jail to help with accountability and transparency. Although some of the atrocities were caught on camera (i.e. Jerome Bartee), the officers and detainees quickly learned that many parts of the jail are without cameras providing them areas to conduct beatings, hazings, and where they can act with absolute impunity to any oversight or accountability. In many

---

[11] https://www.houstonpublicmedia.org/articles/shows/houston-matters/2023/01/19/441370/sheriff-gonzalez-on-jail-deaths-jan-19-2023/

of these incidents, sergeants and supervisors are involved in the use of force and approve of the officer's actions showing the training, supervision, and ongoing policies of these improper actions.

93.    When some video evidence is available of the death or injuries of a detainee, it usually results in Harris County being cited for non-compliance with minimum jail standards.

***Texas Commission on Jail Standards Serious Incident Reports***

94.    Ultimately, some insight can be seen into the horrors within the Jail now that Harris County along with every other county jail in Texas are required to provide a "Serious Incident Report" to the Texas Commission on Jail Standards every month on the fifth day of the month. The only reports available start in 2018.

95.    These statistics tell a gruesome story that underlies the widespread practice of excessive force, lack of medical care, and lack of observation and supervision that has only grown worse since the 2009 DOJ Report and that are the ultimate byproducts of the policies and practice of overcrowding and understaffing the jail.

96.    The Serious Incident statistics are solely reliant on the self-reporting from the county policymaker. With Harris County's history of false reporting and underreporting of assaults and use of force, this would mean that Harris County's Serious Incidents are likely far higher than what is reported.

97.    Texas has 252 county jails. Harris County is the highest populated county jail, but even with its history of overpopulation, it has only accounted for 14% of the jail population across the entire state at its highest. During January 2024 at the time of Plaintiff's incident, Harris County accounted for 11.2% of the jail population across the state.

98.    Each report contains a breakdown of what the law defines as a Serious Incident. This includes suicides, attempted suicides, death in custody, escapes, assaults, sexual assaults,

serious bodily injuries, and use of force resulting in a bodily injury. If a detainee is injured or placed in a hospital due to injuries suffered or lack of medical care in the jail but is "released" from custody prior to passing away, then those individuals are not counted as a "death in custody."

99.    Assaults encompass many different assaults including detainee-on-detainee and officer-on-detainee. Use of force encompasses when an officer uses force on a detainee; however, this is not a serious incident if the use of force does not result in a bodily injury. This is reliant on the county and officers to report the use of force, report an injury, and/or permit a detainee to report an injury which is precarious as detainees are often scared to report officer abuse for fear of additional abuse. Many of the use of force reports or other incidents available to Plaintiff at this time show that most detainees are reported to have refused medical care likely due to the fear of retaliation and to the implications of being someone that complains within the jail.

100.    Despite the likely underreporting of Harris County Jail's Serious Incidents, these reports reveal the abhorrent reality that Harris County's culture of violence, death, and excessive use of force has grown out of control and exemplifies the ongoing policies that Harris County promotes within its system and trains its officers on. This culture of violence is a foreseeable consequence, as noted by the DOJ 2009 report, when the jail has a policy and practice of failing to conduct proper observations, failing to provide proper medical care, when the jail is overpopulated and understaffed, and when the jail trains its staff to use excessive force routinely.

101.    Directly similar to Plaintiff's claims are the use of force statistics shown in these reports. The use of force statistics paint details into the Harris County Sheriff's ratified "culture that quickly leads to physical altercation" due to their insufficient training, insufficient supervision, understaffed and overpopulated Jail, and deliberate indifference to the human lives placed within their care. As stated by the DOJ, TCJS, and Sheriff Gonzalez, the understaffing of the jail leads

officers to losing control, resorting to force too quickly, and failing to use de-escalation techniques showing a direct correlation between staffing and force.

102.    The use of force statistics shows a pattern, practice, and culture of excessive force by officers against detainees in the Harris County Jail. In 2018 when the statistics first started to be reported, Harris County Jail accounted for 23% of all Use of Force resulting in bodily injury in Texas. In 2019, that number grew to 27%. In 2020, Harris County Jail accounted for 30% of all use of force. In 2021, the use of force number grew to 34%. In 2022, Harris County Jail's proportion of the use of force jumped to 51% of all use of force in Texas. In 2023, Harris County reached an all-time high of 53% of all use of force in Texas. In 2024, Harris County accounted for 52% of all use of force in Texas. From January to July 2025, Harris County is far exceeding these prior numbers accounting for 64% of all use of force in Texas.

103.    When looking at the sheer number of uses of force incidents in Harris County in the past six years, the total number of use of force incidents continues to eclipse astronomical records. In 2018, 2019, and 2020, Harris County had 628 use of force incidents combined. In 2022 alone, Harris County had 653 use of force incidents. In 2023, Harris County had a record high 739 use of force incidents. In 2024, Harris County had 543 use of force incidents. Through the first seven months of 2025, Harris County has 384 use of force incidents. Again these uses of force do not account for all reported use of force incidents as the KHOU *Struck* documentary illustrate that from 2020–2024 Harris County produced over 3,000 incident reports where closed-fist strikes were used, but only 2,514 incidents are accounted for in the serious incident reports showing that these numbers are just the tip of the iceberg of the extensive evidence available showing the systemic problems in the Jail.

104.    The monthly totals continue to tell the shocking difference between Harris County and other counties in Texas that have patterns of unconstitutional conditions. In July 2021, Harris County had 42 use of force incidents. Bexar, Dallas, Travis, and Tarrant Counties only had 4 use of force incidents combined. In July 2022, Harris County had 54 use of force incidents. For that same month, Bexar, Dallas, Travis, and Tarrant Counties only had 8 use of force incidents. In January 2023, which was one of the most violent months in Harris County history, Harris County had 87 use of force incidents. Bexar, Dallas, Travis, and Tarrant Counties only had 4 use of force incidents combined. In January 2024, Harris County had 54 use of force incidents with Bexar, Dallas, Travis, and Tarrant Counties having only 9 use of force incidents combined. Even though Bexar, Dallas, Travis, and Tarrant Counties accounted for 24% of the jail population in the state during January 2024, they only accounted for 10% of the use of force incidents while Harris County alone accounted for 60% of the use of force incidents that month. These numbers illustrate the rampant and systematic issues the Jail has with officers quickly using excessive force, failing to use de-escalation techniques, and the discrepancy between Harris County and every other Jail in the state. As experts will show, this drastic difference and number of incidents exemplifies the lack of training, supervision, and the ongoing conditions and policies of the Jail where excessive force is routinely used.

105.    The chart below compares the yearly number of uses of force incidents in Harris County Jail versus the number of use of force incidents in all Texas county jails combined.



106.    These statistics of violence against detainees is the result of the lack of proper observations, understaffing, and overcrowding the jail that lead to officers resulting to violence quicker and not being able to respond to detainees in need. These issues are a direct result of the improper training provided to officers that causes them to escalate situations needlessly, lay hands on detainees too quickly, and using excessive force techniques in unreasonable situations.

107.    The assault statistics also illustrate the ongoing issues within the Jail as they illustrate the understaffing and overcrowded of the Jail as the more understaffed and crowded a jail is the more violent the detainees are likely to be and the less control the officers have over the detainees. Additionally, these statistics illustrate the very items addressed by the DOJ, TCJS, and Sheriff Gonzalez that failing to monitor detainees and provide appropriate medical care including mental health care increases the violence within the Jail. These show the existence of the policies, practices, and training that were the moving force in Plaintiff's claims.

---

[12] The statistics for 2025 run through July 2025. All Serious Incident Reports are a matter of public record. Tex. Gov't Code Ann. § 511.020(d).

108.    From 2018 until today, the number of assaults occurring in Harris County continues to grow. The easiest way of seeing this growth is a breakdown of the number of assaults that occur in Harris County compared to all other Texas counties *combined*. In 2018 and 2019, Harris County accounted for 44% of all assaults that occurred in the state. In 2020, Harris County accounted for 55% of all assaults in the state. In 2021, Harris County accounted for 56% of all assaults in the state. In 2022, Harris County accounted for 52% of all assaults in the state. In 2023, Harris County accounted for 54% of all assaults in the state. In 2024, Harris County accounted for 49% of the assaults in the state. As of July 2025, Harris County has accounted for 49% of the assaults in the state. Thus, for the past six years, Harris County Jail has had hundreds to thousands of more assaults than the 251 other Texas county jails **combined.** From 2018 to present, Harris County has had 54,038 assaults in the Jail accounting for 19.5 assaults per day. For the other 251 counties in Texas combined, they averaged 18.7 assaults per day total. When you divide that amongst all 251 counties, the other individual counties only average .07 assaults per day.

109.    These numbers are even more shocking when you compare Harris County's monthly numbers to the other large counties in Texas. In April 2018, Harris County Jail had 426 reported assaults. The next closest county was Bexar County with 113 which is the only other county in Texas that ever has over 100 assaults. No other county, including Dallas, Tarrant, or Travis, had more than 26 assaults in that month. In January 2020, Harris County had 633 reported assaults. Dallas, Tarrant, and Travis Counties only had 15 assaults in that month combined.

110.    Fast forward to January 2021, Harris County had 711 reported assaults. Dallas, Tarrant, and Travis Counties only had 33 assaults in that month combined. In January 2022, Harris County had 565 reported assaults. Dallas, Tarrant, and Travis Counties only had 23 assaults in that month combined. In January 2023, Harris County Jail had 665 reported assaults. Dallas, Tarrant,

and Travis Counties only had 8 assaults in that month combined. In January 2024, Harris County had 609 assaults with Dallas, Tarrant, and Travis Counties only having 41 assaults combined. In April 2024, Harris County Jail had 629 assaults with Dallas, Tarrant, and Travis Counties only having 23 assaults combined. Since 2020, Harris County Jail has only had one month (April 2020) with less than 500 assaults during that month.

111.    The chart below shows the yearly comparison of assaults in Harris County Jail versus all other Texas county jails combined.



112.    Since 2009, over 200 pre-trial detainees have died in Harris County Jail with a record 28 dying in 2022 alone.[14] Only 160 individuals in all of Texas were executed during that same time period. Out of the 252 county jails in Texas, in 2022, Harris County accounted for 18% of all in custody deaths. Death row is safer than Harris County Jail.

---

[13] The statistics for 2025 run through July 2025. All Serious Incident Reports are a matter of public record. Tex. Gov't Code Ann. § 511.020(d).

[14] With each passing month, this discrepancy continues to grow. Since 2018, Harris County has at least not reported 6 deaths because the detainee was released for an unknown reason after they were sent to the hospital where they died. Mr. Hackl who passed away on June 18, 2024, has not been reported yet and most likely will not be reported by the jail because he was released before he passed away.

113.    The twenty-eight detainee deaths in 2022 is even higher than the eighteen who died in the widely criticized New York's Rikers Island. Unlike Harris County, New York has at least responded to their deaths by seeking a complete reformation of their system. These deaths illustrate the ongoing policies in the Jail as these deaths were the result of excessive force, failure to monitor and observe, failure to provide medical care, and the understaffing and overpopulation which are ongoing issues directly relating to Plaintiff's claims.

114.    Each of these statistics show the ongoing and growing pattern, practice, and culture of excessive force, failure to observe, lack of medical care, overcrowding and understaffing in the Harris County Jail which includes officer on detainee force and the failure to interfere, discourage, or stop detainee on detainee violence which has caused many of the deaths and injuries in the Jail. The Jail's culture of inadequate medical care compounds these issues by being inundated with injuries on a daily basis and not providing sufficient care for those in need. Further, exasperating the situation is the fact that the Jail promotes a culture of overcrowding and understaffing vital positions which then leads to inadequate observation and monitoring of the detainees.

115.    These statistics further show that the Harris County Sheriff as the policymaker for the Jail is actually aware of the widespread practices within the Jail that are the moving force in constitutional violations because the Sheriff is the officer charged with gathering and submitting the Serious Incident Reports each month. The Harris County Sheriff would be hard pressed to say that the Jail does not have a culture of excessive force when it has twenty-five times more uses of force than 251 other Texas counties on average per month.

### iii.    The Texas Commission on Jail Standards Identifies Numerous Constitutional Violations that Illustrate the Policies, Practices,

**Conditions, Lack of Training, and Lack of Supervision that Are the Moving Force in Plaintiff's Claims.** [15]

116.    The widespread practices evidencing Harris County's unconstitutional policies, customs, and de facto policies have been the subject of numerous investigations, reports, commission meetings, and non-compliance notices from the Texas Commission on Jail Standards ("TCJS"). The TCJS inspects county jails to determine if they meet certain minimum standards. The TCJS may conduct reviews of in custody deaths.

117.    In this case, the TCJS has found Harris County consistently non-compliant with minimum standards in their practices, policies, training, and customs which are some of the same policies, trainings, and customs which were the moving force in the deprivation of Plaintiff's constitutional rights. Harris County has been in a continuous state of non-compliance with minimum jail standards since at least September 7, 2022, outside of a couple of weeks in August 2024 where they passed one inspection but immediately failed the next inspection later in the year. Due to their failure to correct the systemic issues, TCJS and the Texas Attorney General have issued three different remedial orders and are currently looking at doing a enforcement action against the Jail to bring them into compliance.

**a.  Texas Commission on Jail Standards March 11, 2016, Report.**

118.    On March 11, 2016, TCJS issued a notice of non-compliance when the Jail failed to provide medical services to a detainee despite the detainee making five (5) different medical requests. These requests spanned over the course of an entire month, yet the detainee was not provided any medical services within the minimum 30-day requirement.

119.    The TCJS report states as follows:

---

[15] Plaintiffs incorporate the Texas Commission on Jail Standards' Reports cited within this Complaint. Plaintiffs ask the Court to take judicial notice of the TCJS Reports.

> Documentation received and reviewed by the Commission revealed that Harris County did not provide MHMR services within thirty days after the requests had been submitted by the inmate. The inmate in question requested MHMR services on 10/30/2015, 11/2/2015, 111812015, 1111012015 and 11/23/2015. The inmate in question had the paperwork triaged on each occasion and the inmate was deemed a level 3. Per Harris Co. policies and procedures, level 3 type inmates are to be seen by the clinician within 30 days of the triage which failed to occur.

120.    This report shows an official record that the Harris County Sheriff as the policymaker for the Jail was aware of the lack of rapid and sufficient medical care to detainees. This is almost identical to the DOJ Report which found a similar incident of a detainee not receiving medical care despite four different requests. This report is also consistent with several similar incidents at or around this time of detainees failing to receive any medical care.

121.    Plaintiff's claims involve similar issues as this report because of Harris County's ongoing policies and customs of failing to provide adequate medical care as Plaintiff also was not provided medical attention despite his clear injuries and only after being left in solitary confinement for awhile was taken to the clinic only for a cursory review. This report also provides another example and illustration of the impact overcrowding and understaffing have on the constitutional rights of the detainees as the lack of staff to handle all medical requests and provide appropriate level of care timely.

### b.  Texas Commission on Jail Standards February 21, 2017, Report.

122.    On February 21, 2017, TCJS issued another notice of non-compliance in a special inspection report while inspecting the in-custody death of Vincent Young.

123.    In this report, TCJS noted that the Jail was required to conduct face-to-face observations every 30 minutes with detainees "known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior. . ."

124.    Vincent Young, as explained more fully below, was known to be suicidal. He had mental illnesses and had made numerous suicidal statements. Unfortunately, Harris County, in accordance with its policies, practices, and procedures failed to properly and timely conduct face-to-face observations of Mr. Young due to being understaffed and overpopulated which made the officers and staff fail to conduct observations or conduct them in a manner that did not actually consider the physical, mental, and emotional well being of the detainee.

125.    TCJS found the Jail non-compliant as follows:

> After reviewing both written documentation and video evidence from Harris County officials, it was determined that the jailer exceeded the 30 minute visual face-to-face observations of I/M Vincent Young by 44 minutes. IIM Young was observed at 1756 hours. The next completed welfare check was completed at 1910 hours.

126.    Ultimately, by failing to properly conduct the face-to-face observations due to the understaffing and overcrowding, Mr. Young hung himself in his cell. The lack of proper observations and improperly conducting observations were consistent with the training and supervision of the officers who routinely fail to properly care for the detainees and conduct their job too quickly to complete all tasks appropriately.

127.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

128.    These same policies and customs of overpopulation, understaffing, and lack of providing appropriate medical care to a detainee in need identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### c.  Texas Commission on Jail Standards April 3, 2017, Report.

129.    On April 3, 2017, TCJS issued a notice of noncompliance to the Jail based on a special inspection report when two detainees were left in a transport van at the jail for ten hours.

130.    TCJS found that the Jail had failed to properly observe and monitor the two detainees because they were left in an unsupervised van. Harris County did not conduct any face-to-face observations during that time. Additionally, Harris County did not account for the missing detainees. This incident was another example of and byproduct of the understaffing and overcrowding of the jail which impedes the officers from taking the time to ensure that they have completed their tasks properly and impedes their ability to properly account for and observe detainees which ultimately deprives them of proper medical care.

131.    The only way Harris County became aware of the detainees being left in the vehicle was a report from a member of the public who passed by the vehicle and heard banging on the walls.

132.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. If the jailers had conducted proper face to face observations they would have noticed that the detainees were missing from their cells.

133.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### d.  Texas Commission on Jail Standards December 19, 2017, Report.

134.    On December 19, 2017, TCJS conducted a special inspection of the Harris County Jail following the in-custody death of Maytham Alsaedy.

135.    As explained more fully below, Mr. Alsaedy had a history of mental illness and suicidal ideations which went untreated while in the Harris County Jail.

136.    Despite his known suicidal intentions, Mr. Alsaedy was largely ignored by the jailers and allowed to place paper over his window and attempt to hang himself with a sheet.

137.    TCJS found that the Jail was non-compliant with minimum standards because they failed to conduct proper and timely face-to-face observations of Mr. Alsaedy due to being understaffed and overpopulated which made the officers and staff fail to conduct observations or conduct them in a manner that did not actually consider the physical, mental, and emotional well being of the detainee. This further impeded the proper provision of medical care.

138.    Further, the Jail permitted Mr. Alsaedy to cover his window with paper, so even though a jailer did pass by Mr. Alsaedy's cell, the jailer did not properly observe him or make him remove the paper.

139.    This non-compliance was a moving force with Mr. Alsaedy being able to commit suicide. The DOJ warned about these dangers in their DOJ Report as explained above.

140.    TCJS report states as follows:

> After reviewing documentation and video evidence in conjunction with self-reporting of facility administration, it was determined that the 30 minute face-to-face observation, prior to the inmate being discovered, did not occur due to the inmate obstructing the view of the jailer by placing paper in the view panel. While the jailer made a round within the required time period, the jailer did not view the inmate face-to-face as required by minimum jail standards.

141.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. These actions were consistent with the training that the officers receive on the job to which their supervisors acquiesce showing a failure to observe and train.

142.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### e.  Texas Commission on Jail Standards August 23, 2018, Report.

143.    On August 23, 2018, TCJS conducted another special inspection of the Harris County Jail in response to the in-custody death of Debora Ann Lyons where they found the Jail in non-compliance.

144.    Ms. Lyons, as explained below, had a history of mental illness and suicidal ideations. Yet, the detention officers failed to ensure that they observed Ms. Lyons face-to-face within the required time limits.

145.    Instead, Ms. Lyons was able to sneak into an empty meeting room for several hours where she was able to hang herself.

146.    Despite the face-to-face observation requirements, the officers did not look for Ms. Lyons. Ms. Lyons was not found until other detainees attempted to use the meeting room and found her unresponsive hanging from a sheet.

147.    By failing to properly observe and monitor Ms. Lyons, the Jail failed to prevent Ms. Lyons from committing suicide and failed to provide timely medical care.

148.    TCJS found Harris County Jail non-compliant and stated the following:

> After reviewing documentation and video evidence in conjunction with self-reporting by facility administration, it was determined that the inmate was not observed every 30 minutes prior to being discovered. While the jailed made a round within the required time period in the inmates' cellblock, the jailer did not view the inmate face-to-face due to the inmate leaving the cellblock for medicine call and never returning.

149.    This report is evidence that the Harris County Sheriff knew that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. This is also further evidence of the policy

and condition of understaffing and overcrowding of the Jail which made the officers and staff fail to conduct observations or made them conduct the observations in a manner that did not actually consider the physical, mental, and emotional well-being of the detainee. This further impeded the proper provision of medical care.

150.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### f.    Texas Commission on Jail Standards December 9, 2020, Report.

151.    On December 9, 2020, TCJS issued their report after its annual inspection of Harris County Jail and found the jail in non-compliance in multiple areas.

152.    First, TCJS noted that "it was determined that staff are routinely not completing the initial classification assessment and re-assessments properly." Classification of detainees is important to help prevent violent criminals from being placed with high-risk detainees or those suffering from a mental illness. This also helps ensure that detainees with mental illnesses or chronic conditions are placed in areas subject to the 30-minute observation requirement and not the 60-minute observation requirement. Unfortunately, throughout its history, Harris County Jail has a pattern, practice, and policy of placing violent detainees with mentally ill detainees resulting in injuries or death of the mentally ill detainee, e.g., Fred Harris.

153.    Additionally, Harris County has a history of failing to classify detainees with mental illnesses properly to ensure that they are observed every 30 minutes. Instead, detainees with mental illnesses are only being placed in the 60-minute observation category which is still not followed by the jail resulting in extended periods of time where these high-risk detainees are not properly observed. This discrepancy are further examples of the understaffing and overcrowding as the officers do not take the proper time to classify properly and do not have the

space to keep classes of detainees in the proper manners leading them to not being properly observed and not receiving their medical care which is consistent with the policies and conditions that were the moving force in Plaintiff's injuries.

154.    Second, TCJS noted that the jail staff were not filling out the detainee medication files correctly with many detainees' records being blank. The records did not show if the medication was issued or if it was refused. Harris County Jail continues to use this same pattern, practice, and policy as many detainees do not receive their medication and their files are either blank or filled out incorrectly. This is another example of the existence of the policies, conditions, and lack of training and supervision as officers are acting in accordance with their training which their supervisors fail to monitor and ensure that detainees are getting timely and proper medical treatment.

155.    Third, TCJS found that the jail staff were not filling in mental health screening forms correctly resulting in many detainees not being classified within the proper mental health category. This is consistent with Harris County's current policies and customs as many detainees are not properly categorized resulting in a lack of medical care or incorrect medical care for those detainees which lead to serious injuries and death.

156.    Fourth, TCJS found significant failures by Harris County in conducting face-to-face observations of inmates ranging from 3 minutes to 464 minutes.

| 275 | Supervision | Reviewed 1081 jailer TCOLE certification records. Reviewed officer documentation. Interviewed staff. Deficiencies noted. Technical assistance provided - While reviewing the face-to-face observations from the 1200 Baker Jail it was observed that the electronic and handwritten 30 minute face-to-face observations were late from anywhere between 3 minutes to 37 minutes on the date October 11, 2020 during first shift. It was also determined during the review of face-to-face observations from 701 North San Jacinto that numerous face-to-face observations were late from multiple shifts on multiple dates in areas where 30 minute face-to-face observations were to be conducted, and also in general population areas where inmate face-to-face observations are to be conducted within 60 minutes. It should be noted that the inspection team reviewed both electronic and handwritten face-to-face observations from 701 North San Jacinto and determined that the observations were late anywhere from 464 minutes on a 60 minute face-to-face observation and 79 minutes on a 30 minute face-to-face observation. The inspection team recommended that the administration implement a plan of action to ensure that all jailers are retrained on when face-to-face observations are required and how to conduct face-to-face observations to include routing issues. Furthermore the inspection team observed several entries made by floor jailers that observations were conducted late due to waiting on support staff or that other inmate services were being conducted. Follow - up action required- The administration will email Inspector Byron Shelton a plan of action and training rosters within 30 days of receipt of the inspection report. Additionally, the administration will email Inspector Byron Shelton random selections of both 30 minute and 60 minute face-to-face observations every Friday until further notice. |

157.    This report is additional evidence that the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. These are further examples of the impact that understaffing and overcrowding have on the safety and care of detainees as these observation issues impede the provision of medical care and show that there are not enough officers to complete basic tasks thoroughly and timely.

158.    It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing medications to their detainees.

159.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### g. Texas Commission on Jail Standards April 6, 2021, Report.

160.    On April 6, 2021, TCJS issued its report and notice of noncompliance to the Harris County Jail for its investigation into the in-custody death of Jaquaree Simmons.

161.    As explained in depth below, Mr. Simmons was beat to death by multiple detention officers within the Harris County Jail and then was left inside of his cell alone without any observation. Mr. Simmons case is one of clear excessive force without any justification as a result

of the training of the officers to resort to using closed fist strikes and other uses of force in response to perceived slights and even after taking a detainee to the ground.

162.    TCJS found that the jail was still in non-compliance with minimum observation requirements as identified in the December 9, 2020, report.

163.    Specifically, TCJS found:

| 275 | Supervision | Deficiencies noted - Upon review of documentation provided by Harris County Jail Administration, it was determined that the observation of inmates by jail staff in 7M1 was not documented from 0715 to 1124 hours as required by minimum jail standards. Additionally, video surveillance was submitted and reviewed, but this inspector was unable to clearly identify when observation rounds were conducted. This issue was an area of Non-Compliance during the annual unannounced inspection conducted between November 30 through December 4, 2020 and has also been monitored by their territory inspector prior to this report. |

164.    The detention officers had not observed any of the detainees within the pod that also contained Mr. Simmons.

165.    Mr. Simmons was suffering from his injuries during this time and needed continuous medical treatment. Similar to Plaintiff, the officers failed to take Mr. Simmons to the clinic immediately after the use of force incidents and when he was taken he was only given a cursory evaluation and sent back to his cell where he later passed away.

166.    By failing to provide proper face-to-face observation and monitoring of Mr. Simmons and the other detainees, Harris County Jail failed to provide sufficient and timely medical care which was a moving force in Mr. Simmons death. This was a result of the overcrowding and understaffing of the jail and the continued improper training and supervision of the officers as the supervisors were involved in the incident and failed to correct their officers to provide proper medical care and to prevent the use of force.

167.    At the time of TCJS's report, it had not been revealed that the use of force documentation leading to Mr. Simmons' death was falsely filled out which will be discussed below

which is further evidence of the lack of supervision and training of the officers as the supervisors failed to audit the reports to determine that the reports matched the evidence.

168.    This report is additional evidence that the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing observations of the detainees. These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### h.  Texas Commission on Jail Standards December 7, 2021, Report.

169.    Despite being in non-compliance in 2017, 2018, 2020, and April 2021, TCJS found Harris County to be in continuous non-compliance in multiple areas in its annual inspection report on December 7, 2021.

170.    Namely, TCJS found that Harris County Jail continued to not conduct face-to-face observations in a timely and sufficient manner with as many as 90 to 144 minutes between rounds. The excuses included short staffed and no rover which are perfect examples of the existence and issues from the understaffing and overcrowding of the Jail.

171.    TCJS also found that compounding these issues is Harris County's use of supervisors and essential personnel including intake personnel to work housing to meet their 1:48 ratio requirements. This was part of the plan and policy discussed by Sheriff Gonzalez in the debate five years previously. This constitutes another example of the understaffing and overcrowding of the Jail and also indicates the failure in the supervision plan of the Jail as supervisors having to do the tasks of the other officers are unable to supervise the jailers to ensure that they are doing their job properly and takes away their time from reviewing and auditing systems.

172.   TCJS specifically commented on this issue with the following:

The Harris County Jail is utilizing supervisors and essential personnel such as intake personnel to work housing unit assignments in order to meet the officer to inmate 1:48 ratio. This is being done on a regular and ongoing basis which does not allow these personnel to perform their regular duties. Minimal staffing has a direct impact on the ability to provide a safe and secure environment for inmates and jail staff in areas such as enforcing inmate rules, ensuring inmates clean housing areas, provide for sufficient staff to support housing officers and has possibly contributed to an increase in inmate on inmate assaults and inmate on staff assaults.

173.   This constitutes more evidence of the existence of the understaffing and overcrowding policy and condition of the Jail and how it affects other aspects of the Jail including the inability to provide a safe environment for inmates and staff, failure to let these officers and supervisors from performing their regular duties, and increases the violence in the Jail which can be seen by the large discrepancy in assaults and uses of force between Harris County and the remainder of the Texas counties.

174.   TCJS's inspector even went a step further and noted the increased violence and assaults within the Jail which is directly correlated with the staffing issues within the Jail.

**Inspector's Note:** It is the professional opinion of the members of the inspection team that the lack of sufficient staffing has contributed to the heightened level of tension and inmate hostility at the Harris County Jail System that was experienced during the course of this inspection. A review of Serious Incident Reports reveals that inmate assaults have increased when comparing 2020 numbers to 2021 numbers. While this was a limited inspection to review specific areas, it was evident that while the administration strives to meet the 1 officer to 48 inmate ratio, it can only be accomplished by reducing the resources allocated to other ancillary but necessary and required services.

175.   This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care as a direct result of the understaffing and overpopulation of the Jail.

176.    It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing observations of the detainees.

177.    Further, this report exemplified the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst detainees and by officers on detainees.

178.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

**i.    Texas Commission on Jail Standards September 7, 2022, Report.**

179.    On September 7, 2022, TCJS issued another Notice of Non-compliance to the Harris County Jail.

180.    Under Texas law, a jail is not permitted to place detainees in temporary holding cells for longer than 48 hours as the holding cells are not supposed to be permanent housing. Detainees are supposed to be brought in, evaluated, and processed quickly to be placed in housing that meets their needs and provides appropriate medical attention and observation.

181.    TCJS inspected the jail in relation to one detainee's complaint that she was kept in an intake cell for longer than the 48 hours allowed. During the course of this inspection, TCJS found that 64 detainees had been kept in their holding cells while waiting admission for longer than 48 hours. One particular detainee had been kept in her holding cell for 99 hours with no records showing that she was provided items for personal hygiene. This information directly correlates to the lack of medical care as many of these detainees were not being provided proper medical care or classification to receive the care correlating with these issues.

182.    The overcrowding and understaffing of the Jail have also led to numerous individuals being left in holding cells unsupervised for significant periods of time. As recognized

by the DOJ, solitary holding cells and speedy admission were two of the areas that the Jail needed to improve on especially as it downgrades the mental health of detainees.

183.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care as detainees were permitted to remain in holding cells without proper processing and observation. Placing detainees in holding cells without immediate medical care is consistent with the care that Plaintiff received in this case.

184.    It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and processing detainees.

185.    Further, this report exemplified the staffing and overcrowding issues which are part of Harris County's ongoing policy which inhibits proper medical care and proper supervision. It also invokes additional resentment between detainees and officers as detainees do not get timely care or processing.

186.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

**j.   Texas Commission on Jail Standards December 19, 2022, Report.**

187.    On December 19, 2022, TCJS issued a notice of non-compliance after a special inspection of the Harris County Jail following the in-custody death of Matthew Shelton.

188.    As explained more fully below, Mr. Shelton passed away in March 2022 due to a failure to receive his diabetes medications and failure to observe due to the understaffing and overcrowding of the Jail which inhibited proper medical care, observation, and kept officers from providing proper supervision.

189.    TCJS found that the Harris County Jail failed to provide, prescribe, or follow doctor's orders for providing medication to Mr. Shelton.

> Provide procedures that shall require that a qualified medical professional shall review as soon as possible any prescription medication an inmate is taking when the inmate is taken into custody.  These procedures shall include providing each prescription medication that a qualified medical professional or mental health professional determines is necessary for the care, treatment, or stabilization of an inmate with mental illness.
> **Documentation reviewed after a custodial death revealed that while insulin was reviewed, ordered and provided while the inmate was in intake, it was not reviewed, ordered and provided once the inmate was housed.**
> All medical instructions of designated physicians shall be followed.
> **Documentation reviewed after a custodial death revealed that daily orders were written for the inmate to receive KOP (Keep On Person) blood pressure medication, however, this order was not filled nor was this medication provided once this inmate was housed.**

190.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees and failure to properly document and provide medical care and medications to their detainees resulting in their deaths.

191.    Further, this report exemplifies the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care and proper supervision of detainees.

192.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

**k.  Texas Commission on Jail Standards March 8, 2023, Report.**

193.    On February 13–17, 2023, TCJS conducted a special investigation of the Harris County Jail in response to the numerous deaths within the jail in December 2022 and January 2023 and to follow up on the deficiencies noted in their investigation into Alan Kerber's death.

194.    On March 8, 2023, TCJS issued its report which found Harris County Jail in non-compliance with numerous minimum jail standards. Notably, TCJS noted that these same areas were supposed to have been corrected by Harris County after the previous non-compliance reports; yet, they had not been fixed.

195.    First, TCJS found that numerous detainees that were supposed to be booked, medically evaluated, and placed in detainee housing within 48 hours, had been in holding cells without proper evaluation for longer than the 48-hour minimum. TCJS noted that this should have been addressed following the September 2022 notice of non-compliance. However, Harris County continues to disregard these warnings and continue with the same policies, procedures, culture, training, and supervision which fails to meet minimum standards and to pose problems for detainees.

196.    Second, TCJS found that the Harris County Jail continued to be in non-compliance with providing timely and sufficient medical care to detainees. Specifically, TCJS found that detainees were not being seen within 48 hours after placing medical requests in the medical kiosks. This again illustrates the consistent policies, procedures, culture, conditions, and lack of supervision and training of officers for providing medical care to detainees especially those who should have been provided medical care immediately but were instead left in a holding cell similar to Plaintiff.

Reviewed a random selection of 60 files. Interviews were conducted with staff and inmates. Reviewed training records. Reviewed the policy. **Deficiencie**' **noted. Technical assistance provided. 1.)** During the inspection team's review of medical requests submitted by inmates through the kiosk system, two inmates were not attended by medical staff within 48 hours, as required by the facility's operation plan. A prisoner submitted a medical request through the kiosk on 10-20-2022 for a large growth protruding from his gum line and was not seen by medical staff until 33 days later on 11-22-2022. Despite being referred to dental, the inmate was not seen by dental for 38 days. On 10-4-2022, a second inmate submitted a medical request for a bullet lodged in his neck. The inmate's medical documentation indicates that he was a "no show" for his appointment on 10-7-22. There was no documentation to explain the no-show. The inmate submitted a second request to the medical staff on 10-28-22. However, he was not seen by the medical staff until 10 days later, on 11-7-22 **2.)** In December 2022 the Harris County Jail was placed in non-compliance for failing to follow a physician's orders and provide medication to an inmate as directed. During the Comprehensive Re-Inspection, this was determined to be a continuing issue by the inspection team. _   **Follow up is required** - HCSO jail staff and the medical provider (Harris Health) shall coordinate to provide a plan of action to the lead inspector within 30 days, to ensure these issues do not occur in the future.

197.    Additionally, TCJS found that several officers who were supposed to have received suicide prevention training had not received that training in accordance with jail policies.

198.    Notably, TCJS found that the Jail continued to be in non-compliance with the minimum observation requirements. Jail staff on a "routine basis" exceeded the minimum observation requirements for detainees that required 60-minute intervals by up to 1 hour and 13 minutes. This exemplifies the consistent issues with understaffing and overcrowding of the Jail.

199.    For detainees that were known to be assaultive, suicidal or mentally ill, they require observations every 30 minutes. However, the Jail routinely exceeded those requirements by up to 2 hours and 9 minutes.

200.    This is a continued pattern of failing to provide sufficient observation and monitoring of detainees which leads to a failure to provide sufficient and timely medical care, to provide intervention in use of force, and fails to deter wrongful acts and prevent attempted suicides. Unfortunately, Harris County in accordance with its policies, practices, and procedures continued to fail to properly and timely conduct face-to-face observations of detainees.

201.    Instead of conducting face-to-face observations, TCJS noted that jailers were documenting that they had conducted observations by simply scanning QR codes within the

housing area. Yet, those jailers never actually observed any of the detainees in that area. This policy of simply walking from one QR code to another without actually looking at and observing the physical, mental, and emotional well-being of the detainee is consistent with how most if not all officers were trained to conduct their observations. Many officers have admitted that this is how they were taught to conduct these observations and that they do not have time to do proper observations because there are not enough staff to do these observations. This is another example of Harris County's pattern, practice, and policy of failing to properly document observations and records which leads to false reporting.

202.    TCJS found that "staffing was not sufficient to perform required functions" despite Harris County's documentation which alleged that they did have enough staff. Particularly, on the day of the inspection, the third floor of 701 Baker had only thirteen officers working when fourteen were needed. The fourth floor was worse when it only had thirteen officers and fifteen were needed.

203.    As has been seen in the numerous reports previously and can be seen in Harris County's history, the Jail does not have sufficient staff to perform required functions which include "transporting of inmates, medication passes, face to face observations and feeding." Many of the deficiencies in conducting face-to-face observations, in intervening in detainee fights, and in the increase in the use of force by officers against detainees can be traced to Harris County's long-running policies, practices, and procedures of understaffing the Jail. This also impedes the supervision of officers as the supervisors are having to take their time to conduct tasks that other officers should have been able to handle. Supervisors do not have the time to properly audit and review incidents and provide corrective action to the officers under their supervision.

Holding Cells - One or more holding cells shall be provided to hold inmates pending intake, processing, release, or other reason for temporary holding. Inmates shall not be held for more than 48 hours.

**Inmates were in holding anywhere from 63 hours to 70 hours. Additionally, during the review of inmate files, seven (7) additional inmates were found to be in holding from 48.5 hours to 66 hours prior to housing**

Health Services Plan - Each facility shall have and implement a written plan, approved by the Commission, for inmate medical, mental, and dental services. The plan shall provide procedures for regularly scheduled sick calls. **Inmates were not seen by medical within 48 hours, as required by facility operation plan.**

Health Instructions: All medical instructions of designated physicians shall be followed.
**In December 2022 the Harris County Jail was placed in non-compliance for failing to follow a physician's orders and provide medication to an inmate as directed. During the Comprehensive Re-Inspection, this was determined to be continuing issue by the inspection team.**

Regular Observation by Corrections Officers - Every facility shall have the appropriate number of jailers at the facility 24 hours each day. Facilities shall have an established procedure for documented face-to-face observation of all inmates by jailers no less than once every 60 minutes. Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined.
**60 minute observations of inmates were routinely exceeded by staff on a routine basis by 1 minute to 1 hour 13 minutes. Additionally, observation records for areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined were routinely exceeded by staff on a routine basis by 1 minute to 2 hours 9 minutes.**

Staff - Inmates shall be supervised by an adequate number of jailers to comply with state law and this chapter. One jailer shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than 1 jailer per 48 inmates or increment thereof on each floor for direct inmate supervision. This jailer shall provide documented visual inmate supervision not less than once every 60 minutes. Sufficient staff to include supervisors, jailers and other essential personnel as accepted by the Commission shall be provided to perform required functions.
**Documentation sent to the lead inspector for supervision indicated that the Harris County staffing was sufficient. However, floor rosters reviewed during the walkthrough of the 3rd floor at 701 Baker verified staffing shortage on the day of inspection.      It was determined that there are only 13 officers currently working the floor when 14 are needed. This is for a total population of 659 inmates. The 4th floor staffing was also reviewed, and it was noted that 13 officers were present when 15 officers were required to supervise 684 inmates.**

204.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

205.    It also provided evidence that the Harris County Jail has ongoing issues with properly documenting and providing observations of the detainees.

206.    Further, this report exemplified the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst detainees and by officers on detainees.

207.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

**l.    Texas Commission on Jail Standards April 17, 2023, Report.**

208.    Despite repeated warnings, inspections, and notices of non-compliance within only a few years, the Harris County Jail failed to make any effort to correct its issues or make any significant change in its policies, practices, customs, training, supervision plan, or culture. Instead, on April 17, 2023, TCJS found Harris County in non-compliance with minimum standards after inspecting the in-custody death of Fabien Cortez.

209.    TCJS found that Mr. Cortez was permitted to enter a restroom and not be observed for over 88 minutes before he was discovered with a pant string wrapped around his neck.

> Every facility shall have the appropriate number of jailers at the facility 24 hours each day.  Facilities shall have an established procedure for documented face-to-face observation of all inmates by jailers no less than every 60 minutes.
>
> **A review of video submitted after a custodial death revealed an inmate was able to enter a restroom and remain unobserved for 88 minutes before being discovered.**

210.    This occurred in the Joint Processing Center where there were not enough officers to properly observe the detainees and to quickly classify and book the detainees to get them the mental and medical care needed and to prevent them from injuring themselves.

211.    Harris County has a continuing and ongoing policy, practice, and custom of failing to properly monitor and observe detainees which leads to the violation of their constitutional rights. Specifically, in this report, it showed that Harris County's policies of failure to observe permitted Mr. Cortez to commit suicide and prevented a timely provision of medical care.

212.    This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

213.    Further, this report exemplified the staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst detainees and by officers on detainees.

214.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### m.  Texas Commission on Jail Standards August 28, 2023, Report.

215.    In a continuing pattern of non-compliance with ***minimum*** jail standards, on August 28, 2023, TCJS issued its report and Notice of Non-compliance from its August 13–18, 2023, random inspection of the jail. This special inspection found that the jail was still in non-compliance with numerous minimum standards that should have been fully addressed after the reports from 2022.

216.    First, as identified in the previous reports, Harris County was continuing to hold detainees in booking longer than 48 hours without the proper evaluation of those detainees. This was an issue identified in 2022 and early 2023 that had not been addressed. Some of the detainees were kept in these holding cells for an additional two days longer than the maximum allowed time. This shows a continuing issue with failing to have enough staff to provide proper medical care to the detainees held in holding cells. Similar to Plaintiff, instead of receiving immediate medical care, detainees are placed in holding cells and left for indefinite periods of time before they are seen in the clinic for their cursory evaluation and sent back to general population.

217.    Second, several detainees were improperly classified resulting in them being placed in incorrect housing areas. For example, a detainee who was supposed to be kept in a minimum custody area was placed with maximum custody detainees for nine days before the discrepancy was caught. This incorrect classification is consistent with the patterns, practices, and procedures of the jail that result in detainees not receiving the proper care for their classification and not being placed in facilities that meet their needs.

218.    Third, TCJS also found that the jail were not properly documenting and ensuring that detainees were given their allotted dayroom time or access to a shower. This issue is the result

of the overpopulation and understaffing of the jail which impedes the officers' availability to provide the basic needs of the detainees.

219.    Fourth, consistent with the reports for the prior year, Harris County was found to exceed the minimum required observations times on a "routine basis."

> **60-minute observations of inmates were routinely exceeded by staff anywhere from 1 minute to 1 hour 18 minutes. Additionally, observation records for areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined were routinely exceeded by staff anywhere from 1 minute to 2 hours 38 minutes.**

Instead, many officers were "completing" their face-to-face observations from the control stations instead of looking at the actual inmates. The officers would either scan the QR codes within the control station or in the housing area without actually conducting the observation. This is consistent with how the officers were trained to not actually conduct face-to-face observations to determine the mental, physical, and emotional well-being of the detainees. It is also consistent with the understaffing and overcrowding of the Jail as there are not sufficient numbers of officers to conduct observations timely and thoroughly but instead officers have to rush to meet any requirements. Further, these observation requirements are consistent with the lack of proper supervision as supervisors should ensure that observations are being done properly.

> t.)  **Technical assistance provided** - During the walk through of the facility the inspection team observed jailers documenting the required visual observation of inmates by scanning QR codes that were located within the housing control station. While the housing control station allows for viewing of the inmate housing area, the jailer never left the housing control station and inspection staff does not believe that the officer is able to visually observe every inmate, face-to-face, that is assigned to the housing area. Officers were also observed scanning QR codes located within the control station without conducting a face-to-face observation of the inmates assigned to that housing areas. Facilities shall have an established procedure for documented face-to-face observation of all inmates by jailers no less than once every 60 minutes according to minimum jail standards. **Follow-up**

220.    Fifth, TCJS found that Harris County did not meet the minimum staffing requirements for each facility. "It was determined that staffing was still not sufficient to perform required functions. Required functions including transporting of inmates, medication passes, face

to face observations, and feeding are not being performed withing minimum jail standards due to inadequate staffing within the housing units." Feedings, which are normally conducted by an officer with the assistance of a trustee, are instead handled exclusively by a trustee while an officer looks on from the control station due to the short staffing. This is further confirmation of the existence and extent of the understaffing and overcrowding of the Jail and the affect that this condition has on the other functions of the Jail which also form the conditions in Plaintiff's claims.

221.    To make matters worse, detainees in the medical unit and mental health units were not being allowed to participate in the required recreation time allegedly because the doctors had stated that they should not participate in the recreation. However, when asked for prescriptions or doctor's orders prohibiting their participation in recreation, the Jail could not provide any paperwork supporting their decision. Jail staff were also shortening other detainees' recreation time without any justification.

222.    As this report shows, Harris County has a continuing and ongoing policy, practice, and custom of failing to properly monitor and observe detainees which leads to the violation of their constitutional rights. This report is additional evidence that despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continued to know that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.

223.    Further, this report exemplified the ongoing staffing and overcrowding issues which is part of Harris County's ongoing policy which inhibits proper medical care, proper supervision, proper response to medical needs and emergencies, and proper deterrence of violence both amongst detainees and by officers on detainees. The report exemplifies the inappropriate measures the officers take to try to superficially meet the minimum standards without actually

meeting those standards. This can be seen in the fact that the officers are scanning QR codes and reporting that they conducted face-to-face observations without ever actually conducting those observations.

224.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### n.  Texas Commission on Jail Standards February 20, 2024, Report.

225.    From February 12–16, 2024, TCJS conducted another inspection of the Harris County Jail. This inspection resulted in a Notice of Non-compliance being issued on February 20, 2024, which found that Harris County Jail continued to be out of compliance with the minimum jail standards.

226.    TCJS found that Harris County was failing to ensure that detainees were receiving medication prescribed by their doctors. As an indication of the incorrect policies, procedures, and training within the jail, detainees who were sent to Court during medicine call are "counted as no-shows" instead of the jail staff ensuring that the detainees are receiving their medication. A detainee should not have to choose between getting their required medicine and appearing for their day in court. This is a recurring issue with several prior reports and the DOJ 2009 Report finding this same issue. This same issue was a direct cause of the death of Kristan Smith and Matthew Shelton and is an indication of the ongoing custom and practice of detainees failing to receive any medical attention or their medications leading to their death or serious injury.

227.    As a common theme throughout each TCJS report, Harris County failed to comply with the minimum observation requirements by a significant amount of time.

> 60-minute observations of inmates were exceeded by staff in January approximately 1400 times by 2 minutes to 115 minutes. Additionally, observation records for areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined exceeded the 30-minute observation by 2 minutes to 195 minutes. This deficiency is continued from the August 28, 2023, inspection.

228.    Additionally, Harris County also failed to meet the minimum staffing requirements several times. This deficiency has been ongoing since 2009.

> On more than one occasion, Harris County failed to meet the 1:48 as required by standards. This deficiency is continued from the August 28, 2023, inspection.

229.    This report like the 14 reports previously provides another example that Harris County has a continuing and ongoing policy, practice, and custom of failing to properly monitor and observe detainees which leads to the violation of their constitutional rights.

230.    Despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continues enforcing, implementing, and encouraging these policies, practices, and procedures that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care which constitutes deliberate indifference to the rights of the detainees within their care.

231.    This report exemplified the ongoing staffing and overcrowding issues which is part of Harris County's continuing policy which inhibits proper medical care, proper supervision, proper response to medical needs and emergencies, and proper deterrence of violence both amongst detainees and by officers on detainees. This report shows the ongoing impact that the

overcrowding and understaffing have on all aspects of detainee care and the continued training and supervision issues which Harris County failed to ever correct.

232.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

### o. Texas Commission on Jail Standards April 10, 2024, Report.

233.    On April 10, 2024, TCJS issued a special Notice of Non-Compliance due to the unconstitutional acts of the officers in the jail in conducting unjustified disciplinary actions against detainees creating dangerous conditions to the detainees.

234.    On April 8, 2024, TCJS conducted a surprise inspection to address detainee complaints that jailers were taking their mattresses for extended periods of time as a way to punish the detainees without any justification. Many detainees were required to sleep on their metal bunks. Notably, the detainees who were interviewed all said that this was a common practice amongst jailers which is an indication of the jailers' lack of training on proper detainee interaction, disciplinary actions, and de-escalation techniques as this form of punishment further agitates the detainee population.

235.    TCJS found that the detainees were correct and that the officers were removing detainees' mattresses for no purpose for several hours at a time. The officers were not conducting a contraband search or any other justified basis for removing the mattresses.

236.    This report provides another indication of the unconstitutional policies, practices, and conditions of the jail as officers are permitted to take whatever action against the detainees they wish with no proper training, supervision, or discipline for their actions. This exemplifies the lack of training the officers have for proper detainee interaction and shows that the officers take the expedient route instead of the proper route when responding to detainee needs. This

exemplifies deficiencies in the supervision plan of officers as supervisors were approving and joining these improper actions which clearly violated constitutional rights.

### p. Texas Commission on Jail Standards August 20, 2024, Report.

237.     On August 20, 2024, TCJS issued a Certificate of Compliance for the first time in several years for the Jail based on an inspection of the Jail from August 12-15, 2024. However, Harris County did not stay in compliance very long as subsequent inspections revealed and this inspection still had several areas that Harris County still needed to correct to be in compliance which illustrate the ongoing policies, lack of training, lack of supervision, and conditions of the Jail.

238.     TCJS noted in relation to "Supervision" that although the Jail was meeting the ratio minimums, they were counting support staff in that ratio who were not actually supervising any detainees. TCJS also specifically noted that Harris County was improperly counting officers who left the floor to take detainees to court or other areas of the Jail within the ratio, but once an officer leaves a floor then they are no longer able to count towards the ratio. This is a common occurrence as officers routinely throughout a shift leave the floor meaning that the floor does not have enough staff to meet minimum standards let alone complete the minimum tasks for detainee safety. This is another example of the affect that understaffing and overcrowding have on detainees.

239.     This also affects the ability of the supervisors to properly supervise their officers to make sure they are following proper policies and that there are enough officers available to de-escalate situations and provide proper responses to any issues. These are some of the same conditions and policies that were the moving force in Plaintiff's claims.

**q. Texas Commission on Jail Standards December 16, 2024, Report.**

240.    On December 16, 2024, TCJS issued a notice of non-compliance to the Harris County Jail for failing to properly search a wheelchair that contained contraband. This is another illustration of the understaffing and overcrowding of the Jail as the officers were not fulfilling their duties and were not being supervised properly causing them to rush and not complete their tasks. This exemplifies the existence and influence of some of the policies, conditions, and lack of supervision that were also the moving force in Plaintiff's claims.

**r. Texas Commission on Jail Standards January 13, 2025, Report.**

241.    On January 13, 2025, TCJS issued a notice of non-compliance to the Harris County Jail.

242.    TCJS found that officers had documented that they had conducted proper observations of detainees without actually conducting the observations. Specifically, TCJS found that the officers had not actually conducted face-to-face observations as required to assess the mental, physical, and emotional well-being of the detainees. Because they failed to conduct proper observations, a detainee did not receive proper medical care resulting in him passing away.

243.    Despite being made aware of these issues through numerous non-compliance notices, the Harris County Sheriff continues enforcing, implementing, and encouraging these policies, practices, and procedures that the Jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care which constitutes deliberate indifference to the rights of the detainees within their care.

244.    This report exemplified the ongoing staffing and overcrowding issues which is part of Harris County's continuing policy which inhibits proper medical care, proper supervision,

proper response to medical needs and emergencies, and proper deterrence of violence both amongst detainees and by officers on detainees. This report shows the ongoing impact that the overcrowding and understaffing have on all aspects of detainee care and the continued training and supervision issues which Harris County failed to ever correct as officers are continuing to conduct observations in the same manner that they were years prior to this notice.

245.    These same policies and customs identified in this report are also the moving force behind the constitutional violations at the heart of Plaintiff's claims.

**s.    Texas Commission on Jail Standards May 6, 2025, Report.**

246.    On May 6, 2025, TCJS issued another notice of non-compliance to the Harris County Jail for failing to provide proper medical care to a detainee due to a lack of staffing.

247.    Specifically, TCJS found that a detainee had submitted a medical request about suffering from chest pains which was ignored. Medical staff could not conduct the assessment because the Jail lacked sufficient staff to assist medical with the evaluation.

248.    This failure continues to show the ongoing policies, procedures, conditions, lack of supervision, and lack of training for providing proper medical care to detainees. This incident also illustrates the extent of the understaffing and overcrowding of the Jail and the affect that condition has on the rendition of medical care to detainees timely.

249.    This incident is similar and illustrates the same issues that occurred in Plaintiff's claim as he was placed in a solitary cell without receiving immediate medical care despite his obvious injuries due at least in part to the lack of staff to provide him with medical care and evaluation that he needed. Accordingly, this notice illustrates the conditions, policies, lack of training, and lack of supervision that was a moving force in Plaintiff's claims.

**t.    Texas Commission on Jail Standards June 30, 2025, Report.**

250.    On June 30, 2025, TCJS issued their notice of non-compliance based on their inspection of the Jail from June 23-27, 2025.

251.    TCJS found that Harris County has a continuing issue of keeping detainees in holding cells longer than the maximum 48 hours permitted. This issue is directly related to the lack of staff to be able to transfer detainees and ensure that they are being properly observed and provided the medical care needed.

252.    TCJS also noted that Harris County continues to have problems ensuring that detainees are given the proper day room time. This also was a result of documentation and classification issues which are ongoing from multiple reports over two years prior.

253.    TCJS found that Harris County was also not compliant with ensuring that staff were following physician orders with detainees not receiving materials that were ordered for them by a physician for 18 days. This exemplifies the ongoing issues with the lack of medical care for detainees also directly correlated with the lack of staffing and supervision.

254.    As exemplified by the prior notices of non-compliance, TCJS again noted the ongoing observation and monitoring deficiencies by Harris County Jail officers which is consistent with their lack of training, improper training, and lack of supervision. A detainee was left in a court holding cell for 5 hours and 45 minutes before being found. Officers did not conduct any observation of the detainee during that time period. This deficiency is a direct result of the understaffing, overcrowding, and lack of training in the Jail which permits officers to act as they wish with no potential repercussions.

255.    This report shows additional examples of the policies, procedures, lack of training, and lack of supervision which were the moving force in Plaintiff's claims.

### u.  Texas Commission on Jail Standards August 3, 2023, Meeting.

256.     Since several of the Notices of Non-compliance were issued, the quarterly meetings of the Texas Commission on Jail Standards have heavily focused on the issues facing the Harris County Jail. These meetings have included testimony by several high officials within the Harris County Sheriff's Office and the County itself with representatives from Sheriff Gonzalez and Judge Hidalgo.

257.     Specifically, the quarterly meetings that occurred on August 3, 2023, November 2, 2023, February 1, 2024, and May 2, 2024, [16] pointed out the ongoing policies and procedures in the jail specifically the lack of conducting proper observations and the overcrowding and understaffing of the jail. In each meeting, the Harris County representative admitted that they were overcrowded and understaffed. The representatives in the May 2024 meeting even went as far as stating that they are unlikely to meet the minimum standards for a long period of time and even requested that they be excused from meeting those standards. Thankfully, TCJS's commissioners pointed out that almost every other county jail is able to meet their staffing requirements and meet all other minimum requirements, so Harris County has no excuse. TCJS pointed out that all of the issues for meeting the minimum standards including the observations, providing medical care, the history of violence between officers and detainees, and the actions of the officers when interacting with detainees all stem from the overcrowding and understaffing of the jail which has been ongoing for almost two decades.

258.     In the November, February, and May meetings, TCJS notified Harris County that they would be removing beds from Harris County to force them to lower their population. This

---

[16] The video recording of these meetings are a matter of public record and are available at the Texas House of Representatives' website. https://house.texas.gov/video-audio/capitol-events/ Unlike most meetings, the November 2023 meeting was not livestreamed or properly recorded and saved in the state archives as required by law.

removal of beds would continue until the population and staffing requirements were met. As of the date of the filing of this Complaint, these issues have not been addressed and continue causing ongoing constitutional violations as per the policy, practice, and procedure of the jail.

### v.  May 11, 2023, Remedial Order.

259.    On May 11, 2023, TCJS reviewed the multiple areas of the Jail that had been out of compliance with minimum standards for the better part of the year prior. TCJS determined that Harris County was not addressing any of the areas including observation, staffing, and medical care for the detainees.

260.    TCJS specifically found that each of the areas of non-compliance were directly correlated to the understaffing and overpopulation of the Jail. These are the same policies, conditions, training, and supervision which are the moving force of Plaintiff's claims.

261.    To remedy this situation, TCJS issued the First Remedial Order "requiring Harris County to comply with minimum jail standards in regards to staffing" requiring the County to provide a new staffing plan within 90 days. This First Remedial Order has still not been resolved over two years after it was issued.

### w.  May 2, 2024, Remedial Order. [17]

262.    On May 2, 2024, TCJS issued its Amended Remedial Order pointing out the continued deficiencies in the Harris County Jail and their failure to remedy the conditions and policies of the Jail to meet minimum standards.

263.    The Amended Remedial Order provides a strong summary of the notices of non-compliance from September 2022 forward. This Order shows the ongoing issues and policies

---

[17] The Remedial Orders are a matter of public record. Plaintiffs request that the Court to take judicial notice of these orders.

within the Jail for failing to observe and monitor detainees and provide proper and timely medical care to detainees directly correlating to the understaffing and the overcrowding of the Jail.

264.    TCJS determined to amend the Remedial Order to require Harris County to remove detainees from the Jail whether through sending them to other facilities or through releasing detainees who were not required to stay in the Jail to lower their population to an amount that corresponded with the appropriate number of staff that the Jail actually had available. This Order was in conjunction with a prior order lowering the number of beds that Harris County could contain in its operation to try to force Harris County to get a grip over the rampant issues associated with the understaffing and overcrowding of the Jail.

265.    However, in the August 2025 Meeting of TCJS, TCJS identified a Second Remedial Order which recognizes the continued issues with the Harris County Jail that have still not been addressed. The Texas Attorney General was directly involved in writing this order and is contemplating an enforcement action against Harris County to get the Jail under control.

266.    Each of the remedial orders identifies the ongoing conditions, policies, lack of training, and lack of supervision within the Harris County Jail that were the moving force in Plaintiff's claims.

267.    Harris County's deliberate indifference to the rights of the detainees is further evidenced when combining the TCJS reports with Harris County's own written policy which identifies the proper procedure for conducting observations.

6. **Observation** – Means to obtain a firsthand evaluation of the inmates' attitudes and temperament, while paying close attention to the physical, mental, and emotional condition of each inmate to detect signs of distress or need for medical, psychological or other special services. (See III, D, (1-12) for additional requirements. **OBSERVATION REQUIRES THE STAFF MEMBER TO ACTUALLY LOOK AT AND EVALUATE EACH INMATE. IF YOU CANNOT SEE THE INMATE, YOU DID NOT COMPLY WITH REQUIREMENTS REGARDING INMATE OBSERVATION!**

268.     In light of the continuous findings that Harris County jailers are not actually observing the detainees through the TCJS findings and the numerous similar incidents below, Harris County has ratified and created a culture where officers are no longer required to complete accurate and proper face-to-face observations. If the officers had conducted the proper observation and "paid close attention to the physical, mental, and emotional condition" of Plaintiffs, they would have observed their condition and should have provided immediate medical care. However, per Harris County's de facto and ratified practices, policies, and procedures, offices did not conduct these proper observations. Each of these failures in observation evidence the understaffing and overcrowding of the Jail while also demonstrating the utter failure of the supervision plan of the Jail as supervisors are either personally involved in the violations or failing to actually supervise and correct these violations by the officers under their care.

### iv.     KHOU *Struck* Documentary Demonstrates the Rampant Policy of Officers Using Excessive Force Against Detainees and the County's Failure to Train and Supervise Their Officers.

269.     As stated above, on December 4, 2024, news station KHOU in Houston published their documentary, *Struck*, that explained the findings of their years-long investigation into the excessive use of force by officers against detainees in the Harris County Jail. Plaintiff again incorporates this documentary as if fully stated herein.

270.     As stated in the documentary, KHOU investigated and reviewed over 3,000 use of force incident reports produced by Harris County that occurred from 2020-2024. These use of force reports focused specifically only on officers that struck detainees in the head with closed-fist strikes (punches), elbows, knees, forearms, or other body parts. Having 3,000 use of force reports in that short period of time dwarfs the number of use of force reports in any other Texas county or in any other comparable jail in the country.

271.    KHOU included in the documentary some video footage of these incidents that they were able to gather from various sources. These video clips show officers running and punching detainees in the face knocking them out in all parts of the jail including the JPC. Other officers are seen punching detainees who are simply sitting on a bench or the ground. Similar to Plaintiff's incident, several of the incidents involve officers punching the detainee for a perceived slight while the detainee is not threatening or simply trying to talk with the officer.



*Officer in the JPC who takes a running start and punches the detainee knocking him out in one punch.*

272.    Other incidents show multiple officers punching the same detainee when they are being held by other officers, restrained, or on the ground. Each of these are nearly identical to Plaintiff's situation. The officers were all acting in accordance with the same training to use punches to the head and neck as a matter of first resort instead of attempting any de-escalation techniques that did not involve a use of force. Several incidents involved supervisors being

involved in the force, assault, or failing to stop the incident from occurring. Most of the officers received little to no discipline for what occurred.



*Officer punching a detainee who was simply backing up and covering his head.*

273.    Sheriff Gonzalez was interviewed during the documentary and discussed several of the incidents and videos themselves. Sheriff Gonzalez admitted that many of the incidents involved use of force that was uncalled for and improper. Sheriff Gonzalez also admitted that the training at the Jail relating to the use of punching detainees was lacking and that they were not properly training officers on the proper use of force. Specifically, Sheriff Gonzalez admitted that the County's training was not sufficient for training officers when they can use closed-fist strikes failing to actually train the officers that closed-fist strikes to the head and face are deadly force and can only be used when deadly force is necessary. In fact, no where in the Harris County's written policies, manuals, or training regimen is there any discussion on the "do's and don't's" of striking detainees in the head.

274.    Sheriff Gonzalez also admitted that multiple categories of the use of force incidents where the officer used a closed-fist strike to the head were unwarranted. Specifically, KHOU noted

that officers were using closed-fist strikes to the head against detainees that "refused orders," "grabbed a detention officer," or "made verbal threats." Sheriff Gonzalez agreed that those situations do not warrant a closed-fist strike to the head. "[Question] Would any of those categories in your mind warrant a closed fist blow to the head? [Sheriff Gonzalez's Answers] Those type of scenarios to me would not."

275.    Notably, during Plaintiff's incident, the officers immediately resorted to using closed-fist strikes to Plaintiff's head and face in accordance with that deficient training. These officers used the closed-fist strikes as a matter of first resort both in retaliation for Plaintiff shrugging his shoulder and while he was being held by the officers both standing up and on the ground where the officers continued to punch him in the head, neck, face, and back. Sheriff Gonzalez as the policymaker for the Harris County Jail essentially admits to the deficient training that the officers were under at the time Plaintiff was injured.

276.    The documentary also revealed that from January 2020-January 2024 and out of thousands of use of force incidents and 810 specific excessive force incidents that officers were only disciplined ten times. Sheriff Gonzalez admitted that officers did not get disciplined for striking detainees in the head under these circumstances. In relation to disciplining officers for head strikes, Sheriff Gonzalez stated, "Yes, I think that we weren't firm enough or clear enough to really address that part of it." Sheriff Gonzalez also admitted that the personnel early warning system which is supposed to identify potential officers to discipline for uses of force did not work. Even when officers were charged with crimes relating to their use of force, Harris County would not discipline those officers and would allow those officers to remain working with inmates with many of them punching other detainees in the head for various questionable reasons. In one example, an officer who was charged with assault struck three other detainees in the head and then

his supervisor determined that he would "become a great field training officer" illustrating both the failure in the County's training and supervision plans.

277.    The documentary also interviewed a former Jail officer who admitted that the use of excessive force and punching detainees was a part of the culture where officers would brag about how many uses of force they had. The officer admitted that staffing, overpopulation, overworking, and ultimately not being held accountable fueled this violence towards detainees. All of these items are conditions, policies, and practices that were the moving force in Plaintiff's claims.

278.    After admitting that Harris County's policies and training on the use of force sends the "wrong message" to their officers, Sheriff Gonzalez changed its written policy on using closed fist strikes identifying that they should only be used as last resort and when deadly force can be used. [18] Sheriff Gonzalez admitted that the officers were using closed-first strikes to the head as "an impulsive reaction or the first reaction." In relation to the deficiencies noted in *Struck*, Sheriff Gonzalez stated that "[y]ou brought some things to our attention that we could be doing better … and obviously when it comes to this [use of force policy and training], we weren't." These changes do not indicate that any actual changes have occurred as officers continue to use closed fist strikes to the head as a matter of first resort, but it does serve as an admission of the existence of a policy, practice, and lack of training of officers routinely using excessive force against detainees including Plaintiff. The data supporting *Struck* were the Jail's own documentation and videos which a reasonable policymaker would have been aware of and changed. However, Sheriff Gonzalez ignored the prior reports and the Jail's own internal reporting showing a complete deliberate

---

[18] https://www.khou.com/article/news/investigations/harris-county-jail-punching-policy/285-455486bd-890e-4e01-84c9-40c0c39d1f0b Discussion of the change in the policy and Sheriff Gonzalez's own statement on the issues with the training and policies incorporated herein.

indifference to the existence of these policies and conditions and with complete indifference for the effect these policies have on the safety and well-being of the detainees in the custody of the Jail.

> **v.    Prior And Concurrent Detainee Deaths and Injuries Due to Harris County's Unconstitutional Policies, Customs, Failure to Train, Failure to Supervise, and De Facto Policies Relating to Excessive Use of Force Incidents**

279.    In addition to the DOJ Report, the admissions by Harris County Sheriffs, the Serious Incident Reports, and the TCJS reports, numerous detainees suffered similar violations of their constitutional rights as Plaintiffs which further corroborates Harris County's pattern, practices, and customs even though specific prior examples are not required to meet the elements for Plaintiff's claims. *Feliz v. El Paso Cnty.*, 441 F. Supp. 3d 488, 499 (W.D. Tex. 2020).

280.    In this section, each of the comparators were involved in an excessive use of force with an officer. Many if not all of the other comparators also illustrate other policies, conditions, failure to train, and failure to supervise similar to the policies, conditions, training, and supervision which were the moving force in Plaintiff's claims.

> **1)  Daevion Young**

281.    Daevion Young was a Plaintiff in this case originally prior to the Court severing his claim from Plaintiff's. Plaintiff incorporates Mr. Young's live complaint into this Complaint as if set forth fully herein.

282.    In March 2024, Daevion Young was in the Harris County Jail. Mr. Young was on the same floor as Mr. Chavez-Sandoval when Mr. Chavez-Sandoval was recovering from his injuries.

283.    On or around March 6, 2024, Mr. Young was in jail and was placed in handcuffs while in the presence of some officers. While Mr. Young was handcuffed, the officers unjustifiably

punched Mr. Young several times and slammed his head into the wall. Mr. Young suffered and continues to suffer head, neck, and other injuries as a result of this unjustified and excessive use of force. Punching Mr. Young in the head and slamming him into the wall while restrained is clear excessive force as no force is justified when a detainee is restrained.

284.    The officers punched Mr. Young in the head and slammed him into the wall in accordance with the policies, practices, and training of the Jail as they did not attempt to use any de-escalation techniques and used closed fist strikes to the head as a matter of first resort and in retaliation for any perceived slights. Similar to Mr. Young, the officers in Plaintiff's incident also punched him needlessly and in retaliation for a perceived slight and while he was being restrained by multiple officers.

285.    To add insult to injury, Mr. Young was placed in solitary confinement for the next 28 days with an occasional hour out of the cell in the dayroom. Mr. Young was not provided proper follow up medical care for his injuries and was precluded from any interaction with other detainees. This resulted in severe anxiety and depression due to his injuries and lack of proper care and interaction. Similar to Plaintiff, the officers knew that Mr. Young needed to be taken to a clinic and provided a full evaluation for potential head injuries or other life-threatening injuries, but instead Mr. Young was not taken immediately to the clinic and when he was he was only provided a cursory evaluation and sent back to his cell. This caused exasperation of his injuries. The officers were acting in accordance with their training in not providing a full evaluation or providing immediate medical care. The supervisors agreed with this approach and approved the use of force. No officers were disciplined for the lack of medical care or excessive force.

286.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use

more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Young's injuries.

287.    Failure to properly observe and monitor Mr. Young and conduct proper face-to-face observations while holding him in solitary confinement led to inadequate medical care being provided to him in a timely manner and impeded proper follow up care for his injuries which caused and exacerbated Mr. Young's injuries.

288.    Harris County Jail's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees and created the environment which intensified the violence against detainees which were the direct cause and moving force of Mr. Young's injuries. Overcrowding and understaffing the jail resulted in the officers resorting to violence too quickly to get a quick result from the detainee instead of following proper techniques to get compliance, and increased the stress and psychological outlook of these officers resulting in them making poor decisions and resulting in excessive force such as in this case. It also slowed down the intake process and classification process which led to Mr. Young being kept in solitary confinement for far too long without the proper follow up medical care for his injuries because of the lack of staff to conduct the reclassification and provide the care for Mr. Young. The lack of staff and overcrowding also led to only a cursory evaluation of Mr. Young's injuries and caused the officers to use excessive force due to the increased stresses and the inability to take the time to de-escalate situations resulting in officers needlessly escalating incidents.

289.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Young suffered his injuries.

### 2)  Jacoby Pillow

290.    The family and representatives of Jacoby Pillow filed nearly identical claims against Harris County due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

291.    On January 1, 2023, Mr. Pillow was placed in the Harris County Jail on a misdemeanor charge.

292.    Mr. Pillow was then set to be released the next day after posting a $100 bond. Mr. Pillow should have been released the same day he posted bond.

293.    However, Mr. Pillow was inexplicably kept in a medical holding cell instead of being placed in the joint processing center in preparation for release. Throughout his time in the Jail, Mr. Pillow was visibly experiencing a mental health crisis; however, the officers did not provide him any medical or mental health care and just left him in solitary confinement based on cursory reviews of his condition due to the understaffing and overcrowding of the Jail very similar to Plaintiff's post injury care.

294.    Despite being prepared to leave, Mr. Pillow was allegedly involved in an altercation with an officer which resulted in the Jail charging him with another crime to keep him in the Jail longer. While Mr. Pillow was standing in his solitary cell, the officers opened the door and rushed at Mr. Pillow causing him to tense up and try to defend himself from this assault. During the officer's use of force, multiple officers punched Mr. Pillow in the head, neck, face, and body while another officer struck Mr. Pillow in the head and face with his knee even while multiple officers were holding Mr. Pillow. Similar to Plaintiff, these officers immediately escalated to using this

form of deadly force without any use of de-escalation techniques. The officers could have remained outside of his cell with a door between them and Mr. Pillow, but in accordance with their training, they opened the door, rushed at Mr. Pillow, and immediately began punching and kneeing Mr. Pillow in the head and face. Also similar to Plaintiff, while holding Mr. Pillow to the ground, the officers picked up Mr. Pillow's ankles and placed him against his back in a hog-tie position which is considered excessive force. In this altercation, multiple officers beat Mr. Pillow to the point where he had significant blunt force trauma to his head, back, and extremities. The officers placed their weight onto Mr. Pillow's chest and back preventing him from breathing until they stopped beating him. Ultimately, each of the officers that have testified agree that they were acting in accordance with the policies, practices, and training they received at the Jail. Additionally, supervisors were directly involved in this incident approving the actions of the officers and telling the officers to rush Mr. Pillow. No officers were disciplined for their actions.

295.    Despite the severity of these injuries, the Jail clinic conducted a cursory evaluation and cleared him to go back to the holding cell similar to Plaintiff. Mr. Pillow was left in the cell alone for several hours without any observation or monitoring. Mr. Pillow was then transferred to a holding cell on the 6th floor of 1200 Baker. Mr. Pillow did not receive a full evaluation for head injuries or other life-threatening injuries consistent with the policies, practices, training, and supervision in the Jail and correlated to the understaffing and overcrowding of the Jail.

296.    When Mr. Pillow was being transferred, Mr. Pillow collapsed multiple times but the officers did not take him back to the clinic or provide any medical care. The officers eventually carried Mr. Pillow like a wheelbarrow all around the 6th Floor of 1200 Baker and then placed him in the holding cell while still restrained. The officers left him in the cell unresponsive and failed to actually check to ensure that he was breathing properly or not suffering from a medical issue.

297.    Eventually on January 3, 2023, an officer finally found Mr. Pillow unresponsive in his cell. Mr. Pillow passed away shortly after arriving at the hospital.

298.    Despite Harris County refusing to provide the medical examiner's report, a second autopsy revealed that Mr. Pillow passed away due to compression and blunt force trauma caused by the officers' excessive force. Mr. Pillow should have been processed and released well in advance of the alleged altercation; yet, due to Harris County's rampant practices and policies Mr. Pillow was kept in the Jail and was beat to death when he should have been at home with his family.

299.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalized excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Pillow's injuries and death. The officers' use of excessive force and lack of medical care were in accordance with their training and supervision of the Jail which Sheriff Gonzalez has admitted was deficient.

300.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Pillow died due to the jail's unconstitutional policies, customs, and practices

### 3) Bryan Johnson

301.    The family and representatives of Bryan Johnson filed nearly identical claims as Plaintiff against Harris County, Texas due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

302.    On June 8, 2022, Bryan Johnson was booked into the Harris County Jail with known medical and mental disabilities.

303.     On or around August 5, 2023, Mr. Johnson was in his cell on the 6th floor of 1200 Baker when several officers asked him to leave the cell as they wanted to investigate a potential detainee/detainee fight. As he was walking out of his cell, an officer pushed Mr. Johnson in the back causing him to stumble. Several officers then tackled Mr. Johnson, placed him on the ground, and began beating him outside of his cell and placed him in restraints. This beating lasted several minutes. The use of force was consistent with the actions the officers took in Plaintiff's case as the officers used closed fist strikes to Plaintiff's head while holding him on the ground and restraining him. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to closed-fist strikes and other excessive force immediately instead of using de-escalation techniques.

304.     Despite the injuries Mr. Johnson suffered, the officers did not take Mr. Johnson to the clinic; instead, they placed him in the floor's holding cell. This is consistent with the training, supervision, and policies of the Jail. This is similar to Plaintiff's incident where the officers did not take Mr. Johnson to the clinic but instead put him in a holding cell.

305.     Mr. Johnson was not taken to the clinic until a couple days later after he was transferred to 701 N. San Jacinto. The clinic did a cursory evaluation and noted that he had injuries to his wrists from the handcuffs, facial bruising, and injuries to his right leg. This cursory review due to the overcrowding and understaffing which prevented them from taking the time to do thorough and appropriate evaluations based on the obvious injuries is consistent with the treatment that Plaintiff received.

306.     Around September 9, 2023, Mr. Johnson began having significant trouble breathing due to the injuries he suffered. He was eventually prescribed an inhaler which was to be kept on

him at all times. Unfortunately, in retaliation, the officers took his inhaler from him and then returned it empty.

307.    Besides providing the inhaler, the Jail did not provide sufficient diagnostic testing that should have been ordered for someone in Mr. Johnson's position. Had they conducted sufficient testing, the Jail would have noticed Mr. Johnson's worsening condition and the sudden onset of lung and heart conditions.

308.    A week prior to his death, Mr. Johnson requested emergency medical assistance for his trouble breathing. Mr. Johnson placed a request on the medical kiosk. However, the Jail did not respond to his requests and did not provide him any medical evaluation. This response is consistent with the policies, training, and supervision of the officers as they do not have the staff or time to respond to medical requests allowing these requests to go unanswered for long periods of time. TCJS and DOJ noted these same issues multiple times over the past two decades.

309.    On October 1, 2022, Mr. Johnson's breathing became worse, and he had another detainee request medical assistance. By the time Jail staff arrived, Mr. Johnson could no longer function. Mr. Johnson was taken to the clinic where he became unresponsive while waiting for care. Mr. Johnson passed away later that day due to the injuries inflicted upon him by the Jail guards which resulted in complications with his heart and lung condition.

310.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalized excessive force by jail employees on detainees, the systemic understaffing and overcrowding of the jail, the lack of training, and lack of supervision were the direct cause and moving force of Mr. Johnson's injuries and death.

311.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Johnson died due to the jail's unconstitutional policies, customs, and practices.

### 4) Jeremy Garrison

312.    Jeremy Garrison filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

313.    Prior to April 23, 2023, Jeremy Garrison was booked in the Harris County Jail.

314.    On or around April 23, 2023, Mr. Garrison was beaten by several detention officers causing him to suffer injuries. Mr. Garrison was talking on the phone when two officers approached him and hung up his call. Mr. Garrison had already complied with count and was told by another officer that he could talk on the phone. When the officers approached they immediately grabbed him. Mr. Garrison sat on the ground after the officers put their hands on him. In response, the officers immediately tackled him to the ground and hit his head on the ground and wall. While on the ground, allegedly because Mr. Garrison's hands were under his body due to the weight of the officers on top of him, one officer began punching Mr. Garrison in the head. The jail alleged that they were investigating this situation, but Mr. Garrison was not provided an update on whether the investigation occurred or not. Mr. Garrison was not aware of any disciplinary action being taken against those guards. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to closed-fist strikes and other excessive force immediately instead of using de-escalation techniques. Mr. Garrison was not a threat and no deadly force was necessary.

315.     On May 20, 2023, Mr. Garrison came out of his cell for his one hour of dayroom time. Mr. Garrison used some of this time to watch television and talk on the phone with his girlfriend.

316.     While on the phone, a detention officer came into the dayroom with a nurse and turned off the television. When Mr. Garrison stated that the officer was not supposed to turn off the television as part of the detainee's right to see the news, the officer replied that the sergeant told the officer to turn off the television. Mr. Garrison then asked to speak to the sergeant. Because Mr. Garrison asked to speak to the sergeant, the detention officer got mad and told Mr. Garrison that he would "put" him back into his cell even though Mr. Garrison was still entitled to his dayroom time.[19]

317.     Mr. Garrison continued to ask to speak with the sergeant to address the television issue. The officer left the dayroom with the nurse and returned with several additional officers but not the sergeant. One of the officers demanded that Mr. Garrison return to his cell, to which Mr. Garrison responded that he still wanted to speak with the sergeant. Mr. Garrison was not threatening, did not raise his voice, did not advance toward an officer, or display any aggressive demeanor.

318.     Instead of simply getting the sergeant, an officer stepped toward Mr. Garrison and sprayed him with pepper spray. Upon being sprayed, Mr. Garrison set the phone down, turned, and walked back toward his cell away from the officers. But the officers could not simply leave Mr. Garrison alone.

---

[19] The issues with cutting off detainees' access to the dayroom was noted by the TCJS above. Jeremy Garrison's case illustrates the reasons and the efforts the officers take to deprive the detainees of their rights. Mr. Young was also deprived of these rights after being beaten by the officers.

319.    While Mr. Garrison was walking away, the officers rushed Mr. Garrison and tackled him to the ground hitting slamming his head into the wall and floor. The other officers then joined the assault and slammed Mr. Garrison against the wall, handcuffed him, and continued to hit him while he was on the ground. Eventually, the officers dragged Mr. Garrison out of the dayroom. The officers that have testified have agreed that their actions were in accordance with their training, supervision, and policies in the Jail.

320.    While escorting Mr. Garrison out of the cell, one officer held Mr. Garrison's handcuffed hands high behind his back which caused Mr. Garrison to walk with his back bent and head pointing forward. The officer then slammed Mr. Garrison into the metal door head first breaking Mr. Garrison's neck. No officer was disciplined for the first two uses of force and only after Mr. Garrison filed a lawsuit and several years later did the officer get disciplined and charged with a crime for breaking Mr. Garrison's neck. Instead of the officers taking pictures of the blood on the floors and walls of the dayroom, the officers had workers clean up the blood before any pictures could be taken. Several detainees asked to provide witness statements, but no officer came and took their statement. These detainees can testify to these facts and the ongoing issues within the jail itself. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to closed-fist strikes and other excessive force immediately instead of using de-escalation techniques.

321.    The detention officers were acting under the common policies, practices, and procedures of the Harris County Jail in taking matters into their own hands. No sergeant or other commanding officer ever came in to interfere or prevent this assault. Supervisors actually approved these actions, did not discipline any officers, and determined that these actions were in accordance with the training and policies of the Jail.

322.    Eventually, Mr. Garrison was taken to the hospital. The doctors found that Mr. Garrison was assaulted by the jail guards resulting in a "Hangman's" fracture of his neck. The doctors found that Mr. Garrison was lucky to be alive and not paralyzed. His injuries required that Mr. Garrison undergo immediate neck surgery.

323.    In addition to his broken neck, Mr. Garrison suffered extreme bruising, head trauma, lacerations to multiple areas of his body, loss of consciousness, visual changes, and loss of strength and use in his right hand as a direct result of Harris County's actions.

324.    Consistent with Harris County's policies, the officers falsified the report of the incident to the medical providers. The medical records show that the officers told the emergency responders that only pepper spray was involved. The doctors knew that this statement was false in light of Mr. Garrison's injuries. The hospital rejected this story and determined that the officers assaulted Mr. Garrison causing the above injuries. [20]

325.    Due to the actions, policies, practices, and customs of Harris County, Mr. Garrison suffered significant injuries to his head, neck, and arms.

326.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of institutionalizing excessive force by jail employees on detainees, the systemic understaffing and overcrowding of the jail, the failure to train officers on de-escalation and appropriate use of force, and failure to supervise were the direct cause and moving force of Mr. Garrison's injuries.

327.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Garrison suffered his injuries.

---

[20] A copy of the article discussing Mr. Garrison's incident and the delayed indictment of the officer is incorporated herein. https://www.khou.com/article/news/investigations/harris-county-detention-officers-charged-inmate-assault/285-8a93d47b-64d2-4c16-9053-74def3f91ebd.

### 5)  Zachery Johnson

328.     Zachery Johnson filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

329.     On or around May 29, 2023, Zachery Johnson was booked into the Harris County Jail. On or around June 6, 2023, Mr. Johnson was attacked by another detainee causing him to have a red eye and other bruising on his body. Officers did not interfere with or prevent this attack on Mr. Johnson. Officers were not properly monitoring or observing detainees to prevent this attack.

330.     Eventually, Mr. Johnson passed out due to the inadequate medicine provided to him by the jail and was taken to the hospital.

331.     A few days later, Mr. Johnson was assaulted by numerous officers within the jail. The officers used closed-fist strikes and other uses of force as a matter of first response instead of attempting to de-escalate the situation. The severity of this assault caused Mr. Johnson to suffer seizures during the assault and go in-and-out of consciousness multiple times. Mr. Johnson did not have any prior history of seizures. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to strikes and other excessive force immediately instead of using de-escalation techniques.

332.     Despite suffering from severe injuries and languishing in pain, the jail did not provide adequate care for his injuries and forced him to remain in the general population of the jail. Similar, to Plaintiff, Mr. Johnson when sent to the clinic only got a cursory evaluation. No

officer was disciplined or corrected by any supervisor for their actions in using excessive force, failing to de-escalate the situation, and failing to provide medical care.

333.    On June 13, 2023, Mr. Johnson's family, for fear of his life, were able to get Mr. Johnson released from the jail and took him to a hospital near their home.

334.    The hospital found that due to the assault by the officers, Mr. Johnson suffered a fractured skull, a fractured neck, a fractured spine, and fractured ribs. Additionally, Mr. Johnson's head injuries caused him to have blood on his brain. No reasonable use of force would have caused these severe injuries. Instead, Harris County's policies, practices, and procedures encouraging officers to use excessive force caused these injuries. Mr. Johnson was care flighted to a larger hospital that could handle Mr. Johnson's life-threatening injuries.

335.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalization of excessive force by jail employees on detainees, promulgation of a culture of violence amongst detainees, systemic understaffing and overcrowding of the jail, failure to train, and failure to supervise were the direct cause and moving force of Mr. Johnson's injuries.

336.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Johnson suffered his injuries due to the jail's unconstitutional policies, customs, and practices.

### 6)  Kenneth Richard

337.    Kenneth Richard filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

338.    On April 22, 2023, Kenneth Richard was booked in the Harris County Jail with a history of anxiety for which he was taking medication.

339.    On or around April 27, 2023, Mr. Richard had an anxiety attack due to Harris County's failure to provide him with his medication regularly. Mr. Richard was able to call for medical help and walked normally to the clinic. This is another example of the policy and condition of failing to provide medical care. Mr. Richard had complained to his mother about the terrible conditions within the Jail over the phone.

340.    While sitting in the clinic, Mr. Richard was waiting to receive care when an officer came in and placed him in handcuffs and leg shackles. Mr. Richard thought this was unusual as they had never shackled him in the clinic previously.

341.    Two officers then came into the clinic and escorted Mr. Richard to a holding cell nearby which was a notorious spot for officer-detainee beatings. The two officers pushed Mr. Richard into the cell telling him not to talk to his mom anymore. The officers then left.

342.    A few minutes later, the two officers came back with four additional officers. While Mr. Richard was still restrained, the six officers with the approval or acquiescence of their supervisor immediately escalated the situation and began punching him to the ground where they proceeded to stomp on him and kick him. This beating lasted for several minutes. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to strikes and other excessive force immediately instead of using de-escalation techniques.

343.    Mr. Richard lost consciousness and was eventually sent to the hospital with severe head injuries, injuries to his back and chest, blurred vision, memory loss, numbness in his extremities, and PTSD. Mr. Richard had lost the skin around his ankles and wrists where the

shackles had been when he was beaten up. When Mr. Richard was in the hospital, his injuries required him to be intubated while he was unconscious.

344.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, systemic understaffing and overcrowding of the jail, failure to train, and failure to supervise were the direct cause and moving force of Mr. Richard's injuries.

345.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Richard suffered his injuries.

### 7)  Jeremiah Anglin

346.    Jeremiah Anglin filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

347.    On November 28, 2022, Jeremiah Anglin was booked into the Harris County Jail with a known mental illness. Specifically, Mr. Anglin was diagnosed with schizophrenia at four years old. Despite having known mental disabilities, Mr. Anglin was placed into the general population of the Jail instead of in the mental health ward. The Jail did not have enough staff to properly evaluate, classify, and provide the medical care needed for Mr. Anglin. Mr. Anglin was likely not receiving his medications regularly.

348.    On or about January 9, 2023, Mr. Anglin was being escorted by a supervisor and other officers to his cell. Mr. Anglin became distraught (likely suffering a mental episode) and grabbed onto one of the officers and dropped to the floor grasping at the officer. The officers and

supervisor did not attempt any de-escalation techniques including failing to step away or try to use open hand techniques. Instead, one officer immediately delivered 3 elbow strikes to Mr. Anglin's upper back. Because Mr. Anglin was still holding onto the officer, the officer delivered 7 closed-fist strikes to Mr. Anglin's face even though he was not actively threatening anyone and was not posing a threat of physical injury with the number of officers surrounding and grabbing him. Mr. Anglin was then tackled to the ground with his hands getting stuck under him. Again, similar to Plaintiff, the officers in accordance with their training delivered 3 more punches to Mr. Anglin's face. Another officer also punched Mr. Anglin three times in the ribs. Each of these punches are clear excessive force but were in accordance with the policies, training, and supervision of the Jail. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to closed-fist strikes and other excessive force immediately instead of using de-escalation techniques.

349.    Due to this inexcusable use of force, Mr. Anglin had six teeth knocked out of his mouth and significant swelling all over his head.

350.    When Mr. Anglin finally received medical care at the hospital, the doctors had to place multiple screws in his mouth.

351.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, systemic understaffing and overcrowding of the jail, the failure to train, and the failure to supervise were the direct cause and moving force of Mr. Anglin's injuries. Each of these policies, practices, and culture were the same moving force in Plaintiff's claims.

352.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Anglin suffered his injuries.

### 8)  Harrell Veal (AKA Tyrell Bolt)

353.    Harrell Veal filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

354.    On or around January 23, 2022, Harrell Veal (aka Tyrell Bolt) was being escorted by a Harris County Jail officer to the 6th floor elevator in 1200 Baker.

355.    While outside of the elevator and then later inside of the elevator outside of the view of any cameras, the officer lifted Mr. Veal's handcuffed arms high behind his back twisting and hurting Mr. Veal's shoulder and back. Then the officer grabbed the handcuffs and pulled them closer together causing significant pain in Mr. Veal's wrists. The officer had no purpose for inflicting this pain but was instead escalating the situation in accordance with the policies and training of the Jail. The officer was acting in accordance with his training in escalating the situation without using any de-escalation techniques and using improper force techniques. The officer was not disciplined and the supervisors did not correct the officer's actions, review the officer's actions, and acquiesced to the officer's actions.

356.    A few months later, Mr. Veal was not receiving his blood pressure medications. These medications were prescribed to him to help control his medical issues. The Jail staff delayed in providing him his medications if they gave it to him at all. This lack of medical care is directly connected to the understaffing and overcrowding of the Jail as it prevented staff from getting the medical attention to him timely and thoroughly. This is consistent with the findings of TCJS and DOJ over the past two decades.

357.    On or around December 24, 2022, Mr. Veal was attacked from behind by either officers or detainees. The assailants punched and kicked Mr. Veal numerous times in the back, chest, and head. Mr. Veal had significant injuries including broken ribs, bruised back, and numerous broken bones in his head.

358.    Mr. Veal was taken to the hospital where he had a plate put into his head and his eye socket reconstructed. Mr. Veal still suffers from these injuries.

359.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalization of excessive force by jail employees on detainees, promulgation of a culture of violence amongst detainees, systemic understaffing and overcrowding of the jail, failure to train, and failure to supervise were the direct cause and moving force of Mr. Veal's injuries.

360.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Veal suffered his injuries.

### 9)  John Coote

361.    John Coote filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

362.    On February 1, 2023, Mr. Coote was booked into the Harris County Jail.

363.    On February 7, 2023, while on the 7th floor of the 701 N San Jacinto, Mr. Coote was threatened by a detainee. Mr. Coote tried to get the attention of the Jail staff to get him moved away from this detainee for fear of personal injury. Per Harris County's policy, instead of talking to Mr. Coote in private, the Jail staff talked with Mr. Coote over the intercom system within earshot

of the detainee that threatened Mr. Coote. This prevented Mr. Coote from being able to specify what was going on in fear of being labeled a snitch.

364.    After a few minutes the officers opened up the main door which led to the vestibule area. Mr. Coote believed that the door was being opened for him to be able to leave the cell due to the threatening. However, the officer on the other side of the door immediately pinned Mr. Coote to the wall. Mr. Coote tried talking with the officer and tried to move the officer's arm from near his throat. Mr. Coote did not threaten or pose any reasonable threat to the officers. Another officer came and grabbed Mr. Coote and escalated the situation by slamming him against a metal door. While both officers had pinned Mr. Coote to the wall and without any provocation or threat of violence, another officer ran into the vestibule and with a running start punched Mr. Coote directly in the face knocking him to the ground. Immediately while Mr. Coote is on the ground, the officer continued to punch Mr. Coote in the head and face another 5 times without Mr. Coote posing any threat. Multiple other officers joined in the assault and laid on top of Mr. Coote. The sergeant then stepped in and sprayed Mr. Coote's face with pepper spray despite the number of officers that had Mr. Coote under control. The supervisors joined into the assault, approved the actions of the officers, and never disciplined any of the officers for escalating the situation and using these excessive force techniques. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to closed-fist strikes and other excessive force immediately instead of using de-escalation techniques. Several of the officers have testified that their actions were in accordance with the policies and training they received at the Jail.

365.    Almost a dozen officers were involved, which was a clear indicator of an excessive use of force that is pursuant to Harris County's policies and practices. Mr. Coote cooperated to the

extent he was trying to protect himself from the kicks and punches of the guards. When Mr. Coote was picked up off the ground, his lips and eyes were swollen with noticeable bruising on his head.

366.    When Mr. Coote was taken to the clinic, the officer escorting him told the nurse that it was a detainee-on-detainee fight. Mr. Coote did not correct this lie out of fear he would be beaten up again. Mr. Coote only received slight care for his injuries which included facial bruising, a broken nose, and difficulty breathing. Mr. Coote likely suffered a brain injury from this beating as he had a hard time remembering events that occurred a few days later.

367.    On February 8, 2023, Mr. Coote was transferred to the 6th floor of 1200 Baker. During this time, Mr. Coote believes that his face had been on the news in the common area TVs. Pursuant to the culture within the Jail, when a detainee's face is on the news, that detainee was usually jumped by the other detainees. Shortly after arriving, Mr. Coote was jumped by four other detainees who kicked and punched him repeatedly while he was on the ground. Officers did not interfere with this attack until it was over. The floor did not have enough staff to observe the detainees, deter acts of violence, and interfere during the assault.

368.    Once the attack was over, Mr. Coote was taken to the clinic which cursorily treated him for a broken foot, nose (still broken), bruised shoulder, and still swollen face. He was again released back to a cell almost immediately without any evaluation for a brain injury or other life-threatening injury based on his obvious injuries.

369.    After being released from the clinic, Mr. Coote was jumped again by three more detainees on the 3rd floor of 1200 Baker where he suffered brain trauma. The officers failed to observe and monitor the detainees, which allowed them to attack Mr. Coote in the cell. Mr. Coote was taken to the hospital where they conducted x-rays of his foot to determine the extent of his injuries.

370.     The hospital placed Mr. Coote in a boot and gave him strong medications and sent him back to the Jail where he was placed on the 2nd Floor of 1200 Baker which is the mental health floor. The medications caused Mr. Coote to forget many things in addition to his brain trauma.

371.     On February 10, 2023, Mr. Coote was involved in another altercation due to his medications. The officers involved used excessive force and improper force techniques by slamming Mr. Coote against the concrete walls and floor and then punched him several times. Mr. Coote had a split lip, and his previous injuries were aggravated. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to closed-fist strikes and other excessive force immediately instead of using de-escalation techniques. Additionally, the officers acted in accordance with the policies, practices, training, and supervision of the Jail in continuing the use of excessive force while a detainee is under control, laying on the ground, or restrained. Due to these various assaults, Mr. Coote still walks with a limp.

372.     Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, the promulgation of a culture of violence amongst detainees, the systemic understaffing and overcrowding of the jail, the failure to train, and the failure to supervise consistent and similar to Plaintiff's claims were the direct cause and moving force of Mr. Coote's injuries.

373.     Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Coote suffered his injuries.

**10) Ryan Twedt**

374.    Ryan Twedt filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

375.    On February 15, 2022, Ryan Twedt was booked into the Harris County Jail with a history of mental illnesses including depression, anxiety, and bipolar.

376.    Mr. Twedt was taking medications for his different disabilities. He was to receive these medications twice daily to help control his behavior. While in the Jail, Mr. Twedt would receive his medications irregularly, if at all, due to the understaffing and overcrowding of the Jail. When Mr. Twedt did not receive his medications, he would act erratically and could not think straight.

377.    On April 8, 2022, on the 5th floor of 1200 Baker, Mr. Twedt was involved in an altercation with another detainee. One of the officers who responded to the altercation threatened Mr. Twedt that if he ever moved to the 6th floor of 1200 Baker they would "beat his a**."

378.    Shortly after the altercation, Mr. Twedt was moved to the 6th floor of 1200 Baker. Due to the officer's threat, Mr. Twedt tried to determine a way to get moved off of the floor. Although he was not thinking straight, Mr. Twedt began to cover the camera of the holding cell. Two other detainees were in the same holding cell. One of the detainees in that cell had just been beat up in another assault.

379.    When the guards finally responded to him covering the camera, the guards yelled and threatened him instead of listening to his complaints. When the guards walked away without removing him from the floor, Mr. Twedt covered the cameras again in hopes they would listen to his concerns.

380.     Instead of listening to his concerns, the Harris County Jail guards made good on their threat and ordered the other two detainees to leave the cell. Once the other detainees were out of the cell, Mr. Twedt was sitting on the bench not posing a threat. The officers then immediately escalated the situation by charging at Mr. Twedt and tackling him to the ground. While multiple officers were tackling Mr. Twedt, an officer immediately began punching Mr. Twedt in the head and face multiple times. Once he was on the ground, the half-dozen officers had his arms on his back and holding his legs down but continued to punch him in the head and face. One officer was twisting Mr. Twedt's small finger on his hand breaking it. The officers also kneed Mr. Twedt while on the ground. Each of these actions were with the blessing and knowledge of the supervisors on duty on that floor with some supervisors being involved in the incident. No officer was disciplined for their actions and their actions were determined to be in accordance with Harris County's policies and training. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to closed-fist strikes and other excessive force immediately instead of using de-escalation techniques. Similar to Plaintiff, the officers resorted to violence immediately instead of using a de-escalation technique and continued to use excessive force while holding Mr. Twedt on the ground.

381.     During this use of excessive force, the officers broke his small finger on his left hand which a doctor has advised would require surgery to fix. Mr. Twedt also suffered bruised ribs and a lacerated head.

382.     When taken to medical, Mr. Twedt could not state what happened out of fear of retaliation as the officer was standing menacingly over him. Mr. Twedt did not receive sufficient medical care or attention which led to the improper healing of his left small finger. Similar to

Plaintiff, after a cursory review, Mr. Twedt was sent back into a cell. Since this incident, Mr. Twedt suffers from short-term memory loss and lower functionality.

383.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, systemic understaffing and overcrowding of the jail, failure to train, and failure to supervise were the direct cause and moving force of Mr. Twedt's injuries.

384.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Twedt suffered his injuries.

### 11) Taylor Euell

385.    Taylor Euell filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

386.    On September 28, 2022, Taylor Euell was booked into the Harris County Jail with a known history of mental and physical conditions to which he received medication including seizures.

387.    On or around September 29, 2022, while in the Joint Processing Center similar to Plaintiff, Mr. Euell was waiting in line holding his commissary back. Mr. Euell kept his paperwork in the bag.

388.    While waiting in line and in the dress out area, an officer inexplicably snatched the bag out of Mr. Euell's hand. When Mr. Euell asked for his paperwork back, the officer grabbed Mr. Euell and slammed his face against a wall, injuring his eye. The officer then twisted Mr.

Euell's hand causing it to break while placing him in handcuffs. The officer needlessly escalated the situation and used excessive force by slamming Mr. Euell's head into the wall and breaking his hand. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to excessive force immediately instead of using de-escalation techniques.

389.    Mr. Euell sought medical treatment for his injuries and was threatened by the officer not to tell anyone about it otherwise he would beat him again. The clinic did not properly treat his broken hand resulting in the hospital months later saying that the bone had grown back improperly. Similar to Plaintiff, Mr. Euell only received a cursory evaluation without receiving the care needed for the injuries he had. This lack of medical care is in accordance with the policies of the Jail and the understaffing and overcrowding of the Jail.

390.    Over the next several weeks and months, Mr. Euell's vision began to blur, which prompted him and his wife to submit numerous requests for medical attention. After several weeks, the only attention he received was a short evaluation by a general doctor and not an eye doctor. His requests to see the eye doctor were not answered. The lack of medical care again was a direct result of the understaffing and overcrowding of the Jail.

391.    During this time, Mr. Euell was not receiving his seizure medication consistently if at all. He went to the clinic multiple times with dangerously high blood pressure. The Jail staff in the clinic would simply require him to sit in the clinic for hours before they would read his blood pressure so that it would look normal. The failure to provide him with his medications or to properly treat him led to a breakthrough seizure around January 27, 2023. This seizure would not have occurred had he received his medications consistently.

392. During this seizure, the officers that responded claimed that Mr. Euell was faking the seizure, so they stomped on his wrists and his ankles. The officers needlessly escalated the situation. No officer was disciplined for their excessive force and the actions were approved or not even monitored by the supervisors.

393. On or around February 2, 2023, Mr. Euell had reported to the detention officers that another detainee had threatened to sexually assault him. Instead, of transferring Mr. Euell or conducting additional observations to prevent any assault from happening, the detention officers stated that they would not do anything to help him until he was actually sexually assaulted. This is consistent with Harris County's ongoing practice of encouraging detainee on detainee violence.

394. After reporting this incident, the other inmate approached Mr. Euell and attempted to sexually assault him. Knowing that the officers would not stop the assault, Mr. Euell tried to defend himself, but the other detainee who was larger than Mr. Euell punched him in the face breaking his nose. The punch also resulted in impaired vision in Mr. Euell's other eye.

395. Mr. Euell was not provided medical treatment for his broken nose or eye. Weeks later, Mr. Euell was finally seen be a doctor who stated that his nose had healed incorrectly and that the Jail should have taken him to the hospital to have it looked at as soon as the assault happened. Instead, Mr. Euell is now stuck with a deformed nose.

396. Due to the actions, policies, practices, and customs of Harris County, Mr. Euell suffered significant injuries to his hand, eyes, and nose as well as increased complications and injuries from seizures.

397. Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalization of excessive force by jail employees on detainees, promulgation of a culture of

violence amongst detainees, systemic understaffing and overcrowding of the jail, failure to train, and failure to supervise were the direct cause and moving force of Mr. Euell's injuries.

398.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Euell suffered his injuries.

### 12) Robert Andrew Terry

399.    The family and parents of Robert Andrew Terry filed nearly identical claims concurrently with the filing of this lawsuit as a Plaintiff against Harris County for their unconstitutional policies, practices, and procedures. Plaintiffs incorporate the First Amended Complaint filed in that lawsuit herein. *Robert Terry, Jr., et. al. v. Harris County, Texas*, Case No. 4:24-cv-3068, Dkt. No. 13 (S.D. Tex. filed November 21, 2024).

400.    On May 13, 2023, Mr. Terry was booked in the Harris County Jail. Mr. Terry had a known history of bipolar disorder to which he was required to take medications. Jail staff noted the need for this medication; however, the jail never provided this medication to Mr. Terry during his entire time in the jail. Mr. Terry was not placed under the supervision requirements of someone with a mental health issues which require heightened observation and medical care requirements. Instead, Mr. Terry was improperly evaluated and placed in the general population subject to the 60-minute interval face-to-face observations instead of the 30-minute intervals required for his condition.

401.    Shortly after entering the jail, several officers unjustifiably dragged Mr. Terry to a holding cell known for beating detainees. No cameras covered this cell. The guards then handcuffed Mr. Terry to an item in the room, beat him significantly until there was blood on the walls, and then dragged his unconscious body back to his cell. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly

and resort to closed-fist strikes and other excessive force immediately instead of using de-escalation techniques. The officers acted in accordance with the policies, practices, and training of the Jail to institutionalize excessive force and to use force (specifically closed-fist strikes) as the one-size-fits-all tool for any perceived slights or inconveniences facing the officers.

402.    Mr. Terry was left to anguish for a long period of time before he was sent to the clinic. Mr. Terry was not sent for his injuries to be looked after, but so that he could be transferred to new housing. The beating caused Mr. Terry to suffer internal bleeding and blunt force trauma which should have been visible to the clinic staff. The internal bleeding and his other injuries caused Mr. Terry to complain of nausea and lightheadedness. Similar to Plaintiff, despite the clear injuries, the clinic staff and officers only provided a cursory evaluation and sent him back to a cell.

403.    The medical staff failed to note Mr. Terry's injuries or the fact that he was recently beaten, but instead ordered a chest x-ray at 1:47 a.m. on May 15, 2023, to look at Mr. Terry's heart and lungs. The medical staff did not evaluate him for a head injury or for potential internal hemorrhaging which would have been consistent with his complaints.

404.    After completing the x-ray, the medical staff sent Mr. Terry to the Mental Health Unit for a cursory evaluation prior to putting him back in general population. The jail staff, however, did not do a proper mental health evaluation which would have confirmed his head injuries and his bipolar diagnosis, but instead sent him straight back into the general population.

405.    While in general population the rest of May 15 and the early morning hours of May 16, the other detainees noted that Mr. Terry was constantly complaining about his stomach and was refusing to ingest anything. Mr. Terry requested medical assistance several times and was ignored. At one point, several officers came into the cell and dragged Mr. Terry out yelling at him and making fun of him. The officers put the entire cell on lockdown for 24 hours. Mr. Terry pressed

the emergency call button several times to which the officers refused to respond. One officer stated they would return with medical assistance but never returned.

406.    Early on May 16, 2023, Mr. Terry began having significant amounts of blood in his stool. The officer informed of this never returned with medical aid. At one point, Mr. Terry began coughing and throwing up blood into the toilet. Again, any requests for medical attention and pressing of the emergency button were ignored by the officers. [21] Mr. Terry began to be uneasy on his feet and stumbling around the room. Mr. Terry passed out and hit his head on the metal toilet. When Mr. Terry regained consciousness, he tried stumbling to the day room, but he again passed out and hit his head on the bars.

407.    During this time, the officers were failing to conduct proper face-to-face observations otherwise they would have seen Mr. Terry's condition timely to render aid. Additionally, due to the misclassification of Mr. Terry, the officers were allegedly conducting observations every sixty minutes instead of the thirty minutes they should have been conducting it in light of Mr. Terry's known risks and mental condition. Consistent with Harris County's policies, practices, and procedures, Harris County was not properly documenting the observations which led to some observations being documented when they were not actually conducted or were late.

408.    Other detainees called for aid. The officers took their time in coming to the cell. When they did, the officers dragged Mr. Terry out of the cell by his legs and stood around him making fun of him and claiming that he was faking it. Eventually, medical staff arrived after Mr. Terry was left to anguish for several minutes. When he was taken to the clinic, Mr. Terry was not properly evaluated for his injuries and became unresponsive. Mr. Terry was transported to the hospital where he was declared deceased.

---

[21] The investigating officer noted that the call button was working. This indicates that the officers were acting with deliberate indifference to Mr. Terry's life as they were intentionally ignoring his requests.

409.    Upon inspection of Mr. Terry's corpse, blood was found in his lower intestines and in the upper interior portions of his leg (a sign of internal bleeding), lacerations were found on his body, and he had a fractured skull. Clear indications of a brutal beating resulting in death.

410.    An item that is frustrating to the families and victims of the Harris County Jail that is part and parcel of the ongoing practices, procedures, conditions, and culture of the jail is the lack of information provided to the families and the falsification of documentation and changing of stories. The autopsy report has still not been provided to the family despite this death having occurred over a year prior to this filing. On the Harris County medical examiner case status website, in January 2024, the cause of death was listed partly as internal hemorrhaging and blunt force trauma. Shortly after this being revealed on the website, Harris County pulled down that evaluation and now have stated that the cause of death is "undetermined" which was how the death was reported to the Attorney General for its custodial death report. Thus, Harris County still has not determined a cause of death in over a year since his death.

411.    Harris County Jail's culture of violence and prevalent polices, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, institutionalized excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Terry's injuries and death. Harris County's deliberate failure to properly train its staff in conducting proper and timely observations, not training or supervising their officers in correct use of force, not training them on de-escalation techniques, encouraging the officers to use techniques that result in unnecessary harm, encouraging and ratifying false reports, summary investigations, and failing to report and send detainees for proper medical attention predictably caused and were the moving force in Mr. Terry's injuries and death. These policies, practices, training, supervision, and procedures were

implemented, enforced, encouraged, and ratified with deliberate indifference to Mr. Terry's rights as it was inevitable that these policies would lead to these constitutional violations.

412.    Sheriff Gonzalez was the policymaker for Harris County with respect to the Jail when Mr. Terry died.

### 13) Mikayla Savage

413.    On February 26, 2024, Mikayla Savage filed claims against Harris County, its policymakers, and several detention officers for violations of her constitutional rights based on a number of the same policies, practices, and procedures at issue in this case. Plaintiff incorporates by reference the Complaint from that case. *Savage v. Harris County, Texas, et al.*, No. 4:24-cv-00666, Dkt. No. 1 (S.D. Tex. Filed on Feb. 26, 2024).

414.    On June 2, 2022, Ms. Savage was booked in the Harris County Jail on charges that were dropped shortly thereafter. Ms. Savage was pregnant at the time she was placed in the jail.

415.    The jail cell she was placed in was uninhabitable with feces, vomit, and blood throughout the cell. The officers ignored her requests for care or for a new cell and she was forced to use soiled blankets and towels as retaliation for reporting these issues. She eventually passed out from the smell and hit her head. The officers did not observe her as required or they would have seen her lying unconscious with this injury. Ms. Savage never received any care for her injury. This lack of care and failure to provide clean cells correlates to the understaffing and overcrowding of the Jail as there are insufficient staff to provide safe and clean cells and to provide proper observations and medical care to detainees.

416.    Ms. Savage was improperly designated when she was initially placed in the jail as she was placed in general population and not the pregnancy cells. This improper designation is common as mentioned previously, and the jail has been cited numerous times for placing detainees in the wrong cells. These deficiencies are exacerbated and caused by the understaffing and

overcrowding of the jail, the improper training of the staff, and the failure to observe the detainees to ensure that the detainees are properly cared for, to avoid detainee violence, to deter other officer violence, and to ensure that the detainee is in the appropriate cell.

417.    Ms. Savage while waiting in line to go to court was assaulted by an officer who caused her damage to her abdomen and extremities. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to strikes and other excessive force immediately instead of using de-escalation techniques. She was not provided a full medical evaluation following this assault. Shortly after this assault, Ms. Savage began experiencing a miscarriage in her cell. The officers did not observe Ms. Savage and failed to provide medical aid and ignored her requests for aid several times. Eventually, Ms. Savage was seen by hospital staff and placed back in the jail.

418.    For the next several weeks, Ms. Savage began having more medical issues but was ignored and failed to be observed by jail staff even after she threw up in her own blanket. The staff eventually sent her to the hospital where she received an unconsented abortion due to her miscarriage. Instead of receiving proper follow-up care and being placed in the medical facility, Ms. Savage was placed in a holding cell and was ignored for hours which is almost identical to Plaintiff where holding cells are used by officers instead of sending injured detainees immediately to the clinic. Ms. Savage was never sent to her follow-up appointment.

419.    When Ms. Savage was placed back in the general population, she was assaulted and raped several times under the supervision of several officers who refused to intervene or provide medical care following the assaults. The detainees who assaulted her were not punished or disciplined for these actions. After one assault, the officer who caused the miscarriage began

assaulting Ms. Savage as well to add further injuries. Other officers did not intervene with this assault.

420.    Due to these conditions and policies and practices, Ms. Savage attempted to commit suicide several times. Despite these known issues, the medical staff and officers did not provide any meaningful treatment and did not change their observation requirements. Her requests for mental health assistance were ignored. The officers instead falsified records and created records that were derogatory of Ms. Savage to discourage others from rendering assistance.

421.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care, encouraging excessive force and assaults of detainees by officers, encouraging and failing to interfere with detainee assaults, the systemic understaffing and overcrowding of the jail, failure to train, and failure to supervise were the direct cause and moving force of Ms. Savage's injuries.

422.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Ms. Savage suffered her injuries.

### 14) Jaquaree Simmons

423.    The family and representatives of Jaquaree Simmons filed nearly identical claims as Plaintiff against Harris County, Texas, and others based on the policies, practices, training, supervision, and procedures of the jail. Plaintiff incorporates the Amended Complaint from that case herein. *Larhonda Biggles v. Harris County, Texas, et al.,* No. 4:22-cv-03326, Dkt. No. 51 (S.D. Tex. filed on Dec. 28, 2022).

424.    On February 10, 2021, Jaquaree Simmons was booked into the Harris County Jail.

425.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encourage officers to resort to violence quickly and to forego reasonable non-violent

techniques. This leads to jailers using force to injure detainees for minor offenses and to use more force than necessary especially in response to any perceived slights.

426.    This culture also encourages jailers to use force as a means of communication and unnecessarily exert their power and authority over detainees for any act that the jailer does not like. A common example is punching detainees in the face even while the detainee is restrained when the detainee talks back to the jailer. This force is unnecessary but encouraged by Harris County because Sheriff Gonzalez is aware of the incessant use of force by his officers and the dangers this imposes on the detainees but fails to make any changes to address these constitutional violations. Essentially, just like the inmates at Shawshank, the detainees of Harris County can just wait to see which detainee will be beaten for crossing the guards.

427.    The example of Harris County's culture of violence is seen in the beating and death of Mr. Simmons which included "significant policy violations"[22] as admitted by the Harris County Sheriff's Office over two years following his death.

428.    On February 16, 2021, at 9:40 a.m. seven detention officers including Eric Morales responded to water flowing under Mr. Simmons' cell door from his clogged toilet.

429.    The only report about this incident disciplined Mr. Simmons and stated that he was removed from his cell while it was cleaned and placed back into his cell "without further incident" and with no report of any use of force being used.

430.    Upon an investigation into this incident, the detention officers had falsified this report and the actions that were taken against Mr. Simmons by those officers in an attempt to cover up this incident.

---

[22] Statement by Jason Spencer, Chief of Staff of the Harris County Sheriff's Office.
https://www.houstonpublicmedia.org/articles/news/criminal-justice/2023/02/06/443102/former-detention-officer-charged-with-manslaughter-in-death-at-harris-county-jail/.

431.    During the investigation, Mr. Morales lied under oath stating that he placed Mr. Simmons against the wall because he was squirming but did not slam him or use any force and that he did not observe anyone else use force against Mr. Simmons.

432.    Contrary to Mr. Morales' testimony, the other detention officers testified that the officers forced Mr. Simmons to the ground, handcuffed him, stripped him of his clothing, threw him against the wall and the ground with significant force, hit him on the face, and then Mr. Morales dropped his knee on Mr. Simmons face with all of his 6'5" 300 lbs. frame which caused Mr. Simmons to stop moving. The other officers testified that it was excessive use of force. Mr. Simmons was 5'10" and 130 lbs. at most. The officer's actions were in accordance with their training and approval of their supervisors to escalate the situation needlessly and resort to strikes and other excessive force immediately instead of using de-escalation techniques or avoiding force altogether.

433.    One officer testified that Mr. Simmons was not resisting when he was being stripped of his clothing; yet two officers including Mr. Morales remained in the cell after the other officers left when they heard banging coming from Mr. Simmons' cell. These officers were continuing to use force against Mr. Simmons as a result of the perceived slight that he was resisting them or failing to obey their orders. Neither situation is a basis for using any force, let alone deadly force such as closed fist strikes.

434.    The officers then placed Mr. Simmons with a lacerated lip and eye and swelling above his left eye back into his cell without any clothing during Winter Storm Uri while the jail was less than 50 degrees Fahrenheit.

435.    The officers did not provide Mr. Simmons with any medical aid despite his obvious injuries and did not report this use of force as required by law.

436.    Mr. Morales was found to have violated numerous policies:

> With regard to the 9:40 a.m. incident, you violated Harris County Sheriff's Office's Department policies, rules, and regulations by using unnecessary and unreasonable force against Inmate Simmons; by failing to de-escalate or reasonably attempt to de-escalate the situation presented to secure Simmons' voluntary compliance and avoid or mitigate the need for force; by failing to render aid to Simmons by ensuring that he received timely access to medical evaluation and care after the incident; by failing to report the use of force to your Sergeant; by failing to document your use of force in a report consistent with the requirements of HCSO Department Policy 501; by failing to report the force you observed other employees use against Simmons to your

> supervisor and in a use of force report; and by knowingly and willingly entering, or causing to be entered, false, inaccurate or improper information in official HCSO records.

> You also clearly violated CJC Policy No. 312(III)(D)(6)(c), which requires supervisory approval in connection with the removal of an inmate's clothing and which requires that the inmate "shall be afforded some type of covering which may include a suicide smock or suicide blanket". After stripping Inmate Simmons of his clothing, you failed to afford some type of covering, such as a suicide smock or suicide blanket. You then walked away, leaving him unclothed and injured in his cell during Winter Storm Uri.

437.    At 6:45 p.m. on the same day, four detention officers were distributing food to the detainees in Mr. Simmons' cell block.

438.    When the officers reached Mr. Simmons' door, he swiped up at the food tray causing it to hit one of the officers. Mr. Simmons then allegedly lunged at the officer who allegedly hit Mr. Simmons two times in the face, which caused Mr. Simmons to stumble and allowed the officer to close the cell. At this point, Mr. Simmons seemed to be under control as he was confined to his cell.

439.    Yet, eighteen detention officers entered the cellblock outside of the view of any cameras for five minutes and emerged with Mr. Simmons, handcuffed, nude, with obvious face injuries. The officers were acting in accordance with the policies, training, and supervision (supervisors participated in the uses of force) they received in the Jail to respond to the slight of getting food thrown on them by punching and using force against Mr. Simmons. The officers needlessly escalated the situation and immediately resorted to excessive force.

440.    Mr. Morales was the officer holding Mr. Simmons up as he was escorted out of the cell. Mr. Morales did not submit a use of force report but issued a false report charging Mr. Simmons with a violation of jail policies after Mr. Simmons had already died. This report falsely stated that no officer punched, struck, or kicked Mr. Simmons.

441.    In those five minutes inside Mr. Simmons' cell after they opened the cell back up, officers hit Mr. Simmons over twenty-five times to his head, face, and ribs.

442.    Some officers claimed that they took Mr. Simmons to the ground easily, restrained him, and then other officers came into the cell and began hitting Mr. Simmons. Hitting a detainee while on the ground and being subdued is consistent with the actions of the officers in Plaintiff's incident. Upon being escorted out of his cell, another officer punched Mr. Simmons in the head and torso two to three times despite him being restrained.

443.    Mr. Morales then picked Mr. Simmons up by the arms, slammed him to the ground, and began punching him multiple times while he was on the ground. Mr. Simmons' head hit the concrete floor. This is again consistent with Plaintiff's incident.

444.    Officers observed that Mr. Simmons was bleeding from his facial area and a pool of blood had accumulated in his cell. Mr. Simmons had to be carried out of his cell due to his loss of consciousness.

445.    Many officers falsified their reports and lied concerning the use of force. Officers used unnecessary force as part of the rampant policy, customs, and practices within the Jail to resort to force as punishment, as retaliation to detainees that offend the guards, and to a greater extent than necessary to control detainees.

446.     Despite his significant and obvious injuries, Mr. Simmons was prescribed medications and was sent back to his cell without any further medical care. This lack of medical care and cursory evaluation is consistent with Plaintiff's claims.

447.     The next day, February 17, 2021, Mr. Simmons had not been properly observed for over four hours when he was finally found face down, unresponsive in his cell.

448.     Upon being taken to the hospital, Mr. Simmons was pronounced dead.

449.     On April 6, 2021, the Texas Commission on Jail Standards issued a notice of non-compliance finding that the jail had failed to conduct proper observations for over four hours on the date of Mr. Simmons death which could have found Mr. Simmons earlier had they been conducted.

450.     The Harris County Sheriff's office then terminated eleven officers for their involvement and their history of falsified use of force reports and suspended six others.

451.     Despite the significant evidence, many of the facts surrounding Mr. Simmons' death were not made public until after two years following his death.

452.     Ultimately, Mr. Morales was charged in 2023 with felony manslaughter for his involvement in Mr. Simmons' death.

453.     The FBI is also investigating the Harris County Jail specifically in regard to Mr. Simmons and Mr. Pillow's deaths.

454.     Failure to properly observe and monitor Mr. Simmons and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately was a moving force in Mr. Simmon's death.

455.     Harris County Jail's culture of violence and prevalent policies, practices, training, supervision, and customs encouraging officers to act in a "culture that quickly leads to physical

altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Simmons' death.

456.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, prevented the rendering of sufficient medical aid, and reduced the jailer's ability to properly observe the detainees which was a moving force in Mr. Simmons' death.

457.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Simmons died.

### 15) Adael Gonzalez Garcia

458.    Adael Gonzalez Garcia filed suit against Harris County asserting claims similar to the Plaintiff's. Mr. Garcia's Complaint is incorporated herein by reference. *Adael Gonzalez Garcia v. Harris County, Texas*, 4:23-cv-00542, Dkt. No. 12 (S.D. Tex. filed Feb. 14, 2023).

459.    After allegedly falling off of his bunk, Mr. Garcia was being escorted back from the clinic. Mr. Garcia seemed to be suffering from a mental and physical crisis and was acting erratically. At one-point, multiple officers tackled Mr. Garcia to the ground. While face down on the ground, multiple officers began punching Mr. Garcia in the head. These strikes were clearly excessive as Mr. Garcia was not posing a threat and was merely trying to cover his head.

460.    When being escorted back to his cell, the officers slammed Mr. Garcia's head straight into the elevator wall while he was restrained and being held by two officers. When finally placed in the day room of his cell, Mr. Garcia followed the officers and supervisors who turned

around and needlessly escalated the situation by grabbing ahold of Mr. Garcia and punching him in the head and then slamming him into the floor. Mr. Garcia immediately was knocked unconscious. The officer's actions were in accordance with the County's policies, their training and approval of their supervisors to escalate the situation needlessly and resort immediately to excessive force instead of using de-escalation techniques. The supervisors were directly involved in each incident. No officers were disciplined initially. [23]

461.    The officers' attack on Mr. Garcia was unwarranted, unprovoked, and was in conjunction with Harris County's pattern, practice, training, supervision, policies, and culture of officers handling matters of disrespect and minor discipline issues with life threatening force.

462.    Mr. Garcia's injuries were so severe that he was placed into a coma in which he remained for several weeks before being placed in a rehabilitation hospital.

463.    While in the hospital, Mr. Garcia's warrant was dropped which meant that he was no longer in custody, so if he had died, he would not be counted against Harris County's quotas.

464.    In May 2024, three of the officers who were involved in the assault of Mr. Garcia were indicted on charges of assault causing a bodily injury. Those officers include John Ziesemer, Ezihuo Osiminibeke, and Jimmy Poole. Similar to the Jaquaree Simmons case, the County waited almost two years before actually indicting any of the officers for their unconstitutional actions. It is unclear if any of these officers were actually disciplined by the Sheriff's office despite the indictments.

465.    Harris County Jail's culture of violence and prevalent policies, improper training, improper supervision, practices, and customs encouraging officers to act in a "culture that quickly

---

[23] A copy of the videos of the excessive use of force can be found at the following link which is incorporated herein. https://www.khou.com/article/news/investigations/harris-county-inmate-videos-injury-coma/285-fde2a91e-340a-407f-a663-a769471536ef.

leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques and to forego reasonable non-violent techniques was a moving force in Mr. Garcia's injuries.

466.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Garcia's injuries.

467.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Garcia was injured.

### 16) Jerome Bartee

468.    Jerome Bartee, Jr. was a pretrial detainee at the Harris County Jail on September 4, 2016.

469.    While Mr. Bartee was being escorted from the clinic to his cell, the detention officer pushed Mr. Bartee out of the door into the hallway.

470.    When Mr. Bartee verbally reacted to the unnecessary push, several detention officers began to assault Mr. Bartee by throwing him against a chair and podium in the hallway and throwing him to the ground. Once on the ground the officers laid on top of him.

471.    Although Mr. Bartee was subdued, around ten detention officers punched, kicked, and stomped on Mr. Bartee while he was on the ground. Other officers watched and encouraged the beating. These actions of needless escalation and using closed-fist strikes and kicking while Mr. Bartee was on the ground is consistent and similar to the actions of the officers in Plaintiff's claims. The officers' actions were in accordance with the County's policies, their training, and approval of their supervisors to escalate the situation needlessly and resort immediately to excessive force instead of using de-escalation techniques. The supervisors were directly involved in the incident.

472.    Once the officers stopped beating Mr. Bartee, the officers handcuffed him and pulled him up from a pool of his own blood.

473.    Due to this vicious and unnecessary assault, Mr. Bartee suffered bilateral nasal bone fractures, orbital fractures, cuts, bruises, and a closed head injury along with unconsciousness.

474.    This beating was one of the few beatings actually recorded by the camera system in the jail because it had just been installed. One jailer even attempted to have the video stop recording once they determined that they were on video.

475.    Following the beating, Mr. Bartee was charged with assaulting an officer and was taken for minimal treatment at the local hospital.

476.    The Harris County Sheriff as the policymaker for the jail expressly stated to the media that the jailers used "an unnecessary application of force," that more jailers than necessary were involved in trying to subdue Mr. Bartee, that jailers failed to de-escalate the situation, and that jailers failed to stop using force when it became unnecessary. Despite recognizing these issues, the policies, practices, training, and supervision of the Jail did not change and only got worse as illustrated in the continuous abuses even leading to today.

477.    Ultimately, Mr. Bartee was released the following day and the charges against him were dismissed for lack of evidence as it was determined he did not initiate the assault.

478.    Three employees were suspended, and five detention officers were indicted for various felonies for their actions in beating Mr. Bartee.

479.    Harris County Jail's culture of violence and prevalent policies, lack of training, lack of supervision, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Bartee's injuries.

480.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force (closed fist strikes to the face) were justified and within the guidelines of their policies, procedures, and the law. Harris County has also encouraged these policies and training by not changing their training and by having supervisors participate in the excessive force directly and acquiescing to the officers' actions.

481.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Bartee's injuries.

482.    The Harris County Sheriff policymaker for Harris County with respect to the jail when Mr. Bartee was injured due to the jail's unconstitutional policies, customs, and practices.

483.    Mr. Bartee filed suit against Harris County which Plaintiffs incorporate by reference herein to which Harris County settled his claims. Order of Dismissal, *Jerome Bartee, Jr. v. Harris County*, 4:16-cv-02944, Dkt. No. 172 (S.D. Tex. filed Oct. 28, 2021).

### 17) Tramell Morelle

484.    Tramell Morelle filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

485.    On or around July 28, 2023, Tramell Morelle was booked into the Harris County Jail.

486.    On July 30, 2023, while in the Joint Processing Center, Mr. Morelle was assaulted by several officers who needlessly escalated the situation and resorted to excessive force in pushing and shoving Mr. Morelle into various items over a verbal argument ultimately resulting in Mr. Morelle's jaw breaking. The officers did not attempt any de-escalation techniques and needlessly

resorted to use of force over a verbal altercation. The officer's actions were in accordance with the County's policies, their training and approval of their supervisors to escalate the situation needlessly and resort immediately to excessive force instead of using de-escalation techniques. The supervisors were directly involved in each incident.

487.    Due to the assault, Mr. Morelle suffered a broken jaw which required an extensive surgery and two metal plates to hold his jaw together.

488.    Instead of immediately taking him to a clinic, similar to Plaintiff, the officers placed Mr. Morelle in a holding cell with another detainee. The other detainee assaulted Mr. Morelle as well before he was finally taken to the clinic.

489.    The officers' failure in not observing, monitoring, or interfering with the assault on Mr. Morelle by other detainees led to inadequate protection from the other detainees and ultimately caused Mr. Morelle's injuries.

490.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Morelle's injuries.

491.    Harris County Jail's culture of violence and prevalent policies, lack of training, lack of supervision, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that

encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Morelle's injuries.

492.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Morelle suffered his injuries.

### 18) Bernard Lockhart

493.    Bernard Lockhart filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

494.    On June 28, 2022, Bernard Lockhart was booked into the Harris County jail. On that day, Mr. Lockhart and an officer exchanged some words; however, Mr. Lockhart was not threatening the officer or becoming aggressive in any other manner.

495.    Despite the lack of a threat or a serious policy violation, the officer grabbed Mr. Lockhart's arm wrenched it behind his back, slammed his face against a wall and then dragged him to the holding cell which is notorious for officer beatings as seen by several of the Plaintiffs and similar incidents in this Complaint. The officers involved slammed his head against a wall and needlessly escalated the situation.

496.    Additional officers then came into the cell that lacked proper observation measures and began using force against Mr. Lockhart while he was being held by several officers. One

officer while holding onto Mr. Lockhart punched him in the head and face causing an injury. At no point was Mr. Lockhart a threat or deserving of receiving the force against him. This resulted in severe injuries including a torn rotator cuff. The officers' actions were in accordance with the County's policies, their training and approval of their supervisors to escalate the situation needlessly and resort immediately to excessive force instead of using de-escalation techniques. The supervisors were directly involved in the incident.

497.    On May 19, 2023, Mr. Lockhart was finally able to receive surgery for his shoulder upon being released from the Jail because the Jail refused to provide him the proper medical care for his injuries.

498.    Harris County Jail's culture of violence and prevalent policies, practices, lack of training, lack of supervision, and customs of failing to provide timely and adequate medical care, the institutionalization of excessive force by jail employees on detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Lockhart's injuries.

499.    Sheriff Gonzalez was the policymaker for Harris County with respect to the Jail when Mr. Lockhart suffered his injuries.

### 19) Christopher Johnson

500.    On July 25, 2015, Christopher Johnson was booked into Harris County Jail.

501.    During the booking process, Mr. Johnson posed to take his booking photo in which he smiled for the camera.

502.    The detention officers did not like that Mr. Johnson was smiling for his photo, so they commanded that he not smile or "We gon' to make you stop smiling."

503.     When Mr. Johnson stated that he was going to smile because he had nothing to worry about, two officers grabbed Mr. Johnson's neck choking him for over 30 seconds while another officer took his picture. Mr. Johnson was handcuffed the entire time. The officers did not attempt to de-escalate the situation but laid hands on Mr. Johnson as a matter of first resort pursuant to the County's policies, training, practices, and lack of supervision.

504.     Other Harris County employees were standing by and witnessed the assault but refused to intervene and/or encouraged the officers' conduct. This approach is consistent with Harris County's policies of allowing, encouraging, and not deterring officers using force unnecessarily when detainees refuse to comply with petty and needless commands.

505.     Mr. Johnson was refused any medical treatment for his injuries and feared that if he pressed the issue he would be met with a beating from the officers.

506.     The officers present falsified reports on what transpired which is consistent with false and incorrect reporting by officers to cover up or mask excessive use of force against detainees and which encourages officers to continue using excessive force.

507.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not

report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Johnson's injuries.

508.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law.

509.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Johnson's injuries.

510.    The Harris County Sherriff was the policymaker for Harris County with respect to the jail when Mr. Johnson was injured due to the jail's unconstitutional policies, customs, and practices.

511.    Mr. Johnson filed suit against Harris County which Plaintiffs incorporate by reference herein to which some of Mr. Johnson's claims were settled. Order of Dismissal, *Christopher Johnson v. Harris County*, 4:16-cv-01623, Dkt. No. 80 (S.D. Tex. filed Aug. 21, 2018).

### 20) Michael A. Alaniz

512.    On October 23, 2015, Mr. Alaniz was booked into the Harris County Jail.

513.    When arriving at the jail, Mr. Alaniz was escorted by two larger detention officers. When they arrived at a window visible to other detainees, Mr. Alaniz was forced to face the wall and be stripped searched.

514.    When Mr. Alaniz asked for the officers' names and badge numbers, they refused and took him to a vacant single cell where they slammed him to the ground, sat on top of his back with their knees, and was repeatedly kicked by the officers. Mr. Alaniz lost consciousness, but instead of being taken to medical, he was left alone in the cell for over two hours. Similar to Plaintiff, the officers immediately resorted to force including strikes instead of using de-escalation techniques and used force in response to perceived slights such as asking for the officers' names. Also similar to Plaintiff, the officers did not take him to the clinic immediately but left him in the holding cell.

515.    When Mr. Alaniz requested medical treatment for his injuries, one officer forcibly grabbed his throat with both hands and cut off his airways. Mr. Alaniz still requested medical despite the officer's response.

516.    Mr. Alaniz's request for medical treatment was refused until thirty-six hours after he was assaulted. The clinic only gave him some ibuprofen and sent him on his way due to their cursory evaluation which is consistent with the treatment provided to detainees after a use of force as exemplified in multiple incidents and in Plaintiff's claims.

517.    Once released from jail, Mr. Alaniz went to the hospital where they diagnosed him with a fractured nose and a concussion.

518.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more

likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Alaniz's injuries.

519.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law.

520.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Alaniz's injuries.

521.    The Harris County Sherriff was the policymaker for Harris County with respect to the jail when Mr. Alaniz was injured due to the jail's unconstitutional policies, customs, and practices.

522.    Mr. Alaniz filed suit against Harris County which Plaintiffs incorporate by reference herein in which Harris County settled Mr. Alaniz's claims. Order of Dismissal, *Michael A Alaniz v. Harris County*, 4:16-cv-01495, Dkt. No. 53 (S.D. Tex. filed Aug. 24, 2018).

### 21) Kareem Jefferson

523.    On May 29, 2019, Kareem Jefferson was in the process of being released from the Harris County Jail.

524.    While waiting in line to leave in the processing center, detention officer Alexandro Ramos confronted Mr. Jefferson that he was past a "line" on the ground.

525.    When Mr. Jefferson spoke to Officer Ramos, Ramos hit Kareem and then slammed him on the ground, injuring him and placing him back in custody. In accordance with the policies, practices, training, and supervision, Officer Ramos immediately resorted to excessive force including closed fist strikes without doing any other de-escalation tactics.

526.    Ramos then filed a false report that Kareem attacked an officer which resulted in him being in Harris County Jail for almost two more years before the case was dismissed for lack of evidence. Officer Ramos was likely not disciplined for his actions. Officer Ramos's actions were consistent with the training, policies, and supervision he received at the Jail.

527.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without

repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion that leads to discipline, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Jefferson's injuries.

528.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force were justified and within the guidelines of their policies, procedures, and the law. Harris County also encourages false reports against detainees preparing to be released from the jail by provoking them and using force against the detainee and writing a report charging the detainee with a false crime. This same action was taken against Mr. Pillow as shown above.

529.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Jefferson's injuries.

530.    The Harris County Sherriff Ed Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Jefferson was injured.

531.    Mr. Jefferson filed suit against Harris County. *Kareem Jefferson v. Harris County, Texas*, 4:21-cv-00545 (S.D. Tex. filed May 11, 2021).

### 22) Kenneth Lucas

532.    On February 14, 2015, Kenneth Lucas was arrested for keeping his children too long during a scheduled visit and was booked into the Harris County Jail.

533.    On February 17, 2015, Mr. Lucas was upset in his locked single cell unarmed and did not pose a threat to anyone. However, Harris County organized several officers to forcibly enter his cell, knock him to the ground, handcuff his arms behind his back, and drag him from his cell by his face. Once pulled out of the cell, the officers continued to sit on his back and legs while he was restrained. Mr. Lucas was not resisting their efforts.

534.    Despite his cries that he was going to pass out and could not breathe, the officers continued their trained tactics of sitting on his back preventing him from breathing and causing him immense trauma and pain. No medical staff were informed of this situation. Eventually, Mr. Lucas stopped breathing due to the officer's actions. Yet, nobody noticed that he stopped breathing and continued to sit on his back and legs.

535.    When Mr. Lucas was taken to the clinic, he was not taken there to receive medical care or evaluation; instead, while officers were still sitting on his back and legs, a nurse gave Mr. Lucas a sedative. This sedative was unnecessary as everyone could see that Mr. Lucas was unconscious. Many officers and supervisors saw the officers' actions and did not attempt to interfere or suggest a different way to restrain him or that they should stop sitting on Mr. Lucas's back. These same tactics were prevalent during the 2009 DOJ Report.

536.     The officers continued to hold Mr. Lucas down for several minutes after he became lifeless. The medical staff tried to take his blood pressure but could not find any. Ultimately, due to the ongoing restraint and unnecessary use of force, Mr. Lucas passed away. In one of the few moments of transparency, the prior Sheriff of Harris County released the full video of the incident but found that the officers did nothing wrong. Instead of condemning these actions, the Sheriff condoned these actions as part of the policies, practices, and procedures of the County.[24] The officer's actions were in accordance with the County's policies, their training and approval of their supervisors to escalate the situation needlessly and resort immediately to excessive force instead of using de-escalation techniques. The supervisors were directly involved in each incident.

537.     Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to

---

[24] In a rare circumstance, Harris County filmed the entirety of this incident and released it to the public. The full video can be seen at the following link: https://abc13.com/jail-footage-video-kenneth-lucas-inmate-death/515300/.

use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Lucas's death.

538.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force (sitting on the back of detainees) were justified and within the guidelines of their policies, procedures, and the law.

539.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Lucas's death.

540.    The Harris County Sherriff policymaker for Harris County with respect to the jail when Mr. Lucas died due to the jail's unconstitutional policies, customs, and practices.

541.    Mr. Lucas's family filed suit against Harris County which Plaintiffs incorporate by reference herein. First. Am. Complaint, *Salcido v. Harris Cnty., Tex.*, 4:15-cv-02155 (S.D. Tex. filed July 30, 2015). Harris County settled the claims against them for $2.5 million.

### 23) Rachel Hatton

542.    On or around May 7, 2016, Rachel Hatton was booked into the Harris County Jail.

543.    While waiting in line with other detainees, an officer ordered her to go back to her cell. Despite moving in that direction, the officer in accordance with the policies and training in the Jail escalated the situation, charged and punched Ms. Hatton causing her to lose consciousness and required her to get stiches for her injuries. Ms. Hatton suffered a concussion due to this excessive and unnecessary use of force. The officer's actions were in accordance with the County's

policies, their training and approval of their supervisors to escalate the situation needlessly and resort immediately to excessive force instead of using de-escalation techniques. Similar to Plaintiff, Ms. Hatton was not posing any threat but the officers immediately resorted to excessive force according to their training and policies resulting in their injuries.

544.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Ms. Hatton's injuries.

545.    Harris County has encouraged this policy by repeatedly determining that the actions of jailers which constitute an unnecessary use of force (closed hand fist strikes to the face) were justified and within the guidelines of their policies, procedures, and the law.

546.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and

physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Ms. Hatton's injuries.

547.     The Harris County Sherriff was the policymaker for Harris County with respect to the jail when Ms. Hatton suffered her injuries due to the jail's unconstitutional policies, customs, and practices.

548.     Ms. Hatton filed suit against Harris County which Plaintiffs incorporate by reference herein. *Hatton v. Harris Cnty., Tex.*, 4:18-cv-01948 (S.D. Tex. 2018).

### 24) Recently Released Videos Show the Ongoing Culture in the Jail.

549.     In January 2024, a Harris County Jail supervisor leaked videos showing excessive violence and abuse in the jail both by detainees and by officers.[25] These videos also show the lack of observation and supervision which encourages violence within the jail and shows issues with the understaffing and overcrowding of the jail.

550.     One video shows a jailer abusing a detainee in a broom closet while being watched by several detainees. The officer's actions indicate that he is very comfortable committing these acts within the jail. The detainee was not posing any threat but received several slaps and an upper cut to the jaw. This same officer was involved in the use of force with Lockhart and with several of the other incidents identified below.

551.     A few of the other videos show officers and detainees fighting with the officers continuing to punch and use force against the detainee even after the detainee has been restrained.

---

[25] https://www.fox26houston.com/news/newly-released-video-shows-alleged-abuse-of-inmates-and-deputies-at-harris-county-jail.

This is consistent with the jails overcrowded and understaffed nature where officers are permitted and encouraged to engage in excessive force as a quicker method to try to get compliance and to punish the detainees. This also shows the lack of training for the officers as they do not engage in appropriate levels of force but use whatever force they want. These videos also exemplify the ongoing policies and procedures of failing to properly observe detainees and officers to ensure that detainees are properly treated and to discourage violence in the jail. The officer's actions were in accordance with the County's policies, their training and approval of their supervisors to escalate the situations needlessly and resort immediately to excessive force including strikes and body slams instead of using de-escalation techniques.

552.    In June 2025, more videos were released of Officer Devin Ortiz using excessive force on two separate occasions in October 2023 and January 2024.[26] In the October 2023 incident, Officer Ortiz and another officer are seen in one of the holding cells with a detainee restrained sitting on a seat in the cell. The officers are seen punching the detainee multiple times in the head despite the detainee not posing a threat at all. These officers' actions are consistent with the policies, training, and supervision of officers in the jail who immediately resort to using deadly force (closed fist strikes) to the head and face of the detainees without any reasonable justification.

553.    In the January 2024 incident, Officer Ortiz is holding a very small woman who has her hands restrained behind her back. Officer Ortiz is seen swinging and slamming this girl to the ground multiple times causing severe injuries. His actions were consistent with his training and the Harris County policies because his justification was based on his claim that the detainee was grabbing his leg. The video establishes that the detainee was not posing a threat of injury. Ortiz

---

[26] The videos of both incidents and commentary on the incidents can be found at the following link which is incorporated herein. https://abc13.com/post/former-harris-county-detention-officer-deven-ortiz-indicted-assault-violent-videos-surface/16841013/.

was not disciplined for either of these incidents and was permitted to remain as a guard until he voluntarily resigned to go work for another police force.

### 25) Paul Salazar: January 1, 2020, Excessive Force Incident.[27]

554.    On or around January 1, 2020, on the 7th Floor of 701 N. San Jacinto, Paul Salazar was involved in an excessive use of force incident with the officers in the Harris County Jail.

555.    Mr. Salazar was in a single cell when an officer forced him back into his cell. When officers returned to remove him from his cell, Mr. Salazar did not want to be handcuffed. Instead of remaining calm and de-escalating the situation, the officers escalated the situation by opening the doors, rushing into the cell, and tackling Mr. Salazar to the ground.

556.    The officers while holding Mr. Salazar on the ground punched him three times in the torso and one time in the face. Mr. Salazar was under the restraint of the officers and was not posing a threat to anyone. The officers' actions were unnecessary and constitute excessive force.

557.    The officers' actions were in accordance with their training and supervision inside the jail when they used closed fist strikes in unnecessary situations and as a response to any perceived slight such as the detainee not moving quick enough, the detainee doing something the officer did not like, the detainee spitting on the officer, the detainee stiffening their body, the detainee making verbal comments or threats, or the detainee not obeying the officer immediately. These actions were in accordance with the policies and practices of the Jail where officers were encouraged and taught to use closed-fist strikes in response to almost any circumstance regardless of whether force was necessary or not. A jail environment is unique because officers have more

---

[27] The following incidents are examples of some of the incidents identified in the KHOU *Struck* documentary that are similar incidents to Plaintiff's incident that show the policy, condition, lack of training, lack of supervision, and culture of excessive force within the Jail. Plaintiff has not received or reviewed all 3,000 incident reports reviewed by KHOU, however, out of the 261 incident reports received these are just a few examples of the incidents that exist that illustrate the use of force.

time and options available to them to handle a detainee then out in the free-world. However, Harris County's officers use excessive force routinely and in violation of the detainee's rights. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 26) Multiple Detainees: January 5, 2020, Excessive Force Incident.

558.    On January 5, 2020, multiple detainees on the 7th Floor of 701 N. San Jacinto were involved in an excessive force incident involving multiple Harris County officers. During this incident, Harris County did not have enough officers on the 7th Floor to handle the number of detainees, so officers from other floors had to respond. This illustrates the understaffing of the Jail because the paperwork of the staffing does not account for officers leaving their floors to assist with other floors. Accordingly each staff that came from another floor left their prior floor out of the minimum staff to detainee ratio.

559.    On this date, the officers were conducting strip searches of one of the cells of detainees when several of the detainees became agitated. One detainee allegedly got into a fighting stance and tried to hit an officer. The officer easily blocked the hit and got control of the detainee. While gaining control, the officer struck the detainee two times in the side of the head. The detainee grabbed another officer's leg. The officer in retaliation punched the detainee two times in the head. While holding the detainee on the ground, another officer punched the detainee again for refusing to give his hands to be handcuffed.

560.    Another detainee at a different time was allegedly in a fighting stance. As admitted by Sheriff Gonzalez in the *Struck* documentary and again in the changing of the written policy, a

fighting stance is not a basis for using closed-fist strikes against detainees. However, the officer punched the detainee in the head and then restrained him.

561.    The officers' actions were in accordance with their training and supervision inside the jail when they used closed-fist and other strikes and use of force in unnecessary situations and as a response to any perceived slight such as the detainee not moving quick enough, the detainee doing something the officer did not like, the detainee spitting on the officer, the detainee stiffening their body, the detainee making verbal comments or threats, or the detainee not obeying the officer immediately. These actions were in accordance with the policies and practices of the Jail where officers were encouraged and taught to use closed-fist strikes in response to almost any circumstance regardless of whether force was necessary or not. A jail environment is unique because officers have more time and options available to them to handle a detainee then out in the free-world. However, Harris County's officers use excessive force routinely and in violation of the detainee's rights. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 27) Jonathan Russell: January 7, 2020, Excessive Force Incident.

562.    On January 7, 2020, on the 6th Floor in 1200 Baker, Jonathan Russell was placed back into his cell by several officers including Officer Gary McCloud.

563.    When the officers were closing the door, Russell spit on Officer McCloud. Instead of closing the door and maintaining a distance from the detainee, Officer McCloud entered the cell and punched the detainee in the face knocking him on the ground. As noted in the KHOU *Struck*

documentary, a detainee spitting on an officer is not a valid excuse for using force against the detainee especially closed-fist strikes to the head. However, it is part of the policy, practice, and training of the Harris County Jail for officers to respond to any slight including getting spit on or pulling an arm away as the case was with Plaintiff by punching the detainee in the head or face. Officer McCloud was operating in accordance with that policy, training, and supervision. Upon information and belief, Officer McCloud was never disciplined for his actions and the supervisors approved of his actions.

564.    The Officer McCloud's actions were in accordance with his training and supervision inside the jail when officers use closed-fist strikes and other excessive uses of force in unnecessary situations and as a response to any perceived slight such as the detainee not moving quick enough, the detainee doing something the officer did not like, the detainee spitting on the officer, the detainee stiffening their body, the detainee making verbal comments or threats, or the detainee not obeying the officer immediately. These actions were in accordance with the policies and practices of the Jail where officers were encouraged and taught to use closed-fist strikes in response to almost any circumstance regardless of whether force was necessary or not. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**28) Mack Watson Jr.: January 16, 2020, Excessive Force Incident.**

565.    On January 16, 2020, on the 2nd Floor of 701 N. San Jacinto, Mack Watson Jr. was involved in an excessive force incident with officers in the Harris County Jail.

566.    Watson was waiting in line when he said something under his breath that the Sergeant did not like. Instead of ignoring the statement or de-escalating the situation, the Sergeant got into the detainee's face causing a conflict. The Sergeant further escalated the situation by laying hands on the detainee to get him to turn around. This caused Watson to become belligerent and push the officer away. Again, instead of de-escalating the situation, the Sergeant again approached the detainee who was allegedly in a fighting stance. The detainee allegedly struck the officer who in turn punched him in the face disorienting Watson.

567.    In the ensuing struggle, multiple other officers responded and tackled Watson to the ground. Watson was not a threat while on the ground but was moving around to avoid the officers. Allegedly Watson was not "obeying orders," so one officer punch him 5 times in the rib cage. Using punches against a detainee for simply not obeying orders is excessive force. While on the ground, another officer struck Watson in the face 3 times despite the officers holding onto him with sufficient control that he was not a threat.

568.    The officers' actions were in accordance with their training and supervision inside the jail when they used closed-fist and other strikes and use of force in unnecessary situations and as a response to any perceived slight such as the detainee not moving quick enough, the detainee doing something the officer did not like, the detainee spitting on the officer, the detainee stiffening their body, the detainee making verbal comments or threats, or the detainee not obeying the officer immediately. These actions were in accordance with the policies and practices of the Jail where officers were encouraged and taught to use closed-fist strikes in response to almost any circumstance regardless of whether force was necessary or not. The officers acted in accordance with training and the policies of the Jail by not stepping back and de-escalating the situation, but instead needlessly escalating the situation and inciting resistance and causing tension with the

detainees. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 29) Marcus Travis: January 18, 2020, Excessive Force Incident.

569.    On January 18, 2020, Marcus Travis while on the 3rd Floor of 1200 Baker was experiencing a medical emergency and was being placed on a medical stretcher.

570.    While getting restrained to the stretcher, allegedly Travis tried to bite an officer. In response, an officer punched Travis in the jaw. It is common understanding that detainees will spit and try to bite officers. However, attempting to bite an officer especially while restrained is not a justification for using force against the detainee especially a closed-fist strike to the head as the force is grossly disproportionate.

571.    However, the officer was acting in accordance with the policies, procedures, training, and supervision of the Jail in using a closed-fist strike in response to any circumstance without any proper understanding and training on when this type of force may be used. The officer failed to de-escalate the situation and step away from the detainee or using other techniques but instead used the only technique taught and practiced by officers in response to any situation which is to punch the detainee in the head.

### 30) Curtis Jones: January 19, 2020, Excessive Force Incident.

572.    On January 19, 2020, Curtis Jones while in the clinic of 701 had an excessive force incident with officers in the Jail.

573.    While being escorted to the elevator lobby, Jones had a struggle that occurred which resulted in Jones backing up and standing in a fighting stance. The officers had plenty of room to back away and de-escalate the situation especially since Jones was restrained with his hands behind his back. However, another officer arrived on the scene and ran up to and struck Jones in the leg with his knee knocking him to the ground. While wrestling the detainee, the same officer placed his forearm against Jones head. Jones had his head slammed against the ground and against the back of the elevator wall similar to Garrison and other detainees.

574.    The officer's actions were in accordance with his training and supervision inside the jail to use knee strikes and other use of force in unnecessary situations and as a response to any perceived slight such as the detainee not moving quick enough, the detainee doing something the officer did not like, the detainee spitting on the officer, the detainee stiffening their body, the detainee making verbal comments or threats, or the detainee not obeying the officer immediately. These actions were in accordance with the policies and practices of the Jail where officers were encouraged and taught to use strikes in response to almost any circumstance regardless of whether force was necessary or not. The officer acted in accordance with the policies and training of the Jail in slamming the detainee's head into walls and floors of the Jail during and following a use of force incident as retaliation to a detainee for getting involved in the use of force incident or resisting the officer's use of force. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**31) Roosevelt Woods: January 22, 2020, Excessive Force Incident.**

575.     On January 22, 2020, Roosevelt Woods while in the clinic was involved in an excessive force incident with officers in the Jail.

576.     Multiple officers that were assigned to various floors were in the clinic at the same time. This is another illustration of the understaffing of the Jail as the Jail routinely includes on the paperwork enough staff on each floor to meet minimum standards but then fails to account for the numerous officers that have to leave the floor throughout the shift.

577.     While in the clinic, officers were restraining Woods to a bed when he allegedly tried to spit and bite the officers. Instead of stepping away to de-escalate the situation since the detainee was restrained to the bed, the officers escalated the situation. One officer held the detainee's head away from him and then struck the detainee in the side of the head. The detainee was not posing a threat worthy of a punch to the head.

578.     The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 32) Dominic Hall: January 24, 2020, and February 27, 2020, Excessive Force Incidents.

579.     Detainee Dominic Hall was involved in two separate excessive force incidents with Harris County jail officers on January 24, 2020, and February 27, 2020.

580.     On January 24, 2020, Hall was on the 2nd Floor of 1200 Baker when he was engaged in an altercation with an officer. The officer eventually tackled Hall to the ground. While Hall was

face down on the ground and the officer was on top of him holding one of his arms, the officer began punching the detainee in the head multiple times because the detainee had his mouth open as if he wanted to bite him. The detainee's position prevented him from biting the officer, but the officer continued to punch Hall until he stopped resisting. This circumstance did not necessitate the use of force let alone a closed-fist strike to the head as Hall was under the control of the officer and was not posing a reasonable threat.

581. On February 27, 2020, Dominic Hall was again on the 2nd Floor of 1200 Baker when he was allegedly refusing to go back into his cell and struck the officer. In retaliation, the officer punched Hall in the head multiple times getting him on the ground. Because Hall continued to "resist" while on the ground, the officer struck Hall 19 times with closed fists.

582. The officers' actions in both incidents were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 33) Broderick Knight: January 25, 2020, and February 4, 2020, Excessive Force Incidents.

583. Detainee Broderick Knight was involved in two separate excessive force incidents on January 25, 2020, and February 4, 2020.

584. On January 25, 2020, in and around the 6th Floor of 1200 Baker, Knight was in an altercation with some officers. Knight attempted to hit an officer but missed. Instead of attempting to leave or de-escalate the situation, the officer in response punched Knight 5 times in the head

and 1 time in the chest in retaliation. Several other officers while tussling with Knight on the ground also punched him multiple times to "gain compliance." These strikes constitute excessive force as they were unnecessary and disproportionate. The supervisor was involved in this incident.

585.     On February 4, 2020, Knight did not want to do count and so he placed his back against a wall so that the officers could not handcuff him. The officers escalated the situation by placing their hands on Knight and trying to pull him away. Because Knight was not obeying orders, one officer struck Knight two to three times in the upper torso and face with a knee strike. Knee strikes should almost never be used as they can cause even more serious injuries or death than a closed-fist strike. These knee strikes to Knight simply because he was not obeying orders in a confined jail constitute excessive force.

586.     The officers' actions for both incidents were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 34) Derian Corona-Saucedo: January 29, 2020, Excessive Force Incident.

587.     On January 29, 2020, Derian Corona-Saucedo in 701 N. San Jacinto was involved in an excessive force incident with officers in the Jail.

588.     An officer confiscated Saucedo's pillow which upset the detainee. The officer eventually grabbed Saucedo's wrist and raised it over his head. Saucedo tried to get out of the grip and walk away when two officers grabbed him and "guided" him to the wall and took him to the

ground slamming his head into a window ledge on the way. While on the ground being restrained, the same officer put the pillow to Saucedo's face and then punched him in the face. Saucedo was restrained, lying on the ground, and under the officers' control making any use of force unnecessary and excessive; however, the officer was acting in accordance with his training and policy in resorting to use punches in response to any issue with detainees.

589.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 35) Angel Omar Diaz: February 8, 2020, Excessive Force Incident.

590.    On February 8, 2020, on the 6th Floor of 701 N. San Jacinto, Angel Omar Diaz was involved in an excessive force incident with officers in the Jail.

591.    Angel Diaz was complaining to an officer about the food trays and was cussing at the officer. The officer took the food tray away from Diaz which caused Diaz to ball his fists and get into a fighting stance. Although Diaz did not actually pose a threat of harm and instead of de-escalating the situation and avoiding the use of force, the officer preemptively punched the detainee in the face. After the punch because Diaz was not "obeying" the officer's orders, the officer delivered two knee strikes to his thigh to gain compliance. Knee strikes to gain obedience or compliance are clearly excessive. The officer's punch was also excessive as the detainee did not actually pose a threat of imminent serious bodily harm.

592.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**36) Dylan Casiano: February 11, 2020, Excessive Force Incident.**

593.    On February 11, 2020, in the holding cell of the 1200 medical infirmary, Dylan Casiano was involved in an excessive use of force incident with officers in the Jail.

594.    Similar to the Pillow case, officers entered the holding cell to remove Casiano's bed. Casiano tried to leave the cell which the officers prevented. Officers responded by tackling and wrestling Casiano resulting in multiple officers using multiple closed-fist strikes, hammer strikes, and "uppercuts" to the face and head of the detainee with several officers punching the detainee in the back of the head. The officers then sat on his back to keep him from resisting which is an improper technique that can lead to the death of the detainee. The officers failed to de-escalate the situation or only use techniques that would not likely lead to injury. Instead the officers resorted to using numerous strikes and other force techniques which could have led to his severe injury or death. These uses of force were excessive as they were unnecessary and disproportionate.

595.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the

understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 37) Danielle Hampton: February 15, 2020, Excessive Force Incident.

596.    On February 15, 2020, on the 4th Floor of 1200 Baker, Danielle Hampton was involved in an excessive use of force incident with the officers of the Jail.

597.    Hampton was out for her one hour of dayroom time and allegedly punched at a medication nurse. The officer accompanying the nurse responded by punching the detainee in the face and placing her in a hold. Instead of de-escalating the situation at this point after getting control of the detainee, the officer resorted to additional uses of force which were excessive. The officer punched the detainee multiple times in the body and face where the officer lost count of how many times she punched her. The officer then tackled the detainee to the ground hitting the detainee's head on the dayroom table. While sitting on top of the detainee, the officer delivered four forearm strikes to the detainee's face. Another officer that responded while the detainee was on the ground also punched Hampton in the head two more times. Each of these strikes after gaining control of the detainee were clearly excessive.

598.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force disproportionate to the needs of the situation while failing to de-escalate the situation. The policy and training is to use strikes against any resisting detainee no matter the situation with no teaching or policy preventing detainees from continuing with uses of force when they are no longer necessary. Instead officers routinely continue to strike detainees until the detainee is unresponsive, lethargic, or no longer being belligerent in any manner. The culture and issue of excessive force

as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 38) James Liberto: February 16, 2020, Excessive Force Incident.

599.     On February 16, 2020, in the 6th Floor Holding Cell of 1200 Baker, James Liberto was involved in an excessive force incident with the officers of the Jail.

600.     Officers were getting Liberto out of the holding cell when he took a "bladed stance." Instead of de-escalating the situation, an officer grabbed Liberto by a leg causing him to slam on the ground and then dragged Liberto out of the cell. Once outside of the cell, the officers got on top of Liberto on the ground. Because Liberto refused to be handcuffed, the officer immediately resorted to using closed-fist strikes and punched him three times in the lower ribs. Liberto was bleeding from his forehead when they finally picked him up off the ground. The officers failed to de-escalate the situation and used excessive force in punching a detainee who was laying face-down on the ground while being restrained and held down by several officers.

601.     The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 39) Seth McCleland: February 22, 2020, Excessive Force Incident.

602.    On February 22, 2020, Seth McCleland was involved in an excessive force incident on the 2nd floor of 1200 Baker.

603.    The Lieutenant who was the watch commander for both 701 and 1200 buildings was conducting a cell search of McCleland's cell. When the Lieutenant began grabbing McCleland's items, McCleland tried pushing past the officers to get into his cell. Instead of de-escalating the situation, the officers immediately resorted to using excessive force through closed-fist strikes. One officer punched McCleland one time in the face because he tried to push past him. When McCleland tried to push past again, the officer punched him two more times in the face. When taken to the ground, other officers also punched McCleland in the face at least twice. McCleland was not posing a threat that would make this use of force reasonable. Instead, these punches were uncalled for and excessive.

604.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 40) Larry Donald Edwards: February 23, 2020, Excessive Force Incident.

605.    On February 23, 2020, Larry Edwards was involved in an excessive force incident on the 7th Floor of 701 N. San Jacinto.

606.    Edwards had flooded his cell, so officers entered the cell to remove him. Edwards allegedly spit on the officer who struck him in the face and then placed him against the wall while

Edwards was restrained. While being escorted out of the pod, Edwards allegedly slipped out of his restraints and struck an officer. The officers then placed him against the wall where they maintained control over him. No force was necessary now that they had control of him. However, while against the wall, an officer punched Edwards three times in the torso and one time with his knee to his body. Another officer struck Edwards two times with a closed-fist. Similar to Plaintiff, instead of taking Edwards to the clinic for treatment, the officers placed him in a holding cell which evidences the lack of medical care to detainees. These strikes were unnecessary and excessive as Edwards was being controlled by officers and was not posing a threat of imminent severe bodily injury or death.

607.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**41) Jessica Hernandez: February 23, 2020, Excessive Force Incident.**

608.    On February 23, 2020, in the Jail clinic, Jessica Hernandez was involved in an excessive use of force incident with officers of the Jail.

609.    Hernandez was standing restrained outside of the clinic when she spit on an officer. The officer in response pushed the detainee causing her to fall. Later Hernandez spit on another officer. This officer punched Hernandez in the head in retaliation for spitting on them. This punch was "reactionary" due to the common policy and training in punching detainees for these types of

situations. Punching a detainee in the head or pushing a detainee causing them to fall due to getting spit on is inappropriate and excessive use of force.

610.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**42) Kevin Casasola: February 26, 2020, Excessive Force Incident.**

611.    On February 26, 2020, in the 5th Floor holding cell of 1200 Baker, Kevin Casasola was involved in an excessive force incident with officers in the Jail.

612.    Casasola attempted to walk out of his holding cell with an officer who had entered his cell. The officer pushed Casasola back into his cell when he allegedly tried to punch the officer. The officer then tackled Casasola and was holding him on the ground. Other officers responded and helped hold Casasola on the ground. While on the ground and under the officers' control, Casasola allegedly try to bite the officer so the officer in response punched him two times in the head. Another officer punched Casasola two times in the torso, while another officer punched him three times in the head. Each of these strikes were excessive as the officers had control of the detainee on the ground and because he was not posing an imminent threat of harm as there was no indication that he could bite an officer or that he would bite an officer or that a bite is a sufficient basis to use strikes to the head or body.

613.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**43) David Jelks: March 6, 2020, Excessive Force Incident.**

614.    On March 6, 2020, on the 7th Floor of 701 N. San Jacinto, David Jelks was involved in an excessive force incident with offices in the Jail.

615.    While an officer was doing rounds, Jelks allegedly charged at the officer which resulted in the officer taking him to the ground. The officer had control over Jelks on the ground removing any threat of harm. However, another officer responded and while Jelks was being held on the ground punched him two times in the face. These punches while Jelks was effectively restrained were unnecessary and excessive. The officer failed to de-escalate the situation.

616.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience

**44) Bobby Turner: March 13, 2020, Excessive Force Incident.**

617.    On March 13, 2020, on the 5th Floor of 701 N. San Jacinto, Bobby Turner was involved in an excessive force incident with officers.

618.    While officers were trying to handcuff Turner, he balled his fists and twisted his body towards the officers. Turner was not posing a threat, but the officers used multiple strikes and pain compliance techniques against Turner because he was not being obedient. Officers also used "two Harris County taught Common Perineal Knee strikes" that were delivered to the thigh and upper torso. This illustrates that Harris County specifically taught officers to use knee strikes against detainees. Each of these strikes were unnecessary and excessive. The officers failed to de-escalate the situation but instead resorted immediately to using strikes against Turner.

619.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**45) Multiple Detainees: March 14, 2020, Excessive Force Incident.**

620.    On March 14, 2020, two detainees were fighting in their cell on the 2nd Floor of 1200 Baker when the officers responded and turned into an excessive force incident.

621.    Two detainees were fighting in their cell when officers arrived. One detainee tried to fight an officer who tackled him to the ground. While on the ground and under the control of several officers, officers punched the detainee multiple times in the face and back to get him to

"stop resisting" and to "prevent" him from spitting. Each of these strikes while the detainee is on the ground are excessive.

622.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

### 46) Multiple Detainees: March 22, 2020, Excessive Force Incident.

623.    On March 22, 2020, officers responded to the 7th Floor of 701 N. San Jacinto where a detainee was being assaulted by other detainees. This illustrates that violent nature of the Jail where assaults occur frequently and are not deterred or prevented by the officers or the policies of the Jail.

624.    After restraining two of the detainees, officers were attempting to restrain another detainee who took an "aggressive stance." Instead of de-escalating the situation, the officer escalated the situation by immediately resorting to laying hands on the detainee which made the detainee upset and tried hitting the officer but missed. Instead of de-escalating the situation by stepping away from the detainee, the officer immediately punched the detainee three times in the face and delivered two knee strikes to his leg. These strikes were unnecessary as the detainee no longer posed a threat and de-escalation techniques were available; however, the officer resorted to the only method that officers are taught which is to deliver strikes to the head and body of a detainee who is not being exactly compliant.

625.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**47) Michael Chavis, Jr.: March 24, 2020, Excessive Force Incident.**

626.    On March 24, 2020, Michael Chavis, Jr. was involved in an excessive force incident with officers in the Jail on the 3rd Floor of 701 N. San Jacinto.

627.    Officers were responding to a detainee fight when Chavis allegedly grabbed an officer. In response the officer delivered an elbow strike to Chavis's face. Once Chavis was on the ground, one of the officers saw another officer kick Chavis in the mouth. These strikes were excessive, unnecessary, and disproportionate to the situation.

628.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**48) Donell Johnson II: March 25, 2020, Excessive Force Incident.**

629.     On March 25, 2020, on the 7th Floor of 701 N. San Jacinto, Donell Johnson II was involved in an excessive force incident with officers in the Jail.

630.     The sprinklers in Johnson's cell were going off causing him to need to be removed from his cell. Allegedly Johnson was not being cooperative which led the officers to tackle him to the ground. While on the ground with the officers on top of Johnson who was facing the floor, the officers allege that Johnson was refusing to provide his hands for handcuffing. This is a common statement in the incident reports with many times the detainees unable to provide their hands because they are stuck under their body when they were tackled to the ground with the officers on top of them. Instead of being patient and de-escalating the situation, an officer punched Johnson 4 times in the back to try to force him to give up his hands. These strikes were needless and excessive because Johnson was not posing a threat and was under the control of the officers who were on top of him. The supervisor was involved in this incident and specifically noted that they did not have sufficient staff which required the officers involved in the use of force to also be the officers that escorted Johnson to the clinic.

631.     The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**49) Kendrick Semiens: March 25, 2020, Excessive Force Incident.**

632.    On March 25, 2020, on the 7ᵗʰ Floor of 701 N. San Jacinto, Kendrick Semiens was involved in an excessive use of force incident with officers in the Jail.

633.    Semiens was in the hallway when an officer told him to go back into his cell. For some unknown reason, Semiens threw some water on the officer. A detainee throwing water at an officer is not a basis to use force as there is no imminent threat of harm. Instead of walking away and just writing the detainee up, the officer escalated the situation by pushing the detainee against the wall and then tackling him to the ground. While being taken to the ground, one officer punched the detainee for no reason. Another officer put his knee on the detainee's torso while he was on the ground which is an improper technique that can lead to asphyxia and death. While Semiens was restrained, Semiens allegedly spit on an officer who responded by punching Semiens in the face. A witnessing officer stated that the responding officer punched Semiens twice after getting spit on. Getting spit on is not a basis to use any force let alone a closed-fist strike to the head, face, or neck which is known to cause serious life-threatening injuries.

634.    Notably, the supervisor filling out the reports determined that the officers' use of force was reasonable and necessary which further establishes the existence of the policy, practice, lack of training, and lack of supervision permitting and promoting excessive force in the Jail. As supported by the supervisor's statement, the officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**50) Jerry Kelly III: March 28, 2020, Excessive Force Incident.**

635.     On March 28, 2020, on the 2nd Floor of 1200 Baker, Jerry Kelly III was involved in an excessive force incident with officers in the Jail.

636.     Jerry Kelly was in the hallway when an officer told him to remove an item from his sock. This upset Kelly who tried to punch an officer but was blocked. The officers then pushed Kelly up against a wall and had him under control. At this point, no other force was necessary or permitted as Kelly was no longer a threat. However, to escalate the situation and in accordance with the County's policies and training, the officers escalated the situation and resorted to using strikes and excessive force to send a message and to continue the force used prior. Officers at the Jail are not taught when force should be stopped to prevent it from becoming excessive or unnecessary; instead, if any part of the altercation requires force, then force is permitted for the entire interaction with the detainee. In accordance with this policy while holding Kelly against the wall, one officer struck Kelly in the torso with his knee. Another officer who "helped out" punched Kelly multiple times to allegedly regain control over the detainee. These strikes were excessive.

637.     The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience.

**51) Joshua Hampton: March 29, 2020, Excessive Force Incident.**

638.    On March 29, 2020, in the clinic holding cell, Joshua Hampton was involved in an excessive force incident with officers in the Jail.

639.    Hampton was in a medical holding cell and had broken his camera in the cell. The officers removed Hampton from his cell and placed him on the ground. While the officers were on top of Hampton, Hampton was allegedly not giving up his hands to be handcuffed (common story). In response, the officer punched Hampton twice in the head to get him to give up his hands. Notably, this officer did not report this use of force in her original report and only added it in a supplement at a later time. Because Hampton was face down on the ground with officers controlling him, he was not posing a threat and the strikes were unnecessary and excessive.

640.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

**52) Malik Williams: March 30, 2020, Excessive Force Incident.**

641.    On March 30, 2020, on the 7th Floor of 701 N. San Jacinto, Malik Williams was involved in an excessive force incident with officers in the Jail.

642.    Detainees were removed from their cell due to a fire in their pod. Williams allegedly elbowed an officer in the chest who took him to the ground. One the ground the officers placed their knee in the middle of his back which is an improper technique. While on the ground, the

officers had control over Williams, and he did not pose a threat to the officers or other personnel. While on the ground, Williams allegedly tried to bite an officer even though he was face down on the ground. Instead of stepping away or moving his body, the officer escalated the situation and immediately resorted to using closed-fist strikes to Williams' face in accordance with his training and Harris County's policies. The officer struck Williams two times in the face for trying to bite him busting Williams' lip. The officer punched Williams two more times for refusing to provide his arms for handcuffing because they were underneath Williams' body. Each of the four strikes were excessive and unnecessary and could have caused life threatening injuries.

643.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

**53) William Lewis: April 3, 2020, Excessive Force Incident.**

644.    On April 3, 2020, on the 7th Floor of 701 N. San Jacinto, William Lewis was involved in an excessive force incident with officers in the Jail.

645.    Lewis was refusing to get into his housing because he was requesting his medication. Lewis eventually took a "fighting stance" and tried to hit an officer. He did not connect, but the officers did not de-escalate the situation or try to create some distance from Lewis. Instead, the officer escalated the situation by responding to Lewis with "5 uppercuts" to Lewis's

face and one knee strike to his body causing Lewis to fall on the ground. When the officers were on top of Lewis, Lewis had his arms underneath him (which is very common). In response, three of the officers delivered multiple knee strikes to all parts of Lewis's body to get him to give up his hands. In many of the reports, the officers did not mention their knee strikes or the uppercuts until months after the incident. The main officer did not mention using a knee strike to Lewis while he was standing until a supplement a month after the incident. This same officer added in a supplement two months after the incident that while escorting Lewis while restrained that the officer delivered another knee strike to Lewis. Each of these strikes were clearly excessive.

646.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident and supervisors were involved.

**54) Anthony Montgomery: April 3, 2020, Excessive Force Incident.**

647.    On April 3, 2020, on the 7th Floor of 701 N. San Jacinto, Anthony Montgomer was involved in an excessive use of force incident with officers in the Jail.

648.    Officers entered Montgomery's cell on an allegation that Montgomery was threatening other detainees. Montgomery allegedly got upset and struck an officer. The officer in response began punching Montgomery with "both fists." Once Montgomery was taken to the ground, the officers did not de-escalate the situation or cease using strikes against him even though

he was under the officers' control. Instead, the initial officer punched and delivered knee strikes to Montgomery multiple times while he was laying on the ground until he "stopped resisting" (which is just a fancy term for a detainee not defending themselves, trying to protect themselves, or from tensing up their body without any indication that the detainee is actively fighting or threatening anyone with physical harm). Other officers involved in the incident also punched Montgomery and delivered several knee strikes to him while he was on the ground. The officers were acting in accordance with the policies and training of the County to continue with uses of force even when they become excessive.

649.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident and supervisors were involved and ratified the officers' conduct.

### 55) Quincy Johnson-Fields: April 3, 2020, Excessive Force Incident.

650.    On April 3, 2020, in various parts of 701 N. San Jacinto, Quincy Johnson-Fields was involved in an excessive force incident with officers in the Jail.

651.    Johnson-Fields was refusing orders in his cell when an officer "placed" him against the wall and restrained him. When they entered the elevator, the officers placed Johnson-Fields' face against the wall. One officer "directed" the detainees face away from him and against the wall

to prevent him from spitting. While facing the wall and restrained, the detainee tried kicking backwards and in response the officer delivered two knee strikes to the detainee with enough force to knock Johnson-Fields to the ground. This force was unnecessary and excessive as Johnson-Fields was restrained and under the control of two officers.

652.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

### 56) Tamika Marks: April 7, 2020, Excessive Force Incident.

653.    On April 7, 2020, in the clinic holding cell, Tamika Marks was involved in an excessive force incident with officers in the Jail.

654.    Marks was in a medical holding cell and yelled at a passing officer. The officers opened her door when she allegedly tried to slap the officer but missed. Instead of closing the door and creating separation to de-escalate the situation, the officers went into the cell grabbed her and put her against the wall. Even though the officers had control over the detainee against the wall, one officer punched Marks in the face while the other officers held her. Once Marks was taken to the ground, the same officer punched her three more times in the head. Marks was under the restraint and control of the officers making any use of force, let alone closed-fist strikes, excessive.

655.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

### 57) Blake Harris: April 17, 2020, Excessive Force Incident.

656.    On April 17, 2020, in various parts of 701 N. San Jacinto, Blake Harris was involved in an excessive force incident with officers in the Jail.

657.    Harris was in the safety vestibule with socks on his hands trying to grab a broom with officers present. One officer sprayed Harris with pepper spray twice because Harris was allegedly verbally threatening the officers. At no point prior to the spray being used, did Harris actually swing at an officer. After getting sprayed, the officers that responded laid their hands on him to which he responded by swinging his arms around trying not to get handcuffed. An officer eventually pushed him which caused him to "fall in the direction of the floor." While being escorted to another cell, he was restrained and allegedly sounded like he was going to spit. An officer in response to the spit noise punched Harris in the face causing him to fall to the ground. While on the ground and restrained, the same officer struck Harris with his knee in the upper body several times. During the entirety of the struggle, other officers also punched Harris in the face multiple times and struck him with their knees several times. While walking Harris allegedly tried to kick another officer but missed. In response an officer punched Harris in the face and attempted

to pull him to the floor. Each of these strikes were excessive and unnecessary especially after he was restrained.

658.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

## 58) Multiple Detainees: April 29, 2020, Excessive Force Incident.

659.    On April 29, 2020, on the 6th Floor of 1200 Baker, multiple detainees were involved in an excessive use of force incident with officers in the Jail.

660.    Multiple detainees were involved in an detainee-on-detainee fight which further exemplifies the assaultive nature of the Jail. Officers responded to the fight only after it was over. When the officers arrived, they attempted to restrain multiple detainees. When one of the detainees became aggressive, one of the officers grabbed the detainee by the leg and dragged him to the ground. While on the ground the detainee was holding onto the officer's leg, so the officer punched the detainee two times in the face. Another detainee was also taken to the ground where he was punched by an officer 7 times in the ribs. Another detainee who allegedly threw a punch at an officer was punched 4 times in the head and then while laying on the ground was punched 10 more times in the stomach by the same officer. Many if not all of these strikes were clearly excessive as the officers did not make any attempt to de-escalate the situation.

661.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

### 59) Brandeion Pruitt: May 3, 2020, Excessive Force Incident.

662.    On May 3, 2020, on the 6th Floor of 701 N. San Jacinto, Brandeion Pruitt was involved in an excessive force incident in the Jail.

663.    Pruitt was allegedly being belligerent to an officer who bowed up to him in his cell. The officer pushed Pruitt who allegedly pushed the officer back and struck him. The officer responded by punching Pruitt two times and then tackling him into the day room table. Once Pruitt was held by two officers who were walking him out of the cell, one officer punched Pruitt in the face and the upper torso. These latter strikes while Pruitt is no longer resisting or a threat are clearly excessive and unwarranted.

664.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them

to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

**60) Multiple Detainees: May 6, 2020, Excessive Force Incident.**

665.    On May 6, 2020, on the 6th Floor of 1200 Baker, several detainees were involved in an excessive force incident in the Jail.

666.    During count while the safety vestibule of the pod was open, one detainee tried to walk out of the cell. Officer McCloud approached the detainee who spit on him. Instead of de-escalating the situation, Officer McCloud escalated the situation and responded to the spit on the face by striking the detainee in the leg with his knee. When the detainee spit on Officer McCloud again, Officer McCloud punched him two times in the head and two times in the ribs. Other officers that responded delivered a total of seven knee strikes to the detainee's side. While in the safety vestibule, Officer McCloud closed the door and the detainees in the pod poked a mop handle through the door poking Officer McCloud. In response, Officer McCloud sprayed pepper spray through the pan hole. The strikes and the use of pepper spray were clearly excessive as spitting is never a basis for using force, especially knee and closed-fist strikes, against a detainee.

667.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and

belief, no officers were disciplined for their actions in this incident and the supervisor was directly involved.

### 61) Derek Brown: May 10, 2020, Excessive Force Incident.

668.     On May 10, 2020, on the 2nd Floor of 1200 Baker, Derek Brown was involved in an excessive force incident in the Jail.

669.     Brown was wanting his shower shoes and was talking with the Pod Control Officer. The officer with Brown tried to handcuff him which resulted in Brown pulling away and trying to punch and grab the officer. The officer responded with several punches to the detainee. As the struggle continued, another officer responded by immediately punching Brown multiple times. Once the officers got Brown on the ground, no more force was necessary as Brown no longer posed a threat. However, in accordance with the County's policies and training, the officers continued to use force against Brown even after he was no longer a threat. While on the ground, Brown had his hands underneath his body. To get Brown to release his hands and to "stop resisting," multiple officers delivered knee strikes to his body and punches to his face causing injury. Each of these strikes while on the ground were unnecessary and excessive.

670.     The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

**62) David Norton: May 10, 2020, Excessive Force Incident.**

671.    On May 10, 2020, in the Joint Processing Center, David Norton was involved in an excessive force incident with officers in the Jail.

672.    Norton refused to give up his shoes so the officer "took him to the floor." Because Norton would not give his hands while the officers were on top of him, the officers tased Norton twice. This tasing was unnecessary as Norton was not posing a threat. Tasing is not an appropriate use of force when a detainee is only refusing to provide his hands while he is being held by the officers.

673.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

**63) Jeffrey Kanu: May 12, 2020, Excessive Force Incident.**

674.    On May 12, 2020, Jeffrey Kanu was involved in an excessive use of force incident on the 2nd Floor of 1200 Baker.

675.    Kanu was in a holding cell when the officers entered his cell. These holding cells on this floor were meant for detainees suffering a mental crisis. While the officers were leaving the cell, Kanu followed after them. The officers turned around and pushed Kanu back into the holding cell. Instead of de-escalating the situation, one officer turned and punched Kanu in the

face. Kanu was not posing a threat making the punch to the face clear excessive force. The officer did not originally report punching Kanu in the face first until a supplement report filed later.

676.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

**64) Keith White: May 15, 2020, Excessive Force Incident.**

677.    On May 15, 2020, in the clinic, Keith White was involved in an excessive force incident.

678.    Officer Mark Garcia, who was involved in the Jacoby Pillow case was escorting a White into the rubber room which is in the same floor and set up as the cell where Pillow was assaulted. After placing White in the cell, White stood up into a fighting stance. White never swung at or actually threatened any officer. Officer Garcia originally reported that because White was in a fighting stance he punched White four times in the head. Officer Garcia three months later had to change his report to admit that he punched White one time in the head knocking him to the ground and then punched him two times in the head while on the ground and missed a third punch while he was on the ground. Each of these strikes were excessive.

679.    Officer Garcia's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in

unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

**65) Andre Taylor: May 26, 2020, Excessive Force Incident.**

680.    On May 26, 2020, on the 7th Floor of 701 N. San Jacinto, Andre Taylor was involved in an excessive force incident with officers in the Jail.

681.    Detainees were being removed from their cell because some of the detainees were smoking. Taylor backed himself into a corner because he did not want to be handcuffed and held his hands out "defensively." Officers needlessly escalated the situation by laying hands on Taylor and trying to take him to the ground. Because Taylor was jerking his body away from the officers, one officer punched Taylor two times in the face to knock him to the ground. When on the ground, another officer punched Taylor two times in the torso because he was refusing to give his hands. Each of these strikes were excessive.

682.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them

to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

### 66) Ruben Valdes: May 29, 2020, Excessive Force Incident.

683.    On May 29, 2020, Ruben Valdes was involved in an excessive force incident on the 7th Floor of 701 N. San Jacinto.

684.    Two detainees were fighting and the officers stepped in between the detainees. Because one detainee remained in a fighting stance, an officer grabbed the detainee in a bear hug and took him to the ground. While on the ground and being held by several officers, two officers delivered punches to Valdes face out of fear that his body might strike someone. Another officer then delivered a "leg strike" to the torso of Valdes to get him to give the officer his arm which was under him. Valdes was not posing a threat of imminent danger and the officers needlessly escalated the situation and used excessive force.

685.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

### 67) William Rubio: June 4, 2020, Excessive Force Incident.

686.    On June 4, 2020, William Rubio was involved in an excessive force incident on the 2nd Floor of 1200 Baker.

687.    Rubio had been involved with a fight with other detainees when officers tried to restrain him. Rubio began to fight with the officers until the officers were able to tackle him to the ground. While controlling Rubio on the ground, the officers could have and should have not used any strikes as he no longer posed a threat and was under control. However, while on the ground, two officers punched him multiple times in the abdomen, leg, and face. These strikes while he was on the ground were excessive.

688.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. The culture and issue of excessive force as recognized by the DOJ, TCJS, and Sheriff Gonzalez is directly correlated to the understaffing and overcrowding of the Jail because officers must work quicker, they make rash decisions, and the psychological impact on the officers impedes their judgment and causes them to make expedient choices instead of de-escalating and having patience. Based on information and belief, no officers were disciplined for their actions in this incident.

**68) Andrew Flynn: September 4, 2021, Excessive Force Incident.**

689.    On September 4, 2021, Andrew Flynn was involved in an excessive force incident with Officer Brandon Brezik (who was involved in excessive force incidents with multiple other comparators) on the 3rd floor of 1200 Baker.

690.    Flynn was in a holding cell and was refusing to give up his shoes. Ultimately, Flynn placed the shoes in his stomach and cradled them to prevent them from being taken. Instead of de-escalating the situation and being patient, Officer Brezik kicked Flynn in the back to get him to give up the shoe. Confiscating a shoe is no justification for using any force against a detainee let alone a kick to the back. This strike was excessive.

691.    Officer Brezik's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**69) Samone Bailey: September 18, 2021, Excessive Force Incident.**

692.    On September 18, 2021, in the Joint Processing Center, Samone Bailey was involved in an excessive force incident with several officers.

693.    In the processing center, Bailey was being searched by an officer and allegedly tried to bite the officer's hand while the officer was behind her. The officer claimed to "redirect" here head to face the wall and "slightly pushed her head forward." The officers eventually slammed Bailey to the ground. The officer had to change her report a month later and admit that she pushed Bailey's head into the wall three times. Pushing a detainee's head into a wall for them trying to bite but not actually posing a threat is excessive and unnecessary.

694.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**70) Kiara Varnado: December 11, 2021, Excessive Force Incident.**

695.    On December 11, 2021, in the Joint Processing Center, Kiara Varnado was involved in an excessive force incident with several officers.

696.    Varnado had been in a fight with other detainees in the JPC. Officers escorted her to a holding cell when she allegedly turned around and struck an officer. The officer punched Varnado in the face twice and then took her to the ground. While on the ground being held by the

officers, Varnado allegedly grabbed the officer's hair. The officer in retaliation punched her three more times in the head. A detainee grabbing your hair is not a valid justification for using deadly force (strikes to the head). These strikes were excessive.

697.     The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

### 71) Vincent Sanders: January 3, 2022, Excessive Force Incident.

698.     On January 3, 2022, Vincent Sanders was involved in an excessive force incident on the 3rd Floor of 1200 Baker.

699.     Sanders was not obeying orders to get into his housing and threw an apple at an officer. The officer failed to de-escalate the situation and slammed Sanders into the wall and eventually took him to the ground. While on the ground, Sanders grabbed the officer's ankle. Sanders was not posing a threat as other officers were present and holding onto Sanders on the ground. Sanders was not attempting to pull on the officer in any way. The officer kicked Sanders three times to get him to let go. Another officer delivered a knee strike to Sanders' side to "gain compliance." The original officer failed to report two of the kicks until almost two years later when he filed a supplement to the report. These kicks and strikes were excessive as Sanders was not posing a threat requiring deadly force.

700.     The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

### 72) Ronald Villavolos: February 18, 2022, Excessive Force Incident.

701.    On February 18, 2022, Ronald Villavolos was involved in an excessive force incident in the Joint Processing Center of the Harris County Jail.

702.    Villavolos who was likely experiencing a health crisis was being loud in the JPC and asking to go to court. An officer grabbed Villavolos' arm and put it behind his back to escort him to a holding cell. Similar to Plaintiff, Villavolos' allegedly turned towards the officer and the officer responded by punching him in the face and pushing him towards the floor. Villavolos was not posing a threat and turning towards someone is not a basis to use a closed-fist strike to the head making this force excessive.

703.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

### 73) Bryon Taylor: March 14, 2022, Excessive Force Incident.

704.    On March 14, 2022, in the Joint Processing Center, Byron Taylor was involved in an excessive force incident.

705.    Taylor was handcuffed by an officer to be escorted further through the classification process. The officers noted that Taylor had medical staples in the back of his head. Allegedly Taylor tried to headbutt an officer with no indication if he was still a threat or if he had connected. Instead of de-escalating the situation especially since he was already restrained, the officers took him to the ground simultaneously while an officer punched Taylor in the head 3 times. These punches were excessive as de-escalation techniques could have been employed and the officers had Taylor restrained removing any threat.

706.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**74) Alex Sanchez: June 5, 2022, Excessive Force Incident.**

707.    On June 5, 2022, in the Joint Processing Center, Alex Sanchez was involved in an excessive force incident with officers of the Jail.

708.    Sanchez was being searched and was allegedly being rude to the officer. When the officer finished, Sanchez allegedly bumped the officer's shoulder as he passed by. The officer immediately reacted with a punch to the side of Sanchez's head causing his ear to bleed. A Houston Police Officer actually had to step in and prevent the Harris County officer from continuing to use force against Sanchez. This strike was excessive.

709.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**75) Daysha Stafford: June 14, 2022, Excessive Force Incident.**

710.    On June 14, 2022, in the Joint Processing Center, Daysha Stafford was involved in an excessive force incident in the Jail.

711.    Stafford was refusing to sit in a chair in the JPC so the officer began escorting her to a holding cell. While walking to the holding cell, Stafford allegedly spit on the officer and got into a fighting stance. The officer responded by punching Stafford fifteen times in the face (the

officer claimed that she only connected five times). Spitting is never a justification for using force, let alone punches to the head or face of a detainee. These strikes were excessive.

712.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**76) Carl Turner: July 21, 2022, Excessive Force Incident.**

713.    On July 21, 2022, in the Joint Processing Center, Carl Turner was involved in an excessive force incident in the Jail.

714.    Turner had his restraints removed to get something out of his hair. Turner allegedly took a bladed stance. Turner, however, never attempted to assault an officer and did not pose a threat of imminent serious bodily injury to justify a closed-fist strike. The officer, however, punched Turner in the face knocking him to the ground. This strike was excessive.

715.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**77) Mark Weaver: July 22, 2022, Excessive Force Incident.**

716.    On July 22, 2022, in the Joint Processing Center, Mark Weaver was involved in an excessive force incident with officers in the Jail.

717.    Weaver was walking toward a holding cell that he was told to go into and turned around with his hands near his face. Weaver was not posing a threat. However, the officer immediately resorted to punching Weaver in the face out of "fear" and then taking him to the

holding cell. A detainee with his hands near his face and turning toward an officer is no justification for using force including a closed-fist strike against them. This strike was excessive.

718.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

## 78) Ronny Garcia: July 29, 2022, Excessive Force Incident.

719.    On July 29, 2022, in the Joint Processing Center, Ronny Garcia was involved in an excessive force incident in the Jail.

720.    Garcia was being held by several officers because he was refusing to enter a holding cell. Similar to Plaintiff, Garcia was jerking his body away from the officers' hold. The officer in response punched Garcia three times in the head causing his head to cut open. A detainee jerking their body away from an officer is not a justification for punching the detainee in the head.

721.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

## 79) Julius Scott: August 4, 2022, Excessive Force Incident.

722.    On August 4, 2022, in the Joint Processing Center, Julius Scott was involved in an excessive force incident.

723.    Scott was talking on the phone in the JPC when an officer wanted him to get off the phone and go to a holding cell. Scott refused and began walking in the opposite direction. Scott allegedly got into a fighting stance and took off his shirt. Scott, however, did not attempt to actually

fight anybody and did not pose a threat of imminent serious bodily harm. However, an officer needlessly escalated the situation by punching Scott in the face. This made Scott angry so he tried punching back to defend himself. Another officer punched him five times in the face and torso. Once the main officer got Scott tackled to the ground, the officer punched Scott in the head one more time and then seven more times in the torso. These strikes were excessive and unnecessary.

724.    The officers' actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**80) Ivy Hamilton: March 31, 2023, Excessive Force Incident.**

725.    On March 31, 2023, in the Joint Processing Center, Ivy Hamilton was involved in an excessive force incident.

726.    Hamilton had set fire to his shirt while in a holding cell. The officers got the shirt out of the cell and put out the fire. Because Hamilton refused to get handcuffed through the pan hole, the officers needlessly escalated the situation and entered his cell and took him to the ground. While on the ground with officers on top of him, Hamilton's hands were stuck under him. However, an officer punched Hamilton four times in the face to get him to give up his hands. Punching someone in the face for not giving up their hands when the officers are on top of him on the ground is excessive force.

727.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**81) Eric Walker: May 2, 2023, Excessive Force Incident.**

728.    On May 2, 2023, in the Joint Processing Center, Eric Walker was involved in an excessive force incident.

729.    The officers noted that Walker was paranoid and was standing on his toilet in a holding cell with his shoe in his hand. Despite knowing of Walker's condition, the officers decided to remove him from one holding cell to another. The officers escalated the situation by entering his cell to remove him. Because Walker was paranoid he resisted by pushing an officer into a wall and biting his shirt. The officer "reacted" by punching Walker four times in the face and took him to the ground. Knowing Walker's mental state and the needless escalation of the incident, the strikes to his face were unnecessary. Even if the first strike was determined to be appropriate, each use of force must be justified and the three additional punches were not justified.

**82) Eric Torres: May 10, 2023, Excessive Force Incident.**

730.    On May 10, 2023, in the Joint Processing Center, Eric Torres was involved in an excessive force incident.

731.    Torres was being escorted to a holding cell in the JPC when he allegedly tried headbutting an officer. One officer that responded pulled Torres away and took him to the ground. While on the ground being restrained by the officers, one officer began kicking Torres and kicked him at least four times in the leg. Torres did not pose a threat while being restrained on the ground making these kicks excessive.

732.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**83) Henry Barnes: May 17, 2023, Excessive Force Incident.**

733.    On May 17, 2023, in the Joint Processing Center, Henry Barnes was involved in an excessive force incident.

734.    Barnes was in a holding cell and was refusing to provide his name to the officer. The officer entered his cell and told Barnes to turn around. Barnes refused to turn around. Instead of de-escalating the situation and being patient, the officer laid hands on the detainee. Barnes jerked away from the officer's grasp and tried to stand up. The officer in response punched Barnes seven times in the head and neck. Barnes was not posing a threat and merely standing up and jerking away from an officer's grasp (similar to Plaintiff) is not a justification to use closed-fist strikes to the detainees head and neck making these strikes excessive.

735.    The officer's actions were in accordance with Harris County's training, supervision, policies, and practices inside the jail by using strikes and other uses of force in unnecessary situations while failing to de-escalate the situation. Based on information and belief, no officers were disciplined for their actions in this incident.

**84) Alexis Cardenas**

736.    The policies, procedures, failure to train, and failure to supervise officers in relation to the use of excessive force has continued to be a problem in the Jail. No effective change has been noted despite Sheriff Gonzalez changing the written policy for use of force. Most officers have not even seen the changed policy and have not been retrained at all when force can be used. The example of the ongoing nature of these rampant problems and systemic excessive force policies, training, and practices can be seen in the case of Alexis Cardenas.

737.    On July 8, 2025, in the JPC, Mr. Cardenas was being released from the Jail. Mr. Cardenas was having a mental health episode throughout his time in the Jail; however, Harris

County never treated him for those issues. Mr. Cardenas did not want to leave the Jail for some unknown reason and so he was walking away from the door. The officers present did not attempt to de-escalate the situation but immediately laid hands on Mr. Cardenas escalating the situation.

738.    Mr. Cardenas was resistant to the officers' actions and laid on the ground several times. The officers eventually tased Mr. Cardenas multiple times. As can be seen in the video, after he made his way into a vestibule, Mr. Cardenas is sitting on the ground with one officer holding his arm. Without any provocation, another officer kneed Mr. Cardenas in the head slamming his head into the wall behind him.

739.    For the next several minutes, multiple officers are pressing their body on top of Mr. Cardenas while Mr. Cardenas is resisting. Although Mr. Cardenas was resisting, the officers had control over his body and he was not posing a threat of imminent injury to any party. Eventually while laying on the ground, one officer punches Mr. Cardenas multiple times in various parts of his body. Another officer then repeatedly punched Mr. Cardenas in the head multiple times despite Mr. Cardenas not providing any actual resistance. The officers including some supervisors rolled Mr. Cardenas over on his stomach and pressed their knees on top of his back for multiple minutes. Mr. Cardenas went unresponsive but the officers did not notice and remained on his back for several more minutes. [28]

740.    Ultimately, Mr. Cardenas passed away from his injuries and from electrical and physical restraint. The officer's actions were in accordance with the County's policies, their training and approval of their supervisors to escalate the situation needlessly and resort immediately to excessive force instead of using de-escalation techniques. The supervisors were directly involved in each incident.

---

[28] A copy of the video of the entire incident can be found at the following link which is incorporated herein. https://www.youtube.com/watch?v=WiTNmkBJ0Xs.

741.    Harris County Jail's culture of violence and prevalent policies, practices, and customs encouraging officers to act in a "culture that quickly leads to physical altercation," to use more force than necessary to subdue an inmate, to use improper force techniques that are more likely than not to lead to serious bodily injury, that encourages an unnecessarily large number of officers to subdue inmates without any attempt to coordinate their respective efforts without repercussion, that encourages officers to utilize excessive force when the inmate fails to comply with verbal orders and/or physical forces without repercussion, that encourages officers to create scenarios that victims cannot comply with and unnecessarily harm them without repercussion, that encourage officers to not adequately document uses of force, that encourages supervisors to not report or discipline uses of force, that encourage officers to use force on subdued and restrained detainees as a punishment and retaliation tactic, to use force as a means of sending a message to detainees despite no justifiable reason for the use of force, to fail to de-escalate or even attempt to use de-escalation techniques, and to forego reasonable non-violent techniques was a moving force in Mr. Cardena's death.

742.    Harris County's rampant practice and policies of understaffing and overcrowding the jail encouraged violence by officers against detainees, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainee's, prevents a correct proportion of guards to carry out the necessary functions of the jail safely which encourages officers to use the quickest methods to get results out of detainees including excessive violence, and makes the employees "overworked, moral is poor, bad decisions happen when [understaffing is] occurring" which was a moving force in causing Mr. Cardena's death.

743.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Cardenas died.

### vi.   Prior And Concurrent Detainee Deaths and Injuries Evidencing Other Harris County's Unconstitutional Policies, Customs, Failure to Train, Failure to Supervise, and De Facto Policies.

744.    Each of the following comparators contain one or more similar incidents that illustrate one or more of the policies, practices, lack of training, or lack of supervision that is also the basis of Plaintiff's claims. For example, the lack of observation and monitoring due to officers not having enough time or staff to complete the functions of the Jail and the observations timely and thoroughly illustrates the understaffing and overcrowding of the Jail.

### 1)  Victoria Margaret Simon

745.    The family of Victoria Margaret Simon was a plaintiff in the original case involving Plaintiff but was severed by the Court into their own separate claims. The live complaint from that proceeding is incorporated herein.

746.    On September 29, 2022, Victoria Margaret Simon was booked into the Harris County Jail and placed into a single quarantine cell. Ms. Simon had a history of drug usage of which she was withdrawing at the time she entered the jail. The jail staff were aware that she was withdrawing and that she had specific medication she had to take during this process. Ms. Simon also had a history of anxiety and depression.

747.    Ms. Simon was never fully processed and provided proper medical evaluation but was instead placed in a single quarantine cell as potentially a way for her to "detox." This process is consistent with Harris County history and their policies and practices as they did not properly evaluate her medical needs, properly classify her to be observed appropriately, or process her in the required 48 hours of being placed in the Jail. Jail staff did not provide her the medication she was required to take and gave her medications that were not appropriate for her condition. One of the causes in this deprivation of medical care is the understaffing and overcrowding of the Jail

which impedes the provision of medical care, delays medical care, and causes the medical staff to provide only cursory evaluations and send detainees to solitary cells.

748.    On October 2, 2022, nurses and a jail officer found Ms. Simon unresponsive in her cell when they came to conduct a tuberculosis test. The officers and jail staff had failed to properly conduct the face-to-face observation prior to this random test with officers failing to actually observe Ms. Simon's physical wellbeing by missing an observation or simply walking past her cell without stopping and doing a full evaluation. This is consistent with the hundreds of other comparators identified in this lawsuit and in others including the TCJS reports where officers routinely and in accordance with their training simply walk from one QR code to another without actually performing a full evaluation of the detainee in the cell. Any officer that passed her cell did not properly stop and conduct a full observation that would have evaluated her condition to see if she was in distress or needed any type of aid. If the officers had conducted a proper face-to-face observation throughout her stay, they would have seen her deteriorating condition and could have and should have rendered medical aid that would have prevented her death. After being transported to the clinic, Ms. Simon was pronounced dead by a jail doctor.

749.    Failure to properly observe and monitor Ms. Simon and conduct proper face-to-face observations led to inadequate medical care being provided to her in a timely manner and ultimately caused Ms. Simon's death. This is in conjunction with the improper classification and evaluation of Ms. Simon which would have required a change in observation requirements and patterns by the jail staff. Plaintiff likewise did not receive a proper evaluation resulting in him being left in a solitary cell and only receiving a cursory evaluation of his medical needs.

750.    Harris County's policies, procedures, customs, and practice of not providing appropriate medical care to their detainees resulted in their failure to provide Ms. Simon with

medication and medical attention for her known medical needs including ongoing complications with her drug withdrawal. This ongoing policy and pervasive conduct led to the deprivation of Ms. Simon's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Ms. Simon's death. Had the Jail provided Ms. Simon with appropriate medical care and attention and conducted full testing in light of her known conditions and obvious symptoms Ms. Simon would have survived.

751.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Ms. Simon's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Ms. Simon's death. The overcrowding and understaffing of the jail stretched the limits of the staff and prevented Ms. Simon from getting processed timely, from receiving her medicine and treatment properly, resulted in an improper classification, interfered with the staff from conducting sufficient observation and monitoring of Ms. Simon in light of her condition, and caused the staff to ignore Ms. Simon's condition which prevented her from receiving medical care timely. The officers and staff in failing to observe and provide thorough medical care were acting in accordance with their training and policies.

752.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Simon died.

### 2)  Alan Christopher Kerber

753.    The family of Alan Kerber likewise brought claims in the Original Complaint with Plaintiff that the Court severed. Plaintiff incorporates those claims as if fully stated herein.

754.    On October 9, 2022, Alan Christopher Kerber was booked into the Harris County Jail in a single quarantine cell which lacked proper observation and monitoring by Harris County officials. Jail staff did not properly categorize Mr. Kerber and place him in a high risk cell which

has greater observation requirements. Instead, Mr. Kerber was placed in a standard quarantine cell which did not have proper suicide prevention methods or additional observation requirements in place.

755.    On October 12, 2022, at 3:20 a.m., the video in his single cell showed Mr. Kerber forcing a tube of toothpaste down his throat. The officer that was supposed to be monitoring the cameras either saw Mr. Kerber's actions and did nothing to interfere with Mr. Kerber's actions or to respond and render aid to get the tube out of his mouth, or the officer was not properly monitoring the cameras. Either situation exemplifies the pervasive pattern and practice of failing to monitor and observe detainees properly to prevent detainees from getting injured or committing suicide or to be able to react quickly and render aid properly. This further exemplifies the understaffing and overcrowding of the Jail as the Jail likely did not have enough officers to provide full and continuous monitoring of its camera systems and to provide proper classification of detainees who were known to be suicidal.

756.    At 3:23 a.m., Mr. Kerber can be seen on the cameras collapsing on the ground next to his toilet. Again, no officers responded to his cell, no officers rendered medical aid, and no officers were monitoring the cameras or conducted any observations. Mr. Kerber lay on the ground unresponsive for two hours before a jailer finally entered his cell at 5:13 a.m.

757.    Egregiously, the cameras show that jailers entered the cell block at 3:28 a.m. and 4:20 a.m. but did not actually conduct a face-to-face observation of Mr. Kerber during those observations despite recording that they did conduct their observations. The officer's actions were consistent with the policy and training of officers in the Jail because the officers are taught to go from QR code to QR code to "document" their observations without actually conducting a full face-to-face evaluation of the physical, emotional, and mental well-being of the detainee. So Mr.

Kerber was lying in his cell and a few feet away was a jailer who was acting in accordance with Harris County's policies, practices, and procedures and falsely stating that he conducted the required observations with deliberate indifference to the rights and conditions of the detainees, specifically, Mr. Kerber.

758.    Mr. Kerber was pronounced deceased by the jail doctor at 5:36 a.m. on October 12, 2022.

759.    The TCJS investigated the conditions surrounding Mr. Kerber's death and determined that Harris County did not have proper policies in place for ensuring that their officers were actually conducting face-to-face observations and not simply walking through and scanning the QR codes or filling in their logbooks without actually looking at the detainees. TCJS determined that this failure to observe was not appropriate and the minimum observation requirements were not completed to observe Mr. Kerber as unresponsive for the two hours he lay on the floor. On January 3, 2023, the TCJS required additional training on conducting proper observations for Harris County and stated that it would be reviewed again within the following three months. In February 2023 as shown below, the TCJS found glaring deficiencies in Harris County's observation requirements which show that Harris County did not change or address the issues that caused Mr. Kerber's death. In fact, TCJS has found continuing issues even into 2025 despite allegedly new observation training which was finally provided to select officers in December 2024.

760.    Failure to properly observe and monitor Mr. Kerber and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Kerber's death. Similar to Plaintiff, Mr. Kerber was not properly classified

and medically evaluated with only a cursory evaluation that resulted in Mr. Kerber not receiving the proper classification and identification for a potentially suicidal detainee.

761.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Kerber's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Kerber's death. The jail due to it being overcrowded and understaffed failed to have sufficient staff to monitor the surveillance footage properly which would have allowed them to have seen Mr. Kerber attempt to stick the toothpaste in his mouth, go unconscious, and lay on the floor for over an hour. The lack of staff and overcrowding caused the jailers to rush their jobs to finish them quickly instead of thoroughly which resulted in two of the jailers failing to conduct the proper face-to-face observations when they passed by Mr. Kerber's cell who would have noticed had they actually had the time to do their observations Mr. Kerber's condition and struggles.

762.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Kerber died.

### 3) Kyle Ryker

763.    Plaintiff incorporates Kyle Ryker's complaint that was severed from this original action as if fully stated herein.

764.    In August 2023, Kyle Ryker was in the Harris County Jail awaiting his day in Court.

765.    On August 7, 2023, while being escorted by several officers, Mr. Ryker was placed in a holding cell at the courthouse with several other detainees. Eventually, two or more detainees who did not like where Mr. Ryker sat in the cell began punching him in the face numerous times until he ended up on the floor where the assault continued. This assault is consistent with the culture of violence in the Jail which the Jail has not changed, addressed, or attempted to deter in

any manner. Assaults occur at an alarming rate throughout any of the holding areas and cells that the Jail is in charge of including the holding cells in and around the courthouse. Despite knowing of the constant fights and assaults, Harris County and its policymakers have not changed the culture of the Jail, have not increased the staffing to deter these assaults, and have not changed the classification and housing of detainees leading to this culture to grow. The assault on Mr. Ryker was a result of this culture.

766.    During the assault, Mr. Ryker saw the three officers watching from the open cell door and laughing at the assault. When Mr. Ryker eventually was beaten out of the door into the hallway, an officer sarcastically stated "Oh, what happened there." The officers never interfered with the assault until the detainees were finished. The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring.

767.    An officer eventually took Mr. Ryker to the clinic where he passed out from the injuries. Six to eight hours later, paramedics were finally called and Mr. Ryker was taken to the hospital.

768.    Due to the actions, policies, practices, and customs of Harris County, Mr. Ryker suffered significant injuries to his face as well as a fracture in his spine. These injuries resulted in Mr. Ryker being placed in a Harris County rehab facility where he experienced significant balancing issues leading to him falling and exacerbating his back injuries.

769.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Ryker's injuries when the Jail staff either failed to observe or monitor Mr. Ryker or the detainees beating Mr. Ryker, deliberately refused to interfere with the ongoing assault, and encouraged detainees to assault each other as a method to solve issues between detainees.

770.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Ryker's access to medical care, impeded providing medical care timely, impeded the jailer's ability or willingness to deter detainee on detainee violence, and reduced the jailer's ability to properly observe the detainees resulting in Mr. Ryker's injuries. The overcrowding and understaffing of the jail results in too many detainees being together at one time that increases detainee violence, and decreases the willingness of the staff to interfere with detainee violence and encourages officers to allow detainees to solve their own issues through violence. Mr. Ryker was in an overcrowded cell that did not have enough officers to encourage them to interfere with any violence resulting in the detainees beating him up without any interference from the officers. This policy also causes detainees to be deprived of timely medical care and proper resolution including only giving the detainee cursory evaluations and delaying them from being sent to proper medical facilities such as the hospital in Mr. Ryker's case.

771.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Ryker suffered his injuries.

### 4) Michael Walker

772.     Plaintiff incorporates herein the complaint and claims of Michael Walker that the Court severed in the underlying action.

773.     In December 2022, Michael Walker was booked into the Harris County Jail with known medical conditions including diabetes requiring insulin. Harris County was aware of these conditions through Mr. Walker's own statements to staff and through his paperwork.

774.     On February 16, 2024, Mr. Walker told his wife that he was not feeling well. Mr. Walker's wife told him to go to the clinic. Mr. Walker was most likely not receiving his insulin at this time which is consistent with Harris County policies, practices, and procedures, i.e. Kristan Smith and Matthew Shelton.

775.     When Mr. Walker made it to the clinic, the clinic simply gave him a shot and a cursory evaluation and sent him back to his cell. The jail staff knew, however, that Mr. Walker was allergic to this type of shot. Mr. Walker was then sent back to his cell without any further follow-up or any revision to the observation patterns by the officers.

776.     Between the allergic reaction to the shot and the lack of insulin, Mr. Walker passed out causing him to hit his head. Mr. Walker remained lying in his cell for a significant period of time without any proper observation or detection by the officers. The officers never responded to the emergency. The officers in accordance with the policies, practices, conditions, and training of the Jail did not conduct proper face-to-face observations but instead walked from QR code to QR code without actually observing Mr. Walker's physical, mental, or emotional well-being.

777.     Eventually, Mr. Walker was found unresponsive in his cell. Fortunately, the EMTs were able to shock Mr. Walker back to life. When Mr. Walker made it to the hospital, the doctors believed that Mr. Walker would be brain dead due to the extensive period of time he was lying

alone. Fortunately, Mr. Walker did eventually wake up but now has to live with severe brain damage.

778.    Harris County Jail's persistent culture of ignoring detainee medical needs, deliberately choosing to not provide required medications, and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Walker's injuries. The understaffing and overcrowding of the jail exacerbated the lack of medical care, and failure to observe and monitor Mr. Walker, prevented the medical staff from having the time and ability to administer his insulin properly, resulted in decisions for treatment to be made rapidly to get Mr. Walker back to his cell because of the lack of staff and overcrowding of the jail to be able to take the time to do their jobs thoroughly, and interfered with their ability to observe and monitor Mr. Walker's condition despite his known medical needs. Each of these conditions were consistent with the conditions and practices that were the moving force in Plaintiff's claims.

779.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Walker suffered his injuries.

### 5) Eric Russell

780.    Plaintiff incorporates herein the complaint and claim of Eric Russell which were severed by the Court from the underlying suit.

781.    On May 1, 2024, Eric Russell was booked into the Harris County Jail. Mr. Russell was placed into a general pod on the 6th floor in the 701 N. San Jacinto building.

782.    On or around July 15–16, 2024, Mr. Russell was set to be released from jail as the charges had been dropped against him. However, pursuant to Harris County policies, practices, and customs, Mr. Russell was kept in his pod and not timely released.

783.    On July 16, 2024, when Mr. Russell was supposed to be home with his family, the officer in the picket on Mr. Russell's floor, after receiving a signal from the other detainees in the pod, turned off the lights in the pod. As soon as the lights were turned off, several detainees jumped Mr. Russell and severely beat him for several minutes. Mr. Russell lost consciousness and suffered facial injuries, skull fractures, and almost lost vision in one of his eyes. It was the middle of the day when Mr. Russell was beat and the lights should have never been turned off. The officers never interfered with the assault. The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail.

784.    When Mr. Russell regained consciousness, he managed to stumble to the pod door to try to get some medical help. Two officers outside of the door saw that Mr. Russell was bleeding from several places on his head and took him to the clinic. Similar to Plaintiff, the clinic only did

a cursory evaluation and sent him back to his cell. The officers in the clinic laughed at Mr. Russell and sent him to a new pod where he spent the night.

785.    Mr. Russell was released on July 17, 2024. Mr. Russell was in significant pain and his family took him to the hospital. He was transferred to a trauma center due to the significance of his injuries so he could see neurologist and optometrist for his injuries. Mr. Russell is receiving on-going care for his head injuries, skull fracture, and injured eye which will likely require surgery. Mr. Russell should not have been in the jail when he was beat, but Harris County due to their overcrowded and understaffed facility left him in the jail to suffer.

786.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, facilitating the ability for detainees to assault other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Russell's injuries when the Jail staff either failed to observe or monitor Mr. Russell or the detainees beating Mr. Russell, deliberately refused to interfere with the ongoing assault, and encouraged detainees to assault each other as a method to solve issues between detainees.

787.    Failure to properly monitor and observe Mr. Russell and the detainees in his pod and conduct proper face-to-face observations led to inadequate protection and intervention from the assaults by other detainees and inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Russell's injuries.

788.     Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Russell's access to medical care, impeded providing medical care timely, impeded the jailer's ability or willingness to deter detainee on detainee violence, impeded the ability to properly process Mr. Russell and release him timely, and reduced the jailer's ability to properly observe the detainees resulting in Mr. Russell's injuries.

789.     Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Russell suffered his injuries.

### 6)  Evan Ermayne Lee

790.     The family and representatives of Evan Ermayne Lee filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

791.     On December 22, 2021, Evan Ermayne Lee was booked into 1200 Baker for the Harris County Jail.

792.     Mr. Lee had a history of mental illness including manic depression, schizophrenia, anxiety, and bipolar. Mr. Lee also had a history of high blood pressure and diabetes. Mr. Lee had medication to treat these items going into the Jail, and the Jail was aware of these conditions.

793.     Throughout his time in the Jail, Mr. Lee would either not receive medication or he would not receive his medication timely. This resulted in Mr. Lee relapsing in his mental state and suffering serious side effects which affected both his physical and social position in the Jail. At one point, Mr. Lee laid in his bunk for two days due to the lack of medication for his diabetes.

794.     The failure to provide Mr. Lee with his medication likely impacted his interactions with other detainees.

795.    On or around March 9, 2022, Mr. Lee was beat up by another detainee resulting in visible facial bruising. The fight was likely relating to gang activities in the Jail which run rampant and are unchecked by Harris County. His injuries were severe enough that the beating was more extensive than a simple punch to the face to which a sufficient staff should have been able to intervene. He was later diagnosed with a blunt force head trauma with blood on his brain.

796.    The first record of Mr. Lee receiving any medical care for his injuries was on March 11, 2022, two days after he was beaten up. The Jail simply looked at Mr. Lee and sent him back to his cell without any treatment, observation, or further diagnostic testing despite his observable head injuries and the known likelihood of suffering life threatening damage due to untreated head trauma. The clinic recorded no reported injuries or deficits. This lack of medical care and treatment is consistent with the same treatment and lack of care that Plaintiff received.

797.    Although Mr. Lee was suffering from severe injuries, Mr. Lee was transferred to a new pod that was known for fighting amongst detainees. One practice was for new detainees to have to slap fight with other detainees to earn their place. Many of these actions were gang related. Officers were taught not to interfere or prevent this boxing and if they did make a comment it would go unheeded without any consequences to the detainees. Despite suffering from a severe head injury, Mr. Lee was involved in more fights that the officers never interfered with and likely worsened his medical condition.

798.    Eventually on March 18, 2022, Mr. Lee tried to get the attention of the Jail staff when he was found altered and disoriented. He was noted to still have facial bruising due to the altercation over a week prior. Mr. Lee had requested to go to the clinic which was originally denied due to the officer determining that it was not a medical issue and that there were not enough staff to escort him to the clinic. Several hours later and only during an insulin check where Mr. Lee was

seen laying on the hallway floor was he finally sent to the clinic. At the clinic, the staff finally noticed his head injuries and altered mental state and sent him to the hospital.

799.    The hospital found that he had significant head injuries with two areas of brain bleed. On March 20, 2022, Mr. Lee became unresponsive and was ruled brain dead. His official date of death was March 22, 2022. The medical examiner determined that the death was a homicide with a blunt force trauma to the head.

800.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Lee's injuries and death. The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail.

801.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the Jail when Mr. Lee died.

### 7)  William Curtis Barrett

802.    The family and representatives of William Curtis Barrett filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

803.    On November 17, 2022, William Curtis Barrett was booked into the Harris County Jail with known mental health issues for which he received medications and having suffered an assault that resulted in significant trauma to his head. Despite the noticeable injuries, the medical staff only provided a cursory evaluation of his condition without checking for head injuries or life-threatening conditions. When placed into the Jail, Mr. Barrett was placed into a single person cell despite his known mental health issues, his known physical injuries, and the known damage solitary confinement can have on the psychological disposition of a detainee with his disability.

804.    Mr. Barrett was not given the opportunity to bond out despite the minor nature of the charge resulting in him remaining in the Jail longer than necessary. Mr. Barrett was not provided sufficient medical treatment or full medical evaluation for known head injuries and did not receive any follow-up care sufficient for a proper evaluation of his injuries.

805.    On November 20, 2022, despite his known injuries, the Jail did not conduct consistent or timely observations or monitoring of Mr. Barrett. Consistent with the Jail's policies, practices, procedures, and training, the officers did not conduct face-to-face observations of Mr. Barrett and simply went from QR code to QR code for several hours without ever looking into his cell and evaluating his physical, mental, and emotional status. Eventually after going unresponsive and unmonitored for a significant period of time, he was found unresponsive on his cell floor.

806.    Mr. Barrett was declared deceased due to blunt force trauma to his head.

807.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Barrett's injuries and death.

808.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the Jail when Mr. Barrett died.

### 8)  Kevin Leon Smith, Jr.

809.    The family and representatives of Kevin Smith, Jr. filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

810.    On July 1, 2022, Kevin Leon Smith, Jr. was booked in the Harris County Jail with known medical conditions. His uncle was Decedent Gary Wayne Smith. Mr. Smith was likely not receiving his medications and proper treatment and/or diagnostic testing for his medical condition. Instead, he may have received only a cursory evaluation without any follow up care.

811.    On or around January 31, 2023, Mr. Smith suffered a medical emergency in his cell. Officers were not properly observing or monitoring Mr. Smith as other detainees had to inform the officers of Mr. Smith's condition. Specifically, after conducting count several hours before his incident, officers never again entered the dormitory style cell to conduct face-to-face observations. At no point for several hours did any officer actually look at Mr. Smith while he was laying in his bunk to determine his physical, emotional, and mental well-being which are the minimum Jail standards. Instead, the officer conducting the rounds on paper admitted that the officers were not trained to actually go into the cell to conduct face-to-face observations but instead

were taught to only have to scan the QR code in the control room and look at the cameras to conduct their rounds. This was the same policy and training that the TCJS noted was grossly inappropriate. This policy was a result of the lack of staff and the overcrowding of the Jail as the officers did not have the time or sufficient staff to conduct the observations properly and complete all other minimum tasks required for the Jail.

812.    Some of the trustees who were working in the clinic were required to get a stretcher even though they were not employees of the jail. Although the trustees were prepared to head to the cell with the emergency, the medical staff stood around the clinic for several minutes joking about unrelated topics. Eventually, the trustees and medical staff headed to Mr. Smith's pod and when they arrived four to five officers ran out of the pod in a hurry.

813.    In the pod, five to six more officers and the sergeant were in the room looking at Mr. Smith in his top bunk. Although the officers knew that Mr. Smith was unresponsive, they were not attempting to get Mr. Smith onto the ground to do CPR or other life saving measures. Instead, the officers were simply stating that Mr. Smith was "faking" it. Eventually, the trustees got Mr. Smith onto the back board and took him to the elevator. No CPR was being conducted. Medical staff were simply standing by the backboard and not providing any assistance.

814.    Mr. Smith's fingers, lips, and face were already blue prior to even entering the elevator. Once in the elevator, an officer reluctantly began giving compressions but refused to let anyone give breaths or provide a breathing apparatus. When they finally arrived at the clinic, an AED was retrieved, but it was not charged. The clinic for the entire jail only had one AED.

815.    Later that day, Mr. Smith was declared dead.

816.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care,

and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Smith's injuries and death.

817.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Smith died.

### 9) Ramon Thomas

818.    The family and representatives of Ramon Thomas filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

819.    On April 19, 2023, Ramon Thomas was booked into the Harris County Jail with a known mental disability including being bipolar and schizophrenic. Due to his mental state, Mr. Thomas was extremely vulnerable to bullying and abuse within the jail. During his time in the jail, Mr. Thomas was constantly bullied to the point that Mr. Thomas's family were requesting that he be placed in the mental health section of the jail. Despite assurances that Mr. Thomas would be placed in a safe part of the jail, the jail placed Mr. Thomas in the general population on the sixth floor of 1200 Baker. This is the same floor where several other detainees identified in this Complaint were injured or lost their lives.

820.    Although Mr. Thomas's mental disability required continuous observation and care to ensure his safety, Mr. Thomas was placed on the sixth floor which lacked measures to provide sufficient observation and monitoring.

821.    On the morning of July 1, 2023, Mr. Thomas spoke with his mother, Ms. Rijsenburg, and did not appear to be suffering from any additional illness. However, Mr. Thomas

did seem threatened by some other detainees in his pod. The next phone call Ms. Rijsenburg received was from the chaplain informing her that Mr. Thomas had died.

822.     Later that night, on July 1, 2023, the other detainees found Mr. Thomas suffering from a medical emergency. The detainees were calling for help for several minutes without any response from the detention officers. The officers had been failing to conduct proper observations and did not complete any face-to-face observations with Mr. Thomas that evening which would have noticed his depleted physical, mental, and emotional condition.

823.     Eventually, some officers responded but failed to begin conducting CPR or any other life saving measures. Instead of handling Mr. Thomas with care, the officers dropped Mr. Thomas on the ground causing the landing to be heard in adjoining rooms. Mr. Thomas was taken to the clinic and was later declared dead at the hospital shortly after arrival. This failure to provide CPR and other life saving measures immediately is consistent with Harris County policies as also seen in the death of Kevin Smith and other detainees. In fact, it is common for Harris County employees to falsify when life saving measures began with Kevin Smith and Ramon Thomas being specific examples.

824.     Notably, Mr. Thomas received significant injuries when he was beaten by either a detainee or an officer as his second autopsy revealed that he had received significant blunt force trauma injuries to his back, chest, and extremities. Notably absent from Harris County's autopsy report is any mention of these blunt force trauma injuries.

825.     Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Thomas's injuries and death.

826.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Thomas died.

### 10) Nathan Henderson

827.    The family and representatives of Nathan Henderson filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

828.    On July 23, 2022, Nathan Henderson was booked into the Harris County Jail. He was transferred from a local hospital where he was being treated for a stab wound in his abdomen. While in the hospital, the wound became infected. Despite this infection and not being cleared to be released, the Jail took over his custody and transferred him to a single cell inside the Jail. The Jail did not provide him with a proper medical evaluation and establish a plan of care for him while he was in the Jail to ensure that his infection would not take his life.

829.    Although Mr. Henderson was prescribed antibiotics for his infection, the Jail in accordance with their pervasive pattern and practice failed to provide him his medications regularly or at all.

830.    Mr. Henderson's wound was not being properly cared for despite the significance of the infection.

831.    On July 31, 2022, Mr. Henderson exited the shower area of his cell when he began to stumble. Eventually, Mr. Henderson steadied himself on a railing. However, as time wore on, Mr. Henderson ended up passing out hitting his head. Mr. Henderson had not been receiving his medication and did not receive any follow-up care for his wounds which caused his injuries to get worse and to have many aspects of his condition missed by the staff. The Jail's cursory evaluation,

lack of medical care, failing to ensure consistent and prompt delivery of medication, and failure to keep a close eye on Mr. Henderson were a moving force in his death and an example of the consequences of understaffing and overcrowding the Jail.

832.    Mr. Henderson passed away later that day from the effects of his infection.

833.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Henderson's injuries and death.

834.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Henderson died.

### 11) Deon Peterson

835.    The family and representatives of Deon Peterson filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

836.    On February 23, 2021, Deon Peterson was booked into the Harris County Jail with a history of asthma, diabetes, and other medical conditions to which he was prescribed medications. While in the Jail, Mr. Peterson had a history of heart disease and needing blood pressure medication; however, the Jail would only prescribe taking Mr. Peterson's blood pressure instead of providing full diagnostic testing and evaluation for his known heart issues.

837.    In July 2021, Mr. Peterson complained of left arm pain which is indicative of heart issues. Yet, the Jail did not provide any additional testing, evaluation, observations, or medications.

838.    On August 10, 2021, Mr. Peterson complained of chest pain and trouble breathing. When he was taken to the clinic, he was summarily assessed and sent back to his cell.

839.    While in the elevator, Mr. Peterson had to place himself on the floor due to his ongoing medical emergency. The clinic simply "looked" at him again and sent him back to the cell. Mr. Peterson continued to complain about his ongoing chest pain which should have indicated to the medical staff a life-threatening heart condition due to his known medical issues.

840.    However, when he was finally taken back to the clinic, Mr. Peterson was left sitting in a chair instead of being permitted to lie down to prevent him from falling should he pass out. Mr. Peterson was left in the chair until he eventually passed out and hit his head on the ground.

841.    Later that day, Mr. Peterson passed away due to an issue with his heart. The Jail staff failed to properly evaluate Mr. Peterson and assess his full injuries and implement a chronic care plan for his issues resulting in him not getting the medication and medical attention he needed. This is another example of the result of the understaffing and overcrowding of the Jail.

842.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Peterson's injuries and death.

843.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Peterson died.

**12) Gary Wayne Smith**

844.    The family and representatives of Gary Wayne Smith filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein.

*Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No.122 (S.D. Tex. Filed March 28, 2025).

845.    On December 6, 2022, Gary Wayne Smith was booked into the Harris County Jail. Mr. Smith had a history of a kidney disorder when entering the Jail that required consistent medication, medical treatment, and observation.

846.    Mr. Smith was placed into a single cell at 1200 Baker which lacked measures to provide sufficient observation and monitoring in light of his condition.

847.    Despite being transported to and from the hospital numerous times over the period of one month, Mr. Smith was not placed permanently in a hospital or sufficient medical facility for continuous observation and care in light of his ongoing medical condition.

848.    On January 10, 2023, Mr. Smith was found unresponsive in his cell and was later declared deceased. In the six hours leading up to Mr. Smith's passing, the officers did not conduct a single proper face-to-face observation of Mr. Smith's physical, emotional, and mental well-being. Instead each officer that conducted a "round" scanned the codes and briskly walked past Mr. Smith's door. Only when a nurse came into his cell was Mr. Smith found unresponsive.

849.    Although he was within a holding cell inside the infirmary portion of the Jail, Mr. Smith was not provided sufficient observation and medical care including failing to provide medications necessary for his treatment or sufficient testing for ongoing medical issues.

850.    Harris County Jail's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Smith's injuries and death.

851.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Smith died due.

### 13) Kristan Smith

852.    The family and representatives of Kristan Smith filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

853.    On April 27, 2022, Kristan Smith was booked into the Harris County Jail with a history of diabetes and blood pressure problems to which she required insulin and blood pressure medication. Although she was required to take her medications for her conditions, Harris County's overcrowding, understaffing, and policies of failing to provide medical care and medications led to Ms. Smith not receiving her medications timely or at all.

854.    Ultimately, on May 20, 2022, Ms. Smith was found unresponsive in her bunk due to the failure to receive her medications. The detention officers were not properly observing or monitoring Ms. Smith as they did not observe Ms. Smith struggling for medical attention or become unresponsive; instead, Ms. Smith was not discovered by the officers until other detainees informed them. In each of the rounds leading up to Ms. Smith being found, the officers did not conduct a single face-to-face observation as required. Instead the officers moved briskly from one QR code to another only occasionally glancing at the detainees' cells without actually stopping and assessing the detainee's physical, emotional, and mental condition.

855.    On May 28, 2022, Ms. Smith was declared deceased due to her diabetes and failing to receive her medications.

856.    Ms. Smith's death is nearly identical, if not identical, to the case of Matthew Shelton below where he did not receive his medication and passed away due to that failure. Harris

County was sited for non-compliance with minimum jail standards for the same policies, practices, and procedures that led to Ms. Smith's death.

857.     Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Ms. Smith's injuries and death. Each of the officers were acting in accordance with their training and supervision as the supervisors participated in the lack of medication and observation and ratified those actions or omissions.

858.     Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Smith died.

### 14) Antonio Radcliffe

859.     Antonio Radcliffe filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the First Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 20 (S.D. Tex. Filed November 21, 2023).

860.     On March 7, 2023, Antonio Radcliffe was booked in the Harris County Jail. Mr. Radcliffe was a trustee in the jail and was tasked with serving meals in other areas of the jail including the Joint Processing Center.

861.     On or around May 18, 2023, Mr. Radcliffe was serving food with two detention officers in the Joint Processing Center when another detainee came and attacked Mr. Radcliffe. The detention officers did not stop the attack or deter the attack from occurring. The room contained hundreds of detainees who ranged in classifications and threats of violence without any delineating factor and with only a couple of officers completing the necessary tasks and not actually observing, monitoring, and controlling the detainees in their custody. The officers could

have easily prevented or intervened in the assault; however, they were deliberately indifferent to the known and obvious risks to Mr. Radcliffe's life but intentionally chose not to interfere in accordance with Harris County's policies, practices, and procedures. The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. Additionally, the Jail intensified the dangerous environment that promoted detainee violence by keeping in the same room hundreds of detainees of different classification scales, detainees in different stages of booking, and detainees of varying histories of violence.

862.    The detainee that attacked Mr. Radcliffe was known by the Jail and the officers to have an extensive history of violence both in the Jail and in the free world, but he was permitted to roam throughout the Joint Processing Center interacting with detainees and posing a danger to the detainees. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail.

863.    Following the attack, Mr. Radcliffe complained that his jaw felt broken, and he had pain and discomfort around his head. The clinic only did a cursory evaluation and forced Mr. Radcliffe to continue working despite his obvious injuries. Several hours later Mr. Radcliffe was eventually taken to the hospital for his injuries.

864.    The officers' failure in not observing, monitoring, or interfering with the assault on Mr. Radcliffe by other detainees led to inadequate protection from the other detainees and ultimately caused Mr. Radcliffe's injuries. Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Radcliffe's injuries.

865.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Radcliffe suffered his injuries.

### 15) Zachary Zepeda

866.    Zachary Zepeda originally filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025). Mr. Zepeda passed away after filing his claims, and his family and representatives substituted for him in the other lawsuit.

867.    On June 6, 2023, Zachary Zepeda was booked in the Harris County Jail with a known mental disability including anxiety.

868.    On June 11, 2023, Mr. Zepeda was attacked from behind by another detainee who punched and stomped on him. Officers did not intervene with this assault and permitted the assault to end naturally before interfering. The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of

the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail. The number of assaults and the prevalence of the assaults throughout every aspect of the Jail illustrates the culture of the Jail promulgated by Harris County and its officers in tolerating assaults, failing to deter the assaults, failing to intervene in assaults, and failing to have sufficient staff to handle the detainees creating a substantial risk of danger to the health and safety of the detainees.

869.    Mr. Zepeda was eventually rushed to the hospital with skull fractures, blood on his brain, blood on the majority of his spine, facial bruising, eye socket was broken, and a compression fracture of his spine. These injuries caused him to have trouble thinking. When the hospital released him the first time, Mr. Zepeda was immediately brought back to the hospital due to weakness in his extremities, severe back pain, and incontinence due to his back injuries. The hospital had to place a catheter to help him go to the bathroom. He had this catheter for several weeks in the jail. When his mother went to see him in the Jail, his head was still swollen with several scars, and he was on crutches. Even while she was visiting him, one of the guards dragged Mr. Zepeda by his leg across the room for no reason. This constitutes excessive force and illustrates the force used by officers in response to any and all circumstances regardless of whether or not the force is justified.

870.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care,

the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Zepeda's injuries.

871.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Zepeda suffered his injuries.

### 16) Jaquez Moore

872.    Jaquez Moore filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

873.    In November 2022, Jaquez Moore was booked into the Harris County Jail with a history of seizures due to a brain injury suffered prior to being arrested and being diagnosed with epilepsy. Mr. Moore had medications when he entered the Jail to control his seizures and symptoms from his brain injury. Mr. Moore would not receive his medications routinely. The officers would withhold Mr. Moore's medications as a punishment for any type of perceived slight.

874.    On or around February 13, 2023, Mr. Moore was holding his commissary bag when returning to his cell. Unbeknownst to Mr. Moore, a large commissary bag is considered a target to the violent detainees within the Jail. In accordance with jail customs, Mr. Moore was attacked by several detainees and suffered significant injuries. In this attack, Mr. Moore suffered a seizure due to being hit on the head where he has a metal plate.

875.    Despite the detainees beating up Mr. Moore and then Mr. Moore remaining on the ground suffering a seizure, Jail staff did not respond to the assault for more than thirty minutes.

876.    Similar to Plaintiff instead of taking Mr. Moore to the clinic to be treated, the Jail staff placed him in the holding cell instead of providing him with immediate medical care.

Eventually, Mr. Moore was sent to medical where he was placed in a holding cell for eight hours and was given Pedialyte and a little pain medicine. Mr. Moore did not receive any thorough evaluation or testing for his injuries including ruling out potential long-term brain injuries. This is consistent with the same treatment and care provided to Plaintiff where the staff is too busy to provide thorough medical evaluations despite obvious and significant injuries.

877.    Throughout his time within the Jail, Mr. Moore has been attacked multiple times. Many, if not all, of these attacks occur in the known blind spots within the Jail that are away from cameras. The officers do not interfere with detainee assaults until the detainees have worked out their differences.

878.    On April 19, 2023, Mr. Moore was attacked again resulting in severe head injuries that resulted in partial memory loss.

879.    In May 2023, Mr. Moore was attacked by another detainee while Mr. Moore was walking back from the commissary. Mr. Moore's commissary back was stolen again. Mr. Moore suffered an eye injury.

880.    Throughout Mr. Moore's time in the Jail and specifically in regard to his eye injury, Mr. Moore has requested medical attention for his injuries and is either ignored or his request is not accepted until a long time has passed. The medical kiosk on his floor is broken preventing him from making medical requests. Officers have stated that it will be fixed, but they have not fixed the kiosk after several weeks. Mr. Moore is still waiting to see a doctor for his eye issues.

881.    During his time and as a result of the continuous violations of his constitutional rights, Mr. Moore has suffered significant injuries including memory loss, seizures, blurred vision, and pain and suffering.

882.    During each of the assaults, the officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail. The number of assaults and the prevalence of the assaults throughout every aspect of the Jail illustrates the culture of the Jail promulgated by Harris County and its officers in tolerating assaults, failing to deter the assaults, failing to intervene in assaults, and failing to have sufficient staff to handle the detainees creating a substantial risk of danger to the health and safety of the detainees.

883.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Moore's injuries.

884.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the Jail when Mr. Moore suffered his injuries.

### 17) Christopher Young

885.    Christopher Young filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the

Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

886.    In February 2023, Christopher Young was in the Harris County Jail.

887.    On or around February 11, 2023, Mr. Young was walking to the bathroom. A few minutes to a few hours later, a detainee casually mentioned that Mr. Young was lying in the bathroom with his head split open. Mr. Young was alleged to have "fallen" in the cell.  This "fall," however, resulted in severe facial fractures that required multiple surgeries and several metal plates being installed. Mr. Young also suffered a lacerated ear and loss of vision in his left eye.

888.    These injuries are not consistent with a fall. Instead, on information and belief, Mr. Young was assaulted by at least one other detainee who left him in the bathroom out of sight of the cameras and the guards.

889.    It is commonly known in Harris County Jail that detainees will "fall" either in the shower or off their bunk to cover up the real reason they were injured. Many times, officers will inform the nursing staff of this type of fall shortly after their use of force caused the injuries.

890.    Mr. Young also was left lying on the floor in significant pain and in his own blood for a significant amount of time because the Jail staff failed to conduct sufficient face-to-face observations and monitoring of Mr. Young. Had they conducted proper and timely monitoring, they would have found him sooner and could have prevented and/or deterred the detainee violence and provided him with medical care timely. Mr. Young had to stay in the hospital for almost a month to recover from his injuries.

891.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence

amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Young's injuries.

892.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Young suffered his injuries.

### 18) Dylan Perio

893.    Dylan Perio filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

894.    Around November 2022, Mr. Perio was booked into the Harris County Jail with a known chronic medical condition. When Mr. Perio was booked into the jail, Mr. Perio told the officers that he had HIV and needed to stay on his medications otherwise he would suffer significant physical injuries and a setback in his condition.

895.    Unfortunately, for almost a year, Mr. Perio was not provided his medications for his illness which resulted in him beginning to suffer a relapse in his condition.

896.    Despite asking for medical care numerous times, Mr. Perio was not provided the medical attention he needed for someone with his condition. He complained that his requests were being ignored, but those complaints were also ignored by the officers and medical staff.

897.    Eventually, in July 2023, Mr. Perio saw a medic in the jail who informed him that his organs were beginning to shut down due to the failure to get his medicine consistently. If Mr. Perio did not receive immediate medical attention, his organs would have shut down further resulting in his death. Mr. Perio was finally provided medication for his condition. However, this

medication is unable to reverse the permanent damage to Mr. Perio's body that the months of lack of medical care caused him.

898.     Due to the actions, policies, practices, and customs of Harris County, Mr. Perio suffered significant injuries to his physical condition as well as increased complications and injuries from his medical condition. Similar to Plaintiff, Mr. Perio's case illustrates the policies, practices, training, and conditions within the Jail in depriving detainees of proper medical care.

899.     Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to provide timely and adequate medical care and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Perio's injuries.

900.     Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Perio suffered his injuries.

### 19) Nathan Nichols

901.     In August 2022, Nathan Nichols was in the Harris County Jail.

902.     On August 2, 2022, Mr. Nichols was inexplicably attacked by another detainee who beat him with a broomstick and a boot. No officers intervened in this beating until it was over. Officers failed to properly respond, supervise, or observe the detainees permitting this assault. The officers did have video cameras capturing the incident; however, the officers were not properly monitoring the cameras or observing the detainees. Even if they did monitor the cameras, the officers failed to react or interfere with the assault until after it was too late.

903.     The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and

overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail. The number of assaults and the prevalence of the assaults throughout every aspect of the Jail illustrates the culture of the Jail promulgated by Harris County and its officers in tolerating assaults, failing to deter the assaults, failing to intervene in assaults, and failing to have sufficient staff to handle the detainees creating a substantial risk of danger to the health and safety of the detainees.

904.    Mr. Nichols suffered a fractured eye socket and cheek bone. When the officers finally stepped in, Mr. Nichols had to be rushed to the hospital to get surgery on his eye.

905.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence amongst detainees, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Nichols's injuries.

906.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Nichols suffered his injuries.

### 20) Dequon Buford

907.    Dequon Buford, by and through his attorney-in-fact, filed nearly identical claims as Plaintiff-Intervenor against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Plaintiff-Intervenor's Original Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 42 (S.D. Tex. Filed April 16, 2024)

908.    On June 12, 2023, Dequon Buford was booked into the Harris County Jail with known schizophrenia, anemia, iron deficiency, anxiety, and bipolar I disorder. Despite his known mental health issues and the need for special care for his condition, Harris County placed him in the general population of the jail. The medical staff saw Mr. Buford prior to placing him in the general population and noted that he was "hearing voices" and showing other signs of disturbance.

909.    On September 25, 2023, Mr. Buford was immediately beaten and raped by three other detainees. The detainees had covered the light and camera while they raped Mr. Buford and no officer responded or attempted to interfere with these actions.

910.    On September 27, 2023, Mr. Buford was raped and assaulted again in the shower. Harris County officials did nothing to interfere or respond to this incident. Mr. Buford reported both incidents to the jail. Although Harris County eventually moved him to an administrative floor, the officers eventually moved him back to general population where he was raped again.

911.    For each of the assaults, the officers acted or failed to act in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail. The number of assaults and the prevalence of the assaults throughout every aspect of the Jail illustrates

the culture of the Jail promulgated by Harris County and its officers in tolerating assaults, failing to deter the assaults, failing to intervene in assaults, and failing to have sufficient staff to handle the detainees creating a substantial risk of danger to the health and safety of the detainees.

912.    While Mr. Buford was in the general population, jail staff were failing to properly deliver Mr. Buford's medications which caused him to have more issues. When medications were provided, they were not in the proper dosage. The failure to provide appropriate medical care in response to his mental health and the physical injuries suffered at the hands of the detainees caused Mr. Buford to deteriorate both mentally and physically. When Mr. Buford was released, he was suffering from dehydration, bed bugs, heart issues, and an injured rectum.

913.    Harris County Jail's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, the promulgation of a culture of violence amongst detainees, the failure to provide proper medical care and medications, and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Mr. Buford's injuries.

914.    Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Buford suffered his injuries.

### 21) Vincent Young

915.    On February 2, 2017, Vincent Young was booked into the Harris County Jail.

916.    Mr. Young had a history of mental illness when he entered the Jail. Mr. Young's mental illness and drug withdrawal was not treated while he was in the Jail. Mr. Young was not provided his medications which he needed to function normally. Mr. Young had made suicidal statements while in the Jail. Mr. Young had made statements that he was becoming depressed without his medication which were unanswered by Harris County staff. Another detainee told jail

staff that Mr. Young might be suicidal, which prompted the officers to place him in a holdover cell by himself.

917.    On February 13, 2017, Mr. Young was found in an infirmary cell after guards making their rounds spotted him hanging from a bed sheet wrapped around his neck. Mr. Young was taken to the hospital where he was declared deceased.

918.    Upon investigating Mr. Young's death, the Texas Commission on Jail Standards issued Harris County a notice of non-compliance finding that Harris County had failed to meet the minimum jail standards by exceeding the required 30-minute face-to-face observation minimum by 44 minutes. Harris County staff had not stepped inside Mr. Young's cell for over six hours. The jailer responsible for checking Mr. Young's cell had recorded numerous cell checks that never happened stating that he was too busy doing other jobs to conduct proper rounds.

919.    The Texas Rangers found numerous discrepancies in round sheets where rounds were said to be conducted when in fact, they were not conducted at all or were done improperly. Each of these actions are consistent with the common policies, practices, and training the Jail to not conduct observations properly to assess the physical, mental, and emotional well-being of the detainee which in part is caused by the understaffing and overcrowding of the Jail.

920.    Failure to properly observe and monitor Mr. Young and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Young's death. Failure to provide Mr. Young with his medications and medical attention for his ongoing mental and physical issues led to the deprivation of Mr. Young's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Young's death. Harris County's rampant practice and policies of understaffing and overcrowding

the jail impeded Mr. Young's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Mr. Young's death.

921.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Young died.

### 22) Maytham Alsaedy

922.    On February 27, 2015, Maytham Alsaedy was booked into the Harris County Jail. Mr. Alsaedy had a history of mental illness and had made suicidal statements and previous suicide attempts while in the jail. Although Mr. Alsaedy was on the mental health floor, he was not placed on suicide watch despite his suicidal statements and suicide attempts. Mr. Alsaedy was not being treated properly for his mental illness.

923.    On November 30, 2017, Mr. Alsaedy had covered his window with paper. No Harris County officer noticed the paper, made him remove the paper, or attempted to observe him in his cell. The jailer making rounds failed to make any face-to-face or any other visual observation of Mr. Alsaedy but instead walked past without evaluating Mr. Alsaedy's physical, mental, and emotional well-being which he would have noticed the suicidal ideations and the suicide attempts.

924.    Ultimately, Mr. Alsaedy was discovered with a sheet around his neck hanging from a smoke detector. Mr. Alsaedy was later declared deceased at the hospital.

925.    The Texas Commission on Jail Standards once again found that Harris County was not in compliance with the minimum observation requirements as the jail permitted Mr. Alsaedy to place paper over his view panel, failed to make him remove the paper, and failed to make any visual check on Mr. Alsaedy for the required time period.

926.    Failure to properly observe and monitor Mr. Alsaedy and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Alsaedy's death. Failure to provide Mr. Alsaedy with his medications and

medical attention for his ongoing mental and physical issues led to the deprivation of Mr. Alsaedy's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Alsaedy's death. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Alsaedy's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Mr. Alsaedy's death.

927.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Alsaedy died.

### 23) Debora Ann Lyons

928.    On August 14, 2018, Debora Ann Lyons was booked into Harris County Jail. Ms. Lyons had a history of mental illness and making suicidal statements while in the jail. Ms. Lyons had been approved for a PR bond this same day.

929.    On August 14, 2018, at 1758 hours, Ms. Lyons exited her cell to receive insulin at which time she grabbed a sheet and placed it around her waist. No officer was observing or monitoring the detainees in her cell otherwise they would have noticed Ms. Lyons sneaking out of the cell with the sheet around her waist.

930.    At 1804 hours, she entered a multi-purpose room on the fourth floor of 1200 Baker and closed the door behind her. Harris County jailers failed to observe Ms. Lyons throughout this timeframe and did not conduct a face-to-face observation with Ms. Lyons during normal rounds. Any rounds conducted were merely cursory to meet check off the box on their observation paperwork.

931.    At 1848 hours, detainees attending a church service in the multi-purpose room opened the door to discover Ms. Lyons handing inside the door. At 1858 hours, the Houston Fire Department was finally notified to transport her to Ben Taub hospital. On August 15, 2018, Ms. Lyons was pronounced deceased by medical staff at the hospital.

932. The Texas Commission on Jail Standards issued another notice of non-compliance for failure to properly observe Ms. Lyons in the proper timeframe. Failure to properly observe and monitor Ms. Lyons and conduct proper face-to-face observations led to inadequate medical care being provided to her in a timely manner and ultimately caused Ms. Lyons' death. Failure to provide Ms. Lyons with her medications and medical attention for her ongoing mental and physical issues led to the deprivation of Ms. Lyons' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Ms. Lyons' death. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Ms. Lyons' access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Ms. Lyons' death.

933. Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Lyons died.

### 24) Tracy Whited

934. On January 12, 2019, Tracy Whited was booked into the Harris County Jail with a $3,000 bond. Ms. Whited had a history of mental illness and making suicidal statements while in the jail. On January 14, 2019, despite being in a general population cell, jailers did not observe Ms. Whited attempting to hang herself. Instead, an inmate advised the guards that Ms. Whited was hanging from a sheet in her cell. The officers did not conduct any actual face-to-face observations of Ms. Whited in the several hours leading up to her death.

935. Ms. Whited was transported to the hospital unconscious. Later that day, Ms. Whited was granted a personal bond, releasing her from custody. Ms. Whited was pronounced deceased after being taken off life support on January 16, 2019.

936. Failure to properly observe and monitor Ms. Whited and conduct proper face-to-face observations led to inadequate medical care being provided to her in a timely manner and

ultimately caused Ms. Whited's death. Failure to provide Ms. Whited with medical attention for her ongoing mental issues and suicidal ideations led to the deprivation of Ms. Whited's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Ms. Whited's death. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Ms. Whited's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Ms. Whited's death.

937.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Ms. Whited died.

### 25) Wallace Harris

938.    On May 1, 2020, Wallace Harris was booked into the Harris County Jail. Mr. Harris had a history of hypertension which required ongoing medication and medical care. Mr. Harris did not receive adequate medical screening or medical care during his time in the jail consistent with Plaintiff's claims. The clinic only did a cursory evaluation without setting up a plan of care.

939.    On May 6, 2020, Mr. Harris was discovered on his cell floor unresponsive with shallow breathing. Officers due to the understaffing and overcrowding of the jail failed to conduct proper face-to-face evaluations and were instead hustling past the detainees to meet their time limits.

940.    After being taken to the hospital, Mr. Harris was declared deceased due to his medical condition.

941.    Failure to properly observe and monitor Mr. Harris and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Harris's death. Failure to provide Mr. Harris with medication and medical attention for his ongoing medical condition led to the deprivation of Mr. Harris's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Harris's death.

Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Harris's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Harris's death.

942.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Harris died.

### 26) David Perez

943.    On September 9, 2020, David Perez was booked into the Harris County Jail.

944.    On September 13, 2020, Mr. Perez was found in his single-cell unresponsive, and CPR was started before he was transported to the hospital. The officers in accordance with the policies and practices of the Jail had failed to conduct proper face-to-face observations leading up to Mr. Perez being found which would have allowed him to have received medical care sooner.

945.    On September 15, 2020, Mr. Perez was declared deceased. The medical cause of his death "could not be determined."

946.    Failure to properly observe and monitor Mr. Perez and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Perez's death. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Perez's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Perez's death.

947.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Perez died.

### 27) Israel Lizano Iglesias

948.    On February 8, 2021, Israel Lizano Iglesias was booked into the Harris County Jail.

949.    Similar to Plaintiff, Mr. Iglesias was not immediately screened for medical or mental health concerns. Instead, he was placed in a holding cell in the jail's clinic to await the proper screening prior to receiving any medical treatment.

950.    Jail staff did not properly observe Mr. Iglesias; instead, other detainees had to inform jail staff that Mr. Iglesias needed medical attention. The officers were failing to conduct proper face-to-face observations of Mr. Iglesias which would have seen his deteriorating condition and could have helped him receive medical attention at an earlier time.

951.    Mr. Iglesias was found alert but non-verbal. After waiting in the clinic, Mr. Iglesias became unresponsive and was transported to the hospital. At 5:08 a.m., Mr. Iglesias was pronounced deceased.

952.    Failure to properly observe and monitor Mr. Iglesias and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Iglesias's death. Failure to provide Mr. Iglesias with medication and medical attention for his ongoing medical condition led to the deprivation of Mr. Iglesias's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Iglesias's death. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Iglesias's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Iglesias's death.

953.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Iglesias died.

### 28) Jim Franklin Lagrone

954.    On July 26, 2022, Jim Franklin Lagrone was booked into the Harris County Jail. Mr. Lagrone had a history of drug usage and abuse and was booked for possession of drugs.

955.    Mr. Lagrone's known history, however, did not result in a further screening of Mr. Lagrone for medical conditions and additional treatment while in the jail. Instead, similar to Plaintiff, the clinic only conducted a cursory evaluation and sent him back to a cell.

956.    Around 4 a.m. on July 31, 2022, Mr. Lagrone was found vomiting into his toilet by detention officers, but he was not provided any medical care or additional monitoring. A few hours later, a detention officer discovered Mr. Lagrone unresponsive inside his single cell. The officers had not conducted proper face-to-face observations leading up to him being found.

957.    Mr. Lagrone was transported to the clinic and eventually transported to the hospital. The doctors declared Mr. Lagrone deceased shortly after arriving at the hospital.

958.    Failure to properly observe and monitor Mr. Lagrone and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Lagrone's death. Failure to provide Mr. Lagrone with medication and medical attention for his known medical needs including potential drug overdose led to the deprivation of Mr. Lagrone's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Lagrone's death. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Lagrone's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Lagrone's death.

959.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Lagrone died.

### 29) James Earl Gamble

960.    On August 26, 2021, James Earl Gamble was booked into the Harris County Jail.

961.    While in the jail, Mr. Gamble was not receiving medical screening, care, or medication for his medical conditions including hypertension.

962.    On August 25, 2022, detention officers were distributing dinner trays when detainees informed them that Mr. Gamble was unresponsive in his bunk.

963.    The detention officers had not properly observed him as unresponsive. The officers conducting rounds had failed to conduct proper face-to-face observations but instead had walked and scanned a QR code and then left the cell without actually observing Mr. Gamble.

964.    After taking him to the clinic, the Houston Fire Department was called who took him to LBJ Hospital. Later that day, Mr. Gamble was declared deceased.

965.    Failure to properly observe and monitor Mr. Gamble and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Gamble's death. Failure to provide Mr. Gamble with medication and medical attention for his known medical needs including hypertension led to the deprivation of Mr. Gamble's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Gamble's death. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Gamble's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Gamble's death.

966.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Gamble died.

### 30) Damien Lavon Johnson

967.    On July 27, 2022, Damien Lavon Johnson was booked into the Harris County Jail.

968.    On November 13, 2022, Mr. Johnson was left unobserved and unmonitored by jail staff for a significant enough time to tie a sheet in his cell, place it around his neck and hang himself until he was unresponsive. Jail staff in fact did not observe Mr. Johnson; instead, a detainee had to inform the officer that Mr. Johnson was hanging in his cell.

969.    On November 15, 2022, Mr. Johnson was declared deceased.

970.    Proper face-to-face observations would have observed either Mr. Johnson attempt to use the sheet, or him hanging in his cell to render aid within a sufficient time that would have prevented Mr. Johnson's death. The officers conducting the rounds failed to actually stop and observe Mr. Johnson during the prior rounds.

971.    Failure to properly observe and monitor Mr. Johnson and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Johnson's death. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Johnson's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mr. Johnson's death as there was insufficient staff to handle the necessary functions of the jail let alone monitor the thousands of inmates even with the minimum required number of officers.

972.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Johnson died.

### 31) Michael Griego

973.    The family and representatives of Michael Griego filed nearly identical claims as Plaintiff against Harris County, Texas, due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates the Second Amended Complaint from that lawsuit herein. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. Filed March 28, 2025).

974.    On March 4, 2022, Michael Griego was booked in the Harris County Jail.

975.    The Harris County Jail is notorious for officer use of force that leads to bodily injury, detainee-on-detainee assaults, and detainee's receiving severe injuries during beatings by officers or detainees in which officers are complicit or indifferent and permit the detainees to beat each other up without any interference until after the beating stops.

976.    Mr. Griego was attacked by his cellmate Chad Maydwell for a long period of time within the observation of the detention officers and other detainees. Maydwell dragged Mr. Griego off of his upper bunk and then punched and slammed him multiple times in the head. Maydwell was known to attack his bunkmates, yet officers continued to keep him in the general population with bunkmates and allowed him to attack Mr. Griego. The officers in the control center were talking with each other instead of monitoring the cells and the cameras and did not observe Maydwell attacking Griego for several minutes. The supervisor entered the control center to conduct rounds, but did not actually conduct any face-to-face observations or actually look into the cell at all otherwise she would have noticed and been able to stop the assault.

977.    Detention officers did not interfere until after the beating had stopped when the detainees were gathering around the unconscious Mr. Griego. Mr. Griego had numerous injuries including severe visible head trauma. Mr. Griego was transported to the hospital where he succumbed to his injuries on November 22, 2022.

978.    The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail. The number of assaults and the prevalence of the assaults

throughout every aspect of the Jail illustrates the culture of the Jail promulgated by Harris County and its officers in tolerating assaults, failing to deter the assaults, failing to intervene in assaults, and failing to have sufficient staff to handle the detainees creating a substantial risk of danger to the health and safety of the detainees.

979.    In accordance with Harris County standard protocols, policies, and procedures, Harris County conducted a "cursory" investigation and then waited almost two years following the passing to finally charge Maydwell with murder of Mr. Griego. They charged him with murder on November 20, 2024, two days prior to the statute of limitations running on Mr. Griego's claims. This is eerily similar to the Jacquaree Simmons case where Harris County waited two years to file criminal charges against the jailers involved in his death. These actions indicate a policy of ratification and indifference to the plight of the detainees in their care by Harris County.

980.    Failure to properly observe and monitor Mr. Griego and the detainees in and around his cell and conduct proper face-to-face observations led to inadequate protection from the other inmates and inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Griego's death.

981.    Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Griego's injuries and death when the Jail staff either failed to observe or monitor Mr. Griego or the detainee's beating Mr. Griego, deliberately refused to interfere with the ongoing

assault, and encouraged detainees to assault each other as a method to solve issues between detainees.

982.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Griego's access to medical care, encouraged violence between detainees, discourages or prevents the staff from interfering with detainee assaults, discourages staff from disciplining known threats or rendering aid without evidence of physical injuries, and reduced the jailer's ability to properly observe the detainees resulting in Mr. Griego's death.

983.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Griego died.

### 32) Rory Ward, Jr.

984.    Rory Ward Jr.'s family has filed a suit against Harris County Jail in this District asserting similar claims for the death of Mr. Ward. *Rowena Ward v. Harris County, Texas,* No. 4:23-cv-01708 (S.D. Tex., filed May 8, 2023). Mr. Ward's First Amended Complaint is incorporated by reference herein. *Id.* Dkt. No. 13.

985.    On May 8, 2021, Rory Ward Jr. was brutally assaulted by detainee Melvin Johnson while being held in Harris County Jail. Despite a duty to prevent detainees from assaulting each other, Detention Officer Kelsey Chambers observed Johnson stand over Mr. Ward and punch him six times in the head while Rory was lying defenseless on the ground. No officer interfered with this senseless beating. The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter

detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail. The number of assaults and the prevalence of the assaults throughout every aspect of the Jail illustrates the culture of the Jail promulgated by Harris County and its officers in tolerating assaults, failing to deter the assaults, failing to intervene in assaults, and failing to have sufficient staff to handle the detainees creating a substantial risk of danger to the health and safety of the detainees.

986.    Mr. Ward only received minor treatment for his injuries without sufficient diagnostic studies in the jail's medical clinic, which has been cited as inadequate to treat serious injuries by the Department of Justice. This is also similar treatment to Plaintiff.

987.    Mr. Ward was then placed back in a single cell without any further medical attention or sufficient observation or monitoring in light of his condition and known head injuries.

988.    Despite the continued failure to observe Mr. Ward either through video or face-to-face observations, Mr. Ward was discovered on May 11, 2021, slumped over in his cell. After being transported to the hospital, Mr. Ward was pronounced deceased due to the blunt force head trauma he received from Harris County's failure to interfere with the assault from a fellow detainee.

989.    The jailers failed to properly observe and monitor Mr. Ward through minimum face-to-face checks, video monitoring, and intermittent medical checkups despite the jailers' awareness of Mr. Ward's head injuries.

990.    Failure to properly observe and monitor Mr. Ward and conduct proper face-to-face observations led to inadequate protection from the other inmates and inadequate medical care

being provided to him in a timely manner and ultimately caused Mr. Ward's death as timely intervention would have prevented Mr. Ward's injuries to begin with, and adequate monitoring would have noticed Mr. Ward's continuous need for medical attention.

991. Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Ward's injuries and death when the Jail staff either failed to observe or monitor Mr. Ward or the detainee's beating Mr. Ward, or deliberately refused to interfere with the ongoing assault.

992. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Ward's access to medical care, encouraged violence between detainees, discouraged or prevented the staff from interfering with detainee assaults, discouraged staff from disciplining known threats or rendering aid without evidence of physical injuries, and reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Mr. Ward's death.

993. Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Ward died.

### 33) Fred Harris

994. On October 10, 2021, Fred Harris was booked into the Harris County Jail. Mr. Harris had known mental disabilities and was very small weighing only 98 pounds. The Harris County Jail was aware of Mr. Harris's disabilities and the need for special care and observation.

995.    While Mr. Harris was in the jail, a known violent detainee, Michael Ownby (weighed 240 pounds) was also in the jail.

996.    On October 27, 2021, Mr. Ownby showed his violent tendencies and viciously attacked and injured a jail detention officer. His violent tendencies required Mr. Ownby to be escorted by jail staff whenever he was outside of his cell.

997.    On October 29, 2021, Mr. Ownby assaulted a detainee so that he could be placed in a single person holding cell. The jailers subsequently took Mr. Ownby and placed him in a 3rd floor holding cell.

998.    At 10:41 p.m. on October 29, 2021, detention officers in a rush to finish other duties that should have been covered if the jail had sufficient staff and less crowding, placed Mr. Harris in the same single holding cell with Mr. Ownby and did not conduct any additional observations or monitoring despite placing a large violent detainee with a small mentally disabled detainee.

999.    The foreseeable happened, and Mr. Ownby knocked Mr. Harris on the concrete floor and repeatedly kicked and smashed Mr. Harris's head on the floor. Three detention officers were aware that Mr. Ownby was killing Mr. Harris, yet those officers watched but did not attempt to make any effort to stop the assault.

1000.    The officers did not make any effort to determine the status of individual detainees to ensure that violent detainees were not placed with other detainees. The understaffing and overcrowding of the jail forces the staff to cut corners and not act in accordance with even the minimum standards of jail operation.

1001.    During the assault, Mr. Ownby ended up stabbing Mr. Harris with a shank. By the time, any officer decided to enter the cell, Mr. Harris was at the point of death. Mr. Harris passed away on October 31, 2021, in the hospital after being pronounced brain dead.

1002.   The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail. The number of assaults and the prevalence of the assaults throughout every aspect of the Jail illustrates the culture of the Jail promulgated by Harris County and its officers in tolerating assaults, failing to deter the assaults, failing to intervene in assaults, and failing to have sufficient staff to handle the detainees creating a substantial risk of danger to the health and safety of the detainees.

1003.   Failure to properly observe and monitor Mr. Harris and his killer, Mr. Ownby, and conduct proper face-to-face observations led to inadequate protection from the other inmates and inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Harris's death as timely intervention would have prevented Mr. Harris's injuries to begin with, and adequate monitoring would have allowed immediate medical intervention.

1004.   Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or deliberately not observing known blind spots within the jail to permit detainees to commit violence

on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Harris's injuries and death when the Jail staff either failed to observe or monitor Mr. Harris or the detainee beating Mr. Harris, or deliberately refused to interfere with the ongoing assault.

1005.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Harris's access to medical care, encouraged violence between detainees, discouraged or prevented the staff from interfering with detainee assaults, discouraged staff from disciplining known threats or rendering aid without evidence of physical injuries, caused jailers to not properly place detainees in appropriate holding cells in accordance with known threats, and reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Mr. Harris's death.

1006.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Harris died.

1007.   Mr. Harris's family has filed a complaint against Harris County for very similar claims as Plaintiffs which is incorporated by reference herein. Plf.'s 2nd Am. Compl., *Dallas Garcia v. Harris County, Texas*, 4:22-cv-03093, Dkt. No. 31 (S.D. Tex. filed March 31, 2023).

### 34) Terry Goodwin

1008.   Terry Goodwin was a pretrial detainee in Harris County Jail who suffered from mental illnesses.

1009.   When a jail compliance team entered his cell on October 10, 2013, they found Mr. Goodwin filthy with a shredded jail uniform with shards of his clothing hanging from the ceiling where he had attempted to hang himself. His sink, toilet, and shower were clogged with feces, toilet paper in an attempt to cover up his fees, and orange rinds to cover the smell.

1010.   The cell had not been opened for months with observations not being conducted other than placing food under his door with a sign on the door telling officers not to open the cell.

1011.   Officers, supervisors, medical staff, and the head of the jail knew for weeks about Mr. Goodwin's position. During this time, Mr. Goodwin's mental and physical health deteriorated, which ultimately required a stay at a mental health facility.

1012.   The jail did not begin an investigation until almost a year after Mr. Goodwin was discovered by a whistleblower.

1013.   Sheriff Hickman who had been recently appointed following this investigation said that more investigations would be conducted, that the culture of the jail would be changed under his watch, and that "breakdowns in leadership in previous administration led to an atmosphere of non-confrontational deference." Ron Hickman, Twitter, 10:42 a.m., June 2, 2015. As can be seen in all of the cases and incidents since this time, this atmosphere and culture has not changed but has gotten worse under the supervision of the policymaker, the Harris County Sheriff's Office.

1014.   Failure to properly observe and monitor Mr. Goodwin and conduct proper face-to-face observations led to inadequate medical care being provided to him and allowed him to be stuck in inhumane conditions in his own feces and waste that was the moving force in the cause of his injuries. Failure to provide Mr. Goodwin with medication and medical attention for his known medical needs including his mental illnesses led to the deprivation of Mr. Goodwin's constitutional rights by being deliberately indifferent to the known and obvious risk that led to his injuries. Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Goodwin's access to medical care, reduced the jailer's ability to properly observe the detainees, led to the deliberate indifference to the needs of human decency by allowing Mr. Goodwin to remain in the cell for over two months as it was more convenient to leave him in the

cell by himself rather than providing him with basic care which was a moving force in Mr. Goodwin's injuries.

1015.   The Harris County Sheriff was the policymaker for Harris County with respect to the jail when Mr. Goodwin was injured. Harris County paid Mr. Goodwin $400,000 in a settlement for his injuries.

### 35) Gregory Barrett

1016.   On June 30, 2021, Gregory Barrett was booked into the custody of Harris County Jail with pre-existing medical conditions.

1017.   On August 26, 2021, Mr. Barrett told his wife during a visitation that he did not feel well and was vomiting blood. On August 27, 2021, Mr. Barrett was still vomiting blood and had not received any medical attention despite the obvious need for medical treatment.

1018.   On August 28, 2021, Mr. Barrett was staying in a solitary quarantine cell in lieu of receiving treatment for his non-Covid symptoms and pre-existing medical attention. Similar to Plaintiff, the officers placed him in this cell instead of sending him to the clinic to receive a full and thorough evaluation.

1019.   That morning Mr. Barrett was discovered in his cell dead on the floor. The officers had failed to conduct any actual face-to-face observations prior to finding him on the floor.

1020.   Failure to properly observe and monitor Mr. Barrett and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Barrett's death. Failure to provide Mr. Barrett with medication and medical attention for his known medical needs including pre-existing medical conditions and his vomiting of blood led to the deprivation of Mr. Barrett's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Barrett's death.

1021.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Barrett's access to medical care and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Barrett's death.

1022.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Barrett died. Mr. Barrett's family filed suit against Harris County with similar to claims to Plaintiffs which is incorporated herein by reference. *Jacqueline Strain-Barrett v. Harris County*, 4:22-cv-03526 (S.D. Tex. filed Oct. 12, 2022).

### 36) Matthew Shelton

1023.   On March 22, 2022, Matthew Shelton was booked into the Harris County Jail with a history of diabetes and blood pressure problems to which he required insulin and blood pressure medication. Although he was required to take his medications for his conditions, Harris County's overcrowding, understaffing, and policies of failing to provide medical care and medications led to Mr. Shelton not receiving his at all after being placed into his cell. Mr. Shelton entered the jail having insulin and needles to treat his diabetes with an order that he was to keep his medications on his person.

1024.   Ultimately, on March 27, 2022, Mr. Shelton was found in his cell unresponsive due to failing to get his medications. The detention officers were not properly observing or monitoring Mr. Shelton as they did not observe Mr. Shelton struggling for medical attention or become unresponsive. Mr. Shelton was declared deceased in the jail clinic later that day.

1025.   On December 19, 2022, the Texas Commission on Jail Standards issued a Notice of Non-Compliance finding that Harris County had failed to meet even minimum jail standards by not providing Mr. Shelton with his medications despite orders to do so.

1026.   Failure to properly observe and monitor Mr. Shelton and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Shelton's death. Failure to provide Mr. Shelton with medication and medical attention for his known medical needs including diabetes and high blood pressure led to the deprivation of Mr. Shelton's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Shelton's death.

1027.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Shelton's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Shelton's death.

1028.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Shelton died.

### 37) Natividad Flores

1029.   On July 27, 2019, Natividad Flores was booked in the Harris County Jail with a history of epilepsy requiring constant medical attention and medications. Mr. Flores disclosed his condition and stated that he needed his medications and needed to stay on a bottom bunk for fear of falling out of the bunk due to his medical condition. Consistent with Harris County's policies and practices of ignoring medical requests of detainees and withholding medical attention and medications from detainees, the detention officers never provided Mr. Flores with his medication and placed him on a top bunk.

1030.   On July 29, 2019, because of the failure to provide him with his medications, Mr. Flores began experiencing several seizures. The officers failed to observe these seizures and failed to monitor Mr. Flores, otherwise they would have noticed his seizures and would have had to render aid. Instead, Mr. Flores continued to suffer seizures on July 30, 2019, and fell from his top bunk suffering a serious head injury. Although some other detainees rendered aid, the officer on duty laughed at Mr. Flores and failed to call for medical assistance or help render aid. Ultimately, Mr. Flores lost consciousness and was taken to St. Joseph Hospital.

1031.   Failure to properly observe and monitor Mr. Flores, conduct proper face-to-face observations, and failed to complete intake documents properly led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Flores' injuries. Failure to provide Mr. Flores with medication and medical attention for his known medical needs including epilepsy led to the deprivation of Mr. Flores's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Flores that he would suffer seizures without medication and would fall from his seizures by being on a top bunk.

1032.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Flores's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Flores's injuries.

1033.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Flores suffered his injuries. Mr. Flores filed a complaint against Harris County

for similar claims as Plaintiffs which Harris County eventually settled. Conditional Order of Dismissal, *Natividad Flores v. Harris County*, 4:20-cv-03162, Dkt. No. 72 (S.D. Tex. filed May 10, 2022).

### 38) Henry Williams

1034.   On or about February 21, 2022, Henry Williams was in the Harris County Jail with a known medical condition specifically gout, high blood pressure, and arthritis. Around this time, Mr. Williams suffered a gout attack and notified the jail through the medical kiosk. Mr. Williams did not get a response to this request. When Mr. Williams talked with the nurse, the nurse said that he would not receive his medication because they were short-staffed, and they had closed the clinic.

1035.   On February 22, 2022, Mr. Williams submitted another request through the medical kiosk for medical assistance and medication for his gout attack. Once again, Mr. Williams did not get a response from the jail.

1036.   On February 28, 2022, Mr. Williams filed a grievance for not receiving any of his medications for three and a half weeks. Mr. Williams did not receive a reply. When Mr. Williams talked with another nurse, the nurse stated that she had asked for his medication but was told that they would not give it to her.

1037.   On March 2, 2022, Mr. Williams again asked the detention officer for medication who informed him that the clinic would not be providing him with his medication because they were short staffed.

1038.   The repeated failure to provide Mr. Williams with his medications led to him suffering bodily injuries including pain and suffering. Failure to provide Mr. Williams with medication and medical attention for his known medical needs including gout, high blood pressure,

and arthritis led to the deprivation of Mr. Williams' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Williams' injuries.

1039.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Williams' access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Williams' injuries.

1040.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Williams suffered his injuries. Mr. Williams filed a *pro se* complaint against Harris County for similar claims as Plaintiffs. *Henry Williams v. Harris County*, 4:22-cv-01215 (S.D. Tex. filed April 14, 2022).

### 39) Loron Ernest Fisher

1041.   On November 7, 2020, Loron Ernest Fisher was booked into the custody of Harris County Jail with a known medical condition specifically sickle cell.

1042.   On June 15, 2022, Mr. Fisher was in his cell when he became in need of medical attention. Detention officers were not properly monitoring and observing Mr. Fisher as they did not observe him needing medical attention and were only made aware of his condition by other detainees. Upon getting to Mr. Fisher, they took Mr. Fisher to the clinic.

1043.   After being in the clinic for three hours with likely only a portion of that being examined by a clinic staff member, Mr. Fisher was cleared and returned to his floor. Similar to Plaintiff, the clinic only provided a cursory evaluation without evaluating the full extent of Mr. Fisher's condition and developing an appropriate plan of care.

1044.    Instead of placing Mr. Fisher with other detainees to allow better observation of Mr. Fisher, the officers placed Mr. Fisher in a holding cell that lacked sufficient windows or cameras to observe him. Later that day, Mr. Fisher was not properly observed until an officer entered the cell after he did not answer the knocks on his door. The officer found Mr. Fisher unresponsive. Mr. Fisher was declared deceased that night at the hospital due to his sickle cell disease. The officers failed to conduct proper face-to-face observations leading up to him being found unresponsive as the officers simply scanned the QR codes without actually assessing Mr. Fisher's physical, mental, and emotional well being.

1045.    Failure to provide Mr. Fisher with medication and medical attention for his known medical needs including sickle cell and failure to provide sufficient examination, observation, and diagnostic testing when Mr. Fisher went to the clinic led to the deprivation of Mr. Fisher's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Fisher's death.

1046.    Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Fisher's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Fisher's death.

1047.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Fisher died.

### 40) Robert Wayne Fore

1048.    The family and representatives of Robert Wayne Fore filed a lawsuit asserting similar claims as Plaintiff for the death of Mr. Fore due to the ongoing unconstitutional policies, practices, and procedures against Harris County. Plaintiff incorporates herein the Second Amended Complaint filed in that action. *Wagner, et. al. v. Harris County, Texas*, N. 4:23-cv-02886, Dkt. No. 122 (S.D. Tex. filed on March 28, 2025).

1049.    On May 21, 2022, Robert Wayne Fore was booked into the Harris County Jail and placed in a single cell. Mr. Fore was not properly booked and evaluated timely to determine the appropriate location for his mental and physical condition.

1050.    On May 24, 2022, shortly after Mr. Fore entered his cell, a neighboring detainee noticed him trying to hang himself with a sheet from his bedding. This detainee notified an officer who simply told Mr. Fore not to hang himself via the intercom. The officer did not approach Mr. Fore face-to-face or try to deter him from committing suicide. The officers and jail staff did not change their observation pattern, report this attempted suicide, or place Mr. Fore under continuous observation with cameras and modified observation rounds.

1051.    Even after this suicide attempt, the officers kept Mr. Fore to a 60-minute observation schedule instead of the required 30-minute observation schedule for someone who has suicidal ideations. Even under this observation schedule, the officers conducting the observations did not actually conduct any face-to-face observations but instead walked right passed his cell to the next QR code. The officers failed to observe his mental and emotional well being which would have provided further evidence of his suicidal tendencies. The officers failed to notice him hanging himself.

1052.   A few hours later, an officer conducting rounds noticed a sheet tied around the mirror and around Mr. Fore's neck. The officer cut Mr. Fore down, but at that time he was already unresponsive.

1053.   The officers and jail staff had failed to properly observe Mr. Fore and conduct face-to-face observations at the correct time periods. In fact, the officers took well over the 60-minute period to conduct their observations and certainly did not attempt to meet the 30-minute observation requirements despite Mr. Fore's known suicide attempts just a few hours previously. The officers also admitted during the Texas Ranger's investigation that they did not stop to conduct a face-to-face observation, but simply walked past and glanced in the cell. One officer admitted that they did not conduct the proper observation because they did not have the time and had to rush. This improper observation was insufficient to actually assess Mr. Fore's physical and mental condition. One officer even stated that they did not look into the cell so that they could complete their rounds on time. This is a further illustration of the pattern and practice of the jail of failing to observe detainees.

1054.   Mr. Fore was later declared deceased at the hospital.

1055.   Failure to properly observe and monitor Mr. Fore and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Fore's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice Mr. Fore using the sheet and intervene.

1056.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Fore's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Mr. Fore's death.

1057.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Fore died.

### 41) Benjamin Pierce

1058.   On May 20, 2022, Benjamin Pierce was booked into the Harris County Jail. Instead of receiving a full medical screening for any health issues upon entering the Jail, Mr. Pierce was placed into a solitary holding cell similar to Plaintiff.

1059.   Detention officers were not properly monitoring and observing Mr. Pierce as they did not conduct face to face observations to determine if he was in need of medical attention upon being placed in the solitary cell that lacked sufficient windows or cameras to observe him.

1060.   On May 21, 2022, at 4:24 a.m., Mr. Pierce was found unresponsive in his cell. Mr. Pierce was declared deceased that night at the hospital due to his heart condition that would have been discovered and treated had Mr. Pierce been properly screened and observed.

1061.   Failure to provide Mr. Pierce with medication and medical attention for his known medical needs and failure to provide sufficient examination, observation, and diagnostic testing when Mr. Pierce was booked into the Jail led to the deprivation of Mr. Pierce's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Pierce's death.

1062.   Failure to properly observe and monitor Mr. Pierce and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Pierce's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice Mr. Pierce become unresponsive.

1063.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Pierce's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known

medical issues, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Pierce's death.

1064.    Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Pierce died.

### 42) Gilbert Allen Nelson

1065.    On February 10, 2021, Gilbert Allen Nelson was booked into the Harris County Jail. Due to the lack of medical care and hygiene within the Jail, Mr. Nelson contracted a urinary tract infection. Mr. Nelson was not receiving medical treatment for this infection despite the obvious need for medical treatment.

1066.    Detention officers were not properly monitoring and observing Mr. Nelson as they did not conduct face-to-face observations to determine if he was in need of medical attention within a sufficient amount of time. On May 11, 2022, detention officers were not monitoring Mr. Nelson as other detainees had to inform them that Mr. Nelson was unresponsive in his bunk.

1067.    Mr. Nelson was declared deceased a few hours later with sepsis due to his untreated urinary tract infection.

1068.    Failure to provide Mr. Nelson with medication and medical attention for his known medical needs led to the deprivation of Mr. Nelson's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Nelson's death.

1069.    Failure to properly observe and monitor Mr. Nelson and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Nelson's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice Mr. Nelson become unresponsive.

1070.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Nelson's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Nelson's death.

1071.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Nelson died.

### 43) Kevin Alexander Sanchez-Trejo

1072.   The family and representatives of Kevin Alexandar Sanchez-Trejo filed a claim as Plaintiff-Intervenors in a lawsuit asserting similar claims as Plaintiff for the death of Mr. Fore due to the ongoing unconstitutional policies, practices, and procedures against Harris County. Plaintiff incorporates herein their Plaintiff-Intervenor Complaint filed in that action. *Wagner, et. al. v. Harris County, Texas*, N. 4:23-cv-02886, Dkt. No. 41 (S.D. Tex. filed on Nov. 21, 2023).

1073.   On November 21, 2021, Kevin Alexander Sanchez-Trejo was booked into the Harris County Jail.

1074.   Detention officers were not properly monitoring and observing Mr. Sanchez-Trejo as they did not conduct face to face observations to determine if he was in need of medical attention within a sufficient amount of time and for failing to prevent his acquiring and ingestion of fentanyl and heroin. Mr. Sanchez-Trejo went unresponsive on his toilet and remained there for several hours in full view of the cameras and the window of his cell. Officers due to the understaffing and overcrowding and in accordance with their training and policies were not monitoring the videos and did not conduct proper observations. Multiple officers passed by the detainee's cell without

ever looking into the cell and conducting a proper face-to-face observation for several hours while Mr. Sanchez-Trejo was sitting unresponsive on his toilet. The officer admitted that she conducted the observations for the entire evening in accordance with the County's policies and her training to just walk from one QR code to another without ever actually looking at a detainee. These actions were in accordance with the training and supervision provided by the officers. The officers were not disciplined or corrected for these actions.

1075.   On February 12, 2022, Mr. Sanchez-Trejo was eventually found unresponsive. Mr. Sanchez-Trejo was declared deceased a few hours later due to a drug overdose.

1076.   Failure to properly observe and monitor Mr. Nelson and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and led to inadequate supervision permitting the distribution and use of illicit drugs within the Jail which has become a significant pattern within the Jail, and ultimately caused Mr. Sanchez-Trejo's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice the distribution and ingestion of the illicit drugs and sufficient time to notice Mr. Sanchez-Trejo become unresponsive.

1077.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Sanchez-Trejo's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to properly observe the use and distribution of drugs amongst detainees in the Jail, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Sanchez-Trejo's death.

1078.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Sanchez-Trejo died.

### 44) Simon Peter Douglas

1079.   On February 10, 2022, Simon Peter Douglas was booked into the Harris County Jail with known mental illnesses. While in booking, Mr. Douglas immediately began exhibiting erratic and aggressive behavior consistent with his mental illness. Similar to how they treated Plaintiff, the detention officers placed him in a single isolation cell that did not have any protections or sufficient avenues of observing and monitoring Mr. Douglas instead of sending him to the clinic to get proper care and a full evaluation.

1080.   While in this cell, Mr. Douglas took a piece of his clothing and attempted to hang himself. Detention officers then entered Mr. Douglas's cell and forcibly handcuffed him and placed him in a single padded room. This room though still had hard objects on the door and wall and a metal grate in the middle of the floor.

1081.   Despite knowing Mr. Douglas's behavior, the officers did not restrain Mr. Douglas any further, did not place him in a suicide vest, and did not attempt to remove damaging items. The officers were acting too quickly and without the proper thoroughness because of the lack of staff and overcrowding of the Jail that prevented them from taking the time necessary to do the jobs appropriately.

1082.   Mr. Douglas then began ramming his head against the door, walls, and the metal grate continuously while the detention officers watched. The detention officers did not interfere with Mr. Douglas despite knowing the harm he was causing to himself and his mental condition. Instead, the officers waited until Mr. Douglas knocked himself out and then went in and carried Mr. Douglas out on a stretcher. Mr. Douglas was declared deceased shortly after at the hospital.

1083.   Failure to provide Mr. Douglas with medication and proper medical care for his known mental condition and failure to provide sufficient examination and observation when Mr. Douglas was booked into the Jail led to the deprivation of Mr. Douglas's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Douglas's death.

1084.   Failure to properly observe and monitor Mr. Douglas and conduct proper face-to-face observations including failure to interfere with Mr. Douglas's attempts at self-harm led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Douglas's death as proper observation and interference would have provided sufficient time to prevent his death.

1085.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Douglas's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues including failure to properly book and evaluate detainees with known mental conditions, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Douglas's death.

1086.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Douglas died.

### 45) Fabien Cortez

1087.   On March 21, 2023, Fabien Cortez was in the Joint Processing Center of the Harris County Jail where he was being booked.

1088.   While in the processing center, Mr. Cortez went to the bathroom.

1089.   In accordance with their customs and policies, Harris County Jail failed to observe, monitor, or conduct any face-to-face observations with Mr. Cortez for at least 88 minutes. Further, the Jail failed to ensure that Mr. Cortez did not have any items which would permit him to attempt to commit suicide. The Joint Processing Center had far too many detainees without sufficient number of staff to actually monitor and control the detainees.

1090.   The Jail did not even know that Mr. Cortez had been gone until another detainee informed them that he had been in the bathroom for a long time.

1091.   Eventually, officers went into the bathroom and found Mr. Cortez with a drawstring from his jacket wrapped around his neck. At this point, it was too late to save Mr. Cortez. Mr. Cortez was declared deceased at the hospital a few hours later.

1092.   On April 17, 2023, the Texas Commission on Jail Standards, as laid out above, found that the Jail violated minimum jail standards by failing to conduct face-to-face observations with Mr. Cortez for over 88 minutes. This led to a severe constitutional violation as Mr. Cortez was given more than enough time to hang himself and the lapse in time prevented timely medical care.

1093.   Failure to properly observe and monitor Mr. Cortez and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Cortez's death.

1094.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Cortez's access to medical care, impeded providing medical care timely, and reduced the jailer's ability to properly observe the detainees resulting in Mr. Cortez's death.

1095.   Sheriff Gonzalez was the policymaker for Harris County with respect to the jail when Mr. Cortez died.

### 46) Elijah Gamble

1096.   Around November 2020, Elijah Gamble was booked into the Harris County Jail. Mr. Gamble's mother is the wife of comparator Taylor Euell. Mr. Gamble is part of the LGBQT+ community which is a vulnerable group in the Harris County Jail.

1097.   Mr. Gamble got into an argument with another detainee when that detainee threatened to fight him. Mr. Gamble went to the officers watching outside of the room and asked to be removed from the room due to the threat of violence. Unfortunately, the officers refused to remove him from the room until he told them who had threatened him. The detainee that threatened him was standing right next to him, so out of fear of getting beat up for snitching, Mr. Gamble did not tell them who had threatened him.

1098.   However, right in front of the officers, the other detainee punched Mr. Gamble in the face knocking him out for a few seconds. When he woke up, he was being stomped on the face by this detainee. The officers did not interfere. The officers acted in accordance with the policies, practices, and training of the Jail when they failed to interfere or delayed in interfering and did not deter or prevent the assault from occurring. The officers and staff also acted in accordance with the policies and training of the Jail in failing to properly monitor the physical, mental, and emotional state of the detainees under their control to recognize and prevent conflicts from occurring. Further, due to the understaffing and overcrowding of the Jail, the floor did not have sufficient officers to deter detainee violence, interfere timely with detainee violence, or monitor the detainee's sufficiently to prevent the culture of violence in the Jail. The thousands of assaults that occur per year severely outnumber every other county in Texas and in many larger jails in the country which illustrate the unreasonable danger the detainees face in the Jail. The number of assaults and the prevalence of the assaults throughout every aspect of the Jail illustrates the culture of the Jail promulgated by Harris County and its officers in tolerating assaults, failing to deter the

assaults, failing to intervene in assaults, and failing to have sufficient staff to handle the detainees creating a substantial risk of danger to the health and safety of the detainees.

1099.   After several minutes, the officers finally came into the cell only after Mr. Gamble was crawling to the door. Upon going to the clinic, Mr. Gamble was told that his jaw was broken but that the clinic would not wire his mouth shut. Eventually, Mr. Gamble was sent to the hospital where they wired his mouth shut. Upon returning to the Jail, Mr. Gamble was not provided with a liquid diet but had to buy his own ramen soup at the commissary when available.

1100.   Eventually on the eve of his surgery for his jaw, the Jail released him which forced him to have to use his own insurance to pay for his surgery.

1101.   In his time at Harris County, Mr. Gamble saw a common trend where detainees would not be provided medical treatment or medications regularly. When a detainee needed to be taught a lesson, the detainee would be taken to a place with closed doors and no cameras and would be beaten up by several officers. Each floor had four cells where these lessons would be taught. Many cells had blood and feces on the walls and floor.

1102.   Failure to properly observe, monitor, and intervene when Mr. Gamble was beat up by the other detainee despite requesting to be removed from the presence of that detainee led to inadequate protection and inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Gamble's injuries as timely intervention would have prevented Mr. Gamble's injuries to begin with, and adequate monitoring would have allowed immediate medical intervention.

1103.  Harris County's culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all to ongoing assaults, failing to observe or ignoring detainee's assaults on other detainees, failing to observe or

deliberately not observing known blind spots within the jail to permit detainees to commit violence on other detainees, encouraging detainees to deal with "snitches" and other interpersonal issues through violence, and failing to discipline detainees who instigate violent attacks on other detainees led to Mr. Gamble's injuries when the Jail staff either failed to observe or monitor Mr. Gamble or the detainee beating Mr. Gamble, or deliberately refused to interfere with the ongoing assault.

1104.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Gamble's access to medical care, encouraged violence between detainees, discouraged or prevented the staff from interfering with detainee assaults, discouraged staff from disciplining known threats or rendering aid without evidence of physical injuries, caused jailers to not properly place detainees in appropriate holding cells in accordance with known threats, and reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Mr. Gamble's death.

1105.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Gamble was injured.

### 47) John Raymond Hackl

1106.   With each passing week, new cases and incidents arise that show the ongoing policies, practices, and procedures that have deprived Plaintiffs and many other detainees of their constitutional rights. This ongoing issue further exemplifies the deliberate indifference that Harris County has towards these constitutional violations and the policies, training, supervision, and practices they endorse and encourage.

1107.   On July 24, 2024, the family and representatives of the estate of John Raymond Hackl filed a Motion to Intervene with an Attached Complaint in the *Wagner* litigation asserting

nearly identical claims against Harris County, Texas due to their unconstitutional policies, practices, and procedures. Plaintiff incorporates that Complaint from that lawsuit. *Wagner, et. al. v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 73-1 (S.D. Tex. filed July 24, 2024).

1108.  John Raymond Hackl was booked into the Harris County Jail on April 24, 2024, with a history of medical issues.

1109.  On May 24, 2024, Mr. Hackl had been complaining about further medical issues but did not receive any medical care by the staff. Eventually, Mr. Hackl passed out in his jail cell from a pulmonary embolism where he lay on the floor for almost two hours with no officers or jail staff watching him or responding to his need for medical care. The officers did not conduct an actual face-to-face observation of Mr. Hackl during this time frame even if they noted that an observation occurred as the officers simply went from QR code to QR code.

1110.  Eventually, a jail employee eventually came to Mr. Hackl's cell where they found him unresponsive and got him transported to the hospital. Mr. Hackl never regained consciousness and was transferred to hospice care. Four days later, Harris County "released" Mr. Hackl from their custody. This is consistent with Harris County's attempt to hide additional deaths that occur on their watch by having the detainees die after they get "released" from custody. Harris County does not have to report deaths that occur after the individual is released. On June 18, 2024, Mr. Hackl passed away due to the reckless actions and inactions of Harris County.

1111.  Failure to provide Mr. Hackl with medication and proper medical care for his known mental condition and failure to provide sufficient examination and observation when Mr. Hackl was booked into the Jail led to the deprivation of Mr. Hackl's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Mr. Hackl's death.

1112.   Failure to properly observe and monitor Mr. Hackl and conduct proper face-to-face observations including failure to observe Mr. Hackl for several hours as he lay unresponsive led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Hackl's death as proper observation and interference would have provided sufficient time to prevent his death.

1113.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Hackl's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues including failure to properly book and evaluate detainees with known mental conditions, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Mr. Hackl's death.

1114.   Harris County Judge Hidalgo following Mr. Hackl's death pointed out some of the issues with overcrowding of the jail on her Twitter/X account. "We've been looking at what's going on that's causing us to have such problems with overcrowding. . ."

1115.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Hackl died.

### 48) Hugo Mota

1116.   Hugo Mota was booked into the Harris County Jail on March 10, 2024, with a history of mental and medical health issues.

1117.   On August 9, 2024, officers and jail staff observed Mr. Mota with a white powdery substance that the jail had failed to apprehend prior to ending up in Mr. Mota's cell. The officers

and staff, however, did not interfere with Mr. Mota or try to take the substance. Then within the observation of those same officers and staff, Mr. Mota allegedly snorted this substance.

1118.   Not until Mr. Mota started to have a medical reaction to this substance did the staff and officers respond and render aid. Mr. Mota ended up passing away due to an overdose on drugs that should have never entered the property.

1119.   The smuggling of drugs into the Harris County Jail is a rampant problem that at its heart has been caused by the policies, procedures, and culture that is the basis of Plaintiff's claims. Specifically, since November 2023, three defense attorneys, Hunter Simmons, Ronald Lewis, and Jason Johnson and one detention officer, Robert Robertson, were arrested for smuggling drugs into the jail. Mr. Simmons was charged on November 14, 2024.

1120.   Each of these individuals and the many others who have not been identified were able to pass these drugs into the jail due to the overcrowding and understaffing of the jail and the lack of proper monitoring and observation within the jail which allowed these detainees to gather this contraband and use it leading to their deaths and injuries. On August 12, 2024, Mr. Mota passed away.

1121.   Failure to properly observe and monitor Mr. Mota and conduct proper face-to-face observations including failure to intervene when the officers and staff should have known what was going to occur but allowing it to occur anyways led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Mota's death as proper observation and interference would have provided sufficient time to prevent his death. The deliberate indifference to the health and safety of detainees is especially exhibited in this matter because the officers as a matter of culture and policy failed to intervene and/or failed to observe what was going on to intervene. Either way, this policy was the moving force in causing Mr. Mota's death.

1122.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Mota's access to medical care, influenced and exacerbated that policy and culture of deliberate indifference to the observation and intervention with detainees, reduced the jailer's ability to properly observe and intervene with detainees, and to properly react to provide them with sufficient medical care resulting in Mr. Mota's death.

1123.   Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Mota died.

### 49) Mark Anthony Mills

1124.   Mark Anthony Mills was booked into the Harris County Jail on June 10, 2024, with a history of medical issues.Due to a lack of appropriate medical care and a lack of observation, on August 20, 2024, Mills had a "medical emergency" which is Harris County's answer for almost any death in the jail. Mills likely did not receive care and was likely suffering this emergency for a while without any care and which was the result of a lack of proper observation of the detainees. Mills passed away on August 22, 2024.

1125.   Failure to properly observe and monitor Mr. Mills and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Mr. Mills' death as proper observation and interference would have provided sufficient time to prevent his death. This policy was a moving force in Mr. Mills' death.

1126.   Harris County's rampant practice and policies of understaffing and overcrowding the jail impeded Mr. Mills' access to medical care, influenced and exacerbated that policy and culture of deliberate indifference to the observation and intervention with detainees, reduced the jailer's ability to properly observe and intervene with detainees, and to properly react to provide them with sufficient medical care resulting in Mr. Mills' death.

1127.  Sheriff Gonzalez was the sheriff and policymaker for Harris County with respect to the jail when Mr. Mills died.

### 50) Additional Unreported Detainee Deaths

1128.  In addition to Mr. Hackl and per Harris County's custom and practice, six individuals who passed away due to the conditions and policies within the jail were unreported. Specifically, each of these six individuals' conditions grew to a fatal level while in the jail but they were "released" from custody just prior to them passing away. This ensures that each of these individuals do not count against the Jail as an in-custody death and their deaths do not get reported to the Attorney General's office or TCJS. As such, very little information is available concerning the circumstances surrounding their deaths.

1129.  Out of the information available and upon information and belief, each death resulted from Harris County's practices, policies, and procedures of failing to observe and monitor detainees and responding to their needs, failing to provide appropriate and timely medical care (including providing required medications), and the rampant understaffing and overcrowding of the jail that were the moving force in the constitutional violations.

1130.  In January 2018, Walter Klein was placed in the Harris County Jail. Within 14 hours, Mr. Klein collapsed and was later taken to the hospital. Harris County failed to properly observe Mr. Klein which delayed the care owed to him. Due to the failure to observe and provide proper medical care, Mr. Klein eventually passed away due to a heart attack. Harris County "released" Mr. Klein prior to him passing which allowed them to not report his passing as an in-custody death.

1131.  Kelvin Williams was arrested and placed in the Harris County Jail in December 2017. Mr. Williams was on dialysis when he entered the jail with his doctors projecting that he would live for an additional 20 years. Per Harris County's policy, practice, and procedures, Harris

County did not provide Mr. Williams with his dialysis while in the jail. Mr. Williams also was subjected to deplorable conditions that resulted in him being sent to the hospital and then an acute care facility. After being released to the hospital, Harris County released him from their custody. Mr. Williams ended up passing away from the damage caused to him by these policies.

1132.   In February 2021, Bobby McGowen was arrested and placed in the Harris County Jail. A month later, Mr. McGowen experienced severe health issues that had not been properly observed or taken care of in the jail per Harris County's policies, practices, and procedures. When Mr. McGowen was finally transferred to the hospital, his case was dismissed. He died nine days later due to Harris County's policies.

1133.   Moses Almazan was in the Harris County Jail in 2021 when he contracted Covid-19 in the jail. He was not properly observed or taken care of in the jail per Harris County's policies, practices, and procedures of failing to properly observe detainees and respond to medical requests and the need for medical care. After being placed in the hospital, Mr. Almazan was "released" from custody and died eight days later.

1134.   Damian Lopez was in the Harris County Jail in 2021 and 2022. Due to the lack of observation and medical care which is part of the policies, practices, and procedures of the jail, Mr. Lopez contracted Covid-19, pneumonia, and sepsis. He was released and placed in the hospital where he died seventeen days later.

1135.   Lawrence Gutierrez was in the Harris County Jail in 2023. The judge dismissed his case making a finding that the officers did not have probable cause. But before the jail processed his release, Mr. Gutierrez began experiencing extreme health issues. Consistent with Harris County's policies, practices, and procedures, the jail failed to properly observe Mr. Gutierrez or

render appropriate medical care due to the overcrowding and understaffing of the jail. Mr. Gutierrez was eventually transported to the hospital where he died eight hours later.

### vii.   Harris County's History of Constitutional Violations Is Further Exemplified Through Testimony of Prior Employees, Witnesses, and Detainees.

#### 1) Treyvan Crowder

1136.   Treyvan Crowder is a relative of decedent Deon Peterson.

1137.   Mr. Crowder spent time as a pre-trial detainee in the Harris County Jail.

1138.   Mr. Crowder suffered from several medical conditions while in Harris County Jail. When Mr. Crowder submitted medical requests in the kiosk within the Jail, the requests would not be responded to and many times the request would be wiped from the system.

1139.   Commonly, detention officers would prevent or deter medical attention to detainees who got on their bad side as a form of retaliation and punishment which is consistent with and similar to the treatment provided to Plaintiff.

1140.   The only way Mr. Crowder would receive medical attention for his treatment would be for his mother to call the jail and demand that he receive medical attention. Many of the family members of the detainees identified above were required to do the same before their loved ones would receive treatment. Even with family members seeking medical treatment for detainees, the Jail could take weeks or months before seeing a detainee for treatment.

#### 2) Harris County Detention Officer J. Valdiviez

1141.   Throughout Sheriff Gonzalez's tenure as the Harris County Sheriff, numerous jail employees and staff have been injured due to Harris County's ongoing practice and policies of understaffing and overcrowding the jail. Some of these employees have filed suit against Harris County while others have bravely stepped forward to talk with the media.

1142.   Officer J. Valdiviez was a detention officer with Harris County. On July 21, 2023, Officer Valdiviez was working on a double lockdown floor in the jail. Officer Valdiviez told the media that the pod he was working in was supposed to have at least three officers but with the systemic understaffing of the jail, the pod only had two officers including himself.

1143.   While Officer Valdiviez was making rounds, a detainee who was supposed to be escorted at all times was left unsupervised and assaulted Officer Valdiviez severely injuring him. Officer Valdiviez suffered injuries all of over his body and eventually had to be resuscitated.

1144.   As stated by Officer Valdiviez, "If we would have had better control of how we staff our personnel, or how we staff every floor in general, I'm pretty sure the situation could have been avoided."[29] His statement directly addresses the existence of the policy of understaffing and overcrowding and the direct and moving force that has on the safety and well-being of the officers and detainees in the Jail.

1145.   Harris County's rampant practice and policies of understaffing and overcrowding the jail and failing to conduct adequate monitoring and observation of detainees encouraged violence by detainees, prevented a correct proportion of guards to carry out the necessary functions of the jail safely, and interfered with the officers' abilities to adequately monitor and observe detainees which was a moving force in causing Officer Valdiviez's injuries.

1146.   Sherriff Gonzalez, as the Harris County Sheriff, was the policymaker for Harris County with respect to the jail when Officer Valdiviez suffered his injuries.

### 3)  Harris County Sergeant Jane Doe[30]

---

[29] https://www.fox26houston.com/news/harris-county-jail-inmate-accused-of-violently-attacking-and-seriously-injuring-detention-officer.
[30] This Sergeant filed suit under a pseudonym due to the sensitive nature of her injuries suffered due to Harris County's rampant policies, practices, and procedures. The location of Jane Doe's allegations can be found at Plf.'s Orig. Pet., *Jane Doe v. Harris County, Tex., et. al.*, No. 2023-47871 (125th Dist. Ct., Harris County, Tex. July 28, 2023).

1147.  On December 6, 2021, Jane Doe was a sergeant within the Harris County Jail. While in her office on the fifth floor of 1200 Baker, a detainee entered her office and sexually assaulted her. This detainee's armband indicated that he was to be escorted anytime he was outside of his cell. Unfortunately for Ms. Doe, the detainee was not escorted.

1148.  Despite crying for help, no other officer or employee ever arrived to help Ms. Doe. This exemplifies the lack of staff on each floor as there should be sufficient staff to monitor and control all detainees. The detainee was able to walk out of the office without any officer interference. Sheriff Gonzalez failed to take responsibility for this action and instead solely blamed the detainee.

1149.  Ms. Doe filed suit against Harris County on July 28, 2023, for their rampant policies, practices, and procedures of understaffing, underfunding, and overcrowding the jail. Ms. Doe's injuries directly resulted from this policy as an officer should have been able to hear her cries for help and should have been escorting the detainee.

1150.  Harris County's rampant practice and policies of understaffing and overcrowding the jail and failing to conduct adequate monitoring and observation of detainees encouraged violence by detainees, prevented a correct proportion of guards to carry out the necessary functions of the jail safely, and interfered with the officers' abilities to adequately monitor and observe detainees which was a moving force in causing Ms. Doe's injuries.

1151.  Sherriff Gonzalez, as the Harris County Sheriff, was the policymaker for Harris County with respect to the jail when Ms. Doe suffered her injuries.

### 4)  Harris County Jail Employees [31]

---

[31] These two jail employees provided an interview to the media in early 2023 but asked to remain anonymous. Part of their interview can be found at the following links. https://www.youtube.com/watch?v=unwfp72ASNY; https://www.fox26houston.com/news/two-former-harris-co-jail-employees-say-inmates-are-running-the-show.

1152.   In February 2023, two former employees of the Harris County Jail who had recently resigned did an anonymous interview with Fox 26 in Houston. In this interview, the employees repeatedly stated that the jail was extremely unsafe. The employees discussed the rampant culture where detainees are welcomed into the "through violence" and are "beaten to a bloody pulp." These statements are further examples of the conditions of the jail where the systemic and ongoing assaults in the jail have made it substantially risk of danger to the safety and health of the detainees.

1153.   The employees specifically discussed the incident involving Sergeant Jane Doe mentioned above. They stated that before the sergeant was raped "these things happened before" and they were warning that something worse would happen if nothing changed and inevitably because Harris County did not change any of their policies or procedures Ms. Doe was assaulted. "After the sergeant was brutally raped and beaten, we expected something different to happen. It never did." Detainees were frequently left unattended and unescorted when they should have been escorted at all times.

1154.   The Harris County Sheriff's Office issued a statement in response recognizing "The crisis in the Harris County Jail" and "the overcrowded conditions." Yet, nothing has changed throughout the history of the jail.

### 5)  The Head of the Harris County Jail Resigns on January 9, 2023

1155.   Harris County's ongoing policies, practices, and procedures of overcrowding and understaffing the jail can also be seen in the resignation of the Head of the Harris County Jail.

1156.   On January 9, 2023, shortly after the death of Jacoby Pillow, Shannon Herklotz who served as the Assistant Chief of Detentions with the Harris County Sheriff's Office submitted

his resignation letter. In this letter, Mr. Herklotz cited numerous issues within the jail that they were seeking to overcome including overcrowding and staffing deficiencies. [32]

1157.   This letter serves as another reminder that the overcrowding and understaffing of the jail is a systemic issue that has not been resolved or addressed despite that issue being raised no later than 2009 in the DOJ Report.

### 6)  Harris County's New Funding and Renovations of the Jail.

1158.   On June 4, 2024, the Harris County Commissioners' Court approved a $122 million emergency maintenance plan for the jail. [33] Harris County admitted that this is only enough to cover the emergency items needed for the jail to avoid a critical failure. Items identified included hiring consultants to try to address the admittedly overcrowded nature of the jail and to help with technical assistance training in conjunction with the Institute of Corrections.

1159.   This technical assistance training is the same training that the TCJS has required for several months to help ensure that the jailers are meeting proper observation requirements, staffing ratios, and to provide proper medical care and medical emergency responses. Judge Hidalgo stated that this just addresses what is required and does not provide the complete overhaul needed and which is being evaluated to make the jail safe.

1160.   This funding is further evidence of the policy, practice, and culture of overcrowding and understaffing the jail as admitted by the policymakers within the county. As shown in the discussions, this overcrowding and understaffing leads to numerous violations of minimum jail standards which include the failure to observe and monitor and provide adequate medical

---

[32] Mr. Herklotz's letter can be found at the following link:
https://www.houstonpublicmedia.org/articles/news/criminal-justice/2023/01/12/440990/head-of-harris-county-jail-resigns-as-death-toll-increases-amid-overcrowding-issues/.
[33] https://harriscountytx.new.swagit.com/videos/307080.

assistance to detainees. Each of these policies, practices, and procedures, were the moving force in Plaintiff's injuries.

### D. CURRENTLY KNOWN POLICIES, PRACTICES, CUSTOMS, AND/OR DE FACTO POLICIES ADOPTED AND PROMULGATED BY THE HARRIS COUNTY SHERIFF WITH DELIBERATE INDIFFERENCE WHICH CAUSED THE VIOLATIONS OF PLAINTIFF'S CONSTITUTIONAL RIGHTS.

1161.   The repeated, extensive, and pervasive acts and omissions of constitutional violations in the Harris County Jail as shown above gives rise to multiple official policies, practices, culture, and customs which have been adopted, ratified, and maintained with objective deliberate indifference to the lives and wellbeing of Plaintiffs and are the basis for many of the causes of action stated below.

1162.   The County's policies, practices, culture, and customs are more fully developed throughout this Complaint, but for the sake of clarity, these policies include but are not limited to the following:

     a. ***Failure to Provide Medical Care:*** Routine failure to provide detainees with medical care and/or sufficient medical care within a timely manner or at all through the failure to provide medications to detainees, failure to follow medical instructions from physicians, failure to properly document health concerns and medical needs of detainees, failure to properly evaluate and test detainees with known injuries in reckless disregard to the known consequences of failing to test and diagnose injuries and medical conditions, and failure to transfer detainees with known or knowable medical conditions to a medical facility or detention facility that could provide adequate acute and chronic care for the detainees' disabilities and medical conditions.

     b. ***Institutionalized Excessive Force by Jail Employees on Detainees:*** Patterns, practices, policies, and culture of encouraging and failing to deter the use of force by jail employees;

         i.   By creating a "culture that quickly leads to physical altercation";

         ii.   Insufficient training and enforcement of non-physical de-escalation techniques;

         iii.   Policy of officers and sergeants utilizing excessive force and inappropriate force techniques that cause unnecessary harm to detainees

to teach detainees lessons for requesting medical care, for snitching on officers, or for requesting too many accommodations;

    iv.   Inaccurate documentation of the use of force, falsified use of force documentation, and failure to investigate allegations of use of force outside the testimony of interested parties;

    v.   Promulgating a culture where detainees are too scared to provide accurate testimony due to threats by officers of physical harm; and

    vi.   Charging detainees with offense/use of force charges by reporting false, misleading, and inaccurate statements and resorting to use of force unnecessarily to extend the stay of the detainee in the jail as a punishment to the detainee.

c. ***Systemic Understaffing and Overcrowding:*** Routine understaffing and overcrowding of the jail that encourages violence between detainees and between detainees and guards, impedes detainees' access to medical care, reduces the staff's abilities to supervise detainees in a safe manner, reduces the staff's abilities to conduct face-to-face observations, and increases the likelihood of harm suffered by the detainees. This policy, practice, and issue is an exacerbating factor of each of the other policies, practices, and cultures above as the lack of appropriate staff and/or the overcrowding of the jail interferes with the ability to properly observe and monitor detainees, respond to incidents, provide proper protection for detainees, prevents or discourages officers from interfering with or preventing detainee violence, causes additional psychological and physical stresses on officers which leads to violent outbursts directed at detainees, prevent a correct proportion of guards to carry out necessary functions of jail safely which encourages officers to use the quickest methods to get results including excessive violence, interferes with the staff's ability to provide medications, to respond to medical requests, to monitor the surveillance footage properly, to take the time to conduct proper observations, and makes the employees overworked, have poor moral and increases bad decisions by officers.

1163.   These policies are not exclusive, but they are the main policies apparent to the public and that are the moving forces in the injuries and deaths of Plaintiffs and that were involved in all similar incidents mentioned above. These policies may be considered individually and in the aggregate as the policies are intertwined and can exacerbate the other policies and culture.

1164.   Additionally, the below policies, conditions, practices, and culture also exhibit the existence and extent of the above policies, practices, and culture. When considering the policies in the aggregate and how the policies interact within the larger system, they illustrate the

pervasiveness and egregious impact the policies have on each other as exhibited in each of the incidents cited above.

    a. ***Promulgated a Culture of Violence Amongst Detainees:*** Creating a culture, pattern, practice, and policy of encouraging violence amongst detainees by failing to render aid, by failing to interfere either timely or at all in ongoing assaults, by ignoring requests of detainees for help, and by encouraging detainees to solve interpersonal issues through violence; and by failing to discipline detainees who instigate violent attacks on other detainees.

    b. ***Failure to Observe and Monitor:*** Routine failure to properly observe and monitor detainees through face-to-face checks, video monitoring, and in identifying and monitoring blind spots within the jail and subsequent inaccurate reporting and documentation of those observations. This policy, practice, procedure, and culture of failing to observe and monitor is a stand alone policy but also exacerbates the the other policies and procedures as it prevents officers and staff from identifying the medical and security needs of detainees, recognizing, interfering with and preventing assaults by detainees and officers, facilitates the violence in the jail and the lack of medical care.

### E. CURRENTLY KNOWN TRAINING AND SUPERVISION DEFICIENCIES THAT HARRIS COUNTY PROMULGATES WITH DELIBERATE INDIFFERENCE THAT WERE THE MOVING FORCE IN PLAINTIFF'S INJURIES.

1165. The repeated, extensive, and pervasive acts and omissions of constitutional violations in Plaintiff's incident and in the comparators above by the Harris County Jail gives rise to multiple deficiencies in the training and supervision of the Jail. Each of these deficiencies are in complete disregard to the safety and well-being of the detainees in the Jail and have been ongoing for the better part of two decades. Sheriff Gonzalez has direct, constructive, and objective knowledge of the existence of these deficiencies as admitted to in his recent press conferences and changes in their training and supervision policies. Yet, at the time the Jail violated Plaintiff's constitutional rights, Harris County implemented these deficiencies with deliberate indifference to his rights. These deficiencies in the training and supervision are closely related to and are the moving force in Plaintiff's injuries that they are not attributable to one officer's shortcomings but are an imbedded part of the training and supervision of all officers in the Jail.

1166.   Each of the below deficiencies were a moving force in Plaintiff's injuries and were adopted, ratified, and practiced with deliberate indifference to his rights. Plaintiff is articulating these deficiencies as they are observed without any discovery in the case. Each of these deficiencies are also fully developed through each of the incidents throughout the Complaint and this section is simply to provide some a summary of the deficiencies currently identified.

1167.   ***Training Deficiencies in the Jail.*** Harris County failed to train their officers on the proper use of force against a detainee. Specifically, Harris County trained their officers to use closed-fist strikes, knee strikes, forearm strikes, and other forceable strikes against a detainee in response to almost any circumstance regardless of whether any force was necessary or not. As admitted by Sheriff Gonzalez, Harris County's training and policies prior to December 2024 failed to instruct their officers that strikes to the head, face, and neck of a detainee should only be reserved in situations where deadly force is necessary. The obvious consequence of failing to train officers on this limitation and specifically training their officers to used strikes to the head and face is that officers will use these strikes and cause severe injuries and potentially death to detainees in response to any perceived slight. Specifically, officers are trained to use closed-fist strikes as a matter of first resort in response to any perceived slight, "resistance," "threat," or belligerence by a detainee regardless of whether or not a detainee is actually posing a threat of imminent severe bodily harm or death. For example as can be seen in Plaintiff's case, simply pulling away from an officer who needlessly lays hands on the detainee results in the officer punching the detainee in the face.

1168.   Officers are also taught to punch and continue to punch and use other strikes against detainees who are being held by other officers even if the detainee is facing the ground. Multiple officers in Plaintiff's incident were continuing to punch and strike Plaintiff in the head and body

even while he was on the ground being restrained by multiple officers. The Jail environment also provides a unique opportunity for officers to not have to resort to any force but can step back and take their time as the detainee is not going anywhere and can be dealt with administratively at a later time if they are not being obedient. However, officers are taught not to take their time but to immediately resort to strikes to a detainee. This can be seen in the over 100 examples of incidents and the thousands of other statistics identified above. Instead of providing officers with multiple tools to deal with detainees, Harris County trains their officers to use only one tool for all situations, strikes against a detainee. This training deficiency and Sheriff Gonzalez's knowledge of this deficiency is easily seen in the *Struck* documentary and the changes to the policies after the *Struck* documentary was released. Each of the officers involved in Plaintiff's incident were trained with these same deficiencies and the obvious consequence of this training deficiency is that the officers will use this excessive force against detainees causing them constitutional injuries.

1169.    Defendant's training program is also deficient in failing to train officers on proper de-escalation techniques. As illustrated in Plaintiff's case and in the comparators above, officers are taught through their hands on training and following the examples of other officers that they should immediately escalate to using force or strikes against a detainee in any circumstance regardless of whether force is justified or not. The obvious consequence of failing to train officers who deal with detainees on a daily basis on how to de-escalate a situation is that the officers will resort to the tool they know and escalate the situation. One example of escalation is immediately resorting to putting hands on a detainee which aggravates the detainee. The officers in Plaintiff's incident did not attempt to de-escalate the situation but escalated the situation in accordance to their training by grabbing onto Plaintiff's shirt unnecessarily and then when Plaintiff pulled away immediately resorting to punching him in the face. Likewise, the other officers that joined into the

assault on Plaintiff added to the assault by striking Plaintiff over a dozen times instead of trying to separate the parties and de-escalate the situation.

1170.   Defendant also failed to train their officers and staff on providing medical care to their detainees as the officers instead delay taking detainees to medical care and then only receive a cursory evaluation without evaluating each case with a full medical evaluation. Officers routinely fail to take detainees after a use of force or who have sustained obvious injuries and need medical attention into holding cells and let them wait in those cells for long periods of time causing them further injuries and an exacerbation of their condition. When officers take detainees to the clinic, the staff are trained to only provide cursory evaluations and to try to quickly get the detainees back to their cell. Officers and staff routinely are taught to ignore the medical needs of the detainees and to downplay their injuries to not provide a thorough evaluation based on their injuries and to check for any additional severe injuries or ramifications. This is readily apparent when detainees suffer head injuries or are punched in the head as the officers and staff fail to evaluate for head injuries despite the known consequence of that type of injury. The known consequence of failing to train officers and staff on how to handle the medical needs of detainees who are known to have medical needs in a jail environment is that detainees will suffer exacerbations of their injuries or even worse suffer new injuries or death. This training deficiency was a moving force in Plaintiff's injuries as he was left to suffer in a solitary cell instead of being taken to the clinic immediately and was not evaluated at the clinic fully when he did arrive.

1171.   Defendant is or should be aware of these training deficiencies as identified above by the Sheriff's own admissions over the past decade and based on the numerous other incidents where officers take these same actions across the whole Jail. These are not simply actions of a handful of officers, but are the actions of most if not all of the officers in the Jail. Instead of

correcting these issues, the Sheriff has encouraged and permitted this training to be ongoing resulting in thousands of detainees suffering injuries at the hands of the inadequately trained officers. This failure to train is evident in Plaintiff's claims as the officers, if properly trained, would not have placed their hands on Plaintiff, would not have immediately resorted to throwing punches against him, would not have continued to punch Plaintiff while restrained by the officers, and would have immediately provided medical care and a full medical evaluation to Plaintiff. These training deficiencies were a moving force in Plaintiff's claims.

1172. ***Supervision Deficiencies in the Jail.*** The County's supervision plan and supervision of its officers is wholly deficient and ultimately a moving force in Plaintiff's injuries. The Jail fails to supervise its officers who are interacting with detainees by not having sufficient supervisors within reach of the floors and officers on the floors. The supervisors also do not observe or monitor their officers allowing the officers to act in the manner they see fit including in immediately resorting to the use of force and escalating situations needlessly when they do not like a detainee's response or actions. The supervisors do not audit, review, or supervise their officers in any manner to make sure that policies are being followed, that proper force is being used, or that de-escalation techniques are being used. Instead, the supervisors are themselves joining into the use of excessive force as can be seen in this case when the supervisors also joined into the assault. The supervisors are also not disciplining or correcting their officers. Instead, the officers are mimicking the actions of their supervisors when interacting with detainees.

1173. Officers in jails that deal with detainees must have close supervision to ensure that they are not abusing detainees within their custody. Officers that interact with detainees must also be supervised to make sure they are de-escalating situations with detainees and have sufficient officers in place to handle detainees without the need to resort to immediate use of force. Officers

also must be supervised to review their actions to correct incorrect decisions and to provide discipline. However, Defendant had no supervision policy with supervisors not paying attention to the officers under their control, supervisors not disciplining officers who abuse their power, or supervisors not enforcing the written policies of the Jail. The obvious consequence of allowing officers in a jail to be unsupervised will include the use of excessive force, failing to de-escalate, officers abusing their power, and officers failing to provide medical care to detainees. Each of these deficiencies in the supervision plan were a moving force in Plaintiff's injuries as the officers acted with impunity and resorted to excessive force immediately with the supervisors joining into the use of force itself. The failure in the supervision of the officers also resulted in Plaintiff being placed in solitary confinement instead of being taken to the clinic and resulted in the clinic only doing a cursory review instead of providing full medical attention. It is unlikely that any officer was disciplined or corrected for any of the actions taken towards Plaintiff.

## V.    CAUSES OF ACTION

1174.    Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein.

### COUNT I: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; CONDITIONS OF CONFINEMENT

1175.    Plaintiff brings claims against Defendant Harris County for the violations of the his 14th Amendment rights under 42 U.S.C. § 1983.

1176.    Plaintiffs invoke the conditions of confinement theory for the deaths and injuries of the Plaintiffs which requires a showing of (1) an official policy; (2) a policymaker; and (3) that the policy was the moving force behind the constitutional violation.[34]

---

[34] Plaintiff asserts the *Monell* claim and the condition of confinement theory jointly and alternatively as separate theories to the extent that the Court and the Fifth Circuit do not consider *Monell* to be applicable to the context of Plaintiff's claims. *See* Order on Motion to Dismiss, *Wagner v. Harris County, Texas*, No. 4:23-cv-02886, Dkt. No. 51 (S.D. Tex. filed on June 4, 2024).

1177.   Harris County's acts and omissions, which resulted in Plaintiff's deaths and injuries, were committed pursuant to one or more interrelated policies, practices, and customs of Harris County that were promulgated by its policymaker, the Harris County Sheriff, and which resulted in conditions, practices, rules, and restrictions imposed on the detainees that "amounts to punishment in advance of trial." *Sanchez v. Young Cnty.*, 866 F.3d 274, 279 (5th Cir. 2017).

1178.   The Court is not required to consider each policy in a vacuum but may consider the interrelation of multiple policies and practices in the county and how each policy may exacerbate the harmful effects of each policy.

### *Harris County's Policies, Practices, and Customs Were the Moving Force Behind the Violation of Plaintiff's Constitutional Rights*

1179.   Plaintiff's injuries and deaths were caused by numerous policies, practices, and customs of Harris County. Those policies have been identified above and constitute a condition of confinement that amounts to the level of a punishment. These policies were the moving force behind the injuries to Plaintiff.

1180.   Harris County's policies were persistent, widespread practices of County officials and employees which were so common and well settled that they constitute a custom within the County that arises to the level of a County policy.

1181.   This persistent, widespread practice has extended unimpeded as far back as the 2009 DOJ Report, through Sheriff Gonzalez's admissions of the culture of the Jail in 2016 and 2023, through continuous TCJS notices of non-compliance beginning in 2017 and continuing till most recently in April 2024, through continuous meetings before the TCJS by Harris County officials, the numerous other detainees' injuries and deaths from the same acts and policies during this time, and through each of the Plaintiff's cases herein.

1182.   Harris County's policies, practices, and customs, singularly and taken together, of failing to provide medical care and medications for Mr. Chavez-Sandoval's known medical needs and injuries incurred while in the Jail, the institutionalization of using excessive force by Jail employees against Mr. Chavez-Sandoval, and the continuous overcrowding and understaffing of the Jail which impeded Mr. Chavez-Sandoval's access to medical care and heightened the use of excessive force by Jail employees was the moving force behind Mr. Chavez-Sandoval's injuries.

1183.   Specifically, Defendant has a pervasive practice, policy and condition of the Jail where detainees are subjected to routine and institutionalized excessive force. This includes officers as a whole escalating situations, using more force than necessary, and using strikes in response to any perceived slights. This policy and practice exceeds simply the acts of a single officer and instead are the policies, practices, and the conditions of the Jail as a whole. Any detainee within the Jail is subject to these conditions which renders the Jail to be in a condition that poses substantial danger to the safety and health of the detainees including Plaintiff. This condition itself of institutionalized excessive force was the direct and moving force in causing Plaintiff's injuries.

1184.   Defendant also has a pervasive and extended practice, policy, and condition of the Jail of failing to provide medical care to detainees. This includes failing to provide detainees with medical care for obvious facial injuries caused by officers' excessive force. Defendant's policy and condition of lack of medical care is pervasive throughout the Jail for the past two decades and directly caused the exacerbation of Plaintiff's injuries, extended his pain and suffering, and hindered his healing and gaining relief. Specifically, the custom and practice of placing detainee's in holding cells following a use of force instead of taking Plaintiff to the clinic impeded Plaintiff's medical care and caused him to suffer pain and an intensification of his injuries instead of gaining relief. Further, the Jail has a policy, practice, and condition of failing to conduct thorough

evaluations of detainees especially in response to obvious facial injuries but instead sends them back to their cells after a cursory evaluation. Each of these policies and conditions were the direct and moving force in causing the exacerbation and intensity of Plaintiff's injuries.

1185.   Additionally, as stated several times by the DOJ, TCJS, and Harris County Sheriff's including Sheriff Gonzalez, Harris County has a persistent and extensive policy, practice, and condition of understaffing and overcrowding the Jail. This has a direct and moving force in causing Plaintiff's injuries as the understaffing and overcrowding causes officers to have quicker triggers on using force, less patience to try to de-escalate situations, and less time to fulfill every task thoroughly including sending detainees to the clinic and having the clinic conduct a full evaluation. Additionally, the understaffing and overcrowding impedes the supervisors' ability to monitor and deter their officers from engaging in excessive use of force or failing to provide medical treatment. Instead, supervisors in the Harris County Jail are having to assist in lower level tasks to meet minimum standards and are unable to conduct any audits, reviews, or enforce the policies which emboldens the officers to engage in excessive force and to deprive medical care. Plaintiff's injuries were directly caused by this condition as a fully staffed jail would have had officers with the time to de-escalate the situation, officers that were not as stressed and would not resort to force as quickly, officers that could take and monitor detainees at the clinic immediately for medical care, and would have had supervisors that could review, prevent, and enforce the policies.

1186.   Absent these policies, practices, and customs, Harris County would have or should have provided proper medical care, would not have utilized unnecessary use of force, and would have had sufficient staff and a limited number of detainees that would have prevented Mr. Chavez-Sandoval's injuries.

1187.   It was highly predictable that Harris County employees would follow these ongoing policies and practices. The known and obvious consequences of Harris County's policies and practices identified above is that detainees would suffer significant injuries and death. A jail that condones institutionalized excessive force will foreseeably result in a plethora of excessive force incidents by their officers. A jail that is overcrowded and understaffed will have an increase in violence in the jail by officers and will have detainees unable to receive full, timely, and proper medical care. A jail that has a policy of not providing proper medical care will result in detainees having their injuries worsen or have them sit in pain longer than necessary. The DOJ, TCJS, and even the Sheriff as explained above have all provided notice of these policies and the likely consequences of those policies causing constitutional violations.

1188. Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Chavez-Sandoval's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continuing to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Mr. Chavez-Sandoval's injuries.

1189.   The officers and employees of the Jail knew that their use of force on Plaintiff, their understaffing and overcrowding of the Jail, and their failure to provide proper medical care to Plaintiff posed a substantial risk of serious harm to Plaintiff and they responded to that risk with subjective deliberate indifference. Harris County and its employees have known of each of the incidents cited above along with the repeated jail standard violations relating to the ramifications of the use of force on detainees, to the improper observation and monitoring of detainees, improper medical care, and the understaffing and overcrowding of the Jail all of which led to the deaths and injuries of detainees within the Jail similar to the exact scenario that led to Plaintiff's injuries. These acts were done in accordance with Harris County's policies, practices, and procedures which

were adopted, maintained, and ratified with objective deliberate indifference to the rights of the detainees. These policies, practices, and procedures were the moving force behind the officer's and employee's constitutional violations of Plaintiff.

### Harris County's Policies, Practices, and Customs Are Not Reasonably Related to Any Legitimate Penological Goal and Amount to Punishment

1190.  Harris County's numerous policies, practices, and customs that were the moving force causing the violations of Plaintiff's constitutional rights are not related to any penological purpose.

1191.  Harris County's continuous and routine failure to provide detainees with medical care and/or sufficient medical care within a timely manner or at all, failure to provide medications to detainees, failure to follow medical instructions from physicians, failure to properly document health concerns and medical needs of detainees, failure to properly evaluate and test detainees with known injuries in reckless disregard to the known consequences of failing to test and diagnose injuries and medical conditions, and failure to transfer detainees with known or knowable medical conditions to a medical facility or detention facility that could provide adequate acute and chronic care for the detainees' disabilities and medical conditions has no legitimate penological purpose. The DOJ and the TCJS have both censured Harris County numerous times for this unjustified policy. This gross inattention to provide adequate and appropriate medical care to Plaintiffs and the detainees constitutes a punishment.

1192.  Harris County's policy, practices, and culture of encouraging and failing to deter the excessive use of force by jail employees against detainees serves no legitimate penological purpose.

1193.  The DOJ found this area had "significant and often glaring operational deficiencies" including lacking: "(1) a minimally adequate system for deterring excessive use of

force, and (2) an adequate plan for managing a large and sometimes violent detainee population." *Id.* The DOJ started their analysis with: "We have serious concerns about the use of force at the Jail." *Id.* at 15. Sheriff Gonzalez and Sheriff Hickman, while serving as the Harris County Jail policymaker, both admitted that Jail employees have a history of excessive use of force showing no change between the DOJ Report and now.

1194.   The TCJS in December 2021 also noted the heightened violence in the Jail when they found the Jail in non-compliance with minimum jail standards.

1195.   The investigation into Mr. Simmons' death also led to multiple findings of the excessive use of force, yet, despite those findings, the number of use of force with serious injuries and the numerous cases where detainees are beat by guards has only grown. The investigation into Mr. Garcia's injuries also led to a finding of excessive force and the charging of three officers with criminal assault. This ongoing issue shows no legitimate penological purpose as violative of Plaintiff's rights.

1196.   Even most recently, Sheriff Gonzalez in response to *Struck* stated that they had a problem and that this force should not occur in the Jail.

1197.   Harris County's systemic understaffing and overcrowding of the Harris County Jail does not serve any legitimate penological purpose. The DOJ, TCJS, the Harris County Sheriff, and numerous similar cases all indicate the pervasive practices and policies that make this condition of confinement amount to the level of punishment.

### *Harris County Sheriff is the Policymaker for the County Jail*

1198.   Under well-established Texas law, the Harris County Sheriff is the final policymaker for the Harris County Jail for the purpose of holding the County liable under § 1983.

1199.   The Sheriff *position* regardless of the individual holding that position is the policymaker.

1200.  In November 2016, Sheriff Ed Gonzalez was elected as the Sheriff of Harris County with specific responsibilities over the Harris County Jail.

1201.  Sheriff Gonzalez was the policymaker when Plaintiff was injured in the Harris County Jail.

1202.  Sheriff Gonzalez was also the policymaker when almost all of the individuals identified above suffered their injuries and died in the Harris County Jail. In addition to these detainees, Sheriff Gonzalez was the policymaker for Harris County Jail when Officer J. Valdiviez and Sergeant Jane Doe suffered injuries in the jail, the two anonymous employees and Shannon Herklotz resigned their positions, and the videos from within the jail showing the excessive force and detainee assaults within the jail. Sheriff Gonzalez was the policymaker during the entirety of the time reviewed by KHOU and discussed in the *Struck* documentary.

1203.  Sheriff Gonzalez compiled the Serious Incident Reports supplied to TCJS since 2018 which show the massive discrepancy in assaults and use of force in Harris County compared to every other county jail in Texas. These reports also show the growing increase in violence in Harris County Jail under Sheriff Gonzalez's watch.

1204.  Sheriff Gonzalez was the policymaker during numerous TCJS reports and notices of non-compliance in relation to the Jail's policies and customs that violated numerous minimum jail standards which are at issue in this case. The TCJS reports and notices during Sheriff Gonzalez's tenure are from February 21, 2017; April 3, 2017; December 19, 2017; August 23, 2018; December 9, 2020; April 6, 2021; December 7, 2021; September 7, 2022; December 19, 2022; March 8, 2023; April 17, 2023; August 28, 2023, February 20, 2024; April 10, 2024; December 2024; January 2025; and the remedial orders and notices in 2023, 2024 and 2025.

1205.  The Harris County policymakers had actual or at the very least constructive knowledge of the policies, practices, and customs outlined in this lawsuit because Sheriff Gonzalez would have known about these policies and practices had he properly exercised his responsibilities.

1206.  Sheriff Gonzalez's own comments on the overpopulation, understaffing, lack of medical care, and the excessive use of force within the Jail show that he had actual knowledge of these policies as early as 2016. Additionally, the DOJ Report, TCJS reports, previous lawsuits, and the numerous other cases identified above, show that Sheriff Gonzalez was aware or should have been aware of the pervasive practices within the Jail.

1207.  Each of the policies, practices, and customs have been the subject of prolonged public discussion and a high degree of publicity. This is exemplified in the 2016 debate between Sheriff Gonzalez and Sheriff Hickman where over half of the debate centered on the overpopulation, lack of medical care, and the culture of violence and excessive force in the Harris County Jail. Nothing has changed since that debate and the conditions have only grown worse.

1208.  Sheriff Gonzalez was aware that continuing and not correcting or remedying these policies and practices would lead to detainees becoming injured and dying. Sheriff Gonzalez has been deliberately indifferent to these known unreasonable risks by failing to implement any corrective or remedial customs, practices, or policies following the TCJS reports or the deaths or injuries of detainees. The Jail has only grown worse with more deaths, more injuries, less medical care, less supervision and observations, less staff, and more detainees.

1209.  Based on Harris County's continued policies, practices, and customs that were the moving force behind Plaintiff's injuries and deaths, Plaintiffs have suffered the damages enumerated in the damage section below.

### COUNT II: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; EPISODIC ACTS OR OMISSIONS

1210.   Plaintiff asserts additionally and in the alternative claims against Defendant Harris County for the violations of his 14th Amendment rights under 42 U.S.C. § 1983 under an episodic acts or omissions claim.

1211.   Plaintiffs invoke the episodic acts or omissions theory for the injuries to Plaintiff which requires a showing of (1) an official policy; (2) a policymaker; and (3) that the policy was the moving force behind the constitutional violation by showing that the employee violated the detainee's rights with subjective deliberate indifference and that the violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference.

1212.   Harris County and its officers' acts and omissions taken individually and collectively were the moving force in Plaintiff's injuries. As illustrated above, each of the officers knew that striking a detainee in the face could cause severe life-threatening injuries but engaged in that force anyways. Additionally, the officers' use of force of punching Plaintiff in the head, neck, face, and back was grossly disproportionate to the needs of the situation as Plaintiff did not pose a threat and was merely standing and shrugged off the officers' grab. Punching a detainee for shrugging off an officer is never justified. Likewise, punching a detainee who is being held and restrained by other officers is also never justified especially once the detainee is taken to the ground. A detainee like any citizen has a right to defend themselves against excessive force. Each of the officers' actions were based on malice and subjective deliberate indifference in striking and placing Plaintiff in a hog-tie position which is a known excessive force position. It is clearly established that detainees have a right to be free from excessive force. The officers violated that right with subjective deliberate indifference.

1213.  Each of the officers' actions were in accordance with the County's longstanding custom and practice of sanctioning excessive force by officers against detainees. Plaintiff incorporates the polices, customs, and practices sections identified above as if fully stated herein as each of these policies were promulgated with objective deliberate indifference. The County policymaker, Sheriff Gonzalez, knew that this policy existed and that this policy would result in the violation of detainees constitutional rights when the officers would use excessive force against them.

1214.  Plaintiff's injuries to his head, neck, and face were a direct and moving result of the officers' subjective deliberate indifference and Harris County's policy as the officers' excessive use of force caused his injuries.

1215.  Likewise, the officers and staffs' failure to provide immediate medical care exasperated and increased Plaintiff's injuries. The officers knew that Plaintiff should have been taken to a clinic immediately especially to be evaluated for known head injuries. Instead, the officers disregarded those medical needs and placed Plaintiff in a solitary cell for a significant period of time. This caused a delay in Plaintiff's medical care which increased neurological damages and elongated his pain and suffering. The officers placed him in this cell with subjective deliberate indifference to his clearly established constitutional rights to medical care in the Jail. Additionally, the staff was aware that Plaintiff suffered head injuries and needed a full evaluation; however, the staff disregarded those needs and only did a cursory evaluation impeding his medical care and exacerbating his injuries.

1216.  The officers and staffs' actions in hindering Plaintiff's medical care were a direct result and caused by the County's longstanding customs, policies, and practices of failing to provide medical care to detainees especially those who have suffered head injuries in the Jail. The

County has a long history of placing detainees with head injuries in holding cells for long periods of time before taking them to the clinic. The County also has a longstanding policy of only providing cursory evaluations of detainees and sending them back to their cells without fully evaluating their head injuries which could prove life-threatening. The County's policies are promulgated and maintained with objective deliberate indifference to the rights of the detainees because the County knows that failing to provide medical care can result in severe injuries, death, or exacerbation of the pain and suffering of a detainee.

1217.    Plaintiffs incorporate the provisions from Count I discussing the policymaker and the policies as if fully stated herein as those provisions apply equally to conditions of confinement and episodic acts and omissions claims.

### COUNT III: *MONELL* CLAIM; VIOLATION OF THE FOURTEENTH AMENDMENT; PURSUANT TO 42 U.S.C. § 1983; FAILURE TO TRAIN OR SUPERVISE.

1218.    Plaintiff incorporates the foregoing paragraphs as if set forth herein.

1219.    Plaintiff also brings claims for Harris County's deliberate failure to train and/or supervise their Jail employees which resulted in the violation of Plaintiff's constitutional rights.

1220.    For a failure to train claim, Plaintiffs must show (1) the training policy and procedures were inadequate; (2) the County was deliberately indifferent in adopting its training policy and procedures; and (3) the inadequate training policy and procedures directly caused the constitutional violation. Similarly, for a failure to supervise claim, Plaintiffs must show (1) the county failed to supervise the officers involved; (2) there is a causal connection between the failure to supervise and the violation of plaintiff's rights; and (3) it was, or should have been, obvious to the policymakers that the highly predictable consequence of not supervising the officers would violate the plaintiff's constitutional rights.

1221.   As shown above, Harris County and its policymaker, Sheriff Gonzalez, have been aware of the Jail's rampant culture of violence, excessive use of force, lack of medical care, and lack of observation for over seven years; yet, despite being made aware of their deficiencies, Sheriff Gonzalez has continued with the same training policies and practices and has not implemented new policies or practices that would correct the failure of the Jail employees until December 2024, after Plaintiff's injuries. Even after Sheriff Gonzalez changed the written policy on use of closed-fist strikes, the training and practice of the officers has not changed as exemplified in the recent beating and killing of Mr. Cardenas.

1222.   Sheriff Gonzalez recognized in 2016 that the Jail had a culture of employees resorting to excessive use of force too quickly and that this was a training problem. Yet, since 2016, as exemplified in the specific detainee incidents and the Serious Incident Reports, the use of force has increased exponentially since 2016. This same issue was noted in the 2009 DOJ Report, but it has only grown worse.

1223.   As exemplified in Plaintiff's claims and in the various reports and incidents noted above, Harris County has a history of encouraging officers to use excessive force, not supervising them in the use of force, not training them on proper de-escalation techniques, encouraging them to use techniques that result in unnecessary harm, encouraging and ratifying false reports, encouraging and ratifying summary investigations, and ultimately charging detainees with the false charges to cover up the use of force. Officers are not disciplined or discouraged from engaging in these practices as their supervisors and superiors are also engaging in these behaviors and are ratifying their actions.

1224.   As shown above, Harris County also has an inadequate training policy and practice for providing medications and medical treatment to detainees. Harris County employees in

accordance with their policy will not provide medications regularly, employees may skip detainees who are being punished, employees will not respond to requests for medical help timely or at all, employees will not conduct sufficient testing or analysis of detainees with injuries which are known to have serious consequences, they falsify records pertaining to the detainee's symptoms and care to make it appear as if the detainee received care, the officers falsify the cause of the medical condition to the medical staff which causes improper treatment and diagnosis of the injury, and they fail to adequately monitor and observe detainees with known injuries and medical conditions to ensure proper medical care. Despite knowing about these failures in their training, Harris County has not made a change to this training policy.

1225.   Sheriff Gonzalez was well aware of the consequences of failing to train the jail employees in the areas of medical care, observation, detainee violence, and use of force. Sheriff Gonzalez knew or should have known that this failure to train employees who are tasked with the care and control of the detainees would result in the deaths or injuries of detainees.

1226.   The need for a different training policy and practice to address the discrepancies raised by the DOJ, the TCJS, and the numerous prior incidents has been obvious for years with knowledge that continued failure to address this policy will result in additional constitutional violations. Harris County's failure to implement new and additional training policies was the direct cause of Plaintiff's injuries.

1227.   ***Training Deficiencies in the Jail.*** Harris County failed to train their officers on the proper use of force against a detainee. Specifically, Harris County trained their officers to use closed-fist strikes, knee strikes, forearm strikes, and other forceable strikes against a detainee in response to almost any circumstance regardless of whether any force was necessary or not. As admitted by Sheriff Gonzalez, Harris County's training and policies prior to December 2024 failed

to instruct their officers that strikes to the head, face, and neck of a detainee should only be reserved in situations where deadly force is necessary. The obvious consequence of failing to train officers on this limitation and specifically training their officers to used strikes to the head and face is that officers will use these strikes and cause severe injuries and potentially death to detainees in response to any perceived slight. Specifically, officers are trained to use closed-fist strikes as a matter of first resort in response to any perceived slight, "resistance," "threat," or belligerence by a detainee regardless of whether or not a detainee is actually posing a threat of imminent severe bodily harm or death.

1228.   This grossly deficient training program was a direct and moving force in Plaintiff's injuries. Specifically, as can be seen in the video, all of the officers engaged in the use of force incident resorted to using strikes to Plaintiff's head, face, and neck immediately despite Plaintiff not posing a threat, merely shrugging off the arm of an officer who did not need to grab him, and punching him even while Plaintiff was being held by multiple other officers.

1229.   Officers are taught to punch and continue to punch and use other strikes against detainees who are being held by other officers even if the detainee is facing the ground. Multiple officers in Plaintiff's incident were continuing to punch and strike Plaintiff in the head and body even while he was on the ground being restrained by multiple officers. The Jail environment also provides a unique opportunity for officers to not have to resort to any force but can step back and take their time as the detainee is not going anywhere and can be dealt with administratively at a later time if they are not being obedient. However, these officers are taught not to take their time but to immediately resort to strikes to a detainee. This can be seen in the over 100 examples of incidents and the thousands of other statistics identified above. Instead of providing officers with multiple tools to deal with detainees, Harris County trains their officers to use only one tool for all

situations, strikes against a detainee. This training deficiency and Sheriff Gonzalez's knowledge of this deficiency is easily seen in the *Struck* documentary and the changes to the policies after the *Struck* documentary was released. Each of the officers involved in Plaintiff's incident were trained with these same deficiencies and the obvious consequence of this training deficiency is that the officers will use this excessive force against detainees causing them constitutional injuries.

1230.    Defendant's training program is also deficient in failing to train officers on proper de-escalation techniques. As illustrated in Plaintiff's case and in the comparators above, officers are taught through their hands-on training and following the examples of other officers that they should immediately escalate to using force or strikes against a detainee in any circumstance regardless of whether force is justified or not. Officers are not taught to evaluate the circumstance at all times to determine if force is justified and to determine if a non-force de-escalation technique is available. Instead, officers are taught to escalate the situations and continue using the same level of force throughout an altercation until the detainee is fully subdued (which could mean knocked unconscious or too beat to respond). The obvious consequence of failing to train officers who deal with detainees on a daily basis on how to de-escalate a situation is that the officers will resort to the tool they know and escalate the situation. One example of escalation is immediately resorting to putting hands on a detainee which aggravates the detainee. The officers in Plaintiff's incident did not attempt to de-escalate the situation but escalated the situation in accordance to their training by grabbing onto Plaintiff's shirt unnecessarily, and then when Plaintiff pulled away, immediately resorting to punching him in the face. Likewise, the other officers that joined into the assault on Plaintiff added to the assault by striking Plaintiff over a dozen times instead of trying to separate the parties and de-escalate the situation.

1231.   Defendant also failed to train their officers and staff on providing medical care to their detainees as the officers instead delay taking detainees to medical care and then only receive a cursory evaluation without evaluating each case with a full medical evaluation. Officers routinely fail to take detainees after a use of force or who have sustained obvious injuries and need medical attention into holding cells and let them wait in those cells for long periods of time causing them further injuries and an exacerbation of their condition. This can be seen in multiple of the comparators cited above.

1232.   When officers take detainees to the clinic, the staff are trained to only provide cursory evaluations and to try to quickly get the detainees back to their cell. Officers and staff routinely are taught to ignore the medical needs of the detainees and to downplay their injuries to not provide a thorough evaluation based on their injuries and to check for any additional severe injuries or ramifications. This is readily apparent when detainees suffer head injuries or are punched in the head as the officers and staff fail to evaluate for head injuries despite the known consequence of that type of injury. The known consequence of failing to train officers and staff on how to handle the medical needs of detainees who are known to have medical needs in a jail environment is that detainees will suffer exacerbations of their injuries or even worse suffer new injuries or death. This training deficiency was a moving force in Plaintiff's injuries as he was left to suffer in a solitary cell instead of being taken to the clinic immediately and was not evaluated at the clinic fully when he did arrive despite the obvious facial and head injuries that he suffered. This caused him to suffer in the holding cell for several hours in pain and agony and intensified his injuries depriving him of care that he needed to begin healing.

1233.   Defendant is or should be aware of these training deficiencies as identified above by the Sheriff's own admissions over the past decade and based on the numerous other incidents

where officers take these same actions across the whole Jail. These are not simply actions of a handful of officers, but are the actions of most if not all of the officers in the Jail. Instead of correcting these issues, the Sheriff has encouraged and permitted this training to be ongoing resulting in thousands of detainees suffering injuries at the hands of the inadequately trained officers. The major reason that this failure to train has been promulgated for so long is that most officer's school training is minimal before they are thrown into working at the actual jail. When at the jail, the trainees are learning most of their job by observing other officers do their job. Because improperly trained officers are teaching improperly trained officers, the deficient training program is a never ending cycle. At no point has Harris County attempted to retrain all of their officers to fix these deficiencies.

1234.  This failure to train is evident in Plaintiff's claims as the officers, if properly trained, would not have placed their hands on Plaintiff, would not have immediately resorted to throwing punches against him, would not have continued to punch Plaintiff while restrained by the officers, and would have immediately provided medical care and a full medical evaluation to Plaintiff. These training deficiencies were a moving force in Plaintiff's claims.

1235. ***Supervision Deficiencies in the Jail.*** The County's supervision plan and supervision of its officers is wholly deficient and ultimately a moving force in Plaintiff's injuries. The Jail fails to supervise its officers who are interacting with detainees by not having sufficient supervisors within reach of the floors and officers on the floors. The supervisors also do not observe or monitor their officers allowing the officers to act in the manner they see fit including in immediately resorting to the use of force and escalating situations needlessly when they do not like a detainee's response or actions. The supervisors do not audit, review, or supervise their officers in any manner to make sure that policies are being followed, that proper force is being

used, or that de-escalation techniques are being used or that if violations are noted the officer can be retrained. Instead, the supervisors are themselves joining into the use of excessive force as can be seen in this case when the supervisors also joined into the assault. The supervisors are also not disciplining or correcting their officers. Instead, the officers are mimicking the actions of their supervisors when interacting with detainees.

1236.   Officers in jails that deal with detainees must have close supervision to ensure that they are not abusing detainees within their custody. Officers that interact with detainees must also be supervised to make sure they are de-escalating situations with detainees and have sufficient officers in place to handle detainees without the need to resort to immediate use of force. Officers also must be supervised to review their actions to correct incorrect decisions and to provide discipline. However, Defendant had no supervision policy with supervisors not paying attention to the officers under their control, supervisors not disciplining officers who abuse their power, or supervisors not enforcing the written policies of the Jail. The obvious consequence of allowing officers in a jail to be unsupervised will include the use of excessive force, failing to de-escalate, officers abusing their power, and officers failing to provide medical care to detainees.

1237.   Each of these deficiencies in the supervision plan were a moving force in Plaintiff's injuries as the officers acted with impunity and resorted to excessive force immediately with the supervisors joining into the use of force itself. The failure in the supervision of the officers also resulted in Plaintiff being placed in solitary confinement instead of being taken to the clinic and resulted in the clinic only doing a cursory review instead of providing full medical attention. It is unlikely that any officer was disciplined or corrected for any of the actions taken towards Plaintiff. The failure in the supervision plan was also a moving force in Plaintiff's injuries as the officers involved in the incident illustrated that they could act with impunity without any fear of

consequences by not even attempting to de-escalate or restrain their actions. It is highly predictable that officers who see their supervisors also engage in excessive force will engage in their own excessive force. It is also highly predictable that these officers who were unsupervised and would not face any audit or correction for their actions would act with impunity towards the rights of the detainees and take the actions that they saw fit.

1238.    Harris County acted with deliberate, callous, conscious, and unreasonable indifference to Mr. Chavez-Sandoval's constitutional rights by being aware of the known and obvious consequences of their training and supervision policies and practices and failing to implement new or additional training policies or procedures to correct these known deficiencies.

## VI.        DAMAGES

1239.    Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

1240.    Plaintiff seeks compensatory damages, pre and post judgment interest, costs, and attorney's fees to the maximum amounts allowed by law.

1241.    Plaintiff suffered the following damages as a direct and proximate result of Harris County's violations as identified above;

    a.    Actual damages;

    b.    Medical expenses incurred in the past and will reasonably and likely to incur in the future;

    c.    Mental anguish and emotional distress suffered in the past and in the future;

    d.    Pain and suffering incurred in the past and in the future;

    e.    Lost enjoyment of life;

    f.    Physical disfigurement;

    g.    Pre-judgment interest; and

h.  Post-judgment interest.

## VII.    ATTORNEY'S FEES

1242.  Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein.

1243.  Pursuant to 42 U.S.C. § 1988(b); Plaintiffs are entitled to recover their reasonable attorney's fees and costs incurred in prosecuting the § 1983 claims against Defendant.

## VIII.    JURY REQUEST

1244.  Plaintiffs respectfully request a trial by a jury of their peers on all matters triable to a jury. Plaintiffs will tender the appropriate fee concurrently with the filing of this Complaint.

## IX.    PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendant Harris County, for an amount in excess of the jurisdictional limits of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which he may show himself entitled.

Respectfully submitted,

**BEN CRUMP LAW, PLLC**

*/s/ Paul A. Grinke*
Paul A. Grinke
Lead Attorney
Attorney to be Noticed
State Bar No. 24032255
paul@bencrump.com
Aaron Dekle
Attorney to be Noticed
State Bar No. 24100961
aaron@bencrump.com
5 Cowboys Way, Suite 300
Frisco, Texas 75034
(972) 942-0494 Telephone
(972) 433-0111 Facsimile

**ATTORNEYS FOR PLAINTIFF**

Thad D. Spalding
State Bar No. 00791708
tspalding@dpslawgroup.com
Shelby J. White
State Bar No. 24084086
swhite@dpslawgroup.com
Durham, Pittard & Spalding, LLP
P.O. Box 224626
Dallas, Texas 75222
(214) 946-8000 Office
(214) 946-8433 Facsimile

**ATTORNEYS FOR PLAINTIFF**

**The Ghuneim Law Firm**

Wisam Ghuneim
Attorney to be Noticed
State Bar No. 24035702
wg@ghuneimlaw.com
4702 Spencer Hwy.
Pasadena, Texas 77505
(281) 487-8929 Telephone
(281) 487-0022 Facsimile
Designated E-Service Email Address:
eservice@ghuneimlaw.com

**ATTORNEYS FOR PLAINTIFF**

**<u>Certificate of Service</u>**

I hereby certify that on September 5, 2025, a true and correct copy of the foregoing Amended Complaint has been served on the following parties and/or counsel of record by filing it with the Court's electronic-filing system.

*/s/ Aaron Dekle*
Aaron Dekle